1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3       **HONORABLE VIRGINIA A. PHILLIPS, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,          )**
                                        **)**
6                   **Plaintiff,          )**
                                        **)**
7      **v.                               )   Case No. CR 23-00082 VAP**
                                        **)**
8   **KHALID ITUM,                        )          Volume 1**
                                        **)        (Pages 1 - 199)**
9                   **Defendant.          )**
   _____**)**

10

11     **REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
                        **TRIAL DAY 1**
12               **TUESDAY, JANUARY 30, 2024**
                        **8:51 A.M.**
13                **LOS ANGELES, CALIFORNIA**

14

15

16

17

18

19

20

21

22   _____

23     **MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
              FEDERAL OFFICIAL COURT REPORTER
24             350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                    (213) 894-2305

**UNITED STATES DISTRICT COURT**

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4        E. MARTIN ESTRADA
          United States Attorney
 5        BY:  DAVID Y. PI
          BY:  MARK AVEIS
 6             Assistant United States Attorneys
          312 North Spring Street
 7        Los Angeles, California  90012

 8

 9    FOR THE DEFENDANT:

10        PAUL HASTINGS, LLP
          BY:  ADAM J. FEE
11             Attorney at Law
          1999 Avenue of the Stars, Suite 2700
12        Los Angeles, California  90067

13        PAUL HASTINGS, LLP
          BY:  BENJAMIN NICHOLSON
14             Attorney at Law
          695 Town Center Drive, 17th Floor
15        Costa Mesa, California  92626

16

17    ALSO PRESENT:

18        MICHELLE VU, FBI Special Agent
          TATIANA THOMAS, Paul Hastings
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

**INDEX OF WITNESSES**

**PLAINTIFF'S WITNESSES**                                                    **PAGE**

(NONE OFFERED.)

**UNITED STATES DISTRICT COURT**

1

**INDEX OF EXHIBITS**

2

| | | FOR IDENTIFICATION | FOR EVIDENCE |
|---|---|---|---|
| **NUMBER** | **DESCRIPTION** | **PG.** | **PG.** |
| 82 - | Stipulation | 157 | 157 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

|   |   |
|---|---|
| | 1 |  TUESDAY, JANUARY 30, 2024; 8:51 A.M. |
| | 2 |  LOS ANGELES, CALIFORNIA |
| | 3 |  -oOo- |
| | 4 |  (The following is a partial transcript |
| 08:29AM | 5 |  of the day's trial proceedings:) |

1        TUESDAY, JANUARY 30, 2024; 8:51 A.M.

2        LOS ANGELES, CALIFORNIA

3        -oOo-

4        (The following is a partial transcript

08:29AM  5        of the day's trial proceedings:)

6        THE COURTROOM DEPUTY:  Calling Item 1,

7  LA CR 23-00082, United States of America versus Khalid Itum.

8        Counsel, please state your appearances for the

9  record.

08:51AM  10        MR. PI:  Good morning, Your Honor.  David Pi on

11  behalf of the United States.  And I'm joined at counsel table

12  by my trial partner AUSA Mark Aveis as well as FBI Special

13  Agent Michelle Vu.

14        THE COURT:  Good morning.

08:51AM  15        MR. FEE:  Good morning, Your Honor.  Adam Fee for

16  Mr. Itum.  And with me is Ben Nicholson.  And Mr. Itum is at

17  the end here.

18        THE COURT:  Good morning.

19        Both sides ready to proceed?

08:51AM  20        MR. PI:  On behalf of the Government, yes,

21  Your Honor.

22        MR. FEE:  We're ready, Your Honor.  A couple of

23  issues related to some of the pretrial filings, I believe.

24        THE COURT:  All right.  Well, I have just now handed

08:52AM  25  you what I came up with for a statement of the case, having

1   reviewed both sides -- the one that you filed late last night,

2   I guess, or this morning, it's just too bare bones and wouldn't

3   give the jury a feel for what the case is about.

4           But last week, when I looked at the ones that each

08:52AM   5   of you submitted, I drafted something, making some changes,

6   calling the defendant by his name, for example.  So that's the

7   one I propose to use this morning, unless either side has an

8   objection to it.

9           MR. PI:  No objection from the Government,

08:52AM   10  Your Honor.

11          MR. FEE:  Your Honor, two perhaps minor points but

12  we'll see.  In the third sentence -- if I may, Your Honor.

13          THE COURT:  I'm sorry.  Just let me get my copy of

14  it.

08:52AM   15          MR. FEE:  Of course.

16          THE COURT:  Okay.  The third sentence.

17          MR. FEE:  The third sentence, the sum borrowed,

18  $260,000 from two different persons.

19          THE COURT:  Uh-huh.

08:53AM   20          MR. FEE:  It's actually 110- plus 125,000 was the

21  original sum.

22          THE COURT:  That's the amount that you had in

23  your --

24          MR. FEE:  There was interest repaid to one of the

08:53AM   25  lenders.  So --

1          THE COURT:  All right.  Do you disagree with that?

2          MR. PI:  No, we don't disagree.

3          THE COURT:  All right.  So it should read 235-?

4          MR. FEE:  It is, Your Honor.  Perhaps a suggestion

08:53AM   5    to streamline this is to just say borrowed funds from two

6    different persons and then he repaid those funds.  I'm not sure

7    the amount is necessarily -- it would not be lost on the jurors

8    at the end of this case what the amounts involved were.

9          THE COURT:  All right.  What else?

08:53AM  10          MR. FEE:  Only other comment, Your Honor, in the

11    last sentence of the -- of the full paragraph, "Mr. Itum then

12    repaid his personal debts."  We would submit it should just say

13    "debts."  There is an issue as to these would be called

14    personal, given that there was an entity that actually was

08:54AM  15    involved in the borrowing.

16          THE COURT:  That's fine.  His debts of -- his debts

17    with that fraudulently -- okay.  That's fine.

18          MR. FEE:  Thank you, Your Honor.

19          THE COURT:  Certainly.

08:54AM  20          I had a question.  The defense did not file any

21    proposed voir dire questions.  And I always write up voir dire

22    specifically for each case.  The only question I had for both

23    sides but particularly for the defense, the Indictment -- which

24    we're not planning to read to the jury because we have a

08:54AM  25    statement of the case -- but early, I think the first or second

 1    sentence, if I recall correctly, in the Indictment states that

 2    Mr. Itum is a citizen of Jordan.  It's not necessary to tell

 3    the jury that, in my view.

 4            MR. FEE:  I agree, Your Honor.  I do think it might

08:54AM   5    come up during the trial from some of the witnesses.  So to the

 6    extent this is where Your Honor is heading, I do think,

 7    especially given headlines just in the last two days, it might

 8    be worth adding a question about views -- you can do this

 9    better than I, Your Honor -- views about Jordan or associations

08:55AM  10    or knowledge of the country of Jordan that might affect your

11    ability to -- to act objectively in this case.

12            THE COURT:  Mr. Pi?

13            MR. PI:  Yes, Your Honor.  The Government does not

14    think that Mr. Itum's citizenship is relevant to this case.

08:55AM  15    And so we would move to have any kind of evidence or testimony

16    about his country of origin to be excluded.  And we did mention

17    some of this in our trial brief on nullification.  I don't see

18    a connection to this case.

19            THE COURT:  Well, I think what I would do is to ask

08:55AM  20    a general question, tell the -- prefaced like this:  You'll

21    hear testimony from a number of different witnesses from

22    different backgrounds during this case.  And I have the formal

23    question somewhere.  Would you be able to listen to the

24    testimony of all of the witnesses without regard to their

08:56AM  25    nationality, national origin, and so forth, or would you hold a

UNITED STATES DISTRICT COURT

        1    bias against anyone because of their national origin, race,

        2    et cetera?

        3              MR. PI:  Yeah.  I -- I'm sorry.

        4              THE COURT:  All right.  So that's all right with

08:56AM  5    you.

        6              Mr. Fee?

        7              MR. FEE:  That is all right with us, Your Honor.

        8    Just to clarify, we would never intend to bring up his

        9    citizenship status.  But the fact of where he was born, I

08:56AM 10    imagine, could come up, Your Honor.

       11              MR. PI:  Again, Your Honor, we would object to that.

       12    We would ask for an offer of proof before the defense puts on

       13    witnesses.  We can do that if he's going to put on a case, but

       14    I don't see the relevance.

08:56AM 15              THE COURT:  Well, if a witness -- I've read the

       16    witness statements, of course.  If one of the witnesses says we

       17    were -- I don't think this is the case -- but, you know, we

       18    were friends from the time we were children in Jordan, there's

       19    no problem with that.

08:57AM 20              MR. PI:  Understood.  That's why I would want the

       21    offer of proof, just to determine if that's what it is, or if

       22    they're getting into things that are 403.

       23              THE COURT:  I don't think we need to get into the

       24    weeds to that extent.  I mean, if anything, I would think the

08:57AM 25    defense would be more cautious about bringing it up.  I see it,

1    frankly, as an issue that could be more harmful to the

2    defendant than to the Government.

3              So to the extent it comes up, you know, I don't -- I

4    don't think it should be part of the Government's case, you

08:57AM  5    know, that it's alleged in the Indictment that he's a citizen

6    of Jordan because I think that could be prejudicial.  But I

7    don't think that, you know, if it comes up because of the way

8    the witnesses got to know him or, you know, that they ate at a

9    Jordanian restaurant, something like that, that's really just

08:58AM  10   not germane.

11             MR. PI:  Understood, Your Honor.

12             The concern for the Government is merely that it

13   would potentially put into the mind of a juror that he could be

14   deported because of a conviction in Federal Court if he were a

08:58AM  15   Jordanian citizen.

16             THE COURT:  Well, I agree that should not come up.

17   But I don't think that most jurors would make a connection

18   between the allegations in this case, not even knowing that --

19   whether he's a citizen of the United States or not.

08:58AM  20             MR. FEE:  I agree.

21             THE COURT:  The fact that he came from another

22   country doesn't mean he's not a citizen.

23             MR. PI:  That's true.  Understood, Your Honor.

24   Thank you.

08:58AM  25             THE COURT:  All right.  What else do we need to --

**UNITED STATES DISTRICT COURT**

by the way, we're apparently the only court picking a jury

today so we should have a panel as soon as we're done talking.

MR. FEE:  Great, Your Honor.

The very last point relates to an issue that the

Government raised late last night about a supplemental jury

instruction that is not yet before the Court.  The defense

raises it only because it presents a theory that we would ask

the Court to preclude the Government from opening on.

So if the Government does not intend to do that,

then we don't need to deal with this now before we pick a jury.

But that's the Government's -- the defense's concern,

Your Honor.

MR. PI:  Your Honor, the -- this is true.  The

Government did share a proposed jury instruction.  All of the

other instructions are agreed upon and joint.  This is one that

the Government would propose because, in receiving the

defense's exhibits, we believe that a theory is going to be

presented that Mr. Itum made the false invoices with the

approval and support of the CEO of HMNY, Mr. Farnsworth.  And

so the proposed instruction is one of co-schemer liability.

And the Government --

THE COURT:  All right.  So are you going to raise

that in your opening?

MR. PI:  The Government is going to use the terms

co-schemer or using other people in the scheme, as it is

alleged also in the Indictment.  There was a scheme to defraud
that is described.  It describes how he submitted invoices --

THE COURT:  Well, if there's a scheme, there's
obviously more than one schemer.

09:00AM  MR. PI:  Yes.  So that's what we want to be able to
say in the opening as well.

THE COURT:  All right.

MR. FEE:  Your Honor, that's not right.  It's
alleged to be a scheme involving more than one person in the
09:00AM  Indictment.

THE COURT:  No, any scheme involves more than one
person.

MR. FEE:  That's not necessarily true, Your Honor.

Your Honor, just to be very clear about what's going
09:00AM  on here, this has been pending for a long time.  The Court
really drilled down on the theory that the defense presented --

THE COURT:  You need to slow down.

MR. FEE:  I will slow down.  But I'm disturbed by
the sequence of events, Your Honor.

09:00AM  First, the Indictment charges just Mr. Itum with
engaging in this fraud.  There is no aiding and abetting count.
There is no conspiracy count.  There has never been one whit of
suggestion that the -- that he had a second substantive
co-schemer; namely, the CEO, Ted Farnsworth.  All the way up to
09:00AM  the pretrial conference, Your Honor, everything about this case

1    was focusing on just Mr. Itum's engagement.

2            THE COURT:  Why don't you focus on why this -- we

3    don't have to worry about the instruction --

4            MR. FEE:  Yes.

5            THE COURT:  -- but why even the mention of it in

6    opening is prejudicial.

7            MR. FEE:  It is a constructive amendment of the

8    Indictment, Your Honor.  This is not the theory --

9            THE COURT:  In opening statement?

10            MR. FEE:  This theory, Your Honor.  They should be

11    precluded from offering this theory.  And let me be very

12    specific about the sequence.

13            THE COURT:  Slow down.

14            MR. FEE:  You saw in our pretrial filings the

15    defense theory, which the Government has known about for

16    months.  And Mr. Pi went into it at length.  Farnsworth and

17    Lowe, the two CEOs of the companies, approved these payments.

18            If you go back and look at the pretrial conference

19    transcript, you asked a lot of good questions about what is the

20    Government's theory in that you're conceding these approvals.

21            Mr. Pi responded, I think, three times and said the

22    theory is that Mr. Itum didn't do the work.

23            Fast-forward, they raise an admissibility stip last

24    week.  The defense is focused on its defense theory, which is,

25    namely, Mr. Itum lacked intent because Farnsworth and Lowe

```
 1   approved.  There is not a word from the Government in its

 2   initial jury instructions, in any of its pretrial filings, in

 3   its trial memorandum, there is no reference to Mr. Farnsworth

 4   being an accessory, like a substantive defendant in the scheme

 5   charged, nothing.

 6          THE COURT:  Well, let me ask you this.  If what

 7   you're arguing is that your client lacked the intent because

 8   Farnsworth gave approval and -- Farnsworth and the other

 9   executive, then how is that inconsistent from the

10   Government's -- well, I mean, you have different views of what

11   that approval means.  But the Government is alleging -- or is

12   now theorizing that Farnsworth did approve because it would

13   have to be an approval in order for the Government's theory

14   of -- that he's a co-schemer to -- to stand up.

15          So I don't see that that's inconsistent.

16          MR. FEE:  So two points, Your Honor.  Number one,

17   it's too late.  Number two, let me address this directly.  It

18   is entirely different.

19          The entire thrust of the discovery in this case,

20   every exhibit we stipulated in at 6:00 p.m. last night was

21   about establishing that Farnsworth and Lowe approved these

22   invoices and that, therefore, Mr. Itum lacked the intent to

23   commit this crime.  And, more importantly, the conduct, the

24   falsity is also disputed because they approved knowing what

25   the -- the work he had done.
```

09:02AM (line 5)
09:02AM (line 10)
09:03AM (line 15)
09:03AM (line 20)
09:03AM (line 25)

**UNITED STATES DISTRICT COURT**

There has never been a suggestion -- this is beyond
a conspiracy.  This is an instruction where they're going to
argue that essentially Farnsworth was a co-defendant.  Every
exhibit we stipulated in at 6:00 p.m. is undercut by this
proposed supplemental instruction they sent to us at 8:00 p.m.

Your Honor, it's hard --

THE COURT:  I don't see how it's undercut.  I mean,
I think --

MR. FEE:  It's directly undercut.

THE COURT:  Well, let me finish.

If your position is that your client lacked intent
because Farnsworth approved and the Government says that it's
going to prove to the jury that, well, yes, Farnsworth did
approve but Farnsworth also had intent, essentially, I don't --
I don't see what the surprise is and I don't see how that's
inconsistent with -- well, I mean, what's inconsistent is
whether there was intent.

MR. FEE:  Your Honor, it's more than just intent.
We're disputing all of the elements.  It is starkly
inconsistent.  They are adding a co-defendant on the eve of
trial after we stipulated to exhibits that we --

THE COURT:  It's not a co-defendant.  It's not --
excuse me.  Let me finish.

MR. FEE:  Yeah.

THE COURT:  Perhaps you could say it's an unindicted

co-conspirator, but it's not a new defendant.

MR. FEE:  No, Your Honor.  It's -- it's accessory liability.  It's not a defendant named in the Indictment.  But they're essentially saying that Mr. Itum is substantively responsible for the acts of Mr. Farnsworth, a theory -- please, the trial -- look at the trial memorandum.  Look at --

THE COURT:  I've read them.

MR. FEE:  -- what Mr. Pi said to you.  That has never been advanced in the year -- more than 12 months this case is pending.  It is after we stipulated in defense exhibits that establish the conduct here, Your Honor.

I -- I don't say this lightly.  It's hard to see the sequence of events where we agreed to stipulate in Government's exhibits.

THE COURT:  I understand.  You're repeating yourself now.

Mr. Pi?

MR. PI:  Yes, Your Honor, a few things here.

One, with regards to the surprise aspect of this and whether the defense did not have notice of this, both Mr. Itum, Mr. Farnsworth, and Mr. Lowe, they're all the defendants in an SEC Complaint alleging these same facts.

THE COURT:  But that's not the case that's before this Court.

MR. PI:  That's true.  But the defense has known

```
 1   that there is -- the Government is generally stating that

 2   that's a possible theory of liability.  And as indicted in this

 3   case, it describes the scheme to defraud and it describes that

 4   in order to pay his creditors -- this is paragraph 12A and B of

 5   the Indictment -- Defendant Itum submitted sham invoices to

 6   HMNY executives for services purportedly rendered.

 7            THE COURT:  I'm sorry.  What paragraph are you?

 8   12 --

 9            MR. PI:  12A and B.

10            THE COURT:  All right.  Go ahead.

11            MR. PI:  So this is where the Government alleges a

12   scheme.  And it is correct that the scheme does involve other

13   people.  And here, it's alleged that he submitted these

14   invoices to HMNY executives for services purportedly rendered

15   by Kaleidoscope and JJ/LA.  And here, it does not -- it says,

16   "In fact, as Defendant Itum knew, HMNY owed neither

17   Kaleidoscope nor JJ/LA for the services listed on the sham

18   invoices."

19            In subparagraph B, it goes on, "Defendant Itum

20   caused HMNY employees to initiate interstate wire transactions

21   to transfer funds from the MoviePass account and the HMNY

22   account to the Kaleidoscope account to pay the sham invoices."

23            This is consistent with the Government's proposed

24   jury instruction and theory --

25            THE COURT:  Why didn't you give him this instruction
```

with the other instructions?

MR. PI:  We received -- the reason is because we received the defense's proposed exhibits, and we didn't know if they would be admissible at trial.  We believed they wouldn't be, but we were negotiating whether or not to reach a stipulation to have them admitted.

Once we reached that stipulation, we knew they would be able to get those exhibits into evidence and that they would support their theory.  We didn't think they would necessarily have a means to support that theory before, but we knew that that was -- we knew from the preparation leading up to trial and what they were telling us about their exhibits that that's where they were going.

So as is always the case, we adapted as trial was approaching and as we learned more.  And it appears that that's where we are.  We are fighting about that issue of whether or not Mr. Farnsworth's approval is -- is enough, whether he was involved.  And for some of these invoices, we're going to suggest and argue that he was a co-schemer.

This cannot be a surprise to the defense because this has always been at the forefront of the theories of the Government against the defendant.

THE COURT:  All right.  Mr. Fee.

MR. FEE:  That is utter nonsense, Your Honor.  They stipulated in the exhibits, two hours later sprung this on us.

1    That is bad faith.

2         THE COURT:  Well, wait, wait.  I think Mr. Pi just

3    stated that, once they stipulated to your exhibits, they

4    realized -- or they knew that those exhibits were going to be

09:09AM   5    admitted into evidence.  And your theory of the case is such

6    that they want to rebut that with the idea that Farnsworth was

7    a co-schemer.

8         MR. FEE:  Your Honor, if they wanted to rebut that

9    theory, they shouldn't have stipulated in the exhibits.  And

09:09AM  10    they should have made it clear months ago that there was a

11    theory here.

12         These are experienced prosecutors.  There is no way

13    they could not have realized they could have added an aiding

14    and abetting count, a conspiracy count, or just used --

09:09AM  15         THE COURT:  But your argument really is that without

16    an aiding and abetting count against Mr. Farnsworth, they

17    shouldn't be allowed to make -- to make this argument or

18    present evidence?

19         MR. FEE:  My theory is two.  One, the grand jury did

09:09AM  20    not pass on this allegation.  This is a constructive amendment

21    of the Indictment.  There is not one word in what Mr. Pi said

22    that references any other individual involved in the scheme.

23    This theory is not present in the Indictment, it's not present

24    in the first proposed jury instructions.

09:10AM  25         At the pretrial conference, you asked the Government

UNITED STATES DISTRICT COURT

its theory, you said, "Those executive" -- this is Mr. Pi.

"Those executives received the invoice and approved it.  The

point is that the information he," Mr. Itum, "was feeding them

about paying for a hotel was false."

09:10AM          You asked again, and he says, Mr. Pi -- the back and

forth about the e-mail showing approval.  Mr. Pi said in

response to your questions, "We would stipulate to the

admissibility of the e-mails I referenced, including many

e-mails in which Mr. Itum submitted the bills, organized the

09:10AM   event, got approval for the bills.  The defense can present

that, argue it, and they will have the full context."

          There was never one word about this theory.  They

have belatedly realized a gap in their case.  They are -- want

to constructively amend the Indictment by offering -- it's

09:10AM   worse than a conspiracy count being added.  They are adding a

vicariously liable substantive defendant.

          Your Honor, everything would be different about this

case.  The discovery, the defense themes.  You've heard about

this south Florida case, Your Honor.

09:11AM          THE COURT:  But paragraph 12B states that

Defendant Itum caused HMNY employees to initiate interstate

wire transactions to transfer funds.  So why isn't it

logically -- why doesn't it logically follow from that that

Mr. Farnsworth -- well, he wasn't exactly an employee -- but

09:11AM   Mr. Farnsworth initiated these wire transfers?

```
 1              MR. FEE:  This is a perfect example, Your Honor.
 2    There is nothing here that suggests HMNY employees had
 3    knowledge or any participation in the actual scheme in and of
 4    themselves.  The actor is Mr. Itum in every paragraph in this
 5    Indictment.  It has been that way for 13 months.  Only after
 6    they stipulated in the exhibits on this defense have they
 7    thrown this on the Court.
 8              Your Honor, you know these cases well.
 9              THE COURT:  Well, wait a minute.
10              MR. FEE:  Yes, Your Honor.
11              THE COURT:  It seems -- what you said a moment ago,
12    you said that the Government shouldn't have stipulated to the
13    admission of these exhibits.  So I guess one solution would be
14    that I refuse to accept that stipulation and those -- your
15    exhibits do not come in and they don't pursue this theory.
16              MR. FEE:  You would be rewarding what I would submit
17    is misconduct of the Government.  The only remedy, the only
18    fair and appropriate remedy is they be precluded from raising
19    this argument that they first introduced last night at
20    8:00 p.m.  Anything else, anything else is deeply unfair and I
21    submit would constitute error, Your Honor.
22              They have had this case and our theory of the
23    defense for a year.
24              MR. PI:  May I respond, Your Honor?
25              THE COURT:  Yes, you may.
```

**UNITED STATES DISTRICT COURT**

09:13AM

1    MR. PI:  Your Honor, with respect to the arguments

2    being revealed close to trial, the Government is not obliged to

3    reveal its argument, its ultimate argument before trial.  The

4    question is whether or not they have sufficient notice before

5    trial that this is a possible argument of the Government.

6    Here, there's plenty of indictments where a scheme

7    is alleged but no other co-schemers are known or alleged even.

8    That's completely proper.  And if a co-schemer is discovered

9    during the course of the investigation or if the defense

10   proposed -- implies that there is a potential co-schemer, there

11   is nothing improper about the Government making that argument.

12   And with respect to the opening statement,

13   Your Honor, if we're wrong, if we're wrong that there's a

14   scheme, we'll -- we'll look like fools when we -- when we start

15   by promising there's a scheme and we can't show one.  And the

16   defense is completely at liberty throughout trial to put on

17   evidence and argue that there was no scheme and to make that

18   argument in closing.

19   THE COURT:  Well, I'm going to allow it in opening.

20   I'm sure this is not the last time we're going to have argument

21   on it, but I'm going to allow the reference in opening.

22   All right.

23   MR. FEE:  Your Honor, one last chance.  He's wrong.

24   THE COURT:  No, I've ruled.  I've ruled.  Thank you.

25   All right.  Anything else before we bring the jury

1   in?

2          MR. PI:  Yes, Your Honor.  At the pretrial

3   conference, you had mentioned that you might ask voir dire

4   questions about stock ownership in HMNY as well as maybe

09:14AM  5   subscriber -- whether the potential jurors were subscribers to

6   MoviePass, but you didn't say whether you had reached a

7   conclusion of whether you would ask that.  The Government --

8          THE COURT:  I am going to ask something like that.

9   I'm not going to ask it at the very outset because I don't

09:14AM 10   think it's -- it's not like the Disney Corporation or

11   something.  It's a little unlikely.

12          But after I read the statement of the case, one of

13   the questions, you know -- well, there's a series of questions,

14   have any of you heard about this dispute, heard about this

09:15AM 15   case, any of you hold stock or have any financial interest in

16   the case, including -- it was my understanding that -- that

17   MoviePass is no longer in existence.  Is that right?

18          MR. PI:  My understanding it's in bankruptcy with

19   HMNY.

09:15AM 20          THE COURT:  But does that mean it's -- I mean, can

21   people still buy MoviePass subscriptions?

22          MR. FEE:  Not on public markets.  No, you can't buy

23   any --

24          THE COURT:  All right.  So in the past has

09:15AM 25   anybody ever --

1          MR. FEE:  Your Honor, there is -- there's a new

2    MoviePass that bears the same name, so someone could plausibly

3    have some association.

4          THE COURT:  All right.  Thank you for telling me

09:15AM  5    that.  So if that comes up, I'll tell them that's not

6    associated with this case.

7          MR. FEE:  I'm not -- I would like to know about it.

8          THE COURT:  Well, certainly.

9          MR. FEE:  It's a question, Your Honor.

09:15AM  10          THE COURT:  Certainly.  But I will tell them that's

11    not the same MoviePass we're talking about in this case.

12          MR. FEE:  Well, so what happened was a previous

13    founder of MoviePass came back and bought some of essentially

14    the IP data from the old MoviePass.  So whether it is not --

09:16AM  15    the same or is not the same is perhaps somewhat of an academic

16    question.  Some of the executives at the original MoviePass are

17    actually at this new MoviePass.

18          THE COURT:  Well, we'll just see if anybody

19    currently has a subscription.

09:16AM  20          MR. FEE:  I think that's fair.

21          THE COURT:  I'll ask about MoviePass in general.

22          MR. PI:  Okay.  Thank you, Your Honor.

23          And then, lastly -- I think lastly -- given this

24    discussion about the parties' stipulation, as we go into the

09:16AM  25    trial and start presenting evidence, we just want to make sure

```
 1    we're on the same page about whether all of those stipulated

 2    exhibits are, in fact, in, are going to be in evidence or

 3    whether the defense has a change of heart.  The Government

 4    would ask for an order accepting the stipulations of the

 5    parties.

 6                THE COURT:  I'm going to let Mr. Fee confer with his

 7    client.  But before we get to your first witness, we'll make

 8    sure that that's settled.

 9                MR. PI:  Thank you, Your Honor.

10                That's it from the Government.

11                THE COURT:  All right.  Then we'll bring the jury

12    up.

13                THE COURTROOM DEPUTY:  All rise.

14                    (Break taken.)

15                    (In the presence of the prospective jurors:)

16                THE COURTROOM DEPUTY:  If you could please stand and

17    raise your right hand.

18                    Ladies and gentlemen, do you solemnly swear that you

19    will make true answers to such questions as may be put to you,

20    touching upon your qualifications to serve as jurors upon the

21    trial of the cause now before you in this court, so help you

22    God?

23                THE PROSPECTIVE JURORS:  (Collectively) I do.

24                THE COURTROOM DEPUTY:  Thank you.

25                    (Pause in the proceedings.)
```

09:16AM 5

09:16AM 10

09:40AM 15

09:41AM 20

09:43AM 25

**UNITED STATES DISTRICT COURT**

1          THE COURTROOM DEPUTY:  Calling item 1,

2     LA CR 23-00082, United States of America versus Khalid Itum.

3          Counsel, please state your appearances for the

4     record.

09:49AM  5          MR. PI:  Good morning, Your Honor.  David Pi on

6     behalf of the United States.  I'm joined at counsel table by my

7     trial partner, AUSA Mark Aveis, and FBI Special Agent

8     Michelle Vu.

9          THE COURT:  Thank you.  Good morning.

09:49AM  10         MR. FEE:  Good morning, Your Honor and everyone.

11    Adam Fee for the defendant, Khalid Itum.  And with me is

12    Ben Nicholson.  And Mr. Itum is standing here to my right.

13         THE COURT:  Thank you.  Good morning.

14         Good morning, everyone.  Welcome to the

09:50AM  15    District Court.

16         Let me introduce to you a couple of the other people

17    that you see in the courtroom.

18         In front of me are my courtroom clerks,

19    Daniel Tamayo and Kevin Reddick.

09:50AM  20         To my right is Myra Ponce.  Her job is especially

21    important as far as all of you are concerned today.  Because

22    this morning, as we go about selecting a jury to sit on this

23    case, it's the only time during trial that you -- you are

24    speaking to us instead of listening.

09:50AM  25         So as you speak to us, keep a couple of things in

**UNITED STATES DISTRICT COURT**

mind and that will make Ms. Ponce's job much easier.  She takes
down every word that is said in the courtroom.  So in ordinary
conversation, many of us have a bad habit of interrupting or
speaking over one other.  A court reporter, even the very best
court reporter -- and that's Ms. Ponce, seriously -- she can
only take down one person speaking at a time.  So please wait
until I finish my question to you until you begin your answer.

        And then two law clerks, Christine Chung and
Darren Schweitzer, are here.  Law clerks are lawyers usually at
the beginning of their career.  They assist me with research
and other matters regarding my cases.

        If you need any assistance during the course of your
time here, any of the people I've just introduced you to would
be happy to assist you, whether it's finding a restroom or
anything.

        You've been asked to come here today into my
courtroom because a defendant in a criminal case has asked for
a jury trial.  The right to a trial by jury is guaranteed to
all of us by the Constitution of the United States.  And most
of us who have had the good fortune to grow up in this country
or live in this country are familiar with that.  We take it for
granted, maybe.  But it's worth considering that it's actually
something that's very uncommon.

        In most countries around the world, with just a
couple of exceptions like the United States, someone who is

suspected of committing a crime is arrested by representatives

of the Government, law enforcement.  They are then charged and

prosecuted for the alleged crimes by other representatives of

the Government, the prosecutors.  In this case, in Federal

Court, prosecutors are called Assistant United States

Attorneys.  And then the question of the suspect's guilt is

decided by another representative of the Government, the judge.

In the United States, we do something extraordinary.

Instead of placing the decision of the defendant's guilt in the

hands of a governmental employee, we entrust it to a jury, an

impartial panel chosen from a representative cross-section of

the community.

And that means that the Government cannot convict

and cannot punish anyone unless 12 citizens from the community

unanimously decide that the defendant is guilty.  So that's an

extraordinary limitation on the power of the Government.  It's

an extraordinary right that every one of us enjoys.  And it

puts extraordinary power in the hands of citizens like

yourselves.

Some of the most important decisions every day made

in our country are made by jurors like yourselves.  The most

powerful federal judge in the country -- and that's not me --

but whoever he or she may be cannot decide this case, only a

jury can.  But we can -- obviously, we can't have trials by

jury unless we have jurors, citizens like yourselves who answer

1    the summons.

2         And I know that jury service is at least an

3    inconvenience and mostly -- for most people, it's a sacrifice.

4    So I appreciate and the parties appreciate all of you answering

09:54AM  5    the summons and making the sacrifice to come here and serve

6    and, therefore, preserving this right that's fundamental to our

7    justice system.

8         We expect -- this is not the longest case that's

9    ever been tried in this court, but that doesn't mean it's not

09:54AM  10   important.  It's the most important case in the world as far as

11   the parties are concerned.

12        But we expect the presentation of evidence to last

13   three or four days.  So you'll probably be done hearing the

14   evidence by Friday of this week.  And then you'll begin your

09:54AM  15   deliberations the following week or whenever it is that you --

16   we finish with the evidence.  But we think we'll be done this

17   week, and you'd come back early next week on Monday to begin

18   your deliberations.

19        The trial day with the jury starts at 9:00 in the

09:54AM  20   morning.  We go until 4:30 in the afternoon.  Obviously we take

21   a lunch break and a mid-morning and a mid-afternoon break.

22        The jury in this case will be a jury of 12 persons

23   with two alternates.

24        And this part of the case this morning is called

09:55AM  25   voir dire where I have the opportunity to ask all of you some

questions about yourselves and your qualifications to serve as jurors on this case.

So let me start with qualifying all of you.  Is everyone able to hear me?

09:55AM    THE PROSPECTIVE JURORS:  (Collectively) Yes.

THE COURT:  All right.  Does anyone have any other physical disability that would make it difficult for you to serve or that we would need to accommodate in order for you to serve as a juror?

09:55AM    All right.  I see no hands.

Are all of you able to understand, read, and speak English?

THE PROSPECTIVE JURORS:  (Collectively) Yes.

THE COURT:  All right.  Are all of you citizens of the United States?

09:55AM    THE PROSPECTIVE JURORS:  (Collectively) Yes.

THE COURT:  And has anyone ever been convicted of a felony, a serious crime?

THE PROSPECTIVE JURORS:  (Collectively) No.

09:55AM    THE COURT:  Congratulations.  You're all qualified.

And it used to be in the beginning days of our country that qualifications included a matter of a juror's property ownership or wealth.  It doesn't any longer.  And so all of you are qualified to sit as jurors on this case.

09:56AM    So there's two purposes for my questions this

morning.  The first purpose is to help me decide whether any potential jurors should be excused for cause.  Cause means that there is a reason a juror would not be able to render a fair and impartial verdict on this case.

09:56AM    For example, maybe a juror has a close relationship with one of the witnesses or one of the parties.  And that might be grounds for a challenge for cause.  It doesn't mean that you're not a -- that a juror is not a fair and impartial person.  It means they might have a connection or a feeling 09:56AM about this particular case.  And I'm going to tell you a little bit about this case in just a moment.

But let me give you an example.  It has nothing to do with this case, that's why I'm using it.

Let's say that a member of the jury panel was a 09:57AM mother whose very young daughter had been killed in a drunk driving accident a month ago.  And let's say that the case before me involved someone who was accused of driving under the influence of alcohol.  We wouldn't expect that juror to be able to be fair and impartial and set aside what had just happened 09:57AM in her life to be fair and impartial in that case.  But my colleague next door is trying a case involving something entirely different, and that juror could be fair and impartial on that case.

So that's what I mean when I say grounds for a 09:57AM challenge for cause.

The other reason for the question -- questioning this morning is to help the lawyers learn a little bit about each one of you so that they can exercise their judgment in a reasonable manner for what we call peremptory challenges.  The law gives each side a very limited number of peremptory challenges where they can ask me to excuse a juror without giving a reason, they just want -- they would prefer to have another juror sit on the case.

By asking questions, though, I'm not intending to pry into your personal affairs for no reason.  And we're not here to pry into matters that have no bearing on issues that may come up in this trial.  But for any reason, if any of my questions you feel are of a personal nature and you would like to answer them outside the presence of the other jurors, just let me know and I'll talk to you with just the lawyers present. We're happy to talk to you about anything outside the presence of the other jurors, if necessary.

It's the sworn duty of a juror to accept from the Court the rule of law, the rules of law that apply to the case. I decide what those rules are.  And then I will give them to you -- and your job is to apply the rules of law to the facts of the case as you find them.  In other words, the jurors are the -- the jurors are the judges of what the facts are.  And you must decide the facts regardless of any -- well, first of all, you must accept the rules of law that I give to you,

regardless of any personal or preconceived notion of what the law is or what it ought to be.

It's the sworn duty of a juror to hear and then consider conscientiously the evidence introduced at the trial and then determine what the facts are based solely and exclusively on the evidence without prejudice, favoritism, or bias.

If you're chosen as a juror, you must consider nothing in determining the facts of the case except the evidence produced from the witness stand or presented to you in the form of, for example, documents.

That's all you can consider, the evidence actually admitted at trial and the law as the Court instructs you on it.

You -- I'm instructing you now that you must not discuss this case or anything related to the case, the witnesses, the evidence, the testimony, anything until the entire trial is finished and you've heard all the evidence, you've heard the arguments of the lawyers, I've instructed you on the law, and you're in the jury room with all of your fellow jurors.

You can't discuss the case before that with the other jurors or anyone else. That means you can't discuss the witnesses, the lawyers, the exhibits, the testimony that you see and hear, anyone else you see in the courtroom, anything about the case at all. You can't read or listen to any media

accounts about the case, whether it's print newspapers, TV, radio, anything on the Internet.

I know you're all probably familiar with this, but it's actually very difficult, it's a very difficult thing we're asking you to do because you're going to be sitting here, if you're selected on the jury, and you're going to hear very interesting testimony.  I promise you, very interesting testimony.

And the only thing you have in common with your fellow jurors is what you're hearing in the courtroom.  And you can't talk about that.  You can talk about anything else.  You can find out what else you have in common, but you can't talk about what you're listening to all day.

Does everyone understand that and agree that they, if chosen as a juror, will be able to follow that instruction?

THE PROSPECTIVE JURORS:  (Collectively) Yes.

THE COURT:  Is there anyone who feels they could not follow that instruction?

All right.  I see no hands.

All right.  This case is brought by the United States.  Sometimes I refer to the United States as the Government or the prosecution.  I'm going to ask the attorneys for the Government to stand up and introduce themselves to the jury again and again introduce the case agent.

MR. PI:  Good morning.

                      Good morning.  My name is David Pi.  I'm an

Assistant United States Attorney here in the Central District

of California, which means I'm a federal prosecutor assigned to

this case.

10:02AM    5          MR. AVEIS:  Good morning.  My name is Mark Aveis.

I'm also a federal prosecutor with the U.S. Attorney's Office

in Los Angeles.

                      SPECIAL AGENT VU:  My name is Michelle Vu.  I'm a

special agent with the FBI in New York.

10:02AM   10          THE COURT:  Thank you.

                      And for the defense?

                      MR. FEE:  Hey, everybody.  My name is Adam Fee, so

it's Pi and Fee.  But I'm the defense lawyer, not the

prosecutor.  And I'm here with my client, Khalid Itum.

10:02AM   15          MR. NICHOLSON:  Good morning, everyone.  I'm

Ben Nicholson, and I do not rhyme with Pi or Fee, but I'm also

representing the defendant, Mr. Khalid Itum.

                      THE COURT:  And the defense attorneys are with the

firm of Sheppard Mullin.

10:02AM   20          MR. FEE:  No, not yet, Your Honor.  Paul Hastings

today, but it's a short week.

                      THE COURT:  I'm sorry.  Paul Hastings.  All right.

Thank you.

                      Do any of you know any of these attorneys or

10:03AM   25   Mr. Itum or Agent Vu?  Anyone familiar?  Anyone familiar with

| | |
|---|---|
| | the firm of Paul Hastings? |
| 2 | All right.  I'm going to see if I can start learning |
| 3 | your names and get your names right. |
| 4 | So let's see.  Would you state your name for me? |
| 10:03AM   5 | PROSPECTIVE JUROR MOAVEN:  Dustin Moaven, |
| 6 | Your Honor. |
| 7 | THE COURT:  Why am I not seeing you on this list? |
| 8 | PROSPECTIVE JUROR MOAVEN:  Dustin Moaven. |
| 9 | THE COURT:  All right.  And how do you know that |
| 10:03AM  10 | firm? |
| 11 | PROSPECTIVE JUROR MOAVEN:  I'm an attorney.  And I |
| 12 | used to practice in corporate litigation, and I believe I was |
| 13 | opposed to them and maybe even co-counsel with them on a few |
| 14 | matters.  But I don't know either of these attorneys |
| 10:03AM  15 | personally. |
| 16 | THE COURT:  All right.  And would your relationship, |
| 17 | if you call it that, with the firm affect your ability to be |
| 18 | fair and impartial if you're selected as a juror? |
| 19 | PROSPECTIVE JUROR MOAVEN:  No, Your Honor. |
| 10:04AM  20 | THE COURT:  What sort of law do you practice? |
| 21 | PROSPECTIVE JUROR MOAVEN:  Currently practice |
| 22 | personal injury, attorney for plaintiff's side. |
| 23 | THE COURT:  Okay.  Thank you. |
| 24 | And then there was -- let's see.  I'm sorry.  And |
| 10:04AM  25 | your name, ma'am? |

**UNITED STATES DISTRICT COURT**

|     |                                                                              |
| --- | ---------------------------------------------------------------------------- |
| 1   | PROSPECTIVE JUROR VOSS:  Elizabeth Voss.                                      |
| 2   | I am a paralegal, and I am familiar with the firm                            |
| 3   | of -- both Paul Hastings and Sheppard Mullin.  I formerly                     |
| 4   | worked for Sheppard Mullin.                                                   |

10:04AM   5    THE COURT:  All right.  But you've never worked for

6    Paul Hastings?

7    PROSPECTIVE JUROR VOSS:  I've never worked for

8    Paul Hastings.  I've been associated with -- in a paralegal

9    capacity with that firm.

10:04AM   10    THE COURT:  With Paul --

11    PROSPECTIVE JUROR VOSS:  But I've never worked with

12    them.

13    THE COURT:  All right.  Maybe you could explain

14    that.

10:04AM   15    PROSPECTIVE JUROR VOSS:  Um, when I was working at

16    Sheppard Mullin, Paul Hastings was co-counsel on a case that

17    I've done.

18    THE COURT:  All right.  What sort of -- what's your

19    area of specialty as a paralegal?

10:04AM   20    PROSPECTIVE JUROR VOSS:  Presently probate, formerly

21    family law and antitrust.

22    THE COURT:  All right.  Thank you.

23    And would your knowledge of the firm affect your

24    ability to be a fair and impartial juror to both sides?

10:05AM   25    PROSPECTIVE JUROR VOSS:  No, Your Honor.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  And I believe that you said you don't

 2    recognize the lawyers.

 3              PROSPECTIVE JUROR VOSS:  I do not recognize any of

 4    the attorneys in the courtroom.

 5              THE COURT:  All right.  Thank you.

 6              And I think there was a third hand.

 7              Yes, sir?

 8              PROSPECTIVE JUROR JOHNSON:  Ben Johnson.

 9              THE COURT:  All right.  And who do you know?

10              PROSPECTIVE JUROR JOHNSON:  I don't know anybody.

11    I'm familiar with the firm of Paul Hastings and

12    Sheppard Mullin.  I'm a litigator as well.

13              THE COURT:  All right.  And are you -- where do you

14    practice?  Do you have your own firm?

15              PROSPECTIVE JUROR JOHNSON:  Currently I'm in-house

16    at an entertainment company where I handle all of their

17    litigation.

18              THE COURT:  All right.  Would your knowledge of the

19    firm affect your ability to be a fair and impartial juror?

20              PROSPECTIVE JUROR JOHNSON:  I don't think so,

21    Your Honor.

22              THE COURT:  All right.  And I think there was one

23    more hand back there.

24              PROSPECTIVE JUROR WANDEL:  Yes.  My name is

25    Stephane Wandel.
```

10:05AM
10:05AM
10:05AM
10:05AM
10:05AM
10:06AM

**UNITED STATES DISTRICT COURT**

1          THE COURT:  All right.  And you know the law firm

2     Paul Hastings?

3          PROSPECTIVE JUROR WANDEL:  I know both law firms.

4     That's correct.  But I don't know any of the attorneys or any

5     of the parties in the courtroom.

6          THE COURT:  All right.  And how do you know the

7     firms?

8          PROSPECTIVE JUROR WANDEL:  I work in real estate

9     development.  We regularly work and interact with a number of

10    law firms in the area, including Paul Hastings and

11    Sheppard Mullin.

12         THE COURT:  All right.  Anything about your

13    knowledge of the firms affect your ability to be fair in this

14    case?

15         PROSPECTIVE JUROR WANDEL:  No, not at all.

16         THE COURT:  All right.  Thank you.

17         Did I miss any hands?  I don't think so.

18         All right.  As you heard, Mr. Pi and Mr. Aveis are

19    with the United States Attorney's Office, federal prosecutors.

20    Do any of you know any of the attorneys in the -- not the

21    District Attorney's Office but the United States Attorney's

22    Office?  Anyone?  All right.

23         Do any of you -- anyone recognize anyone else in the

24    courtroom?  Do any -- do you recognize any of your fellow

25    jurors, for example?  Take a look around.  I don't -- if I have

1    an answer to that question, it should be two hands, not one.

2    But I don't see any hands.  All right.

3              How about my court staff or me?  Anyone recognize

4    anyone?  All right.

10:07AM    5              This matter is here before the Court because of an

6    Indictment filed against the defendant.  I'm going to read you

7    a short description of the charges, what the case is about,

8    before I ask some more questions.

9              This is a criminal case brought by the United States

10:07AM    10    Government.  The Government has charged Defendant Khalid Itum

11    with wire fraud and money laundering.

12              The Government alleges that in 2017, Mr. Itum

13    borrowed funds from two different persons.  After taking on

14    these debts, Mr. Itum began working at a company called

10:08AM    15    MoviePass.

16              In 2018, Mr. Itum submitted fraudulent invoices to

17    MoviePass and its parent company, Helios and Matheson

18    Analytics, Inc., otherwise known as HMNY, for work performed.

19    The fraudulent invoices claimed that Mr. Itum was entitled to

10:08AM    20    money that he was not, in fact, entitled to.

21              Mr. Itum directed MoviePass and HMNY to wire the

22    money he claimed he was owed on those invoices to a bank

23    account that he controlled.  Mr. Itum then repaid his debts

24    with that fraudulently obtained money.

10:08AM    25              Mr. Itum denies all of the Government's allegations

1    and has pleaded not guilty to these charges.

2           Have any of you heard or read anything about this

3    case?

4           Do any of you hold stock in the company I mentioned,

10:09AM    5    Helios and Matheson Analytics?

6           Any of you ever had a subscription to MoviePass or

7    know anyone who had a subscription to MoviePass?

8           Is there anything about the case that I just -- the

9    description I just read to you that affects your willingness or

10:09AM    10    ability to serve on the jury?

11           It's the law in this case, as in all cases, that a

12    defendant is presumed to be innocent.  This presumption of

13    innocence continues throughout the trial.  It's the duty of the

14    jury to acquit the defendant, that is, find the defendant not

10:09AM    15    guilty unless the evidence that's produced in court convinces

16    the jury beyond a reasonable doubt of the defendant's guilt.

17           In other words, the Government always bears the

18    burden of proving to you the defendant's guilt beyond a

19    reasonable doubt.  The defendant never has to prove his

10:10AM    20    innocence.

21           This has been a fundamental principle of our

22    country, our system of justice since the earliest days of our

23    country.

24           Does everyone understand and agree with the

10:10AM    25    principle that, when a person is accused of a crime, we don't

have to prove our innocence and the Government has to prove our

quilt beyond a reasonable doubt?  Does everyone agree with

that?

THE PROSPECTIVE JURORS:  (Collectively) Yes.

THE COURT:  One of the consequences of that

principle, the principle that the defendant doesn't have to

prove his innocence, the Government has to prove guilt, is that

the defendant doesn't have to testify at trial because it's the

Government's burden to prove guilt.  So the defendant never has

to testify.

Everyone understand and agree with that principle?

THE PROSPECTIVE JURORS:  (Collectively) Yes.

THE COURT:  All right.  I've mentioned proof beyond

a reasonable doubt.  Well, proof beyond a reasonable doubt is

proof that leaves you firmly convinced that the defendant is

guilty.  It is not required that the Government prove guilt

beyond all possible doubt.  But a reasonable doubt is a doubt

based upon reason and common sense and is not based purely on

speculation.  It may arise from a careful and impartial

consideration of all the evidence or it may arise from a lack

of evidence.

Everyone understand that concept?

THE PROSPECTIVE JURORS:  (Collectively) Yes.

THE COURT:  All right.  I'm going to read you a list

of the witnesses that we expect to testify in this case.  And

then I'm going to ask all of you if you know any of these

witnesses.

Dr. Thomas -- I hope I'm going to pronounce this

correctly -- Buttgenbach.  That's B-u-t-t-g-e-n-b-a-c-h.

Brody DeBrino, Julian Ross, Jeffrey Consoletti, Stuart Benson,

and Lyssa Bevan.

Do any of you know any of those witnesses?

All right.  There may be other witnesses who testify

at trial.  That's common.  And if it turns out that you do

recognize a witness or when a witness appears, you suddenly

remember that you might know him or her, please let me know

right away.

Our Constitution guarantees that everyone who's

charged with a crime has the right to a trial by jury.  Are

there any of you who hold any religious, philosophical, or

other beliefs that cases such as this should not be brought

into court for determination by a jury?

I see no hands.

Do any of you have any moral, philosophical,

religious, or other belief that you should not sit in judgment

on another person who's accused of a crime?

All right.  I see no hands.

The witnesses in this case include law enforcement

agents from the Federal Bureau of Investigation.  Have any of

you ever been employed by the FBI?

1          No hands.

2          Do any of you have any family members or close

3    friends who have ever been employed by the FBI?

4          Yes, sir.  Can you tell me your name?

10:13AM  5          PROSPECTIVE JUROR ALVAREZ:  Me?

6          THE COURT:  I think you're the only hand.  Oh, there

7    are two hands.  I'm sorry.  We'll start with the person in

8    front.

9          PROSPECTIVE JUROR ALVAREZ:  Yeah.  My cousin is a

10:14AM 10   retired FBI agent.

11          THE COURT:  Okay.  And your name, sir?

12          PROSPECTIVE JUROR ALVAREZ:  Douglas Alvarez.

13          THE COURT:  All right.  You said your cousin is

14   retired?

10:14AM 15          PROSPECTIVE JUROR ALVAREZ:  Yeah.  He's a retired

16   FBI agent.

17          THE COURT:  Ever talk to him about his work when he

18   was working for the FBI?

19          PROSPECTIVE JUROR ALVAREZ:  No.  No.  He just --

10:14AM 20   he's like a distant cousin.  I mean, physically distant as

21   well.  And we do communicate once in a while online, but that's

22   about it.

23          THE COURT:  All right.

24          PROSPECTIVE JUROR ALVAREZ:  I don't really

10:14AM 25   appreciate his sense of humor so --

**UNITED STATES DISTRICT COURT**

1      THE COURT:  Oh.  His sense of humor.

2      PROSPECTIVE JUROR ALVAREZ:  His sense of humor.

3      THE COURT:  I thought you were talking about my

4  sense of humor.

10:14AM    5      PROSPECTIVE JUROR ALVAREZ:  No, not yours.

6      THE COURT:  But that's fine.  Many people don't.

7      All right.  Anything about your relationship with

8  your cousin that would make you favor one side or the other in

9  this case?

10:14AM   10      PROSPECTIVE JUROR ALVAREZ:  Oh, he kind of falls

11  into the stereotypical sense of what I would think an FBI agent

12  is.  So -- I don't know.

13      THE COURT:  All right.  So --

14      PROSPECTIVE JUROR ALVAREZ:  Like, TV, you know, he

10:14AM   15  kind of portrays that.  He's, like, read, like, comic books

16  about it when he was young, so I don't know if he's projecting

17  it.

18      THE COURT:  All right.  Well, would you hold it

19  against the Government's case when it calls an agent to

10:15AM   20  testify?

21      PROSPECTIVE JUROR ALVAREZ:  Oh, no, I don't think

22  so.

23      THE COURT:  All right.  Well, let me ask it a

24  different way.  And this is sort of general for all of you.

10:15AM   25      The law doesn't give any special cloak of

|   | |
|---|---|
| 1 | believability to a witness based on what the witness does for a |
| 2 | living.  All right?  So if you're selected as a juror on this |
| 3 | case, I will give you an instruction on the things to consider |
| 4 | when you decide whether a witness is telling the truth. |
| 5 | The witness's occupation has nothing to do with it. |
| 6 | So the example I usually give -- again, because it has nothing |
| 7 | to do with this case -- is that let's say a judge was called to |
| 8 | testify now.  Now, we might hope that a judge would be a |
| 9 | truthful person, but I would tell you you don't assume anything |
| 10 | about a witness based on what the witness does for a living. |
| 11 | You listen to the testimony and make up your mind. |
| 12 | So that's my long-winded question to you.  Would you |
| 13 | be able to listen to the testimony of all the witnesses, |
| 14 | including any FBI agents, and -- with an open mind and decide |
| 15 | whether or not you believe them based on all of the testimony? |
| 16 | PROSPECTIVE JUROR ALVAREZ:  I think I can, yeah. |
| 17 | THE COURT:  The fact that you have a cousin that you |
| 18 | may not be very fond of or you may not like his sense of humor, |
| 19 | that's him.  Right?  Not the agents who will be testifying? |
| 20 | PROSPECTIVE JUROR ALVAREZ:  Yeah.  Exactly. |
| 21 | THE COURT:  All right.  Thank you. |
| 22 | And then there was another person. |
| 23 | PROSPECTIVE JUROR GISCHE:  My name is James Gische. |
| 24 | And I also have a cousin who works for the FBI. |
| 25 | Currently works for, not retired. |

Timestamps in left margin:
10:15AM (line 5), 10:15AM (line 10), 10:16AM (line 15), 10:16AM (line 20), 10:16AM (line 25)

```
 1              THE COURT:  All right.  Male or female?

 2              PROSPECTIVE JUROR GISCHE:  Female.

 3              THE COURT:  All right.  And do you know what kind of

 4    cases she works on?

 5              PROSPECTIVE JUROR GISCHE:  She's a forensics expert.

 6    She does fingerprinting-type work.  So I don't know exactly

 7    what kind of cases specifically, but that's her field.

 8              THE COURT:  All right.  So she's not an agent, but

 9    she's an employee of the FBI.  Is that right?

10              PROSPECTIVE JUROR GISCHE:  I believe that's right.

11    I don't think she's an agent.

12              THE COURT:  All right.  Would that affect your

13    ability to be fair and impartial to all the -- to both sides in

14    this case?

15              PROSPECTIVE JUROR GISCHE:  I don't believe so.

16              THE COURT:  All right.  Thank you.

17              And you heard the question I asked of the last

18    juror.  Would you decide the credibility of the witnesses,

19    regardless of what they do for a living?

20              PROSPECTIVE JUROR GISCHE:  I would.

21              THE COURT:  All right.  Thank you.

22              Well, you'll hear testimony from a variety of

23    witnesses, from a variety of racial, ethnic, national origins.

24    Does anyone feel that they could not judge all the witnesses by

25    the same standard, regardless of their race, their national
```

**UNITED STATES DISTRICT COURT**

origin, their ethnic background?

Anyone feel they could not be fair and impartial to all the witnesses, regardless of those things?

All right.  I see no hands.

10:18AM    Do any -- and I know a few of you already do.  I've heard from you.  But I'll start with those of you in the jury box.

Do any of you have any training or education or work experience in the law as a lawyer, a paralegal, a courtroom 10:18AM clerk, a judge, anything?  Anyone?

Any close family members or close friends?

Let me see if I can -- Ms. Kumar?

PROSPECTIVE JUROR KUMAR:  Yes.

THE COURT:  And who -- who do you know in the law?

10:18AM    PROSPECTIVE JUROR KUMAR:  I'm married to an attorney.

THE COURT:  Ah-ha.  Well, that counts.

PROSPECTIVE JUROR KUMAR:  And my son was federal defense -- working in the federal defense until recently and is 10:18AM a panel attorney.

THE COURT:  Here in the Central District?

PROSPECTIVE JUROR KUMAR:  Yes.

THE COURT:  All right.  What kind of law does your husband practice?

10:19AM    PROSPECTIVE JUROR KUMAR:  He's in immigration.

| | | |
|---|---|---|
| | 1 | THE COURT:  All right.  And your son practices |
| | 2 | criminal defense work? |
| | 3 | PROSPECTIVE JUROR KUMAR:  Yes. |
| | 4 | THE COURT:  Do you think you could be fair to -- do |
| 10:19AM | 5 | you talk to your son about his work? |
| | 6 | PROSPECTIVE JUROR KUMAR:  I do. |
| | 7 | THE COURT:  All right.  Do you think that you could |
| | 8 | be fair and open-minded as you sit through this trial and |
| | 9 | listen to all the evidence before you make up your mind? |
| 10:19AM | 10 | PROSPECTIVE JUROR KUMAR:  I can try, yes. |
| | 11 | THE COURT:  As you sit here today, do you think you |
| | 12 | favor one side or the other before you've heard anything? |
| | 13 | PROSPECTIVE JUROR KUMAR:  Um, not -- not right now, |
| | 14 | no. |
| 10:19AM | 15 | THE COURT:  All right.  Let's say you're selected as |
| | 16 | a juror on the case.  And after you hear all the evidence and |
| | 17 | you listen to all the views of your fellow jurors in |
| | 18 | deliberations, the jury decides to convict.  And the next time |
| | 19 | that you see your son, would you feel embarrassed about that? |
| 10:20AM | 20 | PROSPECTIVE JUROR KUMAR:  I might be. |
| | 21 | THE COURT:  All right.  Would that affect your |
| | 22 | ability to make an honest and conscientious decision? |
| | 23 | PROSPECTIVE JUROR KUMAR:  No. |
| | 24 | THE COURT:  You said your son is on the panel now? |
| 10:20AM | 25 | PROSPECTIVE JUROR KUMAR:  Yes. |

|   | |
|---|---|
| 1 | THE COURT:  The CJA panel? |
| 2 | All right.  Thank you. |
| 3 | And I was just about to get -- anyone else in the |
| 4 | jury box have any relatives, close friends? |
| 10:20AM  5 | Oh, yes.  Ms. Mortensen -- oh, no, Ms. Hirway. |
| 6 | PROSPECTIVE JUROR HIRWAY:  Hi.  Yes.  I have a |
| 7 | sister-in-law who is a corporate lawyer.  She's a litigator. |
| 8 | And my in-laws are also lawyers. |
| 9 | THE COURT:  All right.  Your parents-in-law? |
| 10:20AM  10 | PROSPECTIVE JUROR HIRWAY:  Yes.  Correct. |
| 11 | THE COURT:  What firm does your sister-in-law work? |
| 12 | PROSPECTIVE JUROR HIRWAY:  Rutan, I think is the |
| 13 | name. |
| 14 | THE COURT:  Okay.  And what kind of -- excuse me. |
| 10:20AM  15 | What kind of law do your in-laws practice? |
| 16 | PROSPECTIVE JUROR HIRWAY:  I think, um, my |
| 17 | mother-in-law is -- I'm not totally sure what she does. |
| 18 | THE COURT:  And is it your father-in-law?  Is he a |
| 19 | lawyer as well? |
| 10:21AM  20 | PROSPECTIVE JUROR HIRWAY:  No.  Sorry.  Not my |
| 21 | father-in-law but then my sister-in-law, her -- both of her |
| 22 | brothers are both lawyers.  One is an entertainment lawyer and |
| 23 | the other is a JAG lawyer. |
| 24 | THE COURT:  All right.  With the -- in the military? |
| 10:21AM  25 | PROSPECTIVE JUROR HIRWAY:  In the military. |

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:21AM | 5 |

THE COURT:  All right.  As you sit here today with not having heard any evidence yet, do you think that you -- any of your experiences, your relationships with your family members would have any effect on your ability to be a fair and impartial juror?

PROSPECTIVE JUROR HIRWAY:  No.  I don't think it would be an issue.

THE COURT:  All right.  And then Ms. -- Ms. Kumar, let me go back to you for a minute.  If you're seated as a juror on this case and -- as I told you, I think it's a very interesting case -- if you have a question about something that happened in the courtroom, you understand that you can't talk to your son about it?

PROSPECTIVE JUROR KUMAR:  Yes, I do.

THE COURT:  No matter how much he might want to know that you're a juror.  You know that you cannot talk to him --

PROSPECTIVE JUROR KUMAR:  I do.

THE COURT:  -- or your husband?

PROSPECTIVE JUROR KUMAR:  (No audible response.)

THE COURT:  And you'd be able to follow that instruction?

PROSPECTIVE JUROR KUMAR:  Yeah.

THE COURT:  All right.  Thank you.

All right.  I think there were some other hands.

Yes, sir.

**UNITED STATES DISTRICT COURT**

1    THE COURT:  All right.  As you sit here today with
2 not having heard any evidence yet, do you think that you -- any
3 of your experiences, your relationships with your family
4 members would have any effect on your ability to be a fair and
10:21AM 5 impartial juror?
6    PROSPECTIVE JUROR HIRWAY:  No.  I don't think it
7 would be an issue.
8    THE COURT:  All right.  And then Ms. -- Ms. Kumar,
9 let me go back to you for a minute.  If you're seated as a
10:21AM 10 juror on this case and -- as I told you, I think it's a very
11 interesting case -- if you have a question about something that
12 happened in the courtroom, you understand that you can't talk
13 to your son about it?
14    PROSPECTIVE JUROR KUMAR:  Yes, I do.
10:22AM 15    THE COURT:  No matter how much he might want to know
16 that you're a juror.  You know that you cannot talk to him --
17    PROSPECTIVE JUROR KUMAR:  I do.
18    THE COURT:  -- or your husband?
19    PROSPECTIVE JUROR KUMAR:   (No audible response.)
10:22AM 20    THE COURT:  And you'd be able to follow that
21 instruction?
22    PROSPECTIVE JUROR KUMAR:  Yeah.
23    THE COURT:  All right.  Thank you.
24    All right.  I think there were some other hands.
10:22AM 25    Yes, sir.

**UNITED STATES DISTRICT COURT**

1    PROSPECTIVE JUROR GISCHE:  My name is James Gische.

2    My father is a retired attorney, and my sister is an

3    attorney as well.

4    THE COURT:  All right.  And what kind of law does

10:22AM    5    your father -- did your father practice?

6    PROSPECTIVE JUROR GISCHE:  Corporate officers

7    insurance.

8    THE COURT:  All right.  And you said your sister

9    also?

10:22AM    10    PROSPECTIVE JUROR GISCHE:  Yeah.  That's right.

11    THE COURT:  What kind of law does she practice?

12    PROSPECTIVE JUROR GISCHE:  She does -- she's

13    in-house at Apple and does patents and trademarks.

14    THE COURT:  All right.  You understand, as I was

10:23AM    15    grilling poor Ms. Kumar a moment ago, if you have questions

16    about things that happen during the trial, you have to wait

17    until the end before you discuss it with anyone?

18    PROSPECTIVE JUROR GISCHE:  I understand.

19    THE COURT:  All right.  Thank you.

10:23AM    20    All right.  Anyone else?  I think there was one more

21    hand up.

22    PROSPECTIVE JUROR ACCOOE:  My name is Philip Accooe.

23    My brother is a lawyer.

24    THE COURT:  I'm sorry.  Your name is Daccooe?

10:23AM    25    PROSPECTIVE JUROR ACCOOE:  Philip Accooe.

```
 1            THE COURT:  Accooe.  I'm sorry.
 2            What kind of law does your brother practice?
 3            PROSPECTIVE JUROR ACCOOE:  I have no clue.  I really
 4  don't.
 5            THE COURT:  Okay.  So is it fair to say that you
 6  don't think that that would affect your ability to be fair to
 7  both sides?
 8            PROSPECTIVE JUROR ACCOOE:  I don't.
 9            THE COURT:  And you probably wouldn't be tempted to
10  discuss the case with your brother if you had a question.
11            PROSPECTIVE JUROR ACCOOE:  No, I would not.
12            THE COURT:  Okay.  Thank you.
13            Did I miss -- and that screen -- we're going to move
14  that screen because it's sort of blocking my view.  And I do
15  think there was another hand up.
16            PROSPECTIVE JUROR WANDEL:  Yes.  Hi.  I'm right
17  behind the screen.  My name is Stephane Wandel.
18            I don't have any relatives, but I think you asked if
19  anybody had education.
20            THE COURT:  Oh.  Education, experience?  Correct.
21            PROSPECTIVE JUROR WANDEL:  So I don't have any
22  formal training in the law.  But as a real estate executive for
23  30 years, I read contracts of all types, asset purchases,
24  sales, leases, literally vendor contracts of every type.  I've
25  done that almost daily for 30 years.
```

|  | 1 | THE COURT:  All right.  Would you have any |

THE COURT:  All right.  Would you have any
difficulty -- if your understanding of the law, based on your
experience, differs from any principle of law that I instruct
you on, would you be able to follow my instructions?

10:24AM          PROSPECTIVE JUROR WANDEL:  Yes.  Absolutely.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR HADDAD:  Hi.  My name is
Basimah Haddad.

I have two children that are currently practicing
10:25AM   law.

THE COURT:  All right.  And what kind of law do they
practice?

PROSPECTIVE JUROR HADDAD:  My daughter is a public
defender in the Orange County courthouse.

10:25AM          THE COURT:  All right.  A federal public defender or
in the Orange County --

PROSPECTIVE JUROR HADDAD:  State.

THE COURT:  State.  All right.

PROSPECTIVE JUROR HADDAD:  And my son is a
10:25AM   private -- he works for a corporation here in L.A.  Don't ask
me the name.  And he does labor law.

THE COURT:  All right.  As you sit here and heard
that very brief description of the case, you haven't heard any
evidence, do you think you would tend to side with one side or
10:25AM   the other because your son is a public defender?

**UNITED STATES DISTRICT COURT**

1        PROSPECTIVE JUROR HADDAD:  My daughter is the public

2   defender.

3        THE COURT:  Oh, I'm sorry.  Your son is the labor

4   lawyer.

10:25AM   5        PROSPECTIVE JUROR HADDAD:  No, that's okay.

6        THE COURT:  All right.

7        PROSPECTIVE JUROR HADDAD:  Well, there's a lot of

8   stuff that's gone on in my life so it's kind of personal.  I'd

9   rather talk to you about it.  So it would be very hard for me

10:26AM   10   to be objective.

11        THE COURT:  All right.  I'll talk to you outside the

12   presence of the other jurors in a few moments.  Thank you.

13        All right.  Anyone else experience or training in

14   the law?  And there's one gentleman right here.

10:26AM   15        PROSPECTIVE JUROR ALVAREZ:  Yes.  My girlfriend's

16   brother is an entertainment lawyer.  And my -- I have -- my

17   ex-girlfriend's a practicing attorney.  And I did take the

18   LSAT.  I don't know if that counts but -- I didn't end up -- a

19   mediocre score, so I didn't get into any, like --

10:26AM   20        THE COURT:  All right.  Your relationships with the

21   people that you mentioned who are lawyers, would that affect

22   your ability to be fair and impartial here?

23        PROSPECTIVE JUROR ALVAREZ:  Yeah, I don't think so.

24   I'll be impartial towards them.  Yeah.

10:26AM   25        THE COURT:  And you would not -- you'd be able to

UNITED STATES DISTRICT COURT

```
          1  follow my instruction not to discuss the case with them?

          2              PROSPECTIVE JUROR ALVAREZ:  Yeah.  I think I can do

          3  that.

          4              THE COURT:  All right.  Thank you.

10:27AM   5              And one more in the back.

          6              PROSPECTIVE JUROR DUONG:  Hi.  My name is

          7  Phibi Duong.

          8              I'm a CPA.  I studied economics and accounting, and

          9  I took several business law classes.  And I even took a

10:27AM  10  financial fraud class.  So I do have strong opinions regarding

         11  financial fraud, money laundering, and wire fraud.  So I don't

         12  think I would be impartial in this case.

         13              THE COURT:  All right.  I'm going to talk to you

         14  outside the presence of the other jurors in just a moment.

10:27AM  15  Thank you.

         16              Anyone else have any training, experience, or

         17  education in the law?

         18              Yes, sir.

         19              PROSPECTIVE JUROR MOAVEN:  Just for full disclosure,

10:27AM  20  Your Honor, I did intern at the DA's office before going into

         21  practice -- to private practice in Van Nuys, the Victim Impact

         22  Program, working with domestic violence and rape victims.  And

         23  I believe I applied for a summer internship at Paul Hastings

         24  and didn't get the job, but I -- just --

10:28AM  25              THE COURT:  Well, would you hold that against the
```

1    defense counsel?

2             PROSPECTIVE JUROR MOAVEN:  I don't think they're the

3    ones who didn't give me the job but --

4             THE COURT:  So you have no problem with them.

10:28AM    5             PROSPECTIVE JUROR MOAVEN:  Not with them but --

6    yeah, just for full disclosure.

7             THE COURT:  All right.  No, but seriously, would

8    that affect your ability to listen to both sides with an open

9    mind?

10:28AM    10             PROSPECTIVE JUROR MOAVEN:  No, Your Honor.

11             THE COURT:  All right.  Thank you.

12             And you said when you were at the Van Nuys DA's

13    office, you were working on domestic violence matters?

14             PROSPECTIVE JUROR MOAVEN:  Yes, Your Honor.

10:28AM    15             THE COURT:  All right.  Thank you.

16             Have I missed anyone?  Don't think so.

17             Have any of you ever testified in court in a

18    criminal case?

19             All right.  I see no hands.

10:29AM    20             Have any of you ever been charged with a crime, like

21    the ones charged --

22             THE COURTROOM DEPUTY:  Your Honor.

23             THE COURT:  Oh, there was one hand.  Yes?

24             PROSPECTIVE JUROR ELMER:  I was the victim in a

10:29AM    25    criminal case.

|    |    |
|----|----|
| 1  | THE COURT:  And your name, ma'am? |
| 2  | PROSPECTIVE JUROR ELMER:  Cassandra Elmer. |
| 3  | THE COURT:  I'm sorry.  Could you -- |
| 4  | PROSPECTIVE JUROR ELMER:  Cassandra Elmer. |
| 5  | THE COURT:  Oh, all right.  Thank you. |
| 6  | Do you mind telling us what the nature of the case |
| 7  | was or would you rather do that privately? |
| 8  | PROSPECTIVE JUROR ELMER:  Privately. |
| 9  | THE COURT:  That's fine.  Thank you. |
| 10 | Actually, let me ask you to come forward to the -- |
| 11 | just follow Mr. Tamayo at the sidebar. |
| 12 | And, counsel, can I see you at the sidebar? |
| 13 | (At sidebar in the presence of |
| 14 | Prospective Juror Elmer:) |
| 15 | THE COURT:  If you'd stand right over here by the |
| 16 | microphone so we can all hear you. |
| 17 | Okay.  Would you tell me about the -- |
| 18 | PROSPECTIVE JUROR ELMER:  I'm not exactly sure how |
| 19 | far it went through the trial process but -- |
| 20 | THE COURT:  But you were the victim in a case? |
| 21 | PROSPECTIVE JUROR ELMER:  Rape and attempted murder. |
| 22 | THE COURT:  Rape -- |
| 23 | PROSPECTIVE JUROR ELMER:  And attempted murder. |
| 24 | THE COURT:  -- and attempted murder. |
| 25 | How long ago was that? |

10:29AM (line 5)
10:29AM (line 10)
10:30AM (line 15)
10:30AM (line 20)
10:30AM (line 25)

|   |   |
|---|---|
| 1 | PROSPECTIVE JUROR ELMER:  Oh, gosh.  13 years. |
| 2 | THE COURT:  But I can tell you're very emotional. |
| 3 | PROSPECTIVE JUROR ELMER:  Yeah. |
| 4 | THE COURT:  Okay.  The charges in this case are |
| 5 | quite different. |
| 6 | PROSPECTIVE JUROR ELMER:  Oh, yeah.  I won't -- |
| 7 | THE COURT:  But would it be difficult for you to sit |
| 8 | as a juror -- |
| 9 | PROSPECTIVE JUROR ELMER:  No. |
| 10 | THE COURT:  -- in the case? |
| 11 | PROSPECTIVE JUROR ELMER:  Not in this type of case, |
| 12 | no. |
| 13 | THE COURT:  Do you think you'd tend to favor the |
| 14 | prosecution? |
| 15 | PROSPECTIVE JUROR ELMER:  (No audible response.) |
| 16 | THE COURT:  You have to say it out loud. |
| 17 | PROSPECTIVE JUROR ELMER:  Oh, sorry.  No. |
| 18 | THE COURT:  I forgot to tell everybody that, you |
| 19 | can't nod or shake your head because the court reporter is |
| 20 | taking it all down. |
| 21 | So that doesn't -- you said it was 13 years ago. |
| 22 | PROSPECTIVE JUROR ELMER:  Yes. |
| 23 | THE COURT:  And -- |
| 24 | PROSPECTIVE JUROR ELMER:  14 now. |
| 25 | THE COURT:  You don't remember if the case went to |

10:30AM (line 5)
10:30AM (line 10)
10:30AM (line 15)
10:31AM (line 20)
10:31AM (line 25)

```
 1   trial.
 2            PROSPECTIVE JUROR ELMER:  Um, I -- I can't remember
 3   how far through the process it went.  It was 14 years ago.  But
 4   I was on the jury stand at one point talking about it.
 5            THE COURT:  So could that have been at a preliminary
 6   hearing?
 7            PROSPECTIVE JUROR ELMER:  Maybe.
 8            THE COURT:  All right.  Do you remember if there was
 9   a jury present?
10            PROSPECTIVE JUROR ELMER:  It was a closed courtroom
11   to begin with, so there wasn't people.
12            THE COURT:  All right.  Was the person convicted?
13            PROSPECTIVE JUROR ELMER:  Yes.
14            THE COURT:  All right.  How do you feel you were
15   treated throughout the process by the justice system?  No
16   problems --
17            PROSPECTIVE JUROR ELMER:  No.
18            THE COURT:  -- with the way you were treated?
19            THE WITNESS:  Fairly.  Sorry.
20            THE COURT:  All right.  Either side want to ask any
21   questions?
22            MR. FEE:  No, Your Honor.
23            MR. PI:  Not from the Government, thank you.
24            THE COURT:  Thank you for answering the summons.
25   You can be seated.
```

1    (In the presence of the prospective jurors:)

2    THE COURT:  Anyone else who's testified in court

3    during a criminal case?  And anyone -- I don't know if I asked

4    this already.  I think I already asked has anyone ever been

10:32AM    5    charged or have a close family member who's ever been charged

6    with the crimes charged in this case?  That's wire fraud and

7    money laundering.

8    All right.  I see no hands.

9    Regardless of your personal beliefs about the law,

10:32AM    10    would all of you give me your assurance that you would follow

11    my instructions on the law, whether or not you agree with it or

12    think it should be changed?  Would all of you give me that

13    assurance?

14    THE PROSPECTIVE JURORS:  (Collectively) Yes.

10:32AM    15    THE COURT:  All right.  There is a difference --

16    well, there are many differences.  But there is a difference,

17    an important difference between a trial in a criminal case and

18    a trial in a civil case.  In a few moments I'll be asking all

19    of you if you've ever sat on a jury before.

10:33AM    20    But in a criminal case like this one, as I've told

21    you, a defendant has to be proven guilty beyond a reasonable

22    doubt.  In a civil case, such as when people are suing over a

23    contract or maybe a car accident, it's only required that the

24    jury find that the evidence that someone did something wrong is

10:33AM    25    more probably true than not true.  That's a much different

standard than beyond a reasonable doubt, which is the highest

standard.

All of you understand that?

THE PROSPECTIVE JURORS:  (Collectively) Yes.

10:33AM    THE COURT:  All right.  Have any of you ever been

involved -- I'll start with the people in the jury box.  Have

any of you ever been involved in a lawsuit of any kind, that

is, have you ever sued someone or been sued?

Yes, sir.

10:34AM    PROSPECTIVE JUROR CASTRO:  Hi, Your Honor.  My name

is Dennis Castro.

I was -- a company that I worked for, I had an

accident during the work hours and they didn't want to take

care of any medical or any financial --

10:34AM    THE COURT:  So you sued?

PROSPECTIVE JUROR CASTRO:  The company.

THE COURT:  All right.  Was it a workers' comp case?

PROSPECTIVE JUROR CASTRO:  Yes.

THE COURT:  All right.  Is that case over?

10:34AM    PROSPECTIVE JUROR CASTRO:  Yes, it is.

THE COURT:  All right.  Anything about that case

that you think would affect your ability to be fair to both

sides in this case?

PROSPECTIVE JUROR CASTRO:  No, Your Honor.

10:34AM    THE COURT:  All right.  Thank you.

1          Anyone else in the jury box?

2          All right.  And then --

3          THE COURTROOM DEPUTY:  There was one gentleman down

4     there.

10:35AM   5          THE COURT:  Yes.  It's Mr. Accooe; am I right?

6          PROSPECTIVE JUROR WANDEL:  Wandel.

7          THE COURT:  I'm so sorry.  We're working with a new

8     chart here, and I'm having some difficulty with it.

9          THE COURTROOM DEPUTY:  I believe he's No. 31,

10:35AM   10    Your Honor.

11          THE COURT:  Got it.

12          PROSPECTIVE JUROR WANDEL:  Yes.  Not me personally

13    but my company, yes.  It was -- a company was sued by a

14    construction company for money that were owed.  Our company

10:35AM   15    disagreed with it.  I believe a case was initiated, and we

16    ended upset settling out of court.

17          THE COURT:  All right.  Did you ever testify at a

18    deposition?

19          PROSPECTIVE JUROR WANDEL:  Not a formal deposition,

10:35AM   20    no.  But I was principally involved in the dispute as a project

21    manager at the time.

22          THE COURT:  All right.

23          PROSPECTIVE JUROR WANDEL:  So very involved in the

24    mediation and -- and the settlement discussions.

10:35AM   25          THE COURT:  All right.  Anything about that

64

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:36AM | 5 |

1   experience that would affect you if you sat as a juror in this

2   case?

3           PROSPECTIVE JUROR WANDEL:  No, not really.  I mean,

4   I -- you know, I mean, I work with contracts all day long.

5   I -- it's important to me to understand contracts, and parties

6   respect contracts.  I don't know if that's a relevant statement

7   in this case or not, but I thought I'd let you know.

8           THE COURT:  All right.  Thank you.

9           And in the back row there.

10          PROSPECTIVE JUROR WEBER:  Your Honor, my name is

11   Frank Weber.

12          I -- my son was injured back in 1993 in an accident

13   in school by another student, needed several -- you know, he

14   was -- a very bad eye injury that -- anyway, we sued the school

15   and the other kid's parents and settled out of court.

16          THE COURT:  So there wasn't a trial?

17          PROSPECTIVE JUROR WEBER:  No.

18          THE COURT:  All right.  How long ago was that?

19          PROSPECTIVE JUROR WEBER:  Uh, 30 years ago.

20          THE COURT:  All right.  Anything about that

21   experience that you think would affect your ability to be fair

22   and impartial in this case?

23          PROSPECTIVE JUROR WEBER:  No, I don't.

24          THE COURT:  All right.  Thank you very much.

25          Anyone else?

10:36AM (lines 5, 10, 15, 20)
10:37AM (line 25)

1          PROSPECTIVE JUROR QUON:  My name is Nadean Quon.

2          And my company was sued by an employer -- employee

3    for discrimination against her pregnancy.  And I had to be a

4    witness in it, and I was part of the settlement.

10:37AM    5          THE COURT:  All right.  So when you say "a witness,"

6    did you give a deposition?

7          PROSPECTIVE JUROR QUON:  Yes.

8          THE COURT:  All right.  But the case did not go to

9    trial?

10:37AM   10          PROSPECTIVE JUROR QUON:  It did not.

11          THE COURT:  All right.  Anything about that

12    experience that you think would affect you if you were a juror

13    in this case?

14          PROSPECTIVE JUROR QUON:  No.

10:37AM   15          THE COURT:  Thank you.

16          All right.  Did I miss any hands?

17          Oh.  Yes, sir.

18          PROSPECTIVE JUROR JOHNSON:  Ben Johnson.

19          I had a lawsuit against my bank for fraud.

10:37AM   20          THE COURT:  All right.  And how long ago was that?

21          PROSPECTIVE JUROR JOHNSON:  Related to my home loan,

22    so that would have been 2012.

23          THE COURT:  So you sued?

24          PROSPECTIVE JUROR JOHNSON:  Actually, sorry.  It was

10:38AM   25    related to my town home before that, so it would have been

about 2010.

THE COURT:  All right.  And you were the

plaintiff --

PROSPECTIVE JUROR JOHNSON:  Yes.

10:38AM    THE COURT:  -- the person suing?

Did the case go to trial?

PROSPECTIVE JUROR JOHNSON:  It did not.  Settled out

of court, Your Honor.

THE COURT:  And were you -- well, there's a saying

10:38AM    that the sign of a good settlement is when both sides are

slightly unhappy.  Does that describe your experience with the

settlement?

PROSPECTIVE JUROR JOHNSON:  I'd say I was slightly

unhappy, but I was okay with settling at that time.

10:38AM    THE COURT:  All right.  Anything about that

experience that would affect you if you were a juror here?

PROSPECTIVE JUROR JOHNSON:  No, Your Honor.

THE COURT:  All right.  Thank you very much.

All right.  Any other hands?

10:38AM    As you heard me say a few moments ago, the jurors in

a case are the sole judges of the credibility, the

believability of witnesses.  So if you're selected as a juror

on this case, it will be your duty to determine the questions

of fact and to decide those questions solely on the evidence

10:39AM    presented to you in this case.

```
 1              Is there any one of you, except -- I think there was

 2    a juror in the back that I'm going to talk to in a moment.

 3    Anyone else who, for any reason, feels that you could not carry

 4    out these duties?

 5              All right.  And let's see, that was -- it's

 6    Ms. Duong?  Yes, could I ask you to come up to sidebar for a

 7    moment.

 8                   (At sidebar in the presence of

 9                    Prospective Juror Duong:)

10         THE COURT:  All right.  Ms. Duong, you said that you

11    had some education in the area of finance.  Why don't you tell

12    us about that?

13         PROSPECTIVE JUROR DUONG:  So when I was in college,

14    I took a class that was special topics in management financial

15    fraud.  And I learned a lot about different financial fraud

16    cases.  And I think after reading it, I just came to the

17    opinion that people sometimes are very greedy.  And when I hear

18    the case and the charges brought, I already have, like, some

19    opinions formed, bias towards one side.

20         THE COURT:  All right.  And you don't -- do you

21    think you could set aside those and follow my instructions,

22    that you'd listen to all the evidence before you make up your

23    mind, or have you already made up your mind?

24         PROSPECTIVE JUROR DUONG:  I kind of already made up

25    my mind.
```

**UNITED STATES DISTRICT COURT**

1             THE COURT:  Even before you've heard any evidence?

2             PROSPECTIVE JUROR DUONG:  I think for someone to be

3  charged with money laundering, there must have been some sort

4  of evidence.  It doesn't just pop up in thin air.

10:41AM   5             THE COURT:  So you don't -- you don't agree with the

6  presumption of innocence that applies to everyone?  You think

7  if someone is charged with the crime, they're presumed to be

8  guilty if it's wire fraud?

9             PROSPECTIVE JUROR DUONG:  I understand the law.

10:41AM  10  We're supposed to presume they're innocent, but I do have my

11  opinions.

12             THE COURT:  But you wouldn't do that?

13             PROSPECTIVE JUROR DUONG:  I can try, but I do have

14  my opinions.

10:41AM  15             THE COURT:  All right.  Thank you.  You can be

16  seated.

17             PROSPECTIVE JUROR DUONG:  Okay.  Thank you.

18              (At sidebar:)

19             MR. FEE:  Me?  Okay.  Your Honor, I would ask the

10:41AM  20  juror be struck.

21             MR. PI:  Stipulated.

22             THE COURT:  I'm not going to tell her right now just

23  in case she's trying for that, but you don't have to ask any

24  questions of her.

10:41AM  25            Oh, I'm sorry.  Counsel, while you're up here.  I'm

1    about done, except for getting the personal information.  Any

2    other questions you want me to ask the panel as a whole?

3                MR. PI:  So far from the Government, no.

4                MR. FEE:  No.  We have one follow-up for one of the

10:42AM   5    particular jurors.

6                THE COURT:  Who is that?

7                MR. FEE:  It's just Mr. -- I think it's -- sorry, I

8    only know his first name, 31, Stephane.

9                THE COURT:  31.

10:42AM   10               MR. FEE:  Yeah.  I think it's just the normal

11    follow-up --

12               MR. PI:  Mr. Wandel.

13               MR. FEE:  Thank you.  Mr. Wandel.

14               He said something to the effect of he believes

10:42AM   15    contracts are important and should be followed.  The Court did

16    not follow up with its usual --

17               THE COURT:  Yeah.  You want me to ask -- no, I've

18    already asked him in particular if he'll follow the law, even

19    if it's different from what he thinks he knows from his work.

10:42AM   20               What other follow-up do you want?

21               MR. FEE:  He -- he -- I think subsequent to that

22    question, Your Honor, he did bring up the point about

23    contracts.  I'm just not quite sure exactly what he meant.

24    Perhaps the question is if there was a question about an

10:42AM   25    interpretation of contract and the Government was taking one

```
 1    side or the other, would it affect your ability to be fair and

 2    impartial to the evidence.

 3              THE COURT:  I'll ask --

 4              MR. FEE:  I didn't do that well, Your Honor, but --

 5              THE COURT:  I got the gist.

 6              MR. FEE:  Okay.  Thank you.

 7                   (In the presence of the prospective jurors:)

 8              THE COURT:  All right.  Starting with Ms. Hirway,

 9    I'm going to ask you to answer the questions on that sheet.

10              Oh, we're going to pass the microphone to you.  I'm

11    sorry.

12              PROSPECTIVE JUROR HIRWAY:  My name is

13    Lindsey Hirway.  I am a fashion designer with a Bachelor of

14    Fine Arts from the Maryland Institute College of Art.  I live

15    in Los Angeles with my husband.  My husband is a musician and

16    podcaster.  He has a music podcast.  I don't have any children.

17    And I have never had experience serving on a trial jury or

18    grand jury.  In terms of newspapers, I read *The New York Times*

19    and sometimes *The Washington Post*.

20              THE COURT:  Any other sources for news?

21              PROSPECTIVE JUROR HIRWAY:  Um --

22              THE COURT:  Or any other magazines that --

23    publications that you read regularly?

24              PROSPECTIVE JUROR HIRWAY:  No, not regularly.

25              THE COURT:  All right.  Is there any reason that you
```

         1    could not serve as a fair and impartial juror on a trial of

         2    this length?

         3              PROSPECTIVE JUROR HIRWAY:  No.

         4              THE COURT:  Thank you.

10:45AM  5              All right.  Juror No. 2, Mr. -- is it Daboul?

         6              PROSPECTIVE JUROR DABOUL:  Colby Daboul.  I'm a

         7    media supervisor, Davis Elen Advertising.  I have a bachelor's

         8    degree from Ithaca College.  I live in Los Angeles.  I am

         9    single, but I live with my girlfriend.  She's an architect.

10:45AM 10    Um, do not have any experience in a trial.  And I can't say I

        11    read much newspapers, magazines, or other publications.

        12              THE COURT:  All right.  Can you tell me a little bit

        13    more about what you do for a living?

        14              PROSPECTIVE JUROR DABOUL:  Yeah.  I work at an

10:45AM 15    advertising agency on the media side for McDonald's.

        16              THE COURT:  All right.  Thank you.

        17              PROSPECTIVE JUROR DABOUL:  Yep.

        18              THE COURT:  Any reason why you could not serve as a

        19    fair and impartial juror on a trial of this length?

10:45AM 20              PROSPECTIVE JUROR DABOUL:  No.

        21              THE COURT:  Thank you.

        22              All right.  Juror No. 3, Mr. Webb.

        23              PROSPECTIVE JUROR WEBB:  Jason Webb.  Um, I'm an

        24    editor at Apple.  I have a Bachelor of Science from

10:46AM 25    UMass Amherst.  I live in La Crescenta with my partner who's

|       |                                                                   |
|-------|-------------------------------------------------------------------|
| 1     | the mother of my daughter.  I have just one child.  I have         |
| 2     | never served on a jury.  And I'd say *New York Times*,             |
| 3     | *Washington Post*, some of the publications that I read.           |
| 4     | THE COURT:  How old is your daughter?                              |
| 5     | PROSPECTIVE JUROR WEBB:  10.                                       |
| 6     | THE COURT:  All right.  So she doesn't have an                     |
| 7     | occupation yet.                                                    |
| 8     | PROSPECTIVE JUROR WEBB:  No.                                       |
| 9     | THE COURT:  Okay.  Thank you.                                      |
| 10    | Any reason why you could not serve on a trial of                  |
| 11    | this length?                                                       |
| 12    | PROSPECTIVE JUROR WEBB:  No.                                       |
| 13    | THE COURT:  Thank you.                                             |
| 14    | All right.  Ms. Kumar?                                             |
| 15    | PROSPECTIVE JUROR KUMAR:  Okay.  My name is                        |
| 16    | Vatsala Kumar.  I'm a physician, a cardiologist.  I live in        |
| 17    | Los Angeles.  Married to an attorney.  I have three children.      |
| 18    | The first one was an ex-federal defense, panel attorney, the      |
| 19    | second is a physician, and the third is in law school.  I've      |
| 20    | not served on a federal jury, but I have served L.A. County.       |
| 21    | THE COURT:  How many times?                                        |
| 22    | PROSPECTIVE JUROR KUMAR:  Once.                                    |
| 23    | THE COURT:  What kind of a case was it?                            |
| 24    | PROSPECTIVE JUROR KUMAR:  It was theft, robbery.                   |
| 25    | THE COURT:  All right.  And without telling me the                |

Timestamps in left margin: 10:46AM (line 5), 10:46AM (line 10), 10:46AM (line 15), 10:47AM (line 20), 10:47AM (line 25).

|       |    |                                                            |
| ----- | -- | ---------------------------------------------------------- |
|       | 1  | verdict, did the jury reach a verdict?                     |
|       | 2  | PROSPECTIVE JUROR KUMAR:  No.                              |
|       | 3  | THE COURT:  Was the jury a hung jury?                      |
|       | 4  | PROSPECTIVE JUROR KUMAR:  Hung jury, yes.                  |
| 10:47AM | 5 | THE COURT:  All right.  And were you the foreperson       |
|       | 6  | of the jury?                                               |
|       | 7  | PROSPECTIVE JUROR KUMAR:  No.                              |
|       | 8  | THE COURT:  All right.  Anything about that prior          |
|       | 9  | experience serving on a jury that makes you reluctant to serve |
| 10:47AM | 10 | again?                                                    |
|       | 11 | PROSPECTIVE JUROR KUMAR:  No.                              |
|       | 12 | THE COURT:  All right.  And you're a -- you're in          |
|       | 13 | private practice as a cardiologist?                        |
|       | 14 | PROSPECTIVE JUROR KUMAR:  I'm with Kaiser, Kaiser          |
| 10:47AM | 15 | cardiologist.                                            |
|       | 16 | THE COURT:  Any reason why you could not serve as a        |
|       | 17 | juror on a trial of this length?                           |
|       | 18 | PROSPECTIVE JUROR KUMAR:  I have to get back to work       |
|       | 19 | on Thursday next week.                                     |
| 10:48AM | 20 | THE COURT:  Thursday of next week?                        |
|       | 21 | PROSPECTIVE JUROR KUMAR:  Yeah.                            |
|       | 22 | THE COURT:  That won't be a problem.                       |
|       | 23 | PROSPECTIVE JUROR KUMAR:  Okay.                            |
|       | 24 | THE COURT:  I can promise you that.  All right.            |
| 10:48AM | 25 | PROSPECTIVE JUROR KUMAR:  And newspapers,                 |

1    *L.A. Times*, *Wall Street*, and medical publications.

2              THE COURT:  All right.  Thank you.

3              Mr. Galindo.

4              PROSPECTIVE JUROR GALINDO:  Yes.  My name is

10:48AM  5    Carlos Galindo.  And my occupation, um, I work in customer

6    service at Dodger Stadium.  And I graduated from a two-year

7    community college.  And I'm single.  No children.  And I take

8    care of my parents at home, mostly my father.  I take him for

9    his appointments.  Both of my parents are elderly.

10:48AM  10             THE COURT:  And so they live with you?

11             PROSPECTIVE JUROR GALINDO:  Yes.

12             THE COURT:  Thank you.

13             PROSPECTIVE JUROR GALINDO:  And when it comes to

14   magazines, I don't do any reading, most of my information is

10:48AM  15   from Instagram, Facebook, and the -- and the TV.

16             THE COURT:  All right.  I'm sorry.  Did you -- are

17   you married?

18             PROSPECTIVE JUROR GALINDO:  No.

19             THE COURT:  All right.  And what did your parents do

10:49AM  20   before they retired?

21             PROSPECTIVE JUROR GALINDO:  My father did some

22   landscaping.

23             THE COURT:  Uh-huh.

24             PROSPECTIVE JUROR GALINDO:  And my mother is -- she

10:49AM  25   was a certified nurse's assistant.  And she's a caregiver.

1            THE COURT:  Oh, so she's still working.

2            PROSPECTIVE JUROR GALINDO:  She's retired, but

3    that's what she did.  She worked privately.

4            THE COURT:  And what do you do at Dodgers Stadium?

10:49AM  5            PROSPECTIVE JUROR GALINDO:  I'm a ticket taker.

6    It's all machines now, but that's what I've been doing.

7            THE COURT:  You're still involved.  All right.

8    Interesting.  Thank you.

9            Any reason why you could not serve as a juror on a

10:49AM  10   case that lasts about a week?

11           PROSPECTIVE JUROR GALINDO:  Um, sometimes it's hard

12   for me to retain a bunch of information that's been given to me

13   all at once.

14           THE COURT:  All right.  Can I talk to you privately

10:49AM  15   at the sidebar?  And counsel.

16                (At sidebar in the presence of

17                 Prospective Juror Galindo:)

18           THE COURT:  Since we're up here, does your client

19   waive presence at the sidebar?

10:50AM  20           MR. FEE:  Yes, Your Honor.

21           THE COURT:  Thank you.

22           Hi.  You said that you attended college.

23           PROSPECTIVE JUROR GALINDO:  Yeah.

24           THE COURT:  What did you study?

10:50AM  25           PROSPECTIVE JUROR GALINDO:  Computer applications.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  All right.

2          PROSPECTIVE JUROR GALINDO:  Under business,

3    Citrus College.

4          THE COURT:  All right.  Can you -- have you ever

10:50AM  5    been diagnosed with dyslexia or any learning disability?

6          PROSPECTIVE JUROR GALINDO:  No.  Well, when I was a

7    child, I had a learning disability.  So I was in special ed up

8    to -- like, by the time I was in sixth grade, I started being

9    in regular classes, but I was still some special ed.

10:51AM  10          THE COURT:  Okay.  You graduated from high school?

11          PROSPECTIVE JUROR GALINDO:  Yes.

12          THE COURT:  And you went to college?

13          PROSPECTIVE JUROR GALINDO:  Yes.

14          THE COURT:  So tell me a little more about your

10:51AM  15    feelings that you would have a hard time retaining information?

16          PROSPECTIVE JUROR GALINDO:  Yeah.  At times, if I

17    get lots of -- it's hard for me to remember people's names --

18    well, it will probably take me a while.  So if you present

19    information, I might not --

10:51AM  20          THE COURT:  Get it the first time?

21          PROSPECTIVE JUROR GALINDO:  Yeah.

22          THE COURT:  I see.

23          PROSPECTIVE JUROR GALINDO:  Uh-huh.

24          THE COURT:  All right.  Thank you.

10:51AM  25          You can have a seat.

| | |
|---|---|
| 1 | (At sidebar:) |
| 2 | THE COURT:  Counsel want to stipulate as to this |
| 3 | juror? |
| 4 | MR. FEE:  Yes, Your Honor. |
| 5 | MR. PI:  The Government does too. |
| 6 | THE COURT:  Okay.  Thank you. |
| 7 | (In the presence of the prospective jurors:) |
| 8 | THE COURT:  All right.  Juror No. 6, Ms. Tabirara. |
| 9 | PROSPECTIVE JUROR TABIRARA:  Yes.  My name is |
| 10 | Christina Tabirara.  I'm retired.  I used to work for the City |
| 11 | of L.A. as a principal accountant.  My educational background, |
| 12 | I have a bachelor's, major in accounting.  I live in Torrance, |
| 13 | California.  I'm married.  My husband is a civil engineer.  I |
| 14 | have two children.  My eldest daughter is a pharmacist, and my |
| 15 | son is a -- in between jobs/photographer. |
| 16 | THE COURT:  Is he a freelancer? |
| 17 | PROSPECTIVE JUROR TABIRARA:  Currently, he's working |
| 18 | with a clothing company. |
| 19 | THE COURT:  All right. |
| 20 | PROSPECTIVE JUROR TABIRARA:  Experience as serving |
| 21 | on a jury, on a trial jury, yeah, I did before. |
| 22 | THE COURT:  How many times? |
| 23 | PROSPECTIVE JUROR TABIRARA:  Once.  At the |
| 24 | L.A. County. |
| 25 | THE COURT:  All right.  And what was that case |

Timestamps in left margin: 10:51AM (line 5), 10:52AM (line 10), 10:52AM (line 15), 10:52AM (line 20), 10:52AM (line 25)

1    about?

2    PROSPECTIVE JUROR TABIRARA:  It's criminal, murder.

3    THE COURT:  All right.

4    PROSPECTIVE JUROR TABIRARA:  Murder case.

10:53AM    5    THE COURT:  How long ago was that?

6    PROSPECTIVE JUROR TABIRARA:  Maybe 25-plus years.

7    THE COURT:  All right.  Well, if you remember -- and

8    please don't tell me what the verdict was, but did that jury

9    reach a verdict?

10:53AM    10    PROSPECTIVE JUROR TABIRARA:  Yes.

11    THE COURT:  And were you the foreperson of the jury?

12    PROSPECTIVE JUROR TABIRARA:  No.

13    THE COURT:  All right.  Are there any other adults

14    that live in your household?

10:53AM    15    PROSPECTIVE JUROR TABIRARA:  Just my husband and my

16    son.

17    THE COURT:  All right.

18    PROSPECTIVE JUROR TABIRARA:  And me.

19    THE COURT:  All right.

10:53AM    20    PROSPECTIVE JUROR TABIRARA:  And newspaper, uh,

21    *L.A. Times* and our local newspaper, *Daily Breeze*.

22    THE COURT:  All right.  Thank you.

23    Any reason why you could not sit as a juror on a

24    trial of this length?

10:53AM    25    PROSPECTIVE JUROR TABIRARA:  Not that I can think

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | of, Your Honor. |
| 2 | THE COURT:  All right.  Thank you very much. |
| 3 | Ms. -- Ms. -- |
| 4 | PROSPECTIVE JUROR DAYRIT:  Dayrit. |
| 10:53AM  5 | THE COURT:  Dayrit, thank you. |
| 6 | PROSPECTIVE JUROR DAYRIT:  My name is Lenny Dayrit. |
| 7 | I'm a retired dentist.  I live in Rolling Hills Estates, |
| 8 | California.  I am married to a physician, semi-retired, who |
| 9 | works at the County.  I have one daughter.  She lives in my |
| 10:54AM  10 | house.  She's 30 years old.  And she finished business. |
| 11 | THE COURT:  I'm sorry.  She does what? |
| 12 | PROSPECTIVE JUROR DAYRIT:  Finished business |
| 13 | administration. |
| 14 | THE COURT:  Oh.  All right. |
| 10:54AM  15 | And what kind of work does she do? |
| 16 | PROSPECTIVE JUROR DAYRIT:  Marketing. |
| 17 | THE COURT:  All right.  Thank you. |
| 18 | PROSPECTIVE JUROR DAYRIT:  My mother lives in my |
| 19 | house also.  She's 86 years old.  I don't have any experience. |
| 10:54AM  20 | This is my first time.  As far as reading magazines, I don't |
| 21 | have any favorite in particular, whatever I have in there is -- |
| 22 | THE COURT:  All right.  Your mother, I take it she's |
| 23 | retired? |
| 24 | PROSPECTIVE JUROR DAYRIT:  She lives in my house, |
| 10:54AM  25 | yes. |

1       THE COURT:  Yes.  And did she work outside the home?

2       PROSPECTIVE JUROR DAYRIT:  Yes, back home, but not

3   here.

4       THE COURT:  All right.  And what did she do?

10:55AM   5       PROSPECTIVE JUROR DAYRIT:  Business.

6       THE COURT:  Oh, all right.  And can you serve as a

7   fair and impartial juror on a trial of this length?

8       PROSPECTIVE JUROR DAYRIT:  I don't think I can

9   finish the whole -- the whole week, Your Honor.  I have -- I

10:55AM  10  have a religious obligation every Wednesday.  I can serve the

11  rest of the week except for Wednesday and Sunday.

12      THE COURT:  All right.  What hours on Wednesday?

13      PROSPECTIVE JUROR DAYRIT:  On Wednesdays, I have to

14  be -- I'm a deacon and a finance officer in the congregation.

10:55AM  15  We have to be in the congregation in Torrance at 5:00 o'clock.

16      THE COURT:  All right.  So you have to be in

17  Torrance by 5:00 o'clock on Wednesday?

18      PROSPECTIVE JUROR DAYRIT:  Wednesdays only.

19      THE COURT:  If we can accommodate that, then,

10:55AM  20  otherwise, you can serve?

21      PROSPECTIVE JUROR DAYRIT:  The rest of the week,

22  yes.  Yes, Your Honor.

23      THE COURT:  So we'd have to finish up a little early

24  on Wednesday so you could get --

10:56AM  25      PROSPECTIVE JUROR DAYRIT:  If that could be done, I

**UNITED STATES DISTRICT COURT**

```
 1    would appreciate that.

 2              THE COURT:  All right.  Thank you.

 3              And, Mr. Ha?

 4              PROSPECTIVE JUROR HA:  My name is Alan Ha.  I'm

 5    currently unemployed, but -- recently unemployed.  And I

 6    graduated from UCLA with statistics.  I live in

 7    Rowland Heights.  I'm not married.  I live with my parents, and

 8    they're in real estate.  I have no experience serving in a

 9    trial jury.  And I don't read many newspapers.

10              THE COURT:  All right.  What was your last job?

11              PROSPECTIVE JUROR HA:  Property management.

12              THE COURT:  Okay.  And can you serve as a juror on a

13    trial of this length?

14              PROSPECTIVE JUROR HA:  I can.

15              THE COURT:  Thank you.

16              If you can pass the microphone down to Ms. Lau.

17              PROSPECTIVE JUROR LAU:  My name Esther Lau.  And my

18    occupation a long time ago was biochemistry.  And educational

19    background is master of science in biochemistry.  I live in

20    Moorpark and married.  And spouse was also in research,

21    biochemistry.  And one child, 45 years old.  And occupation is

22    engineer.  And, yeah, no one else living in the household.  You

23    know, no occupations, except my husband, retired.  And never

24    served on a trial jury.  And I do read, like, *Bloomberg* and

25    *TIME Magazine* and listen to NPR and watch CNN and NBC.
```

1          THE COURT:  All right.  Is there any reason why you

2  could not serve on a trial of this length?

3          PROSPECTIVE JUROR LAU:  No.

4          THE COURT:  All right.  Thank you very much.

10:58AM  5          Ms. -- is it Sampaio-Forman?

6          PROSPECTIVE JUROR SAMPAIO-FORMAN:  Sampaio-Forman,

7  yeah.  Christina.

8          THE COURT:  Thank you.

9          PROSPECTIVE JUROR SAMPAIO-FORMAN:  I work in

10:58AM  10  executive search for the entertainment industry.  I'm a VP of

11  executive search.  I have a bachelor's degree from UCLA.  I

12  live in Porter Ranch.  I'm married.  My husband is a television

13  producer.  I have two children, age 14 and 17.  I have no

14  other -- no other adults in my house.  I have served on a jury.

10:58AM  15          THE COURT:  All right.  Was that in the state court?

16          PROSPECTIVE JUROR SAMPAIO-FORMAN:  In Beverly Hills.

17          THE COURT:  All right.  What kind of a case was it?

18          PROSPECTIVE JUROR SAMPAIO-FORMAN:  Drunk driving.

19          THE COURT:  Did the jury reach a verdict?

10:58AM  20          PROSPECTIVE JUROR SAMPAIO-FORMAN:  It was a hung

21  jury.

22          THE COURT:  It was.  All right.

23          Were you the foreperson?

24          PROSPECTIVE JUROR SAMPAIO-FORMAN:  I was.

10:59AM  25          THE COURT:  Anything about that experience that

|    | 1 | makes you reluctant to do jury duty again? |

```
 1   makes you reluctant to do jury duty again?

 2              PROSPECTIVE JUROR SAMPAIO-FORMAN:  No.

 3              THE COURT:  All right.  Thank you.

 4              PROSPECTIVE JUROR SAMPAIO-FORMAN:  Um, and in terms

 5   of newspapers, I read New York Times, I listen to NPR, I read

 6   trade magazines, like Variety and Hollywood Reporter.  That's

 7   probably the main ones.

 8              THE COURT:  Any reason why you could not sit as a

 9   juror on a case of this length?

10              PROSPECTIVE JUROR SAMPAIO-FORMAN:  No.

11              THE COURT:  Thank you.

12              Mr. Abrego.

13              PROSPECTIVE JUROR ABREGO:  Yeah.  My name is

14   Juan Abrego.  I'm a sales representative for an ice cream

15   company.  I finished 11th grade.  I live in Los Angeles.

16   Married.  Two kids; one 38, one 33.  The girl is working for

17   the school, L.A. school district, and my boy working for

18   American Airlines.

19              THE COURT:  And does your wife work?

20              PROSPECTIVE JUROR ABREGO:  No.  She's at home.

21              THE COURT:  All right.

22              PROSPECTIVE JUROR ABREGO:  My mother living with me

23   too.  She's retired.  No experience with a trial.  And I don't

24   like to read.  I just watch TV.

25              THE COURT:  Okay.  Your mother, did she work before
```

Timestamps in left margin: 10:59AM (lines 5, 10, 15), 11:00AM (lines 20, 25)

UNITED STATES DISTRICT COURT

```
 1    she retired?

 2              PROSPECTIVE JUROR ABREGO:  Yes.  She was a

 3    housemaid.

 4              THE COURT:  All right.  Thank you.

 5              What kind of an ice cream company do you --

 6              PROSPECTIVE JUROR ABREGO:  Blue Bunny.

 7              THE COURT:  Oh.  Blue Bunny.

 8              All right.  Is there any reason why you could not

 9    serve as a juror on a trial of this length?

10              PROSPECTIVE JUROR ABREGO:  No.

11              THE COURT:  All right.  Thank you very much.

12              Mr. Castro.

13              PROSPECTIVE JUROR CASTRO:  Yes.  My name is

14    Dennis Castro.  I work at a company called Meissner in

15    Camarillo where they do medical and water filters.  I work in

16    the warehouse department, and I drive forklift.  I finished

17    high school.  I live in Oxnard, California.  I live at home

18    with my parents, my brother, my fiancée, and my three kids.  I

19    have a 4-year-old, a year and nine months, and an eight-month

20    old baby.  My wife's a stay-at-home wife, fiancée.  And my mom

21    works at a restaurant, my dad does landscaping, and my brother

22    also works with me at the company I work for.  I have never

23    served in any trials.  And newspapers, I don't really like

24    reading at all.  So the only thing I sometimes see news is on

25    television.
```

11:00AM (line 5)
11:00AM (line 10)
11:00AM (line 15)
11:01AM (line 20)
11:01AM (line 25)

THE COURT:  All right.  And are you able to serve as a juror on a trial of this length?

PROSPECTIVE JUROR CASTRO:  It's -- it's a little hard because my 4-year-old just started school.  And then we have my eight-month baby that my wife takes care of and my other daughter, but I hope I can -- I'm going to try my best.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR CERVANTES:  My name --

THE COURT:  Is it Cervantes?

PROSPECTIVE JUROR CERVANTES:  Cervantes.

THE COURT:  Cervantes.

PROSPECTIVE JUROR CERVANTES:  My name is Pedro Cervantes.  I'm a truck driver.  I live out in Lancaster. I'm married with four kids, the oldest one being 18.  So this will be her last year in school -- or high school.  Um, and my wife is a stay-at-home mom.  I don't read.  I get my news from the radio stations.  I was on a jury before, it was hung.

THE COURT:  What sort of a case was it?

PROSPECTIVE JUROR CERVANTES:  It was a DUI.

THE COURT:  All right.  Anything about that experience that makes you reluctant to serve again as a juror?

PROSPECTIVE JUROR CERVANTES:  Um, I don't really like the feeling of either saying that the person is innocent or guilty because it's -- it's kind of a hard decision to make.

THE COURT:  Uh-huh.  Do you think you would --

|  | 1 | you've heard me describe what the job of a juror is and you've |
|---|---|---|

1    you've heard me describe what the job of a juror is and you've

2    been a juror.

3         PROSPECTIVE JUROR CERVANTES:  Right.

4         THE COURT:  Do you think you could carry that out in

11:03AM    5    this case?

6         PROSPECTIVE JUROR CERVANTES:  I think I can.

7         THE COURT:  All right.  And could you sit on a jury

8    of this length, on a trial of this length?

9         PROSPECTIVE JUROR CERVANTES:  I texted my HR

11:03AM    10    department because I'm not sure if the company that I work for

11    pays for it.  So I'm waiting for them to get back to me.

12         THE COURT:  All right.  You'll let me know as soon

13    as you hear?

14         PROSPECTIVE JUROR CERVANTES:  Yeah.

11:03AM    15         THE COURT:  All right.  Thank you.

16         Maybe -- we're going to take a break pretty soon,

17    maybe you can check with them again and see what you know.

18         Thank you.

19         All right.  Mr. Stein.

11:04AM    20         PROSPECTIVE JUROR STEIN:  Good morning, Your Honor.

21    My name is Paul Stein.  I'm a retired firefighter.  I have a

22    bachelor's degree in management.  I also have a -- a public --

23    a public training company, public safety consultants where I do

24    leadership training and I also do a lot of expert -- expert

11:04AM    25    witness information.

**UNITED STATES DISTRICT COURT**

THE COURT:  Have you testified as an expert witness at a trial?

PROSPECTIVE JUROR STEIN:  Yes.

THE COURT:  How many times?

PROSPECTIVE JUROR STEIN:  Twice.

THE COURT:  What sort of cases were they?

PROSPECTIVE JUROR STEIN:  One was a fatality caused by a fire truck.  And the other one was a labor incident where a firefighter was terminated.  And I was on the plaintiff's side.

THE COURT:  All right.  And the first time, were you on the plaintiff's side or the defense side?

PROSPECTIVE JUROR STEIN:  I was on the defense side.

THE COURT:  All right.  When was the last time you testified?

PROSPECTIVE JUROR STEIN:  Just prior to COVID, probably about eight years ago.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR STEIN:  I live in Newbury Park. I'm married.  I have my -- my wife is retired also.  She was a travel agent.  I have two sons.  One is 57 and the other one is 54 and both retired.  My youngest son retired from the fire department in Encinitas.  He was the fire chief there.  I have no other adults --

THE COURT:  And the other son's occupation?

1          PROSPECTIVE JUROR STEIN:  He -- he worked -- we had

2     a -- my youngest son and I had a coin laundry in San Diego, and

3     he was the manager of that.

4          THE COURT:  All right.  Thank you.

11:05AM    5          PROSPECTIVE JUROR STEIN:  And I don't have any other

6     occupants that live in my house, other than one of my

7     granddaughters thinks she lives there.  And I have six

8     grandkids and eight great-grandkids.  And we talked about my

9     experience in trial.  And I don't really read too many

11:06AM   10    newspapers or magazines.

11          THE COURT:  Have you ever been a juror?

12          PROSPECTIVE JUROR STEIN:  I've been a juror twice.

13          THE COURT:  All right.  The first time, what sort of

14    a case was it?

11:06AM   15          PROSPECTIVE JUROR STEIN:  First time was a rape

16    case, and I was -- I was the foreman.

17          THE COURT:  Okay.  Don't tell me what the verdict

18    was.

19          Did the jury reach a verdict?

11:06AM   20          PROSPECTIVE JUROR STEIN:  Yes.

21          THE COURT:  And the second case?

22          PROSPECTIVE JUROR STEIN:  The second case was a case

23    that involved an accident.

24          THE COURT:  Motor vehicle accident?

11:06AM   25          PROSPECTIVE JUROR STEIN:  Motor vehicle accident,

**UNITED STATES DISTRICT COURT**

```
 1   yeah.
 2              THE COURT:  And did the jury reach a verdict?
 3              PROSPECTIVE JUROR STEIN:  Yes.
 4              THE COURT:  And were you the foreperson?
 5              PROSPECTIVE JUROR STEIN:  No.
 6              THE COURT:  All right.  Now, the granddaughter that
 7   thinks that she lives with you, can you tell me, is she a
 8   student?
 9              PROSPECTIVE JUROR STEIN:  Well, she lives in
10   San Diego, but she goes to Cal Lutheran University, which is
11   real close to where my wife and I live.  So she spends a lot of
12   time in our house.
13              THE COURT:  What is she studying?
14              PROSPECTIVE JUROR STEIN:  She's -- she's dual major,
15   she has psychology and she wants to be a teacher.
16              THE COURT:  All right.  Thank you.
17              And did you tell me -- what do you -- what
18   newspapers or news sources do you --
19              PROSPECTIVE JUROR STEIN:  I don't really read any of
20   them.  I watch the news on TV, obviously.  And I'll read the
21   AARP® magazine every once in a while.
22              THE COURT:  All right.  Was that the art magazine?
23              PROSPECTIVE JUROR STEIN:  AARP®.
24              THE COURT:  Oh, AARP®.
25              PROSPECTIVE JUROR STEIN:  Old people.
```

11:06AM (line 5)
11:06AM (line 10)
11:07AM (line 15)
11:07AM (line 20)
11:07AM (line 25)

|  | 1 | THE COURT:  Careful.  It's sensitive to me right |

          1          THE COURT:  Careful.  It's sensitive to me right
          2    now.  Young people.
          3          PROSPECTIVE JUROR STEIN:  Yeah.
          4          THE COURT:  Young and old people.
11:07AM   5          All right.  Any reason why you couldn't serve on a
          6    trial of this length?
          7          PROSPECTIVE JUROR STEIN:  No, ma'am.
          8          THE COURT:  All right.  Thank you, sir.
          9          Ms. Pilart?
11:07AM  10          PROSPECTIVE JUROR PILART:  Yes.  My name is
         11    Talita Pilart.  I am a middle school office supervisor, and I
         12    am currently in school.  My second -- well, the spring semester
         13    starts on Monday.  I'm enrolled full-time, and I take classes
         14    asynchronously.  I live in Long Beach.  I am not married.  I
11:08AM  15    live alone.  My dog lives with me.  I have one child.  He is an
         16    engineer.  Um, I have served on a jury, but it was -- the case
         17    had to be restarted because the defendant in the case, he was
         18    representing himself and then he decided to get a lawyer.
         19          THE COURT:  All right.  So the case didn't go to the
11:08AM  20    jury?  You didn't decide the case?
         21          PROSPECTIVE JUROR PILART:  Yeah.
         22          THE COURT:  Right.
         23          PROSPECTIVE JUROR PILART:  And I read online news
         24    articles.  And I listen to podcasts and news on TV.
11:08AM  25          THE COURT:  Any -- so you have classes starting on

UNITED STATES DISTRICT COURT

```
 1    Monday?

 2                PROSPECTIVE JUROR PILART:  Yes.

 3                THE COURT:  Any reason other than that why you

 4    couldn't serve on a jury -- trial of this length?

 5                PROSPECTIVE JUROR PILART:  Just that.  It would be

 6    very hard because, um, I started school in the fall, full-time,

 7    and I work full-time and it -- I barely got sleep.

 8                THE COURT:  All right.  Thank you.

 9                All right.  Mr. -- is it Burau?

10                PROSPECTIVE JUROR BURAU:  Burau.

11                THE COURT:  Burau.

12                PROSPECTIVE JUROR BURAU:  My name is Chris Burau.  I

13    am a mechanical engineer for Raytheon.  I have a bachelor's of

14    science in industrial technology.  I live in Ventura.  I'm

15    married.  And my wife is a controller in the accounting

16    department for a construction company in Oxnard.  We have no

17    children.  There's no one else living in our house.  I have

18    never served as a juror on any trial before.  And I mostly get

19    my news online from LATimes.com, VenturaStar.com because I'm

20    from that area of Ventura County, and other online sources like

21    MSN and Yahoo!

22                THE COURT:  All right.  And any reason why you

23    couldn't serve on a trial of this length?

24                PROSPECTIVE JUROR BURAU:  No.  I think Raytheon

25    gives us ten days.
```

**UNITED STATES DISTRICT COURT**

|  |  |  |
|---|---|---|
|  | 1 | THE COURT:  All right. |
|  | 2 | PROSPECTIVE JUROR BURAU:  So it's okay. |
|  | 3 | THE COURT:  All right. |
|  | 4 | PROSPECTIVE JUROR BURAU:  It's okay. |
| 11:10AM | 5 | THE COURT:  All right.  Thank you. |

6    All right.  Ladies and gentlemen, we're going to

7  take a recess so you can stand up and stretch.

8    We'll be in recess for 15 minutes.  That makes it

9  11:25 by the courtroom clock.

11:10AM  10    Please leave the sheets on the chairs behind you.

11  And before you go, remember, you haven't been seated as a juror

12  yet, but you cannot discuss anything about the case with

13  anyone.  Everybody understand that?

14    THE PROSPECTIVE JURORS:  (Collectively) Yes.

11:11AM  15    THE COURT:  Don't do any research about the case,

16  don't go online, nothing.

17    All right.  Thank you.  You're excused.

18      (Out of the presence of the prospective jurors:)

19    THE COURT:  All right.  We're on the record outside

11:12AM  20  the presence of the panel.

21    I will ask the follow-up questions when -- of that

22  juror that we discussed at sidebar when I get to him with his

23  personal information.

24    And counsel have stipulated that we'll excuse

11:12AM  25  Mr. Galindo.  So Mr. Tamayo will tell him he doesn't need to

come back with the rest of the jurors.

I don't know if you had any thoughts about the young woman who came up to sidebar who had been a rape victim. Do counsel want to -- I'd entertain a stipulation, but I'm not necessarily inviting one. I just wondered if you had thoughts about it.

MR. PI: The Government is fine with her serving on the jury, but we -- if the defense wishes to stipulate, we won't stand in their way.

MR. FEE: May we have one moment, Your Honor?

THE COURT: Certainly.

(Off-the-record discussion between counsel.)

MR. FEE: Your Honor, we don't really have an application for -- it seems like it's obviously emotional for her to be in this process with law enforcement. So it might just be a mercy to let her go, but I don't think I can think of a for-cause beyond that.

THE COURT: All right. Then I think we'll just keep her. I think she was emotional about telling us about the circumstances, but I think she was very sincere about thinking that she wouldn't have a problem serving.

Then I would suggest that we excuse for cause Mr. -- for financial hardship -- or a hardship, Juror No. 12, Mr. Castro. That's the man with the three little kids who lives up in -- I think he lives in Oxnard or Ventura.

UNITED STATES DISTRICT COURT

1          MR. PI:  Government stipulates -- would stipulate to

2    that.

3          MR. FEE:  Agreed, Your Honor.

4          THE COURT:  All right.  Thank you.  We'll let him

11:14AM   5    know.

6          Does either side at this point have any other

7    challenges to any of the jurors so far?

8          MR. PI:  No, Your Honor.  For cause; right?

9          THE COURT:  Right.

11:14AM  10          MR. PI:  Right.  So I thought we had talked about

11    Juror 39 for cause.  That was the -- the one who had --

12          THE COURT:  Oh, yes, Ms. Duong.  I'm going to but

13    not yet.

14          MR. PI:  Okay.

11:14AM  15          THE COURT:  I don't want her to think that she came

16    up with a good excuse.

17          MR. PI:  Understood.  Thank you.

18          That's it from the Government.

19          THE COURT:  All right.

11:14AM  20          MR. PI:  For now.

21          MR. FEE:  I'm sorry, Your Honor.  Mr. Castro was the

22    gentleman who had the three kids --

23          THE COURT:  Who said it would be difficult for him

24    to serve.

11:14AM  25          MR. FEE:  That's right.  That was my only follow-up

UNITED STATES DISTRICT COURT

1   question, I believe, Your Honor.

2          THE COURT:  All right.  So we're going to excuse

3   him.

4          MR. FEE:  I'm sorry, Your Honor.  One moment.

5             (Off-the-record discussion between counsel.)

6          MR. FEE:  You know, Your Honor, the only other one

7   that I would be concerned about, a similar concern with respect

8   to Mr. Castro, is the -- the young lady who said she was in

9   school and can --

10          THE COURT:  Oh, that's right.  I wanted to bring

11   that up -- I think as a mercy, we should --

12          MR. FEE:  Agreed, Your Honor.

13          THE COURT:  Because I think it's unlikely we'll be

14   done altogether by Monday.

15          MR. FEE:  There's a fair chance, Your Honor.

16          MR. PI:  Yes.  Number 15.  Right?

17          THE COURT:  Right.  Number -- Ms. Pilart.  Any

18   objection?

19          MR. PI:  That's fine with us as well, Your Honor.

20          THE COURT:  It looks like we're going to have plenty

21   of jurors.

22          All right.  So, then, Mr. Tamayo will let

23   Mr. Galindo, Mr. Castro, and Ms. Pilart know that they're

24   excused.

25          Nobody will be sitting in those seats, like I

1    discussed earlier.

2              MR. FEE:  Understood.

3              THE COURT:  All right.  Thank you.

4              We'll be in recess.

11:15AM   5              THE COURTROOM DEPUTY:  All rise.  This court is in

6    recess.

7                   (Break taken.)

8                   (In the presence of the prospective jurors:)

9              THE COURT:  All right.  Now we're over in that

11:32AM  10    corner, Mr. Overholt.

11              PROSPECTIVE JUROR OVERHOLT:  Rick Overholt.  I'm VP

12    of -- Rick Overholt.  Vice president of Grower Sales,

13    North America, for a company called IFCO Systems.  My

14    educational background, I have a degree in finance from

11:33AM  15    Arizona State.  I live in Morro Bay, California.  I'm married.

16    My wife is a psychotherapist and currently under contract with

17    a couple of different online servers.  I have two boys.  One is

18    based in Sonoma County and is director of philanthropy of a

19    nonprofit organization.  And my youngest son is based out of

11:33AM  20    Crookston, Minnesota, and is a welder.  No other adults living

21    in our household.  I have served on three different juries.

22              THE COURT:  All right.  Can you -- let's start with

23    the first one.  What kind of a case was it?

24              PROSPECTIVE JUROR OVERHOLT:  Theft.

11:33AM  25              THE COURT:  Theft?

1          Did the jury reach a verdict?

2          PROSPECTIVE JUROR OVERHOLT:  It was hung.

3          THE COURT:  It was a hung jury.  I've never had so

4   many in one --

11:33AM   5          PROSPECTIVE JUROR OVERHOLT:  Yeah.

6          THE COURT:  Were you the foreperson of that jury?

7          PROSPECTIVE JUROR OVERHOLT:  No, I was not.

8          THE COURT:  And the second one?

9          PROSPECTIVE JUROR OVERHOLT:  Um, the second one was,

11:33AM   10   I guess, I would call it domestic -- domestic --

11          THE COURT:  Violence?

12          PROSPECTIVE JUROR OVERHOLT:  -- violence.  And not

13   guilty.

14          THE COURT:  Okay.  So the jury reached a verdict?

11:34AM   15          PROSPECTIVE JUROR OVERHOLT:  Reached a verdict,

16   yeah.

17          THE COURT:  All right.  And were you the foreperson?

18          PROSPECTIVE JUROR OVERHOLT:  I was not.

19          THE COURT:  And the third one?

11:34AM   20          PROSPECTIVE JUROR OVERHOLT:  I -- it was theft.  And

21   for some reason, I don't know why, but we didn't -- we were

22   asked to -- we were excused.

23          THE COURT:  All right.  Before -- before

24   deliberations?

11:34AM   25          PROSPECTIVE JUROR OVERHOLT:  Yeah.  Before we got

1    into deliberations.

2              THE COURT:  All right.  Anything about your

3    experience, especially in the jury -- the trial where the jury

4    didn't reach a verdict, that makes you reluctant to serve on

11:34AM    5    this jury?

6              PROSPECTIVE JUROR OVERHOLT:  No.

7              THE COURT:  All right.  Thank you.

8              And the next question, I think, is about the reading

9    material.

11:34AM    10              PROSPECTIVE JUROR OVERHOLT:  Oh, I'm sorry.  Um,

11    regular TV news for the most part.  Mostly trade journals,

12    produce news, a lot of things related to the business I'm

13    involved in.

14              THE COURT:  All right.  And any reason why you

11:35AM    15    couldn't serve on a trial of this length?

16              PROSPECTIVE JUROR OVERHOLT:  I am currently under

17    treatment, and I have an appointment that I -- I can postpone

18    it, but I -- I have to do a blood draw every -- every three

19    weeks.  I can postpone it to maybe Tuesday at the latest.

11:35AM    20              THE COURT:  When is it now scheduled?

21              PROSPECTIVE JUROR OVERHOLT:  It's for this Thursday.

22              THE COURT:  And what time of day?

23              PROSPECTIVE JUROR OVERHOLT:  It's usually in the

24    afternoon.  It's in San Luis Obispo.  I live four-and-a-half

11:35AM    25    hours from here.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Oh, I see.  So you're staying here?
 2              PROSPECTIVE JUROR OVERHOLT:  Yes.  I had to stay
 3    overnight last night.
 4              THE COURT:  All right.  Thank you.
 5              PROSPECTIVE JUROR OVERHOLT:  Yep.
 6              PROSPECTIVE JUROR JOHNSON:  Ben Johnson.  Occupation
 7    is attorney, litigator.  I've been a litigator for 20 years.  I
 8    started at Quinn Emanuel and then moved into an in-house
 9    position at a toy company.  I'm currently with an entertainment
10    company.  Excuse me.  Educational background, I have a law
11    degree from Brigham Young University.  I live in Valencia,
12    California.  Married.  My spouse is -- stays at home with our
13    children.  I have three children.  They're 16, 13, and 10.  I
14    don't have any other adults in the household.  And I have not
15    served on any jury.  I've been eliminated before they started.
16              THE COURT:  Reading material?
17              PROSPECTIVE JUROR JOHNSON:  I read trade magazines
18    and entertainment, licensing, and in toys, as well as
19    Breitbart, InstaPundit.  Those are the main sources, probably.
20              THE COURT:  The name of the company where you're
21    in-house counsel?
22              PROSPECTIVE JUROR JOHNSON:  ZAG Entertainment, Inc.
23              THE COURT:  Is it fair to say -- I know you said
24    you're a litigator.  Are you primarily in -- litigating in
25    intellectual property?
```

|  |  |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:37AM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:37AM | 10 |

1    PROSPECTIVE JUROR JOHNSON:  Yes.

2    That -- that was my previous -- when I was -- when I

3    was with private practice.  With the in-house, it's more across

4    the board.  There's a lot of corporate litigation, breach of

5    contract type stuff and then some labor -- labor and employment

6    law as well now.

7    THE COURT:  If you're seated as a juror on this case

8    and if my instructions on the law differ from your

9    understanding, would you follow my instructions?

10    PROSPECTIVE JUROR JOHNSON:  I -- I'd like to say I

11    would hope so.  I don't -- I don't -- I don't know.

12    THE COURT:  All right.  Well, you understand it's

13    the duty of the jurors to decide the facts of the case and it's

14    the duty of the judge to instruct you on the law.

15    PROSPECTIVE JUROR JOHNSON:  I understand.

16    THE COURT:  And so you decide the facts and you

17    apply the instructions that I give you to those facts.

18    Do you think you'd be able to do that?

19    PROSPECTIVE JUROR JOHNSON:  I think so, Your Honor.

20    THE COURT:  All right.  And you've never served as a

21    juror?

22    PROSPECTIVE JUROR JOHNSON:  No, Your Honor.

23    THE COURT:  And you can serve for -- on a trial of

24    this length?

25    PROSPECTIVE JUROR JOHNSON:  Um, yeah.  You said it

```
 1    would be over by next week.  I'm going out of town at the end

 2    of next week so --

 3              THE COURT:  That shouldn't be a problem.

 4              All right.  Thank you.

 5              PROSPECTIVE JUROR VOSS:  Your Honor, my name is

 6    Elizabeth Voss.  I am a paralegal.  My educational background,

 7    in addition to my paralegal certification, I have a bachelor's

 8    from UC Riverside.  I live in Walnut, California.  I am

 9    married.  And my spouse formerly worked as an accountant for

10    Southern California Edison.  He is now retired.  We have three

11    adult children:  A 38-year-old who works in mergers and

12    acquisitions, a 35-year-old who works in pharmaceutical quality

13    control, and a 33-year-old who works as a tax -- tax manager

14    for a construction company.  We have no other adults living in

15    our household.  I have served on two juries.

16              THE COURT:  All right.  Let's start -- the first

17    one, what was that case about?  And by the way, go,

18    Highlanders.

19              PROSPECTIVE JUROR VOSS:  I'm sorry?

20              THE COURT:  Go, Highlanders.

21              PROSPECTIVE JUROR VOSS:  Okay.  Thank you,

22    Your Honor.

23              Okay.  In the first -- the first dealt with assault

24    and -- over a drug deal.

25              THE COURT:  All right.  And without telling me the
```

11:38AM (line 5)
11:38AM (line 10)
11:39AM (line 15)
11:39AM (line 20)
11:39AM (line 25)

```
 1   verdict, did the jury reach a verdict?
 2              PROSPECTIVE JUROR VOSS:  They did.
 3              THE COURT:  Were you the foreperson?
 4              PROSPECTIVE JUROR VOSS:  No.
 5              THE COURT:  All right.  And the next one?
 6              PROSPECTIVE JUROR VOSS:  Domestic violence.
 7              THE COURT:  And same thing, did the jury reach a
 8   verdict?
 9              PROSPECTIVE JUROR VOSS:  They did.
10              THE COURT:  All right.  Were you the foreperson of
11   that jury?
12              PROSPECTIVE JUROR VOSS:  No, Your Honor.
13              THE COURT:  All right.  Thank you.
14              PROSPECTIVE JUROR VOSS:  I do a lot of -- I read
15   The L.A. Times, The Washington Post, some articles from
16   The New York Times, online magazines, and publications,
17   including MSN, Yahoo!, the standard ones.
18              THE COURT:  All right.  Any reason -- so you're
19   still working; correct?
20              PROSPECTIVE JUROR VOSS:  Yes, Your Honor.
21              THE COURT:  Any reason why you couldn't serve as a
22   juror on a trial of this length?
23              PROSPECTIVE JUROR VOSS:  Your Honor, I have a
24   long-standing medical appointment scheduled on the 8th of
25   February.  Other than that, no.
```

11:39AM (line 5)
11:39AM (line 10)
11:39AM (line 15)
11:40AM (line 20)
11:40AM (line 25)

UNITED STATES DISTRICT COURT

1        THE COURT:  The 8th of February.  That is about a

2   week from tomorrow.

3        PROSPECTIVE JUROR VOSS:  Correct, Your Honor.

4        THE COURT:  We'll be done by then.

11:40AM   5        PROSPECTIVE JUROR VOSS:  Thank you, Your Honor.

6        THE COURT:  All right.  Thank you.

7        Ms. Chagollan.

8        PROSPECTIVE JUROR CHAGOLLAN:  Yes, Your Honor.  My

9   name is Angelica Chagollan.  I am a registered behavioral

11:40AM   10   interventionist.  I have a bachelor's degree in psychology.  I

11   live in the city of Lynwood.  I'm married.  My husband is an

12   instructor for MTA.  I have three children.

13        THE COURT:  I'm sorry.  Did you say an instructor?

14        PROSPECTIVE JUROR CHAGOLLAN:  Yes.

11:40AM   15        THE COURT:  And for whom?

16        PROSPECTIVE JUROR CHAGOLLAN:  MTA.  Metro.

17        THE COURT:  Oh.  MTA.  Got it.  Thank you.

18        PROSPECTIVE JUROR CHAGOLLAN:  I have three children.

19   The oldest is 13, my second one is 8, and my baby is 5 years

11:41AM   20   old.  Their job is to go to school.  Um, there's no other

21   adults living in our household.  I have no experience serving

22   trial jury.  And I do *L.A. Times* and then online publications.

23        THE COURT:  All right.  And you said you're a

24   registered behavioral --

11:41AM   25        PROSPECTIVE JUROR CHAGOLLAN:  Interventionist.

**UNITED STATES DISTRICT COURT**

|  |  |
|---|---|
| 1 | THE COURT:  All right.  Can you tell me a little bit |
| 2 | about that work? |
| 3 | PROSPECTIVE JUROR CHAGOLLAN:  Yes.  So I work at a |
| 4 | school for the Long Beach School -- Long Beach Unified School |
| 11:41AM  5 | District, and I work with children that are in the spectrum. |
| 6 | THE COURT:  Okay.  Thank you. |
| 7 | What we used to say, the autism spectrum? |
| 8 | PROSPECTIVE JUROR CHAGOLLAN:  Yes. |
| 9 | THE COURT:  And any reason why you could not serve |
| 11:41AM  10 | as a juror on a trial of this length? |
| 11 | PROSPECTIVE JUROR CHAGOLLAN:  Yes.  I actually -- |
| 12 | I'm the primary community -- commuter from my house to my kids' |
| 13 | school, and I live all the way in L.A.  And they go to school |
| 14 | three cities away from where I live.  So I'm the primary |
| 11:42AM  15 | driver. |
| 16 | THE COURT:  So for this week, is there someone else |
| 17 | in your family who could take care of that for you or a |
| 18 | neighbor, a friend? |
| 19 | PROSPECTIVE JUROR CHAGOLLAN:  No because, |
| 11:42AM  20 | unfortunately, my kids go to school three cities away from |
| 21 | where I live.  And I don't think -- |
| 22 | THE COURT:  Three different cities? |
| 23 | PROSPECTIVE JUROR CHAGOLLAN:  Yeah.  Three cities |
| 24 | away from where I -- |
| 11:42AM  25 | THE COURT:  Are they in school in three different |

locations?

PROSPECTIVE JUROR CHAGOLLAN:  No.  So I live in Lynwood, and then they go all the way to Cerritos to school.

THE COURT:  Who took them this morning?

PROSPECTIVE JUROR CHAGOLLAN:  They missed school today.

THE COURT:  Okay.  All right.  Thank you.

PROSPECTIVE JUROR MOAVEN:  Good morning, Your Honor.  Dustin Moaven.  I'm an attorney, personal injury on the plaintiffs' side.  I work at Dordick Law Corporation.  I have got my JD from Loyola Law, and I got my MBA from LMU.  And my undergrad was at UCSB in economics and accounting.  I live in Beverly Hills.  I am married.  My wife is an interior designer.  We have an 11-week-old boy at home who she is taking care of right now.  He does not have a job, but he's pretty cute and people say he can be a Gerber baby.  Never served on a jury.  And I listen to NPR, I read *The Advocate* and *The Daily Journal* occasionally.  And I -- I follow a bunch of different major news outlets on Instagram, no one in particular, all across the spectrum.

THE COURT:  So you're with the Dordick firm.  Are you able to serve as a juror in terms of the time required for this case?

PROSPECTIVE JUROR MOAVEN:  I have several depositions next week.  I have three on Tuesday, one on

|        |    |                                                                        |
|--------|----|------------------------------------------------------------------------|
|        | 1  | Thursday.  And then the -- I have depositions the following            |
|        | 2  | week.  So it would be -- with mediations and trial coming up,          |
|        | 3  | so it would be very difficult to reschedule or to have -- and          |
|        | 4  | these are cases that I'm lead counsel on so they are                   |
| 11:44AM| 5  | depositions that I should be taking.                                   |
|        | 6  | THE COURT:  But those are next week; right?                            |
|        | 7  | PROSPECTIVE JUROR MOAVEN:  Yeah.  They're next week.                   |
|        | 8  | THE COURT:  All right.  Thank you.                                     |
|        | 9  | Ms. Immer.                                                             |
| 11:44AM| 10 | PROSPECTIVE JUROR IMMER:  Hello, Your Honor.  My                       |
|        | 11 | name is Rena Immer.  I work at an elementary school in Lakewood        |
|        | 12 | where I live.                                                          |
|        | 13 | THE COURT:  And what do you do there?                                  |
|        | 14 | PROSPECTIVE JUROR IMMER:  A little bit of                             |
| 11:44AM| 15 | everything.                                                            |
|        | 16 | THE COURT:  Whatever they tell you to?                                 |
|        | 17 | PROSPECTIVE JUROR IMMER:  Whatever they tell me to.                    |
|        | 18 | THE COURT:  And what would that be most days?                         |
|        | 19 | PROSPECTIVE JUROR IMMER:  I supervise the children                     |
| 11:44AM| 20 | everywhere, I work in the office, I speak with parents and            |
|        | 21 | handle situations, I go or do whatever the principal asks me to        |
|        | 22 | do.                                                                    |
|        | 23 | THE COURT:  All right.  Thank you.                                     |
|        | 24 | PROSPECTIVE JUROR IMMER:  I'm married.  My husband                     |
| 11:44AM| 25 | is in information services at Northrop Grumman.  We have two           |

```
 1    daughters, 14 and 11.  Very exciting ages.  There's no other

 2    adults in our home.  I have never served on a jury.  And as far

 3    as news, I don't read newspapers, but I do skim the Internet

 4    quite often, all different websites for different news.  And I

 5    will occasionally pop on the TV and watch cable news or local

 6    news.

 7              THE COURT:  And your education?

 8              PROSPECTIVE JUROR IMMER:  Some college.  I attended

 9    up until I needed to go home and help my mom take care of my

10    aging grandmother.

11              THE COURT:  All right.  Any reason why you couldn't

12    serve on a trial of this length?

13              PROSPECTIVE JUROR IMMER:  No.

14              THE COURT:  Okay.  Thank you.

15              All right.  Ms. Elmer.

16              PROSPECTIVE JUROR SCHELLERT:  My name is

17    Lisa Schellert.  Occupation is --

18              THE COURT:  Oh, I'm sorry.  I missed one.

19    Ms. Schellert.  I apologize.

20              Go ahead.

21              PROSPECTIVE JUROR SCHELLERT:  I'm retired currently.

22    I used to be a project manager for a mill working company.  I

23    have a bachelor's degree in fine art.  I live in Castaic.  My

24    spouse is retired, a retired postal worker.  No children.  So

25    that takes care of that.  No experience on a jury.  And mostly
```

11:45AM (line 5)
11:45AM (line 10)
11:45AM (line 15)
11:46AM (line 20)
11:46AM (line 25)

| | |
|---|---|
| 1 | I read CNN on my iPad. |
| 2 | THE COURT:  Any reason why you couldn't serve on a |
| 3 | trial of this length? |
| 4 | PROSPECTIVE JUROR SCHELLERT:  No. |
| 11:46AM  5 | THE COURT:  Thank you. |
| 6 | All right.  Now, Ms. Elmer. |
| 7 | PROSPECTIVE JUROR ELMER:  Hello.  My name is |
| 8 | Cassandra Elmer.  I have a bachelor's in technical theater, but |
| 9 | I am an RBT, a registered behavior technician.  I live in |
| 11:47AM  10 | Torrance.  I'm not married.  No kids.  No other adults in my |
| 11 | home.  Never served on a jury.  And kind of same, local, cable |
| 12 | news across the board and then ABA publications, applied |
| 13 | behavioral analysis. |
| 14 | THE COURT:  All right.  And tell us what you do as a |
| 11:47AM  15 | registered behavior technician.  Do I have that right? |
| 16 | PROSPECTIVE JUROR ELMER:  Yes. |
| 17 | Um, I work with -- well, currently I work with |
| 18 | adults who have developmental or intellectual disabilities who |
| 19 | suffer from maladaptive behaviors. |
| 11:47AM  20 | THE COURT:  All right.  Thank you. |
| 21 | Do you work in a non-profit, or who do you work |
| 22 | with -- for? |
| 23 | PROSPECTIVE JUROR ELMER:  We have a nonprofit |
| 24 | division, but we are a profit business. |
| 11:47AM  25 | THE COURT:  All right.  Thank you very much. |

UNITED STATES DISTRICT COURT

|  | 1 | PROSPECTIVE JUROR SIMMONS:  My name is Jan Simmons. |

1          PROSPECTIVE JUROR SIMMONS:  My name is Jan Simmons.

2  I am a full-time career nanny.  I live in Los Angeles.  I am

3  not married.  No children.  And I live with a roommate, just a

4  best friend.

11:48AM  5          THE COURT:  And what is that person's occupation?

6          PROSPECTIVE JUROR SIMMONS:  Nothing.

7          THE COURT:  Unemployed?

8          PROSPECTIVE JUROR SIMMONS:  Mommy pays bills.

9          THE COURT:  Okay.  Unemployed.

11:48AM  10          PROSPECTIVE JUROR SIMMONS:  As long as my rent's

11  paid, I'm good.

12          Um, I have not served.  And same thing, just

13  anything I see on social media that kind of gets my attention,

14  I open it up and take a look.

11:48AM  15          THE COURT:  And your education?

16          PROSPECTIVE JUROR SIMMONS:  Just high school

17  diploma.

18          THE COURT:  Thank you.

19          And any reason you can't serve as a juror on a trial

11:48AM  20  of this length?

21          PROSPECTIVE JUROR SIMMONS:  Being a nanny, other

22  than them finding care for their kids, no.

23          THE COURT:  But they know about this?

24          PROSPECTIVE JUROR SIMMONS:  Yes.

11:48AM  25          THE COURT:  All right.  Thank you.

**UNITED STATES DISTRICT COURT**

1          PROSPECTIVE JUROR ALVAREZ:  Hello.  My name is

2    Douglas Alvarez.  I am recently retired from the City of

3    Glendale.  Graphic design work for them.

4          THE COURT:  I'm sorry.  You did what for them?

11:49AM    5          PROSPECTIVE JUROR ALVAREZ:  Graphic design work.

6    Graphic designer.

7          THE COURT:  Graphic.  Right.

8          PROSPECTIVE JUROR ALVAREZ:  L.A., valley.  I'm not

9    married.  No children.  Um, I live with my girlfriend, and

11:49AM    10   she's a paraeducator for a public school in Santa Monica.

11   No -- no experience as a juror at all.

12          THE COURT:  And your education?

13          PROSPECTIVE JUROR ALVAREZ:  I'm sorry.  I have two

14   bachelor's degree, one in political science and the second one

11:49AM    15   in art at CSUN.

16          THE COURT:  All right.  Thank you.

17          PROSPECTIVE JUROR ALVAREZ:  Oh, yeah.  And I forgot

18   this -- No. 8.  Yeah, I listen to a variety of news, online,

19   mostly, like, *Breaking Points* and *The Hill*, non- --

11:49AM    20   non-mainstream news, a lot of podcasts and art magazines like

21   *Artillery* and *Coagula*.

22          THE COURT:  All right.  Any reason why you couldn't

23   serve on a trial of this length?

24          PROSPECTIVE JUROR ALVAREZ:  No.

11:50AM    25          THE COURT:  All right.  Thank you.

1          Mr. Lopez Gonzalez.

2          PROSPECTIVE JUROR LOPEZ GONZALEZ:  Yes.  My name is

3    Osvaldo Lopez Gonzalez.  I'm a skilled maintenance worker and

4    grocery clerk.  I have an associate's in general ed.  Live in

11:50AM   5    Long Beach.  Married.  My wife is a part-time administrative

6    clerk.  We have two boys, 4 and 2, just troublemakers.  Um --

7          THE COURT:  Give some advice to Mr. Moaven raising a

8    boy.

9          PROSPECTIVE JUROR LOPEZ GONZALEZ:  Be ready.  Be

11:50AM   10   ready.

11         No other adults living in the household.  I have one

12   trial, civil.

13         THE COURT:  And what was the case about, generally?

14         PROSPECTIVE JUROR LOPEZ GONZALEZ:  Vandalism.

11:50AM   15   THE COURT:  All right.  Did the -- don't tell me the

16   verdict.  Did the jury reach a verdict?

17         PROSPECTIVE JUROR LOPEZ GONZALEZ:  Correct.

18         THE COURT:  Were you the foreperson?

19         PROSPECTIVE JUROR LOPEZ GONZALEZ:  I was not.

11:51AM   20   THE COURT:  All right.  Thank you.

21         PROSPECTIVE JUROR LOPEZ GONZALEZ:  Any newspaper,

22   just *Wall Street Journal*.  That's about it.

23         THE COURT:  Any reason why you could not serve as a

24   juror on a trial of this length?

11:51AM   25   PROSPECTIVE JUROR LOPEZ GONZALEZ:  None at all.

1          THE COURT:  All right.  Thank you.

2          PROSPECTIVE JUROR INIGUEZ:  Hello.  My name is

3    Manuel Iniguez.  I'm a manager at a grocery store.  I live in

4    Sherman Oaks, California.  I'm not married.  I have no kids.  I

11:51AM    5    live at home with my mom and my brother.  I've never served on

6    jury duty.  And I read *The L.A. Times* and just the local news.

7          THE COURT:  I'm sorry.  Did you tell me your

8    education?

9          PROSPECTIVE JUROR INIGUEZ:  High school diploma.

11:51AM    10         THE COURT:  Your mother's -- your mother's

11   occupation?

12         PROSPECTIVE JUROR INIGUEZ:  My mom is handicap, and

13   I'm also her caretaker, me and my brother.

14         THE COURT:  What does your brother do?

11:51AM    15         PROSPECTIVE JUROR INIGUEZ:  He's a barista at

16   Starbucks.

17         THE COURT:  Any reason why you couldn't serve as a

18   juror on this case?

19         PROSPECTIVE JUROR INIGUEZ:  Well, I take care of my

11:51AM    20   mom part-time, me and my brother.  So I take her to dialysis on

21   Mondays, Wednesdays, and Fridays.  But other than that, it

22   shouldn't be a problem.

23         THE COURT:  What time do you take her to dialysis?

24         PROSPECTIVE JUROR INIGUEZ:  9:00 o'clock in the

11:52AM    25   morning.

**UNITED STATES DISTRICT COURT**

|   |   |
|---|---|
| 1 | THE COURT:  All right.  Thank you very much. |
| 2 | PROSPECTIVE JUROR PADILLA:  Hello.  My name is |
| 3 | Jerry Padilla.  I'm from Lancaster, California.  I work at |
| 4 | Northrop Grumman as a senior aircraft mechanic.  I'm a lead out |
| 11:52AM 5 | there for special programs.  I have a wife and two kids.  My |
| 6 | wife's a barista at Starbucks, and my son is 14 and my daughter |
| 7 | is 4.  And I have no experience doing jury duty.  And -- high |
| 8 | school -- I have a high school diploma, and I'm going to school |
| 9 | to be a professor for Northrop Grumman.  And what's the -- |
| 11:52AM 10 | THE COURT:  You've never served on a jury? |
| 11 | PROSPECTIVE JUROR PADILLA:  I've never served on a |
| 12 | jury. |
| 13 | THE COURT:  You subscribe to -- |
| 14 | PROSPECTIVE JUROR PADILLA:  Oh, yeah.  I listen to |
| 11:53AM 15 | news, all right.  Aerospace news, war, things like that. |
| 16 | That's about it. |
| 17 | THE COURT:  All right.  Any reason that you could |
| 18 | not serve as a juror on a trial of this length? |
| 19 | PROSPECTIVE JUROR PADILLA:  No, ma'am.  But on the |
| 11:53AM 20 | 8th, I have a delivery that I have to do for my company. |
| 21 | THE COURT:  On the 8th.  So that's later next week. |
| 22 | PROSPECTIVE JUROR PADILLA:  That's later next week. |
| 23 | THE COURT:  That shouldn't be a problem, but thank |
| 24 | you for telling me. |
| 11:53AM 25 | All right.  Eltaib; is that right? |

**UNITED STATES DISTRICT COURT**

|      |      |
|------|------|
| | 1 | PROSPECTIVE JUROR ELTAIB:  Yes. |
| | 2 | Good morning.  My name is Elbashir Eltaib.  I'm a |
| | 3 | social services supervisor, Los Angeles County.  I have a |
| | 4 | degree in economics, bachelor.  And I have a master's degree in |
| 11:53AM | 5 | public administration.  I live in Simi Valley.  I'm married. |
| | 6 | My wife is a research scientist.  I have two daughters, one is |
| | 7 | still in university, one is a recent graduate working as a |
| | 8 | teacher aide, living with us.  Uh -- |
| | 9 | THE COURT:  Any other adults in your household? |
| 11:54AM | 10 | PROSPECTIVE JUROR ELTAIB:  No.  Only three of us. |
| | 11 | I don't have experience -- I never served on a jury |
| | 12 | before.  I listen to -- actually, I read news from CNN and then |
| | 13 | BBC, Al Jazeera English.  That's about it. |
| | 14 | THE COURT:  All right.  Any reason why you could not |
| 11:54AM | 15 | serve as a juror on a trial of this length? |
| | 16 | PROSPECTIVE JUROR ELTAIB:  I can serve.  But on |
| | 17 | Friday, I have a congregation, maybe couple of hours. |
| | 18 | THE COURT:  And what time? |
| | 19 | PROSPECTIVE JUROR ELTAIB:  Start at 1:00, 1:00 to |
| 11:54AM | 20 | 2:00.  But driving back and forth, maybe -- the whole thing, |
| | 21 | maybe couple of hours, maybe two hours, the whole thing.  Other |
| | 22 | than that -- |
| | 23 | THE COURT:  I'm sorry.  Is that a religious |
| | 24 | obligation you said? |
| 11:55AM | 25 | PROSPECTIVE JUROR ELTAIB:  Exactly.  Yes, it is. |

**UNITED STATES DISTRICT COURT**

1          THE COURT:  All right.  Thank you very much.

2          PROSPECTIVE JUROR ELTAIB:  You're welcome.

3          THE COURT:  All right.  Ms. -- no, Mr. Wandel.

4          PROSPECTIVE JUROR WANDEL:  Yes, Your Honor.

11:55AM   5   Stephane Wandel.  Occupation, I'm a senior executive for a real

6   estate development company.  My educational background is I

7   graduated from infantry school for the Royal Belgium Army,

8   became a U.S. citizen in 2001, somebody might ask.  I have a

9   bachelor's in international trade and foreign policy.  I have a

11:55AM   10  master's degree, an MBA with a focus on finance and real

11  estate.  I live in Manhattan Beach.  I'm married.  My wife is

12  director of human resources for a nonprofit.  I have two kids;

13  21, 23, both in college.  No other adults in our household.

14  I've been interviewed but never sat on a jury.  And as far as

11:56AM   15  news, I read quite a bit.  My favorite is *The Economist*,

16  followed by *Wall Street Journal*, probably a series of others,

17  *Washington Post*, *L.A. Times*, *New York Times*, news.  Other than

18  that, it would be primarily CNN, Fox, and a number of real

19  estate publications.

11:56AM   20         THE COURT:  All right.  Your wife works in HR at a

21  nonprofit.  What sort of nonprofit outfit is it?

22         PROSPECTIVE JUROR WANDEL:  They do international

23  outreach, medical support in places where people really need

24  medical support.

11:57AM   25         THE COURT:  All right.  And your children are both

1    in college?

2             PROSPECTIVE JUROR WANDEL:  Yes.

3             THE COURT:  What are they studying?

4             PROSPECTIVE JUROR WANDEL:  My daughter, 21, is a

11:57AM  5    human resources -- business human resources.  My son is

6    finishing a master's in accounting.

7             THE COURT:  All right.  Now, earlier when -- oh, let

8    me ask that last question.  Any reason why you couldn't serve

9    as a juror on a trial of this length?

11:57AM  10            PROSPECTIVE JUROR WANDEL:  I mean, like probably

11   everybody else, it would be quite a hardship in my company.  I

12   have an important role.  But if I'm selected, I'll do my very

13   best.  You'll have my undivided attention during the day, but I

14   will be working late evenings taking care of my day job.

11:57AM  15            THE COURT:  I appreciate that.  That's the case for

16   so many people who answer the summons.

17            You -- when we spoke earlier, you said -- you have a

18   lot of experience over the years in contracts, I think you said

19   contracts, visas, all kinds of things like that.  Am I

11:58AM  20   remembering that correctly?

21            PROSPECTIVE JUROR WANDEL:  Well, visas -- I've

22   traveled a lot through the world.  My prior employer, I was

23   managing their international real estate operations.  I've

24   traveled the world more than most, but visas not particularly.

11:58AM  25   But contracts, yes, real estate -- all real estate related, a

```
 1   variety of them, purchase agreements, sales agreements, leases,

 2   and then vendor contract of every type, construction contracts

 3   and whatever else.  I have lot of experience with wire

 4   transfers, both U.S. and international.

 5        THE COURT:  All right.  And you've heard me say this

 6   to some of the other jurors.  The job of the jury is to decide

 7   the facts of the case, and the Court instructs you on the law.

 8   Interpretation of a contract, I'm not sure that that would come

 9   up here.  And there will be discussion of contracts.

10        But the Court gives -- to the extent it would even

11   come up in this case, the Court interprets the contract because

12   that's a matter of law.

13        Would you be able to follow the Court's

14   instructions, even if there's something that you remember from

15   some of your work that seem to differ from what I tell you?

16        PROSPECTIVE JUROR WANDEL:  Yeah.  I'll definitely do

17   my best.  If I have any questions, I will definitely ask.  But,

18   you know, I'm used to processing a lot of information and

19   analyzing it and figuring out what makes sense, doesn't make

20   sense.  But if I have a question, I'll definitely ask.

21        THE COURT:  All right.  Thank you very much.

22        PROSPECTIVE JUROR MCCARTHY:  I'm Dorothy McCarthy.

23   And I have a degree in mathematics.  And I've done a lot of

24   real estate.  I still have my license.  I've had it for like

25   40 years.  I live in San Marino, California, next to Pasadena.
```

11:58AM (line 5)
11:58AM (line 10)
11:59AM (line 15)
11:59AM (line 20)
11:59AM (line 25)

**UNITED STATES DISTRICT COURT**

1    And I'm married.  My -- my husband's retired, and he owned a

2    company.  He does a lot of investments.  He continues to do a

3    lot of investments.  I have two -- we have two children.  My

4    son owns a software company, and my daughter is an artist.

12:00PM  5    And, um, there are no other adults living in the house other

6    than my husband.  And, um, I have been selected for a jury, but

7    then they -- there was a plea agreement.  So we never went --

8    we never gave a --

9            THE COURT:  A verdict.

12:00PM  10           PROSPECTIVE JUROR MCCARTHY:  A verdict.

11           And I read *The New York Times*, I listen to too much

12   NPR, I should listen to music.  It would be, you know, less

13   worrisome.  But -- and I -- I read a lot of interior design

14   magazines and gardening and things like that.

12:00PM  15           THE COURT:  All right.  You said your husband, who's

16   now retired, owned a company.  What sort of company?

17           PROSPECTIVE JUROR MCCARTHY:  He owned a company in,

18   um, Garden Grove that, um, made sensors that tested the acidity

19   and alkalinity of water.

12:01PM  20           THE COURT:  All right.  Thank you.

21           You said you -- all right.  And any reason that you

22   couldn't serve as a juror on a trial of this length?

23           PROSPECTIVE JUROR MCCARTHY:  No.

24           THE COURT:  Thank you very much.

12:01PM  25           PROSPECTIVE JUROR TANG:  Hi.  My name is Ruby Tang.

I'm a medical assistant and incoming medical student.  I have a

bachelor's of science in human biology and society and a minor

in biomedical research from UCLA.  I live in Los Angeles.  Not

married.  No children.  I live with three adult roommates.  One

is a medical scribe, one is a clinical research coordinator,

and the other is a tutor.  No experience serving as a jury

member.  And I read, like, *L.A. Times*, *New York Times*,

*Washington Post*, CNN.

       THE COURT:  You said you're an incoming medical

student?

       PROSPECTIVE JUROR TANG:  Uh-huh.

       THE COURT:  Where are you going to be going to

medical school?

       PROSPECTIVE JUROR TANG:  I don't know.  I have a

couple of acceptances, and I'm still waiting to hear back from

others.  So I'm not sure where I'll be matriculating to as of

yet.

       THE COURT:  Congratulations.

       PROSPECTIVE JUROR TANG:  Thank you.

       THE COURT:  And currently where are you working?

       PROSPECTIVE JUROR TANG:  I work in Santa Monica at a

private practice.

       THE COURT:  Any reason why you couldn't serve as a

juror on a trial of this length?

       PROSPECTIVE JUROR TANG:  No, Your Honor.

1          THE COURT:  All right.  Thank you very much.

2          PROSPECTIVE JUROR WANDEL:  Your Honor, can I go

3    back?

4          THE COURT:  Yes.  Certainly.

12:02PM    5          PROSPECTIVE JUROR WANDEL:  Stephane Wandel again.  I

6    apologize, something I just remembered.  I'll be sharing my

7    experience on wire transfer, and my company is -- I don't know

8    if this is relevant but you'll determine.  My company was the

9    subject of wire fraud about two years ago.  So we've -- I have

12:02PM    10   some experience with that as well.

11         THE COURT:  All right.  Let me ask you to come up to

12   the sidebar, and I can talk to you further about that.

13              (At sidebar in the presence of

14               Prospective Juror Wandel:)

12:03PM    15         PROSPECTIVE JUROR WANDEL:  I'm sorry, Your Honor.  I

16   should have remembered.

17         THE COURT:  That's okay.  Let me just wait for all

18   the attorneys to get here.

19         All right.  Can you tell us a little bit about that?

12:03PM    20         PROSPECTIVE JUROR WANDEL:  Yeah.  Absolutely.

21         So we do a lot of transfers -- buying, selling

22   properties.  In this particular case, we had some unknown group

23   requesting a wire transfer for $300,000.  That somebody

24   pretended it came from our CEO to our CFO.  The wire transfer

12:03PM    25   was made, and we realized after the fact that this was not --

this was a scam, basically.

1

        THE COURT:  Was there a prosecution, to your
knowledge?

        PROSPECTIVE JUROR WANDEL:  Not to my knowledge, no.
I don't know if they ever figured out who it was.

        THE COURT:  Was it reported to law enforcement?

        PROSPECTIVE JUROR WANDEL:  I have no idea.

        THE COURT:  So you -- you never -- you don't even
know if it went to court or if there were charges filed,
anything?

        PROSPECTIVE JUROR WANDEL:  I -- I don't know for
sure.  I figured if it had gone to court, I would have heard
about it.  Since I didn't hear about it, I'm going to guess it
didn't.

        THE COURT:  Okay.  Now, do you think that would
affect you -- as you listen to the evidence in this case, would
it make you favor one side or the other?

        PROSPECTIVE JUROR WANDEL:  I don't think it will
make me favor one side or the other, but it definitely makes me
mindful of understanding all the issues involved.

        THE COURT:  All right.  Counsel -- any counsel wish
to inquire further?

        MR. PI:  Nothing from the Government.

        MR. FEE:  Just perhaps a follow-up on what he means
mindful of things involved.

UNITED STATES DISTRICT COURT

1              THE COURT:  Sure.

2              What do you mean by that?

3              PROSPECTIVE JUROR WANDEL:  That's a fair question.

4    What did I mean by that?  Um, you know, just -- you know,

12:04PM  5    through contracts, making sure things -- that if someone

6    requested payment, it's a payment that's owed.  If monies are

7    being sent, that it's a real request, a fair request consistent

8    with an obligation.  That's what I mean by that.

9              THE COURT:  All right.  Thank you.

12:05PM 10              You can take a seat.  Thank you.

11              PROSPECTIVE JUROR WANDEL:  Thank you.

12                 (At sidebar:)

13              THE COURT:  Counsel, I'm just going to -- by my

14    count, even with the ones we've excused, we're about there.  So

12:05PM 15    I'm just going to get information from about two more, and then

16    I'll call you up to see if you have any challenges for cause

17    and peremptories.

18              MR. FEE:  Thank you.

19                 (In the presence of the prospective jurors:)

12:05PM 20              THE COURT:  All right.  Ms. Alvarado.

21              PROSPECTIVE JUROR ALVARADO:  Good morning --

22    afternoon.  My name is Jene Alvarado.  I am currently a manager

23    and I -- I've been for the last 30 years.  I have a certificate

24    in communication from my country and high school diploma here

12:06PM 25    in the United States.  I live currently in Granada Hills.  I'm

1    single.  I do have two children.  One is 32, and he's -- he

2    just works in a company where they put chemicals together.  No

3    degree.  And I have a daughter who is a film editor.  She's 29.

4    They don't live with me.  I do live with my sister, and she has

12:06PM    5    two children.  My sister and I both work in the movie industry.

6                THE COURT:  In the what?

7                PROSPECTIVE JUROR ALVARADO:  Movie industry.

8                THE COURT:  Movie.  All right.  Thank you.

9                PROSPECTIVE JUROR ALVARADO:  I have never served

12:06PM   10    before, so this is my first time and very proud of.  Um, I

11    don't really like to read news because it's always bad, but I

12    do sometimes listen to CNN and MSNBC.

13                THE COURT:  All right.  And you said you're a

14    manager.  You've been a manager for many years?

12:07PM   15                PROSPECTIVE JUROR ALVARADO:  Uh-huh.

16                THE COURT:  What aspect of the movie industry do

17    you --

18                PROSPECTIVE JUROR ALVARADO:  It's in the health

19    industry.

12:07PM   20                THE COURT:  Oh, health industry.

21                PROSPECTIVE JUROR ALVARADO:  For the movie industry.

22    So my company covers those individuals who work in the movie

23    industry.

24                THE COURT:  Oh, I see.

12:07PM   25                PROSPECTIVE JUROR ALVARADO:  And I work in the back

1    office.

2            THE COURT:  All right.  Any reason why you couldn't

3    serve as a juror on this case?

4            PROSPECTIVE JUROR ALVARADO:  No.

12:07PM    5            THE COURT:  All right.  Thank you very much.

6            All right.  Before you get started, we're going to

7    take just a moment.  You can stand up and stretch.  Don't leave

8    the courtroom.  You can stand up and stretch, chat.  I need to

9    talk to the attorneys at the sidebar.

12:07PM    10            Did you have something else?  No?  Okay.  Thank you.

11            Excuse me, ladies and gentlemen.  Why don't you step

12    outside for about ten minutes.

13            Please remember, don't discuss the case, don't form

14    any opinions about the case, don't do any research of any sort.

12:08PM    15    Thank you.

16                (Out of the presence of the prospective jurors:)

17            THE COURT:  All right.  We're on the record outside

18    the presence of the jury.

19            We had one -- we have one small issue.  We intended

12:10PM    20    to dismiss Mr. Castro, but instead -- probably because of a

21    language problem, it was Juror No. 11, Mr. Abrego, that was

22    excused.

23            So we should still excuse Mr. Castro as -- as we

24    intended.

12:10PM    25            Any objection to going ahead without Mr. Abrego?

| | |
|---|---|
| 1 | MR. FEE:  None, Your Honor. |
| 2 | MR. PI:  Not from the Government either. |
| 3 | THE COURT:  All right.  So, first of all, are there |
| 4 | any challenges for cause to any of the jurors up to Juror |
| 12:11PM 5 | No. 34, I think we are? |
| 6 | MR. PI:  Does that include hardship? |
| 7 | THE COURT:  Anything.  Hardship or challenges for |
| 8 | cause.  I think there are a couple who have really stated a |
| 9 | valid hardship. |
| 12:11PM 10 | MR. PI:  Yes, Your Honor.  So just starting in |
| 11 | numerical order, 17.  This was both -- this is the San Luis |
| 12 | Obispo four-hour drive, Mr. Overholt.  And he also has a blood |
| 13 | draw. |
| 14 | THE COURT:  That's right.  I think we should excuse |
| 12:11PM 15 | him. |
| 16 | MR. FEE:  Your Honor, actually, he indicated that |
| 17 | the blood draw could be pushed back.  And he doesn't -- he's |
| 18 | not a caretaker or commuter for kids.  I don't think he |
| 19 | actually said -- he said he noted the distance but did not say |
| 12:11PM 20 | it would prevent him from serving as a juror.  He actually |
| 21 | answered it would not be a problem. |
| 22 | THE COURT:  No, no.  He has two kids, but they're |
| 23 | grown. |
| 24 | MR. FEE:  Exactly.  Meaning -- |
| 12:11PM 25 | THE COURT:  He has a blood draw on Thursday, which |

1    he seemed reluctant -- that was what I thought was a reason to

2    excuse him.

3              MR. FEE:  He -- he volunteered that he could move

4    it, Your Honor.  He said it happens every three weeks.

12:12PM    5              MR. PI:  Your Honor, I mean, in addition to the

6    blood draw, I think that -- I mean, he needs every three weeks.

7    Moving it five days, he was willing to, but that is an

8    imposition, in addition to the distance that he has to come

9    here.

12:12PM   10              THE COURT:  Well, he doesn't -- he's not driving

11    because he's staying in a hotel.

12              MR. PI:  Understood, Your Honor.

13              THE COURT:  Yeah.  He's staying in a hotel.  So it's

14    not -- no, I'm going -- I think we'll keep him for now.

12:12PM   15              All right.  Any other challenges?

16              MR. PI:  So we agreed on 17 -- oh, no.

17              THE COURT:  17 is staying.

18              MR. PI:  He's staying.  Okay.

19              20 is another hardship potentially.  This is the

12:12PM   20    woman whose children missed school today because they live

21    three cities away or go to school three cities away.

22              THE COURT:  Any objection to excusing that juror?

23              MR. FEE:  No, Your Honor.

24              THE COURT:  That's Juror No. 20, Ms. Chagollan.  All

12:12PM   25    right.

UNITED STATES DISTRICT COURT

1       MR. PI:  So with respect to Juror No. 21, he has an

2   11-month-old daughter and a lot of depositions.  He didn't ask

3   for it, but we wouldn't be opposed to a hardship.

4       THE COURT:  You know, as consumers of the legal

12:13PM   5   system, the fact that they have obligations -- no.  They have

6   every reason to serve.

7       MR. PI:  Understood.

8       MR. FEE:  Agreed, Your Honor.

9       THE COURT:  All right.

12:13PM  10       MR. PI:  The last potential hardship for cause, 28,

11   Mr. Iniguez.  He takes his mother to dialysis.

12       THE COURT:  Oh, yes.  I think that's a good hardship

13   challenge.  He's taking care of his mother.

14       Any objection to --

12:13PM  15       MR. FEE:  No, Your Honor.  Agreed to excuse.

16       THE COURT:  All right.  Mr. Iniguez, No. 28.

17       Does the defense have any challenges?

18       MR. FEE:  Yes, Your Honor.

19       THE COURT:  For cause.

12:13PM  20       MR. FEE:  For cause, Your Honor.  Mr. Johnson,

21   No. 18, the general counsel.

22       THE COURT:  Yes.

23       MR. FEE:  Your Honor posed the question -- and I

24   won't be as eloquent -- about whether his legal training and

12:14PM  25   experience could be set aside based on your instructions.  And

1    he gave you three answers, none of which were yes.  The first

2    was I hope so; you inquired again, he said I don't know,

3    Your Honor; and then you inquired again, and he said I think

4    so, Your Honor.  I don't think that's good enough, Your Honor,

12:14PM    5    given that he's a lawyer, essentially suggesting that he's

6    going to find his own path on the law.

7                    THE COURT:  Mr. Pi?

8                    MR. PI:  The Government doesn't object to that.

9                    THE COURT:  All right.  Number 18.

12:14PM    10                    MR. FEE:  Next, Your Honor, No. 29, Mr. Padilla.

11    The gentleman worked at Northrop Grumman.  Frankly, I hope I

12    heard him right when you asked about news sources.  I think he

13    said war.

14                    THE COURT:  He reads about the war.

12:14PM    15                    MR. FEE:  He reads about the war.  Is that what he

16    meant?

17                    THE COURT:  That's what I heard him say.

18                    MR. PI:  Yeah, I don't know --

19                    THE COURT:  He was talking about what he reads the

12:15PM    20    news for.

21                    MR. FEE:  Right.  Okay.  I have nothing on that,

22    Your Honor.

23                    The last one, Your Honor -- sorry.  One moment,

24    Your Honor.

12:15PM    25                    Yeah, I'm sorry, Your Honor.  Just to get back to

1  that.  Part of the concern is that his job by mentioning war,

2  attention to war --

3         THE COURT:  Why don't we do this, why don't I have

4  him come in and I'll ask him a little more about it?

12:15PM  5         MR. FEE:  Thank you.  And also, you know, given the

6  war that is happening in the Middle East right now --

7         THE COURT:  Right.  I'll ask him what he meant by

8  that.

9         MR. FEE:  Thank you, Your Honor.

12:15PM  10        Lastly, No. 31, Mr. Mandel -- or Wandel,

11  Stephane Wandel.  Again, you asked the follow-up question about

12  the contracts.  He gave you three or four answers, none of

13  which were yes.  I think he even said I'm trained to do my own

14  analysis, figure out what makes sense or does not make sense,

12:15PM  15  and then said I'll do my best.

16         THE COURT:  But I took that -- well, I took that as

17  him saying I'm used to taking in information, like we ask the

18  jurors to do, and making -- making his own decision about it,

19  which is what we ask the jurors to do.

12:16PM  20         I thought he was very thoughtful in saying, on the

21  one hand, he has a lot of obligations at work, but he

22  understands he has a duty -- I don't think he's particularly

23  eager, but I think he -- I think he's being straightforward,

24  and I think he would follow the law.  That was what I took as a

12:16PM  25  whole from his answers.

```
 1              MR. FEE:  Understood, Your Honor.

 2              MR. PI:  Same from the Government.  We would agree

 3   with the Court's analysis.

 4              THE COURT:  All right.  Let's ask Mr. --

 5              MR. FEE:  Padilla.

 6              THE COURT:  -- Mr. Padilla to come in for a moment.

 7              (In the presence of Prospective Juror Padilla:)

 8              THE COURT:  Hi, Mr. Padilla.  I just had a follow-up

 9   question because I wasn't sure I heard all of one of your

10   answers.

11              PROSPECTIVE JUROR PADILLA:  Yes, ma'am.

12              THE COURT:  When you were talking about what you

13   read or watch or listen to in terms of news, can you tell me

14   about that again?

15              PROSPECTIVE JUROR PADILLA:  Yeah.

16              THE COURT:  I heard you say the word "war," but I'm

17   not sure I understood.

18              PROSPECTIVE JUROR PADILLA:  It's a war magazine,

19   it's through work and the aerospace.  And I'm in that industry.

20   I build products for the war fighter.  And so that's what my

21   main --

22              THE COURT:  So is it sort of trade magazines that

23   you read?

24              PROSPECTIVE JUROR PADILLA:  Yeah.  Yeah.  Things

25   like that, yeah.
```

12:16PM (line 5)
12:17PM (line 10)
12:17PM (line 15)
12:17PM (line 20)
12:18PM (line 25)

UNITED STATES DISTRICT COURT

1          THE COURT:  Oh, I see.  All right.

2          Thank you very much.  You can go back outside.

3              (Out of the presence of the prospective jurors:)

4          THE COURT:  All right.  Anything further as to

12:18PM  5  Mr. Padilla?

6          MR. FEE:  No, Your Honor.  Thank you.

7          THE COURT:  Thank you.  I'm glad we cleared that up.

8          All right.  As I calculate it, our 12th juror now is

9  Juror No. 16, Mr. Burau.  And the two alternates would be

12:18PM  10  Mr. Overholt and Ms. Voss.  That's 17 and 19.

11          Again, you can exercise your challenges to anyone in

12  the entire panel if you'd like.

13          MR. PI:  Your Honor, can we potentially revisit a

14  couple of jurors?  I was -- when I went through my list, it was

12:18PM  15  four for hardship.  I did have a couple others that I just

16  wanted to get potentially follow-up questions.

17          THE COURT:  All right.

18          MR. PI:  The first was Juror No. 13, which this --

19  Mr. Cervantes.  He had said that he finds -- he would find it

12:19PM  20  very hard to decide between somebody's innocence versus guilt.

21  And, you know, there's some questions around that.  I would

22  just like to probe -- the Court to probe a little bit onto

23  that.  He was also on a hung jury, which -- you know, that in

24  and of itself is not a problem, but in combination with his

12:19PM  25  statement about the difficulty deciding innocence or guilt, we

1    think it would be important to ask him some questions.

2            THE COURT:  Anyone else?

3            MR. PI:  Yes, No. 4.  I think Ms. Kumar, she

4    addressed the issue of whether she would be embarrassed to tell

12:19PM  5    her son who is a former public defender if she were part of a

6    guilty verdict.  But it would be -- I think it would be helpful

7    just to probe that as well to see if -- to see if, you know --

8            THE COURT:  Well, I think I've asked her about as

9    much as I could ask her on that.  And she said -- I mean, she

12:20PM  10   acknowledged, you know, her son's a public defender.  She

11   talked to him about his work.  But she said that she, you know,

12   wouldn't favor one side or the other.

13           MR. PI:  That's fair enough, Your Honor.  So maybe

14   just 13 at that -- 13, yes.

12:20PM  15           THE COURT:  Is it 13?  Right.

16           Anything else, Mr. Fee?

17           MR. FEE:  No, Your Honor.  I think you did ask the

18   follow-up to Mr. Cervantes.  So I think we'll be repeating

19   ourselves.

12:20PM  20           THE COURT:  Well -- no, actually, I have an asterisk

21   by his name, which meant I meant to go into that a little

22   further.

23           So let's ask Mr. Cervantes, Juror No. 13, to --

24   Pedro Cervantes.

12:20PM  25               (In the presence of Prospective Juror Cervantes:)

```
 1              THE COURT:  Mr. Cervantes, I just had a follow-up
 2     question or two for you.  If you want to come forward and stand
 3     by that microphone.
 4              You previously were on a jury that -- but the jury
 5     couldn't reach a verdict; right?
 6              PROSPECTIVE JUROR CERVANTES:  Right.
 7              THE COURT:  And I think when I talked to you before,
 8     I asked you if -- if you would have any reservations or be
 9     reluctant to serve again on a jury.  Do you remember that?
10              PROSPECTIVE JUROR CERVANTES:  Yeah.
11              THE COURT:  And you said it's difficult for you.
12     Could you tell me a little more about that?
13              PROSPECTIVE JUROR CERVANTES:  I don't like making
14     decisions on other people's lives.  This is going to affect him
15     one way or another.
16              THE COURT:  And do you -- when you say you don't
17     like to do it, do you think you would be able to listen to the
18     evidence with an open mind and have a frank and open discussion
19     with the other jurors when it's time to deliberate?
20              PROSPECTIVE JUROR CERVANTES:  Well, I'll do my best.
21              THE COURT:  All right.  But do you have -- when you
22     say it would be difficult for you, can you tell me a little
23     more about that?
24              PROSPECTIVE JUROR CERVANTES:  Um, I just don't feel
25     comfortable, you know, making a decision.  I mean, of course
```

12:21PM (line 5)
12:21PM (line 10)
12:21PM (line 15)
12:22PM (line 20)
12:22PM (line 25)

1    I'm going to end up with a decision because I'm going to have

2    to.  But other than that, I don't --

3              THE COURT:  Would you be uncomfortable talking about

4    your view of the case with the other jurors?

12:22PM    5              PROSPECTIVE JUROR CERVANTES:  No.

6              THE COURT:  If -- if all of the other jurors had a

7    view that was different from yours, after you consider their --

8    what they have to say and they consider what you have to say,

9    would you be able to stick with your own view of the case, even

12:22PM   10    if everyone else disagreed with you?

11              PROSPECTIVE JUROR CERVANTES:  Yeah.

12              THE COURT:  All right.  Thank you very much.

13              (Out of the presence of the prospective jurors:)

14              THE COURT:  All right.  I'm going to deny the

12:23PM   15    challenge as to that juror.  I think he's expressed that it's

16    something difficult, but he would do it, especially -- I think

17    he's very specific about being able to hold his own in

18    deliberations.

19              All right.  So the first challenge is with -- excuse

12:23PM   20    me.  The first challenge is with the Government.

21              MR. PI:  Yes.  The Government would ask that the

22    Court thank and excuse Juror No. 4.

23              THE COURT:  Ms. Kumar.  All right.

24              And the next challenge -- the defense has two

12:23PM   25    challenges now.

1          MR. FEE:  Your Honor, Juror Nos. 6 and 8.

2          THE COURT:  Ms. Tabirara, Mr. Ha.

3          MR. FEE:  Correct, Your Honor.

4          THE COURT:  All right.  Our 12th juror now is

12:24PM   5   Mr. Moaven.  And the Government has the challenge.

6          MR. PI:  The Government would ask the Court to thank

7   and excuse Juror No. 13, please.

8          THE COURT:  Mr. Cervantes.

9          All right.  Now we're up to Juror No. 22, Ms. Immer.

12:24PM   10   And the defense has two challenges.

11          MR. FEE:  Your Honor, Juror Nos. 14, Mr. Stein, and

12   16, Mr. Burau.

13          THE COURT:  16 -- oh.  Mr. Burau.  14 and 16.  All

14   right.

12:25PM   15          And now we're up to Ms. Elmer, No. 24.  And the

16   challenge is with the -- wait a minute.  Well, let me think.

17   The challenge is with the Government.

18          MR. PI:  Oh, I'm sorry, Your Honor.  The Government

19   would ask the Court to thank and excuse Juror No. 10.

12:25PM   20          THE COURT:  All right.  Ms. Sampaio.  Thank you.

21          Now we're up to Ms. Simmons.  And the challenge --

22   or the defense has two challenges.

23          MR. FEE:  I'm sorry, Your Honor.  Two for us again?

24          Thank you.  Your Honor, we're going to strike Juror

12:26PM   25   No. 7 and Juror No. 19.

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | THE COURT:  Ms. Voss.                                              |
|       | 2  | MR. FEE:  That's right, Your Honor.                               |
|       | 3  | THE COURT:  Okay.  And now we're up to Mr. Lopez.                 |
|       | 4  | MR. PI:  What number is Mr. Lopez, Your Honor?                    |
| 12:26PM | 5  | THE COURT:  Pardon me?                                            |
|       | 6  | MR. PI:  What number is Mr. Lopez?                                |
|       | 7  | THE COURT:  He's 27.  Let me just make sure I've got            |
|       | 8  | this right.                                                       |
|       | 9  | Yes.  He's No. 27, and he's the 12th juror.                       |
| 12:26PM | 10 | MR. PI:  Yes, Your Honor.  It's the Government's               |
|       | 11 | turn?                                                             |
|       | 12 | THE COURT:  Yes.                                                  |
|       | 13 | MR. PI:  The Government would ask the Court to thank            |
|       | 14 | and excuse Juror No. 26, please.                                 |
| 12:26PM | 15 | THE COURT:  Mr. Alvarez.                                          |
|       | 16 | MR. FEE:  I'm sorry.  That was 36, Your Honor?                   |
|       | 17 | THE COURT:  26.                                                   |
|       | 18 | MR. FEE:  26.                                                     |
|       | 19 | THE COURT:  All right.  Now we're up to Mr. Padilla,             |
| 12:27PM | 20 | and the defense has two challenges.                              |
|       | 21 | MR. FEE:  Your Honor, we're going to strike Juror              |
|       | 22 | No. 29 and Juror No. 31.                                          |
|       | 23 | THE COURT:  The challenge is with the Government.                 |
|       | 24 | MR. PI:  Sorry, Your Honor.  May I have just ten               |
| 12:27PM | 25 | seconds to confer with my counsel?                               |

```
1              THE COURT:  Yes.

2              MR. PI:  Thank you.  Co-counsel.

3                  (Off-the-record discussion between counsel.)

4              MR. PI:  Your Honor, if the Government skips and the

5   defense -- if we pass and the defense exercises two more, do we

6   lose those, that one that we passed on?

7              THE COURT:  No.

8              MR. PI:  Okay.

9              THE COURT:  Well, you lose the one you passed on,

10  but you have one more still.

11             MR. PI:  Okay.

12                 (Pause in the proceedings.)

13             MR. PI:  Government passes, Your Honor.

14             THE COURT:  All right.  This is the defense's

15  challenge.

16             MR. FEE:  One moment, Your Honor.  I'm sorry.

17                 (Off-the-record discussion between counsel.)

18             MR. FEE:  Your Honor, I'm sorry.  We'll strike Juror

19  No. 27.

20             THE COURT:  All right.  That's Lopez Gonzalez.

21             Okay.  And this is the Government's last challenge.

22             MR. PI:  Government passes.

23             THE COURT:  Defense?

24             MR. FEE:  I'm sorry, Your Honor.  One moment.

25             Your Honor, we're going to strike Juror No. 23.
```

12:28PM  5
12:28PM  10
12:28PM  15
12:29PM  20
12:30PM  25

**UNITED STATES DISTRICT COURT**

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 12:31PM | 5 |

THE COURT:  Ms. Schellert.  All right.

So the jury consists of, No. 1, Hirway; No. 2, Daboul; No. 3, Webb; No. 9, Lau; 17, Overholt; 21, Moaven; 22, Immer; 24, Elmer; 25, Simmons; 30, Eltaib; 32, McCarthy.  Agreed?

MR. PI:  Is that -- that's -- is that 11 or 12?  I counted 11.

THE COURT:  Two, three, four, five, six, seven, eight, nine, ten -- oh, 11.  Tang.

MR. PI:  33?

THE COURT:  Is 33.

MR. PI:  Yes, Your Honor.

THE COURT:  So now we have alternates.

I haven't -- we could ask Ms. Gutierrez to come in.

MR. PI:  Oh, we ran out of --

THE COURT:  Well, you each have one challenge.  Right now -- the alternates right now are Alvarado, who you've heard from, and Gutierrez, who you haven't heard from.

MR. PI:  May I ask what numbers those --

THE COURT:  34 and 35.

MR. FEE:  Your Honor, I don't believe we heard from 35.

THE COURT:  Exactly.

MR. FEE:  Got it.  Sorry.

MR. PI:  So the Government is -- if you're asking

**UNITED STATES DISTRICT COURT**

|  |  |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 12:32PM | 5 |

1    about strikes, we don't want to strike at this time.  We'd

2    rather hear from 35 as well.

3              THE COURT:  Why don't we have -- Daniel, why don't

4    you ask Ms. Gutierrez, Mr. Accooe, and Mr. Gische to come in.

5    And they can sit in their regular seats.

6              So each side gets one peremptory for the alternates.

7              MR. PI:  Understood.  Thank you.

8                   (In the presence of the Prospective Jurors

9                    Gutierrez, Accooe, and Gische:)

10             THE COURT:  All right.  Ms. Gutierrez, you were just

11   about to answer the questions.

12             PROSPECTIVE JUROR GUTIERREZ:  I was.

13             THE COURT:  Now is your chance.

14             PROSPECTIVE JUROR GUTIERREZ:  Okay.  My name is

15   Stephanie Lee Gutierrez.  I'm a chief compliance officer at my

16   family's business.  It's warehousing and distribution in the

17   IE.  I live in Walnut, California.  I'm not married.  And I

18   don't have any children.  And it's a family business, so my mom

19   is the CEO, my aunt is the CFO, and my cousin is the DC

20   manager.

21             THE COURT:  And you said the IE, you mean the

22   Inland Empire?

23             PROSPECTIVE JUROR GUTIERREZ:  Yes.

24             THE COURT:  And your education?

25             PROSPECTIVE JUROR GUTIERREZ:  I have a bachelor's

| | |
|---|---|
| 1 | degree in psychology. |
| 2 | THE COURT:  Thank you. |
| 3 | PROSPECTIVE JUROR GUTIERREZ:  And I've never been in |
| 4 | any trial jury.  And I just get my news from online, like |
| 12:34PM 5 | Instagram and -- |
| 6 | THE COURT:  All right. |
| 7 | PROSPECTIVE JUROR GUTIERREZ:  -- YouTube. |
| 8 | THE COURT:  Do you -- do you live by yourself or do |
| 9 | you live with your family? |
| 12:34PM 10 | PROSPECTIVE JUROR GUTIERREZ:  I live with my family. |
| 11 | THE COURT:  All right.  The ones you've told us |
| 12 | about who work in the family business. |
| 13 | PROSPECTIVE JUROR GUTIERREZ:  Yes.  My mom, my aunt, |
| 14 | and my cousin.  And my brother, he just goes to school. |
| 12:34PM 15 | THE COURT:  All right.  Any reason why you couldn't |
| 16 | serve on a trial of this length? |
| 17 | PROSPECTIVE JUROR GUTIERREZ:  No. |
| 18 | THE COURT:  All right.  Thank you very much. |
| 19 | And next is Mr. Accooe. |
| 12:34PM 20 | PROSPECTIVE JUROR ACCOOE:  Yes.  Hi.  I'm |
| 21 | Philip Accooe.  I'm a clinical laboratory scientist.  I have a |
| 22 | bachelor's from Rutgers University and two master's from |
| 23 | Johns Hopkins University.  I live in Long Beach.  I'm single. |
| 24 | No children.  And I live alone.  I have no experience on a |
| 12:35PM 25 | jury.  And I don't have any subscriptions to any specific |

```
 1    publications.

 2            THE COURT:  You're a clinical laboratory scientist.

 3    Can you tell me a little bit about your field of research?

 4            PROSPECTIVE JUROR ACCOOE:  So I'm clinical, so I

 5    work in a hospital.  I work for the U.S. Department of Veterans

 6    Affairs in Long Beach.

 7            THE COURT:  Oh, all right.

 8            PROSPECTIVE JUROR ACCOOE:  So for, like -- I pretty

 9    much oversee, like, the blood transfusion program at the

10    hospital so the blood transfusion laboratory.  I oversee all

11    the testing, the regulatory compliance, and things like that.

12            THE COURT:  I see.

13            All right.  Thank you very much.

14            And, Mr. Gische.

15            PROSPECTIVE JUROR GISCHE:  Yes.  James Gische.  I'm

16    an operations planning manager at an autonomous vehicle

17    company.  Educational background, I have an undergraduate

18    degree in economics and an MBA.  I live in Los Angeles.  I'm

19    married.  My wife is -- she works in real estate asset

20    management at JPMorgan.  I have one child, a son, he's a year

21    old.  No other adults in the household.  I did serve on a jury

22    about 10 years ago.  It was in San Francisco.  I was living in

23    San Francisco at the time.  It was a civil case regarding a

24    rent dispute between a landlord and a business tenant.

25            THE COURT:  Did the jury reach a verdict?
```

12:35PM (line 5)
12:35PM (line 10)
12:35PM (line 15)
12:36PM (line 20)
12:36PM (line 25)

1          PROSPECTIVE JUROR GISCHE:  They did, yes.

2          THE COURT:  Were you the foreperson?

3          PROSPECTIVE JUROR GISCHE:  No.

4          THE COURT:  Thank you.

12:36PM    5          PROSPECTIVE JUROR GISCHE:  Uh, and then in terms of

6    news and -- and all that, I read primarily *New York Times*,

7    *Washington Post*, listen to NPR, *The Atlantic*, um, you know,

8    those are probably the main ones.

9          THE COURT:  And for all three of you -- I think I

12:37PM   10    asked Ms. Gutierrez this, I think I forgot to ask Mr. Accooe --

11    any reason why you couldn't serve on a jury trial of this

12    length?

13          PROSPECTIVE JUROR GISCHE:  No.

14          THE COURT:  All right.  And, Mr. Accooe, you're

12:37PM   15    shaking your head no?

16          PROSPECTIVE JUROR ACCOOE:  No.

17          THE COURT:  Okay.  Thank you very much.  You can go

18    back outside.

19          We're just about done.

12:37PM   20          (Out of the presence of the prospective jurors:)

21          THE COURT:  All right.  So we're on the record

22    outside the members of the jury panel.

23          The alternates right now would be No. 34 and No. 35.

24    Each side has one peremptory.

12:37PM   25          Are there any challenges for cause as to the -- the

UNITED STATES DISTRICT COURT

```
 1   four --

 2                MR. PI:  No from the Government.

 3                THE COURT:  Pass for cause?

 4                MR. FEE:  We're not going to exercise -- oh, nothing

 5   for cause.  Sorry, Your Honor.

 6                THE COURT:  Does the Government have any peremptory

 7   challenges?

 8                MR. PI:  Yes.  The Government would like to ask the

 9   Court to thank and excuse Juror No. 34, please.

10                THE COURT:  Thank you.

11                That means that Accooe and Gutierrez would be the

12   two alternates.

13                MR. FEE:  We're going to pass, Your Honor.

14                THE COURT:  All right.  So Ms. Gutierrez and

15   Mr. Accooe are the two alternates.

16                Thank you.

17                We'll bring the jury back in, and I'll just tell

18   them who's serving.  And to reiterate that, that's No. 1,

19   No. 2, No. 3, No. 9, No. 17, No. 21, No. 22, 24, 25, 30, 32,

20   and 33.  Agreed?

21                MR. PI:  Yes.  Agreed from the Government.

22                MR. FEE:  Agreed.

23                THE COURT:  All right.  Let's bring them in.

24                Oh, I'm sorry.  I'm sorry.  Just one moment.  If you

25   could wait outside just one more moment.
```

**UNITED STATES DISTRICT COURT**

1          Counsel, we forgot to discuss Mr. Eltaib who has a

2     religious obligation, he said, on Friday in the middle of the

3     day.  So I think that's a hardship, and I think he should be

4     excused.

12:40PM   5          MR. PI:  Yes, Your Honor.

6          What number is Mr. Eltaib, please.

7          THE COURT:  He's No. 30.

8          MR. PI:  Thank you.

9          Yes.  The Government does not object to that.

12:40PM   10         MR. FEE:  Your Honor, perhaps there could be more

11    inquiry on this.  I believe he's referring to the services.

12         THE COURT:  He said he had a congregation.  So I --

13    and then I asked -- my follow-up is this a religious obligation

14    and he said yes.  So I think he -- I should have brought it up

12:40PM   15    earlier, I apologize.

16         MR. FEE:  Your Honor, perhaps it's worth at least a

17    question again about what is the nature of this obligation.  I

18    don't know what he means when he says I have a congregation.  I

19    imagine it could be --

12:40PM   20         THE COURT:  All right.  Let's bring him in.

21             (In the presence of Prospective Juror Eltaib:)

22         THE COURT:  Mr. Eltaib, I apologize, I forgot to ask

23    you something earlier to follow up.

24         You said you have a religious obligation on Friday?

12:41PM   25         PROSPECTIVE JUROR ELTAIB:  Uh-huh.  Yes.

**UNITED STATES DISTRICT COURT**

|     |     |
| --- | --- |
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 12:41PM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 12:42PM | 10 |

1        THE COURT:  Can you tell me about that?

2        PROSPECTIVE JUROR ELTAIB:  Yeah.  I'm a Muslim.  We

3   have our prayer, our holy day on Friday.  So every season it

4   varies, but right now it's from 1:00 to 2:00.  And depending

5   how far the mosque is going back and forth.  And then the

6   prayer itself may take about an hour or so, just on Fridays.

7        THE COURT:  It's on Fridays.

8        So do you know which mosque you would be attending?

9        PROSPECTIVE JUROR ELTAIB:  Well, because I live in

10   Simi Valley.  But in this area, there is one in downtown, I

11   think, on Vermont and 3rd.

12        THE COURT:  So you could attend service at that?

13        PROSPECTIVE JUROR ELTAIB:  I can, yeah.

14        THE COURT:  All right.  So if we had an extended

15   lunch hour on Friday and you could attend the mosque, would

16   that be agreeable for you?

17        PROSPECTIVE JUROR ELTAIB:  Sure.

18        THE COURT:  All right.

19        PROSPECTIVE JUROR ELTAIB:  I just need time to go

20   and come back and then one hour for prayer time.  That's all.

21        THE COURT:  A little bit -- like a little -- like an

22   hour and a half?  Would that be enough time?

23        PROSPECTIVE JUROR ELTAIB:  Maybe an hour and a half,

24   two hours.  I -- all I need is just time to go and come back

25   and then attend the prayer.  That's all I need.

```
 1              THE COURT:  All right.  Thank you very much.
 2              PROSPECTIVE JUROR ELTAIB:  You're welcome.
 3                  (Out of the presence of the prospective jurors:)
 4              THE COURT:  All right.  We can -- oh.  Go ahead.
 5   I'm sorry.  I was just talking to the lawyers.
 6              Well, he seems willing to serve.  I think we can
 7   accommodate that depending on where we are on Friday.  But one
 8   way or the other, we'll accommodate his schedule.
 9              All right.  Let's bring the rest of the jury in --
10   or bring all of them in, Daniel.  Sorry.
11              THE COURTROOM DEPUTY:  Yes.
12                  (In the presence of the prospective jurors:)
13              THE COURT:  All right.  Let the record reflect the
14   presence of all members of the jury panel, all counsel -- oops,
15   not quite all members -- now I have all members, and counsel
16   and the defendant also present.
17              All right.  Thank you, ladies and gentlemen, for
18   your patience and attention.  We are done with jury selection,
19   in time to have a slightly late lunch.
20              So I'm going to read off the names of those who will
21   serve on the jury.  Listen carefully for your name.  I hope I'm
22   pronouncing it correctly.
23              If I call your name, don't leave.  We will find you.
24   If I -- if I don't call your name, that means I'm about to
25   thank you and excuse you.
```

12:42PM (line 5)
12:43PM (line 10)
12:45PM (line 15)
12:45PM (line 20)
12:45PM (line 25)

1      All right.  So the jury in this case is going to be

2  the following:  Juror No. 1, Ms. Hirway; Juror No. 2,

3  Mr. Daboul; Juror No. 3, Mr. Webb; Juror No. 9, Ms. Lau; Juror

4  No. 17, Mr. Overholt; Juror No. 21, Mr. Moaven; No. 22,

12:46PM  5  Ms. Immer; No. 24, Ms. Elmer; No. 25, Ms. Simmons; No. 30,

6  Mr. Eltaib; No. 32, Ms. McCarthy; No. 33, Ms. Tang.  And then

7  the alternates will be Ms. Gutierrez and Mr. Accooe.

8      All right.  The rest of you, thank you very much for

9  your time and attention today.  I appreciate the willingness

12:46PM  10  and the sacrifice that you've made, even to attend the summons.

11      Stop congratulating yourselves, those of you who are

12  leaving.  And go back down to the jury room.

13      And if I called your name, stay here, we're going to

14  reseat you.

12:47PM  15          (Pause in the proceedings.)

16      THE COURT:  All right.  We're going to reseat you

17  now.  So Mr. Tamayo, Mr. Reddick will tell you -- the first

18  three of you, just stay right where you are.

19      I'm sorry.  We're going to be playing musical

12:49PM  20  chairs.

21      Never mind.  You're fine.  Keep going.

22      And the alternates go at the end.  They can go in

23  the first row.  Right there, yeah.

24      All right.  Would you please rise to be sworn.  But,

12:50PM  25  first, just the first 12, not the two alternates yet.

1     THE COURTROOM DEPUTY:  Please raise your right hand.

2     Ladies and gentlemen of the jury, do you solemnly

3 swear that you will well and truly try the cause now before

4 this Court and a true verdict therein render according to the

12:50PM 5 evidence and instructions of the Court, so help you God?

6     THE JURORS:  (Collectively) I do.

7     THE COURTROOM DEPUTY:  Thank you.

8     THE COURT:  All right.  Now the alternates can

9 stand.

12:50PM 10     THE COURTROOM DEPUTY:  Please raise your right hand.

11     Do each of you as alternate jurors solemnly swear

12 that you will well and truly try the cause now before this

13 Court and a true verdict therein render according to the

14 evidence and instructions of the Court, so help you God?

12:50PM 15     THE ALTERNATE JURORS:  (Collectively) I do.

16     THE COURTROOM DEPUTY:  Thank you.

17     THE COURT:  Thank you.

18     Well, I'm sure you'll be relieved that the first

19 order of business is lunch.  And what I like to do is I like to

12:50PM 20 finish jury selection, and then I can let everybody go who's

21 going to go and we take a little bit later lunch.

22     So I will expect you back here at 2:00 o'clock this

23 afternoon.  Before you go, I want to give you the formal

24 instruction that is very important.

12:51PM 25     Do not communicate with anyone in any way and do not

let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This restriction includes discussing the case in person, in writing, by phone, tablet, computer, or any other means via e-mail, text messaging, any Internet chat room, blog, website, application -- it's really hard to keep this up-to-date, but I think these are the most -- there might have been something since I took the bench this morning -- but including, but not limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other form of social media.  This restriction also applies to communicating with your fellow jurors until I give you the case for deliberation.  And it applies also to communicating with everyone else, including your family members, your employer, the media or press, and the people involved in the trial.  You may notify your family and your employer that you've been seated as a juror in the case and how long you expect the trial to last but nothing else.

If you are asked or approached in any way about your jury service or anything about this case, you must respond that you've been ordered not to discuss the matter and then you must report that contact to the court by one of my staff members that I introduced you to.

Because you will receive all the evidence and legal instruction you may -- you properly may consider to return a verdict, do not read, watch, or listen to any news media -- any

news or media accounts or commentary about the case or anything to do with it.

I don't have any information that there will be news reports about the case, but it's always a possibility.

Do not do any research, such as consulting -- this is old fashioned -- consulting dictionaries, encyclopedias -- remember those? -- books, searching the Internet, or using any other reference materials. Do not make any investigation or in any other way try to learn about the case on your own. Don't visit or view any place discussed in the case. Don't use the Internet or any other resource to search for or view any place discussed during the trial. Do not do any research about the case, the law, or the people involved, including the parties, the witnesses, or the lawyers until you've been excused as jurors at the end of the trial.

If you happen to read or hear anything touching on this case in the media, turn away, turn it off, and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on the evidence that's been presented here in court.

The witnesses that you'll hear from in court, they take an oath to tell the truth. And the accuracy of their testimony is tested through cross-examination, through the trial process.

1          But if you do any research or investigation outside

2     the courtroom or gain any information through improper

3     communications, then your verdict may be influenced by

4     inaccurate, incomplete, or misleading information that has not

12:54PM  5     been tested by the trial process.

6          Each of the trial -- each of the parties is entitled

7     to a fair trial by an impartial jury.  And if you decide the

8     case based on information not presented in court, you will have

9     denied the parties a fair trial.

12:54PM  10          Remember that you just took an oath to follow these

11     rules, and it's very important that you do so.

12          It's important in terms of your investment as well

13     because sometimes -- thank goodness it's never happened to

14     me -- but there will be a trial in a case and you will all have

12:54PM  15     spent time listening and participating and then near the end of

16     the trial a juror goes on Facebook and posts something about

17     the trial or reads something and we have to start all over

18     again with a new jury and you've wasted your time.  And we

19     certainly don't want to do that.  So these rules are very

12:55PM  20     important.

21          Thank you.

22          Mr. Tamayo and Mr. Reddick are going to show you --

23     you'll now have access to the secured hallway.  They'll show

24     you how to get back here.  You have your private jury room

12:55PM  25     where you can leave your belongings.  There's cooking

facilities, you can leave lunch there in the future when you

come in.  And they'll tell you how to gain access.

We'll see you back in the jury room no later than

2:00 o'clock.  We'll start promptly at 2:00 o'clock with all of

12:55PM   you.

And we'll begin with the -- the first thing is I

will give you instructions on the law, and then you'll hear the

opening statements and then witnesses this afternoon.

Thank you.  You're excused.

12:55PM   THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  All right.  We're in recess.

If you need to stay in the courtroom or set up your

things for your openings, I think Mr. Tamayo and Mr. Reddick

12:56PM   will be happy to have you stay in if you need to.

MR. PI:  Yes, Your Honor.

Can we ask a couple of housekeeping issues before --

THE COURT:  Certainly.

MR. PI:  One of them is just in regards to timing

12:56PM   for witnesses and today's proceedings.  I understand the

Court -- we go until 4:30 typically.

THE COURT:  Typically.  Sometimes -- you may be

seated.  Sometimes -- not if you're speaking.

The jury's been here since 7:00 o'clock this

12:56PM   morning.  So sometimes I -- I let them go a little early, like

1    4:00 o'clock, depending on the flow of witnesses.

2              MR. PI:  Understood, Your Honor.

3              THE COURT:  So how long do you -- I should have set

4    a time limit for your openings, but I'm anticipating no longer

12:57PM   5    than 30 minutes for each side.

6              MR. PI:  We'll be less than ten on the Government's

7    side, Your Honor.

8              THE COURT:  All right.

9              MR. FEE:  Yes, Your Honor.

12:57PM  10              MR. PI:  So assuming we get back at 2:00 and have

11    instructions and those shorter openings, I have four witnesses

12    ready today.  But if we're not -- if there's kind of no chance

13    we would get to the fourth one, I would rather let them know

14    that he's off call today.

12:57PM  15              THE COURT:  I would doubt that we'd get beyond three

16    witnesses today.  And like I said, it's -- they've been here

17    since early this morning, so I don't mind letting them go a

18    little earlier the first day.

19              MR. PI:  Yes.  Then if we could let the fourth one

12:57PM  20    know that he'll be tomorrow morning.

21              THE COURT:  And who -- so who are your first three?

22              MR. PI:  The first three will be Mr. Buttgenbach --

23    Dr. Buttgenbach, Mr. DeBrino, and then Mr. Ross.

24              THE COURT:  All right.

12:57PM  25              MR. PI:  The fourth would have been Mr. Consoletti.

1          THE COURT:  So he'll be tomorrow morning probably.

2          MR. PI:  We'll let him know that he doesn't have to

3    come today.

4          THE COURT:  Great.

12:57PM    5          MR. PI:  Thank you, Your Honor.  And my

6    co-counsel --

7          MR. AVEIS:  If I may be heard.  Thank you,

8    Your Honor.  Mark Aveis for the Government.  I'm responsible

9    for delivering the Government's opening statement.

12:58PM    10         In light of the litigation this morning and defense

11   counsel's claims, I'd like to front, if I can, right now what I

12   intend to say --

13         THE COURT:  All right.

14         MR. AVEIS:  -- so that there aren't any fireworks.

12:58PM    15         THE COURT:  All right.

16         MR. AVEIS:  So in relation to the objection, if you

17   will, that was raised this morning that the Court ruled on, I

18   intend to indicate that the defendant turned to Mr. Farnsworth

19   and together they plotted a side hustle to defraud HMNY and

12:58PM    20   MoviePass.  I'll describe how the evidence will show that.

21         It relates to the fact that Mr. Farnsworth overrode

22   controls designed to protect company money and shareholders

23   from fraud by characterizing the defendant's compensation that

24   the defendant ultimately used to repay his personal creditors

12:58PM    25   as something that was not permitted under his contract.  That's

```
 1   what I intend to say about that.
 2           THE COURT:  All right.
 3           MR. AVEIS:  Thank you.
 4           THE COURT:  And your objection is noted, the record
 5   that you made earlier.
 6           MR. FEE:  And I think it's sharpened.  If plotted
 7   together, it is a brand-new theory of the case that they're
 8   offering today.
 9           THE COURT:  All right.  Well, your objection is
10   noted for the record.
11           Now, does either side intend to show any exhibits
12   during your openings?
13           MR. AVEIS:  I do not, Your Honor.  Thank you.
14           MR. NICHOLSON:  No, Your Honor.
15           THE COURT:  All right.  Thank you.  We're in recess.
16           MR. AVEIS:  Thank you very much.
17           MR. FEE:  Your Honor, I'm sorry.  I have one issue
18   relating to the first witness.  We can do it after lunch, if
19   you'd like.
20           THE COURT:  No.  Go ahead.
21           MR. FEE:  So Dr. Buttgenbach, there was an agreement
22   with the Government that they would not be arguing that the --
23   the means by which Dr. Buttgenbach's $41,000 debt turned into
24   $110,000 debt constituted -- was a result of fraud or deception
25   on Mr. Itum's part.  I want to note that for the record just to
```

12:58PM (line 5)
12:59PM (line 10)
12:59PM (line 15)
12:59PM (line 20)
12:59PM (line 25)

avoid any car accidents during the direct.

THE COURT:  We don't want fireworks, we don't want car accidents.

MR. FEE:  Exactly.

MR. PI:  Your Honor, that is correct, that there is such a stipulation.  But we are not going to argue anything during witness examinations at all.  But we do anticipate asking him questions about how much he agreed to allow Mr. Itum to charge on his credit card and ultimately how much the overall debt was and what his understanding of how it got to that amount.

MR. FEE:  I'm not sure his understanding is relevant, and it may not be admissible depending how they ask it.  But if the point is they're going to elicit facts about what happened, understood, Your Honor.

THE COURT:  All right.

MR. FEE:  Only other point, Your Honor, is -- I just want to make sure the witnesses have been admonished by the Government.  The Government's witnesses have been admonished about the Court's motion in limine ruling with respect to the prior conviction.  Many of these witnesses we have seen in FBI interview summaries are aware of Mr. Itum's prior --

THE COURT:  So make sure that that doesn't come up.

MR. PI:  Yes, Your Honor.

MR. FEE:  Thank you, Your Honor.  That's all.

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | THE COURT:  All right.  Thank you. |
| 2 | (Lunch recess taken.) |
| 3 | (Out of the presence of the jury:) |
| 4 | MR. PI:  Yes, Your Honor.  I asked to just meet with |
| 02:11PM 5 | the Court for a moment to see if we've resolved the issue on |
| 6 | the defense side about moving these exhibits into evidence |
| 7 | pursuant to the stipulation of the parties.  I didn't want to |
| 8 | have a hang-up in front of the jury. |
| 9 | THE COURT:  All right.  The stipulation stands; is |
| 02:12PM 10 | that right? |
| 11 | MR. FEE:  Yes, Your Honor. |
| 12 | THE COURT:  All right. |
| 13 | MR. PI:  Should we move in front of the jury or just |
| 14 | move -- |
| 02:12PM 15 | THE COURT:  You can do it now.  I'll accept a |
| 16 | stipulation.  That's all I have to do, and that's done. |
| 17 | MR. PI:  Yes, Your Honor.  So the Government moves |
| 18 | that the stipulation between the parties entered at document |
| 19 | entry 82 be entered by the Court. |
| 02:12PM 20 | THE COURT:  So ordered. |
| 21 | (Exhibit 82 for identification |
| 22 | and received into evidence.) |
| 23 | MR. PI:  Thank you. |
| 24 | THE COURT:  Thank you. |
| 02:12PM 25 | MR. PI:  Your Honor, pursuant to the Court's order, |

**UNITED STATES DISTRICT COURT**

I also admonished the first two witnesses regarding the motion in limine.  The third is not here yet.  But after the first two, if I could have a two-minute recess to make that admonishment, I will do so.

THE COURT:  All right.

MR. PI:  Thank you.

(In the presence of the jury:)

THE COURT:  Let the record reflect the presence of all members of the jury, all counsel and the defendant present.

All right.  I'm going to give the preliminary instructions at this time, ladies and gentlemen.  At the end of the case, I will give you the full and complete instructions that will govern in your deliberations.

(Reading:)

"When you deliberate, it will be your duty to weigh and to evaluate all the evidence received in the case and in that process to decide the facts.  To the facts as you find them, you will apply the law as I give it to you, whether you agree with the law or not.  You must decide the case based solely on the evidence and the law before you.

"Perform these duties fairly and impartially.  You should not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes,

**UNITED STATES DISTRICT COURT**

sympathy, prejudice, fear, public opinion, or biases, including
unconscious biases.  Unconscious biases are stereotypes,
attitudes, or preferences that people may consciously reject
but may be expressed without conscious awareness, control, or
intention.  Like conscious bias, unconscious bias can affect
how we evaluate information and make decisions."

As you heard me say earlier, "This is a criminal
case brought by the United States Government.  The Government
charges the defendant with wire fraud, in violation of
Section 1343 of Title 18 of the United States Code, and money
laundering, in violation of Section 1957 of Title 18 of the
United States Code.  The charges against the defendant are
contained in the Indictment.  The Indictment simply describes
the charges that the Government brings against the defendant.
The Indictment is not evidence and does not prove anything.

"The defendant has pleaded not guilty to the charges
and is presumed innocent unless and until the Government proves
the defendant guilty beyond a reasonable doubt.  In addition,
the defendant has the right to remain silent and never has to
prove innocence or present any evidence."

I'm going to give you a few instructions about the
evidence in the case and how you're to consider it.

"The evidence that you are to consider in deciding
what the facts are consists of:

"First, the sworn testimony of any witness;

1       "Second, the exhibits that are received in evidence;

2   and

3       "Third, any facts to which the parties agree."

4       Usually when the parties agree on something, they

02:17PM   5   call it a stipulation.  That's just another word for agreement.

6       "The following things are not evidence, and you must

7   not consider them as evidence in deciding the facts of this

8   case:

9       "First, statements and arguments of the attorneys;

02:17PM   10       "Second, questions and objections by the attorneys;

11       "Third, any testimony that I instruct you to

12   disregard; and

13       "Fourth, anything you may see or hear when the court

14   is not in session, even if what you see or hear is done or said

02:17PM   15   by one of the parties or by one of the witnesses.

16       "Evidence may be direct or circumstantial.  Direct

17   evidence is direct proof of a fact, such as testimony by a

18   witness about what that witness personally saw or heard or did.

19   Circumstantial evidence is indirect evidence, that is, it's

02:18PM   20   proof of one or more facts from which one can find another

21   fact."

22       I'm going to give you an example because I think

23   that instruction is confusing myself.

24       If a witness on the witness stand testifies under

02:18PM   25   oath that, when they came into the courthouse in the morning,

it was raining, they felt the rain, they experienced the rain,
that's direct evidence of rain.  That's the witness's supplied
direct evidence.

If a witness on the witness stand says, when I came
into work this morning, I saw that there was rain on my car or
there was water on my car and the roads were wet, that's
indirect evidence that it was raining.  There's evidence of
facts from which you could find that it rained, the fact that
there was water on the car, water on the streets, you could
make an inference from that.

"You're to consider both direct and circumstantial
evidence.  Either can be used to prove any fact.  The law makes
no distinction between the weight to be given to direct or
circumstantial evidence because it's for you to decide how much
weight to give to any evidence.

"There are rules of evidence that control what can
be received in evidence during trial.  When a lawyer asks a
question or offers an exhibit in evidence and a lawyer on the
other side thinks that it is not permitted by the rules of
evidence, that second lawyer may object.  And if I overrule the
objection, then the witness can answer the question or the
exhibit can be received into evidence.  But if I sustain an
objection to a question" -- that means there's not supposed to
be an answer -- "then you must ignore the question and you must
not guess what the answer would have been."  Because, as I just

said, what a lawyer says is not evidence.  So you need the question to give meaning to the answer.  If a lawyer asks a yes or no question and the answer is yes, well, you have to consider the question.

02:20PM

But if there's a question, for example -- and, again, this is an example I use because it's not related to this case -- if a lawyer asks a witness, "Have you stopped cheating on your taxes yet?" and I sustain the objection, there is no evidence about anybody cheating on their taxes just because a question was asked.

02:20PM

Sometimes if a witness answers a question before I have time to rule, then I may order that the evidence -- the answer be stricken from the record and that you disregard or ignore the evidence.  And that means when you're deciding the case, you must not consider any evidence that I told you to disregard.

02:20PM

"In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

02:21PM

"In considering the testimony of any witness, you may take into account the following things:

"First, the witness's opportunity and ability to see or hear or know the things testified to;

02:21PM

"Second, the witness's memory;

1          "Third, the witness's manner while testifying;

2          "Fourth, the witness's interest in the outcome of

3     the case, if any;

4          "Fifth, the witness's bias or prejudice, if any;

5          "Sixth, whether other evidence contradicted the

6     witness's testimony;

7          "Seventh, the reasonableness of the witness's

8     testimony in light of all of the evidence; and

9          "Eighth, any other factor that bears on

10    believability.

11         "You must avoid bias, conscious or unconscious,

12    based on a witness's race, color, religious beliefs, national

13    ancestry, sexual orientation, gender identity, gender, or

14    economic circumstances in your determination of credibility.

15         "And the weight of the evidence as to a fact doesn't

16    necessarily depend on the number of witnesses who testify about

17    it.  What is important is how believable the witnesses are and

18    how much weight you think their testimony deserves."

19         All right.  Now I'm going to give you an instruction

20    or two about the charges in this case.

21         "The defendant is charged in Counts 1 and 2 of the

22    Indictment with wire fraud, in violation of Section 1343 of

23    Title 18 of the United States Code as follows:

24         "On Count 1, on the date of February 26, 2018, a

25    wire of $150,000 from victim employer MoviePass's account at

Citibank to an account controlled by Defendant Itum under the
name of Kaleidoscope at JPMorgan Chase.

"Count 2, March 30th, 2018, a wire of $350,000 from
victim employer HMNY's account at Citibank to an account
controlled by Defendant Itum under the name of Kaleidoscope at
JPMorgan Chase.

"For defendant to be found guilty of wire fraud, in
violation of Section 1343 of Title 18 of the United States
Code, the Government must prove each of the following elements
beyond a reasonable doubt:

"First, the defendant knowingly participated in or
devised a scheme or plan to defraud or a scheme or plan for
obtaining money or property by means of false or fraudulent
pretenses, representations, or promises.  Deceitful statements
of half-truths may constitute false or fraudulent
representations;

"Second, the statements made as part of a scheme
were material, that is, they had a natural tendency to
influence or were capable of influencing a person to part with
money or property;

"Third, the defendant acted with the intent to
defraud, that is, the intent to deceive and cheat; and

"Fourth, the defendant used or caused to be used an
interstate wire to carry out or attempt to carry out an
essential part of the scheme.

1          "In determining whether a scheme to defraud exists,

2     you may consider not only the defendant's words and statements

3     but also the circumstances in which they are used as a whole.

4     A wiring is caused when one knows that a wire will be used in

02:24PM  5     the ordinary course of business or when one can reasonably

6     foresee such use.

7          "It need not have been reasonably foreseeable to the

8     defendant that the wire communication would be interstate in

9     nature.  Rather, it must have been reasonably foreseeable to

02:24PM  10    the defendant that some wire communication would occur in

11    furtherance of the scheme and an interstate wire communication

12    must have actually occurred in furtherance of the scheme.

13         "The defendant is charged in Counts 3 and 4 of the

14    Indictment with money laundering, in violation of Section 1957

02:25PM  15    of Title 18 of the United States Code as follows:

16         "In Count 3, on February 26, 2018, there was a wire

17    of $150,000 from an account controlled by Defendant Itum under

18    the name of Kaleidoscope at JPMorgan Chase to debtor B.D.'s

19    account at TD Bank.

02:25PM  20         "Count 4, on April 20, 2018, a wire of $110,000 from

21    an account controlled by Defendant Itum under the name of

22    Kaleidoscope at JPMorgan Chase to debtor Soleil Management,

23    LLC's account at Bank of America.

24         "For defendant to be found guilty of money

02:25PM  25    laundering, in violation of Section 1957 of Title 18 of the

United States Code, the Government must prove each of the following elements beyond a reasonable doubt:

"First, the defendant knowingly engaged or attempted to engage in a monetary transaction;

"Second, the defendant knew the transaction involved criminally derived property;

"Third, the property had a value greater than $10,000;

"Fourth, the property was, in fact, derived from wire fraud; and

"Fifth, the transaction occurred in the United States.

"The term *monetary transaction* means the deposit and transfer in or affecting interstate commerce of funds or a monetary instrument by, through, or to a financial institution.

"The term *financial institution* means an insured bank, as defined in Section 3(h) of the Federal Deposit Insurance Act found at 12, United States Code, Section 1813(h), such as JPMorgan Chase, TD Bank, and Bank of America.

"The term *criminally derived property* means any property constituting or derived from the proceeds obtained from a criminal offense.

"The Government must prove that the defendant knew that the property involved in the monetary transaction constituted or was derived from proceeds obtained by some

criminal offense.

"The Government does not have to prove that the defendant knew the precise nature of that criminal offense or knew the property involved in the transaction represented the proceeds of money laundering.

"Although the Government must prove that of the property at issue more than $10,000 was criminally derived, the Government does not have to prove that all the property at issue was criminally derived.

"The above definition of *criminally derived property* refers to the proceeds of a criminal offense.

"For cases involving conduct on or after May 20th, 2009, *proceeds* means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."

I have a couple of instructions further explaining some of the terms in the last couple of instructions.

"An act is done *knowingly* if the defendant is aware of the act and does not act through ignorance, mistake, or accident.  The Government is not required to prove that the defendant knew that his acts or omissions were unlawful.  You may consider evidence of the defendant's words, acts, or omissions along with all the other evidence in deciding whether the defendant acted knowingly."

And just a few more instructions, and these are

about your conduct as jurors, some of which I already explained
to you.

     "First, keep an open mind throughout the trial.  Do
not decide what the verdict should be until you and your fellow
jurors have completed your deliberations at the end of the
case.

     "Second, because you must decide this case based
only on the evidence received in the case and on my
instructions as to the law that applies, you must not be
exposed to any other information about the case or to the
issues it involves during the course of your jury duty."  So as
I told you earlier, "Until the end of the case, unless I tell
you otherwise:

     "Don't communicate with anyone in any way, don't let
anyone else communicate with you in any way about the merits of
the case or anything to do with it.  This includes discussing
the case in person, in writing, by phone, tablet, computer, or
any other means via e-mail, text messaging, Internet chat
rooms, blog, website, or other application, including, but not
limited to, Facebook, YouTube, Twitter, Instagram" -- I guess
we should say X now -- "LinkedIn, Snapchat, TikTok, or any
other form of social media.  This restriction also applies to
communicating with your fellow jurors until I give you the case
for deliberation.  And it applies to communicating with
everyone else, including your family members, your employer,

1    the media, or the press, and the people involved in the trial."

2        Now, if you run into one of the lawyers or a witness

3    or the defendant in the elevator or in the hallway, please

4    don't even say hello or good morning.  They cannot have any

02:30PM    5    contact with you.

6        If you say hello to them or make a comment, even

7    about the weather, they will turn and walk away, not because

8    they want to be rude but because there must be no contact.

9        Please make sure you always wear your juror badges

02:30PM    10   outside your clothing so that they can identify you.  And even

11   when you're outside the courthouse, a place having coffee in

12   the morning or at lunch, again, make sure you're wearing your

13   juror badges so that you don't accidentally overhear something.

14       And if -- again, as I told you earlier, if something

02:30PM    15   happens and you accidentally overhear something or have

16   contact, please report that to me right away.  The sooner we

17   hear about it, the more likely it is we can take care of the

18   problem without having a greater problem.

19       "Because you will receive all of the evidence and

02:31PM    20   the legal instruction that you properly may consider to return

21   a verdict, you cannot read, watch, or listen to any news or

22   media accounts or commentary about the case or anything to do

23   with it.  Don't do any research, such as consulting

24   dictionaries, encyclopedias, searching the Internet, or using

02:31PM    25   other reference materials.  Do not make any investigation or in

any other way try to learn about the case.  Don't visit or view
any place discussed during the trial.  Don't use the Internet
or any other resource to search for or view any place discussed
during the trial.  Do not do any research about the case, the
law, the people involved, including the parties, the witnesses,
or the lawyers until you've been excused as jurors after the
trial.  If you happen to read or hear anything touching on this
case in the media, turn away, and then please report it to me
right away.

"As I told you, these rules protect each party's
right to have this case decided only on evidence that has been
presented here in court.

And as I told you earlier, "A juror who violates
these restrictions jeopardizes the fairness of the proceedings,
and a mistrial could result that would require the entire trial
process to start all over.

"If any juror is exposed to any outside information,
please notify the Court immediately."

You can hand out the notebooks.

We're going to give you notebooks that you can use
to take notes in.

"At the end of the trial, you'll have to make your
decision based on what you recall of the evidence.  You will
not have a written transcript of the trial.  So I urge you to
pay close attention to the testimony as it is given.

1     "If you wish, you may take notes to help you

2     remember the evidence.  If you do take notes, please keep them

3     to yourself until you and your fellow jurors go to the jury

4     room to decide the case.  And don't let note-taking distract

02:32PM  5     you from being attentive to the witnesses and observing the

6     witnesses while they testify.  Every time you leave the court,

7     leave your notebooks on your seats behind you.  Nobody will

8     read your notes.

9          "Whether or not you take notes, you should rely on

02:33PM  10    your own memory of the evidence.  Notes are only to assist your

11    memory.  You should not be overly influenced by your notes or

12    those of your fellow jurors."

13         Now we're going to begin trial.

14         "First, each side may make an opening statement.  An

02:33PM  15    opening statement is not evidence.  It is simply an outline to

16    help you understand what that party expects the evidence will

17    show.  And a party is not required to make an opening

18    statement.

19         "After opening statements, the Government presents

02:33PM  20    evidence by putting on its witnesses, and then the defense may

21    cross-examine.  And then if the defendant chooses to offer

22    evidence, then counsel for the Government may cross-examine the

23    defense witnesses.

24         "After all the evidence has been presented, I'll

02:33PM  25    instruct you on all of the" -- "all the law that applies to the

case, then the attorneys will make their closing arguments, and then you will retire to deliberate."

If you can't -- well, as I told you earlier, we usually take a break mid-morning, have a lunch break, mid-afternoon break.  If you need to take a recess for any reason, signal to me by raising your hand or catching my eye and we can take an earlier break, if necessary.

If you can't see something that's being displayed on the screens, if something goes out of focus or the monitors in front of you aren't working, again, catch my eye, and we'll take care of that right away.

Everything we do in the courtroom, with one small exception, is being done for your benefit.  So if you can't hear or see something that's being presented to you, let me know so that we can fix it.

If you -- I'm sure you've all watched a television program or seen a movie involving courtroom dramas.  And there's a dreaded thing called sidebars.  We almost never have sidebars in my courtroom.  We try to take care of everything before you arrive in the morning so that we use your time efficiently.  Sometimes a lawyer may ask for a sidebar and I'll tell them no and we'll take it up later.  If we do have a sidebar, feel free to stand up and stretch.  You'll hear the white noise coming on, you can stand and stretch.  But we keep those to an absolute minimum.

UNITED STATES DISTRICT COURT

1          Like I said, what we're doing is trying to use your

2    time as efficiently as possible.

3          Sometimes I will ask the lawyers to come to sidebar

4    because I might have a suggestion about a way to speed things

02:35PM    5    up or use your time more efficiently.  Don't pay any attention

6    or attach any significance to that.

7                              *  *  *  *  *

8          (Proceedings continued.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(THIS PAGE INTENTIONALLY LEFT BLANK.)

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6              I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17              DATED THIS 22ND DAY OF FEBRUARY, 2024.

18

19

20                         /S/ MYRA L. PONCE
                    _____
21                  MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                        FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**