1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3    **HONORABLE VIRGINIA A. PHILLIPS, U.S. DISTRICT JUDGE**

4

5    **UNITED STATES OF AMERICA,**                    )
                                                       )
6                    **Plaintiff,**        )
                                                       )
7        **v.**                            )   **Case No. CR 23-00082 VAP**
                                                       )
8    **KHALID ITUM,**                      )        **Volume 2**
                                           )    **(Pages 200 - 272)**
9                    **Defendant.**         )
     _____)

10

11       **REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
                             **TRIAL DAY 1**
12                  **TUESDAY, JANUARY 30, 2024**
                             **2:35 P.M.**
13                  **LOS ANGELES, CALIFORNIA**

14

15

16

17

18

19

20

21

22   _____

23       **MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
                 FEDERAL OFFICIAL COURT REPORTER
24               350 WEST 1ST STREET, ROOM 4455
                 LOS ANGELES, CALIFORNIA  90012
25                      (213) 894-2305


**UNITED STATES DISTRICT COURT**

1                          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        E. MARTIN ESTRADA
         United States Attorney
5        BY:  DAVID Y. PI
         BY:  MARK AVEIS
6            Assistant United States Attorneys
         312 North Spring Street
7        Los Angeles, California  90012

8

9    **FOR THE DEFENDANT:**

10       PAUL HASTINGS, LLP
         BY:  ADAM J. FEE
11           Attorney at Law
         1999 Avenue of the Stars, Suite 2700
12       Los Angeles, California  90067

13       PAUL HASTINGS, LLP
         BY:  BENJAMIN NICHOLSON
14           Attorney at Law
         695 Town Center Drive, 17th Floor
15       Costa Mesa, California  92626

16

17   **ALSO PRESENT:**

18       MICHELLE VU, FBI Special Agent
         TATIANA THOMAS, Paul Hastings
19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **INDEX OF WITNESSES**

2

3   <u>**PLAINTIFF'S WITNESSES**</u>                                    <u>**PAGE**</u>

4   BUTTGENBACH, Ph.D., Thomas

5       Direct Examination by Mr. Pi                        220
        Cross-examination by Mr. Fee                       234
6       Redirect Examination by Mr. Pi                     243

7

8   DEBRINO, Brody

9       Direct Examination by Mr. Pi                        249
        Cross-examination by Mr. Fee                       262

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1

**INDEX OF EXHIBITS**

2

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 16 - | E-mail | 265 | |

```
 1                TUESDAY, JANUARY 30, 2024; 2:35 P.M.

 2                     LOS ANGELES, CALIFORNIA

 3                              -oOo-

 4            (The following is a partial transcript

 5             of the day's trial proceedings:)

 6                          *  *  *  *  *

 7            (In the presence of the jury:)

 8            THE COURT:  All right.  And we will begin with

 9    opening statement from the Government.

10            You may proceed.

11            MR. AVEIS:  The evidence in this case will show that

12    defendant was neck deep in debt and his creditors were hounding

13    him for repayment.  So he deceived and cheated his new employer

14    with lies and bogus documents to get money to pay his own

15    bills.  That, the evidence will show, is fraud.  And he

16    disguised the flow of that money that he got from defrauding

17    his employer to conceal what he had done.  And that, the

18    evidence will show, is money laundering.

19            So good afternoon, ladies and gentlemen of the jury.

20    May it please the Court.  My name is Mark Aveis.  I'm a member

21    of the prosecution team.  Together with my trial partner,

22    Assistant U.S. Attorney David Pi, and with the assistance of

23    FBI Special Agent Michelle Vu, we present to you the case of

24    U.S. versus Khalid Itum.

25            In late 2017, defendant took a job at a company
```

02:35PM (line 10)
02:36PM (line 15)
02:36PM (line 20)
02:37PM (line 25)

**UNITED STATES DISTRICT COURT**

called MoviePass.  MoviePass sold subscriptions to movie

theaters where a customer would pay like $10 a month for a

credit card or a debit card for unlimited visits to movie

theaters.  Think of it, if you will, as an all-you-can-eat

02:37PM    buffet of movies.

Now, defendant's title was vice president of

business development.  He was an executive.  Defendant signed

an employment contract with MoviePass, and it was very

detailed, spelled out the terms of his employment.  And you'll

02:37PM    see that contract.

Now, that contract gave defendant an annual salary

of $120,000.  Now, also under that contract, defendant was

entitled to a bonus of up to $30,000 every six months if

defendant met certain performance metrics or goals that

02:38PM    benefited MoviePass.

So the very most that defendant could make in the

first six months of his contract with MoviePass was $150,000.

Keep that number in mind.

Shortly after MoviePass -- excuse me.  Shortly after

02:38PM    defendant went to work for MoviePass, MoviePass was taken over

by Helios and Matheson Analytics, which we're going to identify

by its stock exchange call sign HMNY.

Now, HMNY was a public company.  And you'll learn

that a public company is a business that's owned by

02:38PM    shareholders or investors, and its shares are traded on a stock

exchange, like Apple or General Motors might be traded on the
stock exchange.

And public companies are required, among other
things, to have controls, to make sure, among other things,
that people that work at those companies properly use the
company's money.

Now, the chief executive officer of HMNY was a
gentleman named Ted Farnsworth.  Ted Farnsworth was the top
executive of HMNY.  And you'll hear evidence that at the
relevant time Mr. Farnsworth effectively ran MoviePass.

Ted Farnsworth was many years older than defendant.
Yet despite their different ages and ranks in the company,
defendant and Ted Farnsworth were very close.  They socialized
together.  Defendant called Farnsworth "Teddy."

Now, I mentioned earlier the defendant was under
pressure to pay his debts.  Specifically owed -- he owed more
than a quarter million dollars to two individuals.  And they
wanted their money, and they had been hounding him for more
than a year.  They will testify and tell you why defendant owed
the money and the efforts they went to to get paid.

Now, the evidence will show the defendant was very
concerned that these debts and how they rose would negatively
affect his reputation.  He was also concerned it could
jeopardize his job and standing at MoviePass.  So he turned to
Teddy Farnsworth, and together they plotted a side hustle to

1    defraud HMNY and MoviePass.

2         You'll see evidence that despite the fact that

3    defendant was at most entitled to a salary and bonus of

4    $150,000 that I mentioned, he and Teddy Farnsworth took steps

02:40PM  5    to override the controls designed to protect company money and

6    shareholders from fraud.  They agreed that Teddy Farnsworth

7    would tell the accounting department to pay off one of

8    defendant's debts by paying defendant's personal side business,

9    a consulting fee of $150,000.

02:40PM  10        That side business that defendant owned and operated

11   did nothing for either MoviePass or HMNY to earn that money.

12   And no taxes were to be withheld as well.  So the payment had

13   the effect of more than doubling defendant's compensation.

14        And to further the fraud, defendant made up invoices

02:41PM  15   and sent them to the accounting department to make the payments

16   seem legitimate when clearly it was not.  Defendant got that

17   money and paid off one of his creditors, lo and behold in the

18   exact amount of $150,000.

19        Well, defendant needed another more than $100,000 to

02:41PM  20   pay a different creditor.  So he directed an event planner.

21   Think of someone who prepares events like weddings but on

22   steroids, much bigger events for Hollywood stars, luminaries,

23   music events, and the like.

24        And this individual and his company had done other

02:41PM  25   unrelated work for HMNY.  And the defendant asked this

individual to include a bogus line item, a fake line item on a budget. And defendant told the event planner that defendant would make sure that HMNY would approve that line item.

That line item had nothing to do with that budget. That line item was in the exact amount of money the defendant owed to his own creditor.

The evidence will show that HMNY relied on that budget and that bogus line item and made a payment defendant used to pay off that creditor.

The evidence will just -- will thus show that defendant exploited his close relationship with Teddy Farnsworth to lie and peddle fake documents, and defendant used his employer's money as his personal piggy bank to pay off his personal debts and to dodge the controls that were in place to protect both his employer and the shareholders.

That was not all that defendant did. The evidence will show that he wanted to cover up the fraudulently obtained payments that he had obtained to pay his creditors. So he concealed those payments, he hid them by routing the money through the bank of his personal shell entity and also through a hotel that defendant set up solely as a smokescreen.

Now, if this sounds confusing, mission accomplished. That's exactly what the defendant intended.

Now you'll see evidence of this confusing paper

1    trail, and we will offer the testimony of an FBI agent who will

2    walk you through this.

3            And defendant has been charged with fraud and money

4    laundering, as Judge Phillips described.  The Government will

02:43PM   5    prove these charges through the testimony of witnesses and

6    through documents that include the defendant's own texts and

7    the defendant's own e-mails.

8            Now, at the conclusion of this case, my partner will

9    give the Government's closing argument.  And he will summarize

02:43PM  10    the evidence and the charges, and he will discuss the law that

11    Judge Phillips will give to you at the conclusion of the trial.

12    And he will ask you to return the only verdict that is

13    supported by the evidence and the law and that is that

14    defendant deceived and cheated his employer out of money and he

02:44PM  15    laundered that money to hide what he had done, and that means

16    guilty on all counts.

17            Thank you.

18            THE COURT:  Thank you.

19            Mr. Nicholson for the defense.

02:44PM  20            MR. NICHOLSON:  Thank you.

21            Ladies and gentlemen, I am Ben Nicholson with my

22    colleague, Adam Fee.  We have the honor of representing

23    Mr. Khalid Itum.

24            Now, I just met you, but I'm going to make a

02:44PM  25    promise.  I promise you that the evidence will not support what

the Government just told you.  The Government's case is a
misdirection.  You know what a misdirection is; right?  A
misdirection is when you're told to focus on one thing over
here so much that you completely miss the other thing that's
going on over here.

Now, the best example of a misdirection I can give
you is a famous study about selective attention.  You are shown
a video.  And at the beginning of the video, you're instructed
to count how many times a group of people wearing white pass a
basketball between one another.

And then the video starts, and people are moving
around and they're passing the basketball.  So you count them.
Then the video ends and it says how many times did they pass
the basketball?  And you answer.  You get it right, 15 times.

But while that was happening, while you're so
focused on counting the passes, something so obvious happened
that you won't believe that it actually happened until you see
the video again.  A person in a gorilla costume walks right
into the middle of the group, beats their chest a few times,
stares at the camera, and then walks out the other side.

Most people don't see the gorilla.  Why?  Because
they've been told to focus on something else entirely.  That's
what you just heard from the Government.

Personal debts, invoices, budgets.  Ladies and
gentlemen, I'll tell you now he did many of those things.  He

submitted invoices for what he did.  He submitted budgets

describing that work -- budgets describing work he was going to

do at big events and that he, shocking as it may be, used money

he earned to pay off personal debts.  Now, if that were a

02:46PM  crime, I'd be in an orange jumpsuit today.

All the testimony you're going to hear about budgets

and loans and invoices is misdirection.  It is literally

distracting you from what this case is about.  So what is this

case about?  This case is about whether Mr. Itum told a lie to

02:46PM  receive money to which he was not entitled.

Now, I'm going to make a request of you.  I'm going

to ask you each day of this trial to make a mental log, a

little imaginary list, create a list, let's call it evidence

that Mr. Itum lied to obtain money.

02:47PM  By the end of this trial, you will have an empty

list, totally empty.  By the end of this trial, after all the

evidence is shown, you'll hear that Mr. Itum only told the

truth and nothing but the truth.

You'll also hear that Mr. Itum never laundered

02:47PM  money, that he never tried to hide what he was doing with

money.  In fact, you'll hear that Mr. Itum was very honest

about his intentions with the money.

You'll hear that Mr. Itum deposited money into his

bank account that listed his name and his home address, that

02:47PM  Mr. Itum submitted invoices from his company where it said his

**UNITED STATES DISTRICT COURT**

name and his title at the company.  He was honest, he was open, he was transparent.

Now, you'll also hear that he paid off his loans with the money that he earned, just as I pay off my loans with the paychecks that I get.

So now that we've learned what this case is going to be, this game of misdirection, we need to talk about the things we need to look for, what's going to be the person dressed in the gorilla costume walking right in.  Once you know that, it's going to be obvious when it happens.

That first thing to know is the MoviePass business itself, the company for which Mr. Itum was working for.

So MoviePass -- in order to understand why Mr. Itum was paid what he was paid, we're going to have to understand a little bit about the MoviePass business.  Fortunately, it's quite an interesting business.

So MoviePass was like a Netflix but for cinema. 9.95 per month for unlimited movies.  It was an amazing deal. Millions of customers signed up and went and watched millions of movies.

As you can imagine, financially that didn't quite work out.  When the cost of one ticket in L.A. is more than 9.95, selling unlimited tickets for 9.95 doesn't work on its own.  But there was a method to this.  MoviePass understood this.  They -- their business model depended on generating

1    additional revenue streams.  It was incredibly important at

2    MoviePass that they find ways to generate additional revenue.

3              Now, that's the work that Mr. Itum was doing.

4    That's the value that he was bringing to the company.

02:49PM    5              So the misdirection you'll get about MoviePass from

6    the Government is really quite a simple one.  They're not going

7    to call a single witness who worked for MoviePass, not a single

8    person that was in the room that can describe the work that was

9    being done.

02:50PM   10              They will call witnesses that worked for the parent

11    company, HMNY, but you'll hear that Mr. Itum did not report to

12    these people.  He reported to the boss of these people.  He

13    took his instruction from the top, not the middle.

14              You'll hear evidence that Mr. Itum had an employment

02:50PM   15    agreement with MoviePass.  That's right.  He had an employment

16    agreement with MoviePass.  But he did a lot of work outside the

17    scope of that employment agreement.  Why?  Because he was

18    instructed to do so.

19              It's important to keep in mind who Mr. Itum was

02:50PM   20    working for at various stages so that you can understand why he

21    was being compensated.  So we understand that he had a

22    MoviePass employment agreement.  But who was he taking

23    instruction from?

24              Well, there's two people in particular that we're

02:51PM   25    going to talk about.  One is a gentleman named Ted Farnsworth.

He was the CEO of HMNY.  You'll hear that he was essentially the boss setting the business strategy, making the big decisions, not just for HMNY but for MoviePass as well.

You'll hear that he was a supporter of Mr. Itum and that he instructed Mr. Itum to do additional work.  Now, you heard the Government describe this as a plot, the plot being Mr. Itum did work that his boss instructed him to do and then was rewarded for doing that additional work.

The second person you need to know about is a gentleman named Mitch Lowe.  He was the CEO of MoviePass.  It's going to be a little bit harder to keep him in view because ultimately Mitch Lowe is a little bit of an absentee boss.  He had some personal issues, he was taken away from the company a little bit, and he left a leadership void at MoviePass.  And who filled that void?  Mr. Itum.

Mr. Itum started filling that void within weeks of joining MoviePass.  Within weeks of signing his employment agreement, he was already doing all sorts of things way outside the scope of that agreement.  And we'll talk a little bit more about that in a moment.

You're going to be misdirected, though, from the evidence of who Mr. Itum was working for by zooming -- zooming in, by taking a microscope to some invoices and budgets that Mr. Itum submitted.  We're going to torch to death some words on a page of some budgets until they no longer have any

meaning.  We're going to play spot the difference with invoices, how this one said that at this time and that one says this at that time.  But this is misdirection.

And we zoom in super close on these documents, so close with our face to the page, we're not going to see what was actually going on at the business.  Mr. Itum was doing the work.

So what was that work?  You're going to hear about two events in particular where he did additional work.  These were both in 2018.  One was at the Sundance Film Festival.  The other one was at the Coachella Music Festival.

You'll hear that Mr. Itum did -- not only did he create the idea for these events and had the vision and strategy for these events, he orchestrated them.  But he actually also did additional work that was valuable to the company at these events.

So at the MoviePass Sundance event, he went out and he acquired films for MoviePass.  They purchased films.  They weren't doing this before.  They started doing this at Sundance, an additional revenue stream.

Remember how important the additional revenue streams were for the business.

Mr. Itum did that work.

Coachella Music Festival.  He negotiated and executed a deal with iHeartRadio, big entertainment company,

1    super well-established brand.  He negotiated, he executed that

2    deal.

3         This put MoviePass on the map in the way it wasn't

4    before.  Customers loved MoviePass, but the industry didn't.

02:54PM  5    The industry saw this great big up and coming company as a

6    threat.  It got in between them and their customers, got in

7    between the theaters and their customers.  The industry was

8    skeptical of MoviePass.  This hindered their ability to

9    generate those additional revenue streams they needed.

02:54PM  10        So these two events where they're going out and

11    they're becoming contributors to the industry by investing in

12    film, by going to Coachella and partnering with an established

13    brand.  This is part of a broader PR campaign that's going to

14    open the doors for MoviePass to go and actually do the deals it

02:55PM  15    needs to do in order for the business model to work.  This was

16    important work that Mr. Itum was doing.

17        The misdirection you're going to get about these

18    events, it's going to be that they were expensive and that

19    Mr. Itum was paid a lot.  Yes, they were expensive.  They were

02:55PM  20    big events.  That was the point.  We were trying to make a

21    splash, we were trying to turn heads.  And, yes, Mr. Itum was

22    paid a lot for doing valuable work, as you might hope to be

23    paid a lot for doing valuable work.

24        As long as we keep the perspective, keep our

02:55PM  25    perspective of the MoviePass business in mind, those payments

will make sense.

MoviePass went from a few thousand subscribers in 2017 to over 3 million in 2018.  It experienced growth bigger and faster and quicker than Netflix and Spotify.  It became a huge company very, very quickly.  But it was still a starter. It didn't have the employees and the infrastructure to handle all that additional work.

Mr. Itum did that work.  He rose to that challenge, he provided more to the company and, therefore, got compensated more.

You'll hear how Mitch Lowe earned millions of dollars in his role at the company and that he essentially disappeared and that Mr. Itum ended up taking his role at the company, taking on his roles and responsibilities, doing that extra work.  And then the business decision was made to reward him for that work.

Now, the last piece of misdirection that we need to talk about, Mr. Itum's loans.  Yes.  He owed some money.  The ninth deadly sin, apparently.

What you need to know about these loans is, first, the obvious point, Mr. Itum is welcome to do whatever he wants with the money that he earns.  But, second, he was very honest and open about his intentions with this money.  All the relevant people knew what he intended to do with this money. And, in fact, some of the irrelevant people knew what he was

going to do with this money.  This was no secret.  He was not

hiding this fact.

        You're going to hear a lot about Mr. Itum in the

coming days; that he's an entrepreneur, that he's passionate

02:57PM  about his work, that he's really passionate about MoviePass.

You will see that passion in the documents, in the really long

e-mails where Mr. Itum's coming up with the next great big plan

for the company.

        You will see it spill over at times.  But

02:58PM  ultimately, you will see that Mr. Itum cared a great deal for

this company, did everything he could to make it a success.

        For the additional work that he did, he was paid

extra.

        So, ladies and gentlemen, as the Government passes

02:58PM  back and forth the invoices and the loans and the budgets, we

need to make sure we're watching for the evidence that's going

to walk right in in front of you, the evidence that Mr. Itum

was doing the work, the evidence of Mr. Itum being honest about

his intentions with money.

02:58PM          Mr. Itum's innocent.

        THE COURT:  Thank you.

        All right.  Your first witness?

        MR. PI:  Thank you, Your Honor.  The Government

calls Dr. Thomas Buttgenbach.

02:58PM          THE COURT:  All right.  And could I see all counsel

**UNITED STATES DISTRICT COURT**

```
 1   at the sidebar very briefly?
 2              (At sidebar:)
 3              THE COURT:  Who's the person sitting at counsel
 4   table?
 5              MR. FEE:  Oh.  Ms. Thomas.  She's assisting us.  She
 6   works at Paul Hastings.
 7              THE COURT:  Oh, okay.  Well, I just wanted to let
 8   the jury know.
 9              MR. FEE:  I'm sorry, Your Honor.
10              THE COURT:  That's all right.
11              So I'll tell the jury that she's an assistant.
12              MR. FEE:  That's right.  She had child care
13   responsibilities this morning.
14              THE COURT:  That's fine.  I just want to let them
15   know who the mystery person is.
16              (In the presence of the jury:)
17              THE COURT:  In case you were wondering, ladies and
18   gentlemen, the person who's sitting at counsel table closest to
19   me on the defense side, that's Ms. Thomas.  She's an assistant
20   at the defense law firm.  Mystery solved, in case you were
21   wondering.  All right.
22              THE COURTROOM DEPUTY:  Please stand by the court
23   reporter.
24              Please raise your right hand.
25              Do you solemnly swear that the testimony you shall
```

02:59PM (line 5)
02:59PM (line 10)
02:59PM (line 15)
02:59PM (line 20)
03:00PM (line 25)

|     |     |
| --- | --- |
| 1 | give in the cause now before this Court shall be the truth, the |
| 2 | whole truth, and nothing but the truth, so help you God? |
| 3 | THE WITNESS:  I do. |
| 4 | THE COURTROOM DEPUTY:  Okay.  Please go around and |
| 5 | take a seat here on the witness stand. |
| 6 | Please state and spell your name for the record. |
| 7 | THE WITNESS:  Tom Buttgenbach.  Buttgenbach is |
| 8 | B-u-t-t-g-e-n-b-a-c-h. |
| 9 | THE COURT:  Thank you. |
| 10 | You may inquire of the witness. |
| 11 | MR. PI:  Thank you, Your Honor. |
| 12 | THOMAS BUTTGENBACH, Ph.D., |
| 13 | called as a witness by the plaintiff, was sworn and testified |
| 14 | as follows: |
| 15 | **DIRECT EXAMINATION** |
| 16 | BY MR. PI: |
| 17 | Q.   Good afternoon, Dr. Buttgenbach. |
| 18 | Where do you currently work? |
| 19 | A.   At my company Avantus. |
| 20 | Q.   What does Avantus do? |
| 21 | A.   It's a solar developer and technology company. |
| 22 | Q.   What is your role at Avantus? |
| 23 | A.   I'm currently on the board, running the sales |
| 24 | process for -- for the company. |
| 25 | Q.   How long have you been at Avantus? |

03:00PM (line 5)
03:00PM (line 10)
03:00PM (line 15)
03:00PM (line 20)
03:01PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1        A.    I founded the company nearly 15 years ago.

 2        Q.    And what is your area of expertise in terms of

 3   education?

 4        A.    My background in education?

 5        Q.    Yes.

 6        A.    So I -- I have an undergraduate degree from Germany

 7   in physics and mathematics, and then I have a master's and two

 8   Ph.D.s from Cal Tech in physics and astronomy.

 9        Q.    Do you know the defendant, Khalid Itum?

10        A.    I do.

11        Q.    Approximately when did you first meet the defendant?

12        A.    I want to say something like five or six years ago.

13        Q.    Okay.  So if we're in 2024, around 2019?  2018?

14        A.    Maybe 2017, something like that.

15        Q.    And could you describe your recollection of the

16   first time you met him?

17        A.    I was introduced to him -- I think it was a birthday

18   party of -- of someone.  I don't remember the details.  But

19   whoever introduced us said, hey, you guys should talk to each

20   other.  You're both entrepreneurs and you -- you know, find a

21   lot of common things, common interests to talk about business.

22            Um, at the time, I lived up in the Hollywood Hills,

23   a lot of folks are in the entertainment industry, which I'm

24   not.  So I thought it would be fun to talk to someone who has

25   more of a business and entrepreneurial background.
```

03:01PM (line 5)
03:01PM (line 10)
03:02PM (line 15)
03:02PM (line 20)
03:02PM (line 25)

1    Q.    So what did you talk about on that occasion?

2    A.    About just that, entrepreneurial ideas, can I call

3    him Khalid or Mr. Itum -- I always called him Khalid.  He

4    always had ideas about, you know, businesses.  And we talked

03:03PM  5    about business models and a lot of good conversations about,

6    you know, what entrepreneurs talk about.

7    Q.    Okay.  After that first meeting that you had with

8    the defendant, did you meet with him again?

9    A.    Yeah.  I think we ran into each other occasionally,

03:03PM  10    um, kind of a handful of times.  And then I seem to remember we

11    had one meeting, a breakfast meeting that he actually asked for

12    to pitch me an idea on some business that he was looking at.

13    Q.    Tell us about that.  What did he say to you about

14    that business idea?

03:03PM  15    A.    To be honest, I don't totally remember the details.

16    Um, you know, he was a -- he was a wealth of business ideas.

17    And -- and I don't remember exactly what -- what that

18    particular idea was about.  He helped companies fundraise.

19    Yeah, I don't remember the details.

03:04PM  20    Q.    So you met that other occasion at breakfast.  Any

21    other meetings with Mr. Itum that you recall in that -- in the

22    first initial meetings that you had with him?

23    A.    Just, like, random kind of -- you know, running into

24    each other at various social functions.  That may have been a

03:04PM  25    handful, three, four, five times, something like that.

```
 1        Q.    At a certain point, did the defendant ask you to get
 2   involved in any of his business ideas?
 3        A.    Um, I think it's fair to say that anytime someone
 4   pitches you an idea, you know, there's an undertone of, you
 5   know, investing into that idea.  Um, I have never invested in
 6   any of the ideas.  Um, but I think Khalid also didn't -- didn't
 7   kind of pressure me into -- into that either.
 8        Q.    And at that point in time, did you consider him a
 9   friend?
10        A.    I would consider him an acquaintance.
11        Q.    Okay.  And by the way, we've been talking about the
12   defendant in the abstract.  But do you see Mr. Khalid Itum in
13   the courtroom today?
14        A.    I do.
15        Q.    Could you please point him out and describe
16   something unique about what he's wearing?
17             MR. FEE:  Your Honor, we're happy to stipulate that
18   he's sitting right here.
19             THE WITNESS:  He's over there with the purple tie.
20             THE COURT:  All right.  The presence of the
21   defendant is identified by the witness.
22        Q.    (BY MR. PI:)  I'm going to switch gears now and ask
23   you some questions about the Coachella Music Festival.
24             Have you ever attended Coachella?
25        A.    I have.
```

03:05PM (lines 5)
03:05PM (line 10)
03:05PM (line 15)
03:05PM (line 20)
03:05PM (line 25)

**UNITED STATES DISTRICT COURT**

1      Q.    Now, for those who don't know, what is Coachella?

2      A.    It's a music festival, um, out in -- south of

3   Palm Springs.

4      Q.    When was the first time you went to Coachella?

03:06PM   5      A.    Um, I think that may have been 2017.

6      Q.    And why did you decide to go to Coachella that year?

7      A.    Um, so, um, that goes into, you know, a conversation

8   I had with Khalid where he called me up and he said, look, I

9   need to ask you a favor.  Um, I'm -- I'm running the start-up.

03:06PM  10   I think it was called something like Kaleidoscope.  And -- and

11   I have a small problem which is that I have organized the whole

12   event, I have a bunch of sponsors, um, and -- and the hotel

13   where the event is supposed to happen, um, needs to have

14   $40,000 on a credit card in order to hold the rooms.

03:07PM  15   Otherwise, the whole event is going to blow up.

16           And he -- you know, he asked me if I could help him.

17   He would repay the money.  Um, and he made a proposal, um, to

18   either repay me a 10 percent profit on it within -- I forgot,

19   like, you know, 30 days or something.  He said the money was

03:07PM  20   about to come in.  Um, or alternatively, um, he could, um, get

21   me two tickets, VIP tickets to the Coachella event as well as

22   stay at the hotel where he's hosting the event.  And -- yeah.

23      Q.    Okay.  And you said that he had told you about an

24   event -- event he was organizing.  What did you -- what did he

03:07PM  25   tell you about that event that he was organizing?

**UNITED STATES DISTRICT COURT**

1        A.      Um, well, it was his business that he was running at

2   the time or had just started.  I think it was the first event,

3   if I'm not mistaken.  Um, and I don't exactly remember the

4   details, but it was some kind of -- basically outside of

03:08PM  5   Coachella, um, people that are interested in music and -- and

6   having kind of fireside chats with, like, the CEO of a big

7   music company.  I think there was a radio -- radio company, um,

8   that was there that has, like, very large number of radio

9   stations.  I forgot the name.  And I have very little knowledge

03:08PM  10  about the whole music or entertainment industry.

11        So me, that was all, you know, interesting but

12  certainly not a business I would invest in because I don't

13  understand anything about that space.

14        Um, but he basically said he has all the sponsors,

03:09PM  15  they just have been slow at paying him, and he needs that cash

16  advance -- or actually turned out to be a credit card, um,

17  booking, if I could help him out.

18        Q.      And did -- with respect to the $40,000 that he was

19  talking about, did he ever say he would pay you back for any

03:09PM  20  charges on your credit card?

21        A.      Well, he said he would pay back the 40,000 either

22  with 10 percent interest or, you know, kind of with -- you

23  know, staying at the hotel and VIP and nice treatment and --

24  and at the time, I had never been to Coachella.

03:09PM  25        And, quite frankly, I wasn't really interested in

1   10 percent and, you know, making money on something like that.

2   I mean, $40,000 is -- is -- is a decent amount of money.  But

3   at my income level, that was not -- you know, not something

4   that I would kind of dive into massive detail and treat that as

03:10PM   5   an investment opportunity.

6         But the idea of -- of going to Coachella, I'd never

7   been.  My best friend from Germany who is a big music fan was

8   going to be in town.  And I said, you know what?  That sounds

9   like a lot of fun.  I'll do that.  I'll help you out.  Um,

03:10PM   10   and -- and the understanding was that the $40,000, of course,

11   gets repaid.  But for me taking the risk, I was going to

12   Coachella and treated very nicely, which all happened.

13         Q.    Okay.  And so I'm going to display now what's

14   previously been admitted as Exhibit 2.  It should appear on

03:10PM   15   your screen.  It's also in hard copy in the box to your left,

16   but you should see it on your screen.

17         Do you see that?  Dr. Buttgenbach, do you see the --

18   does it appear on your screen?

19         A.    Yes, I do.

03:11PM   20   Q.    Okay.  Is this the authorization form you signed for

21   the Coachella 2017 event that the defendant was organizing?

22         A.    That looks like it, yes.

23         Q.    I'm going to zoom in here on the bottom left portion

24   here.

03:11PM   25         Is that your signature?

|       | 1  | A.    That is. |
|-------|----|----------------|

          1    A.    That is.

          2    Q.    Okay.  And over here, I'm zooming into the middle

          3    portion on the right side that says in the amount of $41,000.

          4    What does that mean?

03:11PM   5    A.    So that's the -- the amount that I approved.

          6    Q.    Would that be the limit, the maximum amount you

          7    approved?

          8          MR. FEE:  Objection as to form.

          9          THE COURT:  Overruled.

03:11PM  10          You may answer.

         11          THE WITNESS:  Yes.

         12    Q.    (BY MR. PI:)  And what is the date that you executed

         13    this authorization form?

         14    A.    Looks like January 30th, 2017.

03:11PM  15    Q.    That's over here in the bottom right.

         16    A.    So that actually clarifies.  I must have met him

         17    before 2017.  So this was probably two years into knowing him.

         18    Q.    Now, did you end up attending the event that the

         19    defendant organized around the time of Coachella 2017?

03:12PM  20    A.    I'm sorry.  Say that again.

         21    Q.    Did you attend the event that the defendant

         22    organized around Coachella 2017?

         23    A.    Yes.  I stayed at the hotel.  I went into Coachella

         24    itself, the event that -- that Khalid organized was at the

03:12PM  25    hotel.  I stopped by.  I had a drink.  I had -- I didn't spend

a whole lot of time there, but, you know, I mostly went with my

friend to the actual music festival.

    Q.    Okay.  And was your credit card charged, the exact

$41,000 limit as set out on the authorization form?

03:12PM    A.    No, it was not.

    Q.    What happened --

    A.    My accountant sometime later, I don't remember

anymore, but sometime later said what is this charge?  There

was a total of over $100,000 on my credit.  And I said that

03:13PM    can't be because I -- I do recall I approved 41,000, but she

said it was over 100,000.  And -- and it was a while after the

event.

    Q.    What's the name of your accountant?

    A.    Liz Ross.

03:13PM    Q.    What did you do when you found out that your credit

card had been charged more than $41,000?

    A.    Um, I talked to, um -- actually, my -- my executive

assistant, um, Carrie Morrison, and said, you know, can you

call -- call the credit card company?  I think she's the one

03:13PM    who handled this paperwork for me, and she kind of does

everything.  So she's -- she's just down the hall next door.

So I asked her, Can you look into that, what on earth happened

here?  And tell the credit card company, you know, that's not

approved.  41K, yes, I -- I authorized that.  But over 100K,

03:14PM    something must have gone awfully wrong.

Q.    Did you also talk to the defendant about the
overcharge on your card?

A.    I did.

Q.    What did he say?

A.    Um, you know, best of my recollection -- that's
quite a while ago -- something along the lines of there must
have been a mistake and I'll look into that and I'll take care
of it.

Q.    Did he ever tell you that he authorized the hotel to
make charges beyond $41,000?

MR. FEE:  Objection as to form, Your Honor.
Leading.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Um, so I do recall -- and I got this
secondhand because I had both my assistant as well as my
accountant, um, deal with a lot of that.  Um, I remember that
my first reaction kind of was like how -- you know, how can the
hotel charge massively more to my card when they had in writing
an authorization of 41,000?

So I'm like -- you know, I told either my accountant
or my assistant, I forgot, um, you know, call up the hotel and
basically yell at them, saying, like, what are you guys doing?
You know, that wasn't authorized.

So that all happened.  And there may have been

1    conversations with Khalid where, you know, he said, no, the

2    hotel screwed up and -- and by then, I had heard -- to answer

3    your question, I had heard from either my accountant or my

4    assistant that Khalid said that he did not authorize that.  So

03:16PM    5    I don't know if I talked to him directly or if I heard it from

6    my assistant or accountant.

7           But, you know, there was kind of he said/she said

8    where the hotel claimed that he had authorized that, Khalid

9    said no.  And I said, look, I don't care.  I signed the thing

03:16PM   10    for 41-.  I'm standing behind that.  But the rest is the hotel.

11           And then I asked my assistant as well to call the

12    credit card company and say deny those charges.  Here's proof

13    of, you know, authorization, and everything beyond that is

14    between them and the hotel.

03:16PM   15         Q.   (BY MR. PI:)  Okay.  I'm displaying previously

16    admitted Exhibit 3 on your screen.

17           Okay.  At the top -- I'm going to zoom in because

18    the text may be small on your screen.

19           At the top, it says "Settlement Agreement and

03:17PM   20    Release."  Do you see that?

21         A.   Yes.  Uh-huh.

22         Q.   And there's also a copy in the box next to you, if

23    you want to look.  I'm going to direct you to page 6 and I'm

24    also going to go there in this document.

03:17PM   25           Okay.  On the middle left side, is that your

1      signature again?

2            A.    Correct.  Yes.

3            Q.    And the date of execution, when was that?

4            A.    April 19, 2018.

03:17PM    5      Q.    2018.  So that's approximately a year after the

6      Coachella 2017 event you attended?

7            A.    That looks right.

8            Q.    Okay.  And what is this document?  I'm going to go

9      back up to the top.  What is this document?

03:17PM   10      A.    Um, to be honest, I don't actually recall this

11      document other than in the conversations, um, we had.  It, you

12      know, appears to be a Settlement Agreement where -- where --

13            Q.    I'll zoom in for you.

14            A.    Where Khalid was going to pay back the hotel,

03:18PM   15      The Chateau at Lake La Quinta.  And then the hotel was going to

16      refund the charges to me.

17            Q.    Understood.

18                  So let's look at the top portion of this document.

19      It says, "This Settlement Agreement and Release is made and

03:18PM   20      entered into this 20th day of April, 2018, by and between

21      Khalid Itum, Thomas Buttgenbach, and LLQ Partners, LLC, doing

22      business as The Chateau at Lake La Quinta and provides as

23      follows."

24                  Do you know what The Chateau at Lake La Quinta is,

03:19PM   25      first?

1      A.    Yes.  That's the host hotel where Khalid had his

2   event and also where I stayed.

3      Q.    Okay.  And then in the next paragraph, it says,

4   "Whereas, certain claims have arisen between the parties with

03:19PM  5   respect to the rights, relationships, duties, and obligations

6   of the parties to each other.  These claims concern the five

7   payments for a sum of $109,851.13 received by LLQ from

8   Buttgenbach between February 9, 2017, and April 17th, 2017, in

9   connection with the Coachella 2017 event that was held at

03:19PM  10   The Chateau from April 13th through 15th, 2017."

11          Is that the Coachella event that you attended?

12      A.    Correct.

13      Q.    Okay.  And I'm going to draw your attention to the

14   settlement terms, which is also on page 1.  It's in

03:19PM  15   Article One.  And Provision 1.1 states, "Itum agrees to pay to

16   LLQ the amount of $109,851.13, the reimbursement amount, by

17   wire on or before April 19, 2018."

18          And Provision 1.2, "Upon receipt of the

19   reimbursement amount, LLQ shall issue a check to Buttgenbach in

03:20PM  20   the amount of $109,851.13 on the next business day after

21   receipt of the reimbursement amount from Itum."  It says, "Such

22   check shall be overnighted to Buttgenbach at address set forth

23   below."

24          Subsequent to April 19th, 20 -- 2018, were you

03:20PM  25   repaid for the almost $110,000 charges on your credit card?

1    A.    What I heard, yes.  Um, but, you know, in all

2   fairness, I wasn't really very involved in this process.  So

3   this was handled by my staff.  And one day they said this is

4   getting resolved.  There's an agreement.  Sign here, here, and

03:21PM   5   here, and they're going to send the money.

6        Q.    So to your knowledge, the debt to you was repaid?

7        A.    To my knowledge, yes.

8        Q.    Did the defendant ever tell you how he was able to

9   repay the debt of $110,000, approximately, to repay you?

03:21PM  10        A.    Not really.

11            MR. PI:  No further questions at this time,

12   Your Honor.

13            THE COURT:  Thank you.

14            Cross-examination.

03:21PM  15            MR. FEE:  Thank you, Your Honor.

16            THE COURT:  Actually -- excuse me, Mr. Fee.  I think

17   we'll take a short break before cross-examination.

18            So we'll be in recess for 15 minutes, ladies and

19   gentlemen, which would make it about 3:37 by the courtroom

03:21PM  20   clock.

21            Please remember, don't discuss the case, anything

22   about the case.  And don't do any research or investigation.

23   Don't speak about it with anyone.  Don't make up your minds

24   about any issue in the case.

03:21PM  25            Thank you.  You're excused.

|  | 1 | THE COURTROOM DEPUTY:  All rise. |
|--|---|---|
|  | 2 | (Break taken.) |
|  | 3 | (In the presence of the jury:) |
|  | 4 | THE COURT:  Let the record reflect the presence of |
| 03:44PM | 5 | all members of the jury, all counsel and the defendant present. |
|  | 6 | You may inquire, Mr. Fee. |
|  | 7 | MR. FEE:  Thank you, Your Honor. |

**CROSS-EXAMINATION**

BY MR. FEE:

    03:44PM 10    Q.   Hi, Dr. Buttgenbach.

11    A.   Good afternoon.

12    Q.   Good afternoon.

13    You answered some questions on direct about the

14 agreement you had signed with The Chateau, listing the $41,000.

03:44PM 15 Do you recall that?

16    A.   Um, yes.

17    Q.   I'm going to ask Ms. Thomas to put up GX2, which I

18 hope is that authorization.  It will be on your screen,

19 Dr. Buttgenbach.

03:45PM 20    Do you see it?

21    A.   Yes, I do.

22    Q.   And I just want to point out something that I'm not

23 sure was covered, Dr. Buttgenbach.  There is no portion of this

24 credit card authorization form that is signed by Khalid Itum;

03:45PM 25 correct?

|  | 1 | A.    That's correct. |

1          A.    That's correct.

2          Q.    And there's no reference on here to the company that

3    you mentioned that Khalid was using to run the 2017 event,

4    Kaleidoscope.  That's not on there either; right?

03:45PM    5          A.    Well, I thought it says reference group Kaleidoscope

6    event, April 13th.

7          Q.    That's right.

8                So the event is referenced for being run by

9    Kaleidoscope in April.  But there's no signature, excuse me, to

03:45PM   10    restate my question, on behalf of Kaleidoscope in this

11    document; right?

12          A.    Correct.

13          Q.    And you would agree that the credit card

14    authorization was from you because you had -- you owned the

03:46PM   15    credit card.  It's your credit card; correct?

16          A.    Uh-huh.  Yes.

17          Q.    To the hotel, telling them how much you agreed or

18    authorized them to charge.  That's right?

19          A.    Correct.

03:46PM   20          Q.    So it's up to the hotel to make sure you're not

21    charged more than $41,000; right?

22          A.    That was my viewpoint, yes.

23          Q.    And then you, as you said, eventually do get paid

24    back by Mr. -- or thanks to Mr. Itum.  Fair to say; right?

03:46PM   25          A.    The money came from the hotel, yes.

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:46PM | 5 |

```
        Q.    That's right.  That's right.

              But as you discussed on the direct with Mr. Pi from

    the prosecution team, Mr. Itum got the money to the hotel and

    then the hotel gave you back the money; correct?

        A.    That's what the agreement said.  I --

        Q.    So let's look at that agreement briefly one more

    time.

              MR. FEE:  Ms. Thomas, if you can put up Government's

    Exhibit 3, please.  And so if we can zoom in on -- let's say

    the first third.

        Q.    (BY MR. FEE:)  Again, just to point out some basic

    facts about this.  The first paragraph of the agreement has the

    name of Khalid Itum, you, and LLQ Partners, which is the hotel.

    You'd agree?

        A.    That's what it says, yes.

        Q.    And Khalid Itum is Khalid Itum's name; right?

    That's how you knew him?

        A.    I think so.

        Q.    So you would agree that there is no effort in this

    agreement to hide that Khalid Itum was a party to the agreement

    whereby your funds were repaid; correct?

        A.    Correct.

        Q.    And just in the second paragraph, the same point, it

    references the event between February 9th, 2017, and

    April 17th, 2017, is when the payments came in connection with
```

Line numbers and timestamps:

1
2
3
4
03:46PM  5
6
7
8
9
03:46PM  10
11
12
13
14
03:47PM  15
16
17
18
19
03:47PM  20
21
22
23
24
03:47PM  25

the Coachella 2017 event held at The Chateau in 2017.

So would you agree, Dr. Buttgenbach, that it clearly

shows the event to which these payments related?

A.    Correct.

MR. FEE:  Um, if we can go to the sixth page of this

agreement, the signature page.  Just scroll forward.  There we

go.  The one where Mr. Itum signs.

So -- well, we can stop there, actually.

Q.    (BY MR. FEE:)  Mr. Buttgenbach, that is your

signature; correct?

A.    Correct.

Q.    And it's notarized?

A.    That's what it looks like, yeah.

Q.    Do you remember getting it notarized?

A.    No.

Q.    But you would agree that a notary made a record of

this, given the notary stamp there?

A.    Yeah.  Looking at this, Avalon, she's one of our

staff members.  And I probably notarized at the time five to

ten agreements per week.

Q.    Got it.

So she works for you?

A.    She works for my company, yeah.

Q.    Got it.

You don't remember discussing this agreement with

Mr. Itum?

    A.    I do not.

    Q.    And so fair to say at no point did Mr. Itum tell you to keep this agreement secret?

03:49PM    A.    No.

    Q.    At no point did Mr. Itum ever suggest that anything about taking the loan from you to put on the event and repaying you these funds was secret or inappropriate or couldn't be shared with whoever you wanted to share it with?  Fair to say?

03:49PM    A.    I don't recall anything like that.

    Q.    I know you didn't spend a lot of time at the Kaleidoscope event in 2017, but you stopped by for a drink you said?

    A.    I did, yes.  Uh-huh.

03:49PM    Q.    It was a real event; right?  People are there, talks being given?

    A.    Yep.  It was well put on.

    Q.    And Mr. Itum, you know, ran that event, he put on that event?

03:50PM    A.    That's what I understood, yes.

    Q.    After you got your money repaid in full from the hotel, you continued to have occasional contact with Mr. Itum, you'd agree?

    A.    I think I ran into him briefly once or twice

03:50PM somewhere.

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:50PM | 5 |

         Q.    And you had some contact as well about Coachella.
Do you recall asking him for help getting a room at Coachella
in 2019?
         A.    I do not recall that.
                MR. FEE:  Your Honor, may I approach to refresh?
                THE COURT:  Show opposing counsel what you're going
to --
                MR. FEE:  Yes, of course.
                THE COURT:  -- show the witness.
                MR. FEE:  May I?
                THE COURT:  You may approach.
         Q.    (BY MR. FEE:)  Now, don't read the document out
loud.  Just look at it, take a moment, and look up when you're
done, please.
                (Pause in the proceedings.)
                THE WITNESS:  Okay.  I read it.
         Q.    (BY MR. FEE:)  Thank you, Dr. Buttgenbach.
                Does this document refresh your recollection that in
April of 2019 you or someone on your behalf reached out to
Mr. Itum to try -- to get his help in obtaining two rooms at
The Chateau La Quinta for the 2019 Coachella Festival?
         A.    I still don't remember it, but that's what appeared
to have happened, yes.
         Q.    Understood, Dr. Buttgenbach.
                Um, you started your testimony -- and I'm going to

1    let you go very soon -- by talking about your employment,

2    which I believe you said was Avantus?

3        A.    Correct.

4        Q.    That's a -- was at one point under a prior name, a

03:52PM    5    start-up company; correct?

6        A.    Well, I founded it in 2015.  So by the finish -- it

7    was a start-up in 200- -- hold on.  2009.

8        Q.    I wouldn't have -- I wouldn't have second guessed

9    you.

03:52PM   10        So when it started, it was relatively small, solar

11    project company?  Is that correct?

12        A.    Out of my living room, yes.

13        Q.    There you go.

14        And now it's a big deal; right?

03:52PM   15        A.    We provide about 10 percent of the power here in

16    this building and in all of Los Angeles.  So, yeah, we build

17    large projects, billion-dollar projects.

18        Q.    Okay.  Well, we appreciate that.

19        You were -- I believe you said now you're on the

03:53PM   20    board.  But you had been CEO of this company that's now called

21    Avantus for -- since its inception until a point relatively

22    recently?

23        A.    It was called 8minute Solar Energy, 8minute

24    Renewables prior to Avantus.  We did a name change about two

03:53PM   25    years ago.

         1       Q.    You held the position of CEO for much of the life of
         2   the company?
         3       A.    Correct.
         4       Q.    As the CEO of a start-up, you would agree that
03:53PM  5   you're really the captain of a relatively small ship.  Fair to
         6   say?
         7       A.    Yep.
         8       Q.    And as that ship grows, you're bringing on mates and
         9   other people to help you run that ship?
03:53PM  10      A.    Correct.
         11      Q.    And as the captain of that ship, you have to keep a
         12  handle on many different details in a start-up, you would
         13  agree?
         14      A.    For sure.
03:54PM  15      Q.    And some of those details might require you to dip
         16  in to finance, to accounting, to marketing, to engineering,
         17  given your background?  You'd agree on all that?
         18              MR. PI:  Objection, Your Honor.  Relevance.
         19              THE COURT:  What's the relevance?
03:54PM  20              MR. FEE:  Your Honor, they elicited his background
         21  as -- as a start-up CEO.  So I'd like to ask him some questions
         22  about how he runs his business.
         23              THE COURT:  Well, what's the relevance of that?
         24              MR. FEE:  Your Honor, I'm going to ask him how he
03:54PM  25  handles discretionary bonuses to employees, given what the

1    Government opened on today.

2              THE COURT:  The objection is sustained.

3              MR. FEE:  Thank you, Your Honor.

4         Q.    (BY MR. FEE:)  Dr. Buttgenbach, finally, you

03:54PM  5    testified that the Settlement Agreement with The Chateau came

6    about after some of your people had threatened suit to

7    The Chateau.  Is that your recollection?

8         A.    I don't recall that.

9         Q.    You recall in your direct testimony talking about

03:54PM  10   how someone on your staff relayed that you're upset with

11   The Chateau; correct?

12        A.    Yeah.  And my executive assistant, um, she's pretty

13   forceful.  So I wouldn't be surprised if she yelled at the

14   hotel pretty good.

03:55PM  15        Q.    So you'd agree that the method that was devised as a

16   result of the Settlement Agreement where Mr. Itum had money

17   wired to The Chateau and The Chateau gave you back -- or

18   whatever you call it, let go of the charges on your card

19   resolved the dispute that your assistant had conveyed to the

03:55PM  20   hotel?

21        A.    Yes.

22             MR. FEE:  One moment, Your Honor.

23             (Off-the-record discussion between counsel.)

24             MR. FEE:  Your Honor, no further questions for

03:55PM  25   Dr. Buttgenbach.

|     |     |
| --- | --- |
| 1 | THE COURT:  Thank you. |
| 2 | Any redirect? |
| 3 | MR. PI:  Yes.  Thank you. |
| 4 | **REDIRECT EXAMINATION** |
03:55PM | 5 | BY MR. PI: |
| 6 | Q.    Okay, Dr. Buttgenbach.  I'm going to display for you |
| 7 | previously admitted Exhibit 4.  This is going to be page 3 of |
| 8 | 5. |
| 9 | Okay.  Remind us, who is Carrie Morrison? |
03:56PM | 10 | A.    Carrie Morrison was my executive assistant. |
| 11 | Q.    She's the one who's forceful? |
| 12 | A.    Yep. |
| 13 | Q.    Okay.  So this is an e-mail sent by Carrie on |
| 14 | May 2nd, 2017.  That's after the Coachella event that you |
03:57PM | 15 | attended; correct? |
| 16 | A.    Yes. |
| 17 | Q.    You're cc'd on this e-mail; correct? |
| 18 | A.    That's what it looks like, yep. |
| 19 | Q.    And it's an e-mail to Patricia Donovan with an |
03:57PM | 20 | e-mail extension @TheChateauLakeLaQuinta.com and |
| 21 | KhalidItum@gmail.com? |
| 22 | A.    Correct. |
| 23 | Q.    In the e-mail, it says, from Carrie Morrison, "Hi, |
| 24 | Patricia.  Thanks for the information.  I've attached the |
03:57PM | 25 | credit card authorization form with signature that was sent to |

1    the hotel in January, which I confirmed was received, that only

2    authorizes the hotel to charge $41,000 to his credit card.  Tom

3    would like to understand how you can charge his card for any

4    additional amount without authorization from him directly.  If

03:57PM    5    you would let us know, we'd greatly appreciate it."

6          Do you see that?

7    A.    Yes, I do.

8    Q.    Okay.  So on page 6 of this exhibit -- or excuse me.

9    Page 5 of the exhibit, that's the attachment, that is the

03:58PM   10    authorization form we've been looking at.

11          So after Carrie's e-mail here on May 2nd, 2017,

12    there is a response.  This is at the bottom of page 1,

13    Exhibit 4.

14          Now it's from Patricia Donovan, back responding to

03:58PM   15    Carrie Morrison, this time cc'ing Khalid Itum but not you.

16          "Carrie, thank you for providing this information.

17          "We are not in a position to refund any charges

18    until we receive payment from another source.  I have e-mails

19    from Khalid instructing us to use this card for all payments.

03:59PM   20          "We will be in touch with him today.  I will copy

21    you on that correspondence."

22          Mr. Buttgenbach, did Mr. Itum ever tell you that he

23    was instructing the hotel to use your card for all payments?

24    A.    No, he did not.

03:59PM   25    Q.    I'm going to go now to previously admitted, by

**UNITED STATES DISTRICT COURT**

stipulation, Exhibit 31.

Now we're going back in time.  This is March 30th,
2017.  Again, Patricia Donovan.  The e-mail states:  "Dear
Khalid, I am following up regarding payment for food and
beverage for your upcoming event per our agreement."

So putting us back in time, March 30th, 2017.  That
is before the Coachella event that you attended; correct?

A.    Yes.

Q.    "Below is an excerpt of our agreement.  I have
attached a credit card authorization form for your use.  We
will require the remaining deposit amount of $30,000 by end of
day April 1st, 2017."

And then it provides information on food and
beverage minimums.

And below that, there is a second payment due on or
before March 1st, 2017, which is past due.  That's March 30th
at 10:14.

MR. FEE:  Your Honor, objection.  I don't hear a
question.

THE COURT:  Is there a question coming?

MR. PI:  I'm laying a foundation for the second --
the next -- the response e-mail.

MR. FEE:  There is no foundation, Your Honor.  He's
not on the e-mail.

MR. PI:  It's in evidence, Your Honor.

UNITED STATES DISTRICT COURT

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | THE COURT:  This is stipulated into --                               |
|       | 2  | MR. FEE:  Absolutely, Your Honor.                                    |
|       | 3  | THE COURT:  I'm sorry.  What's your objection?                       |
|       | 4  | MR. FEE:  That this witness doesn't have information                 |
| 04:01PM | 5  | about this e-mail.                                                 |
|       | 6  | THE COURT:  Well, then, he can state that he doesn't                 |
|       | 7  | know.                                                                 |
|       | 8  | MR. FEE:  Thank you, Your Honor.                                     |
|       | 9  | THE COURT:  All right.                                               |
| 04:01PM | 10 | Q.    (BY MR. PI:)  Now zooming in to the response e-mail.         |
|       | 11 | This is from Khalid Itum@gmail to Patricia Donovan, March 30th       |
|       | 12 | at 11:21 a.m.                                                        |
|       | 13 | "Patricia, I was unaware of this."                                   |
|       | 14 | THE COURT:  Wait, wait.  Are you going to ask him if                 |
| 04:01PM | 15 | he has seen this before?  Are you going to lay a foundation for    |
|       | 16 | his knowledge about it?                                              |
|       | 17 | MR. PI:  I was going to ask him if he was aware that                 |
|       | 18 | this e-mail was sent by Mr. Itum and the information in it.          |
|       | 19 | THE COURT:  Do that before you begin to read it.                    |
| 04:01PM | 20 | MR. PI:  Yes, Your Honor.                                          |
|       | 21 | Q.    (BY MR. PI:)  Dr. Buttgenbach, were you aware of              |
|       | 22 | this e-mail that was exchanged between Mr. Itum and                  |
|       | 23 | Patricia Donovan, copying Chris Cline?                               |
|       | 24 | A.    I was not.                                                     |
| 04:02PM | 25 | Q.    It states, "Patricia, I was unaware of this" --              |

```
 1              MR. FEE:  Objection, Your Honor.  He said, "I was

 2    not."

 3              THE COURT:  Exactly.  So the objection is sustained.

 4              MR. PI:  Understood, Your Honor.

 5       Q.    (BY MR. PI:)  Again, did you know -- did you ever

 6    hear from the defendant that he had instructed the hotel to

 7    charge your card for all payments related to the 2017 event at

 8    Coachella 2017?

 9       A.    All I heard is -- and this is indirect through my

10    assistant -- that Khalid said that he had not authorized the

11    charges.

12       Q.    Okay.  Going back to the Settlement Agreement.

13    Focusing again on the principal settlement terms, Article One.

14    You testified about this both in direct and cross-examination.

15    There is a two-step procedure here that you -- we discussed

16    both during direct and cross.

17              Do you know why there was this two-step process to

18    get you paid back rather than a direct payment from Mr. Itum to

19    you?

20              MR. FEE:  Objection.  Relevance.

21              THE COURT:  What is the relevance?

22              MR. PI:  Your Honor, this -- it goes to the nature

23    of the -- of Count 4, the money laundering count in terms of

24    the movement of the money.

25              MR. FEE:  Your Honor --
```

04:02PM (line 5)
04:02PM (line 10)
04:02PM (line 15)
04:03PM (line 20)
04:03PM (line 25)

```
        1              THE COURT:  No speaking objections.  Just a moment.

        2              The objection is overruled.  He can answer if he

        3     knows.  The question is?  Do you know?

        4              MR. PI:  Correct.

04:03PM  5              THE WITNESS:  I did not know.

        6              MR. PI:  No further questions at this time,

        7     Your Honor.

        8              THE COURT:  There's no recross.

        9              MR. FEE:  Thank you, Your Honor.

04:04PM 10              THE COURT:  Thank you.

       11              You may step down.  You're excused.

       12              THE WITNESS:  Okay.  Thank you.

       13              THE COURT:  Thank you.

       14              Your next witness?

04:04PM 15              MR. PI:  The Government calls Brody DeBrino.

       16              THE COURT:  Oh, just leave that up there.  Thank

       17     you.

       18              I'm sorry?

       19              MR. PI:  The Government calls Brody DeBrino.

04:04PM 20              THE COURT:  And, Mr. Fee, you can retrieve that

       21     exhibit that you --

       22              MR. FEE:  Oh, yes.  Of course, Your Honor.

       23              THE COURT:  Thank you.

       24              THE COURTROOM DEPUTY:  Sir, please come here behind

04:04PM 25     the court reporter.  Stand right there.
```

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | Please raise your right hand. |
|       | 2  | Do you solemnly swear that the testimony you shall |
|       | 3  | give in the cause now before this Court shall be the truth, the |
|       | 4  | whole truth, and nothing but the truth, so help you God? |
| 04:04PM | 5  | THE WITNESS:  Yes, sir. |
|       | 6  | THE COURTROOM DEPUTY:  Perfect.  Go ahead and go |
|       | 7  | around the bend and take the stand. |
|       | 8  | Please state and spell your name for the record. |
|       | 9  | THE WITNESS:  Brody DeBrino.  B-r-o-d-y, DeBrino, |
| 04:05PM | 10 | D-e, capital B-r-i-n-o. |
|       | 11 | THE COURT:  Thank you. |
|       | 12 | You may inquire. |
|       | 13 | MR. PI:  Thank you, Your Honor. |
|       | 14 | BRODY DEBRINO, |
| 04:05PM | 15 | called as a witness by the plaintiff, was sworn and testified |
|       | 16 | as follows: |
|       | 17 | **DIRECT EXAMINATION** |
|       | 18 | BY MR. PI: |
|       | 19 | Q.   Good afternoon, Mr. DeBrino.  Do you know the |
| 04:05PM | 20 | defendant, Khalid Itum? |
|       | 21 | A.   Uh, yes. |
|       | 22 | Q.   Approximately when did you first meet him? |
|       | 23 | A.   I want to say somewhere around 2017, if I recall |
|       | 24 | correctly. |
| 04:05PM | 25 | Q.   Could you describe the context under which you met |

**UNITED STATES DISTRICT COURT**

1    him for the first time?

2         A.    Yes.  He was introduced.  A friend of a friend

3    introduced us.

4         Q.    And what was the purpose of that introduction, from

04:05PM    5    your perspective?

6         A.    He was looking for a sponsorship slot for a brand

7    activation that he was doing for the -- for Coachella.

8         Q.    Okay.  So for those of us not familiar with some of

9    those terms, what is a brand activation?

04:06PM   10         A.    It is a, um, opportunity for a brand to get positive

11    press and notoriety.

12         Q.    Okay.  And I think you used the term a sponsorship

13    spot.

14         A.    Correct.

04:06PM   15         Q.    What is that?

16         A.    Um, typically those arrangements are you pay X

17    amount of dollars for your brand to be included in the

18    advertisement, whether that's the step and repeat, whether

19    that's the, you know, general highlight of the event, generally

04:06PM   20    speaking.

21         Q.    Understood.

22              So whose idea was it to make this -- who wanted to

23    meet whom?  Was it you who initiated that?

24         A.    Well, it was brought to me -- I saw an opportunity

04:07PM   25    for the brand to -- it sounded good when it was pitched to us.

1    Q.    When you say "the brand," are you referring -- what

2    are you referring to?

3    A.    Referring to the brand that I was -- invested in and

4    a part of, Cannabinoid Water®.

04:07PM  5    Q.    Is that the company you worked for at the time?

6    A.    Correct.  Also an investor.

7    Q.    And so what happened?  What did Mr. Itum say to you

8    on that first meeting?

9    A.    He just said that there is a Coachella refresh party

04:07PM 10    that his company, Kaleidoscope, was -- was -- was putting

11    together.  And he named a few other brands that were going to

12    be involved.  It sounded like it was a good opportunity for the

13    company to get some good press and content.

14    Q.    Okay.  Did you say refresh party?

04:08PM 15    A.    Yes.  That's what it was referred to, the Coachella

16    refresh party.

17    Q.    Okay.  What does that mean?

18    A.    I -- that's just what it was called.

19    Q.    Okay.  And so what did he ask -- did he -- what else

04:08PM 20    did you say on that call apart from describing this refresh

21    party?

22    A.    Well, it was -- it seemed to take a turn where, you

23    know, it seemed like there were brands that were -- if I recall

24    correctly, there were brands -- or a brand or two that were

04:08PM 25    dropping out.  And the sponsorship dollars were needed to

**UNITED STATES DISTRICT COURT**

1    actually fund the event, from what I recall.  And, you know,

2    that was an opportunity for the company to get great exposure

3    in a positive light.

4        Q.    Okay.  And so how did that call -- how did that

04:08PM  5    discussion end?  Did you have any agreement?  Or what was sort

6    of the next step forward?

7        A.    Yeah.  It was -- it was, well, you know -- because

8    he needed the money, it was -- I believe he offered to -- you

9    know, instead of taking a traditional sponsorship, you know, us

04:09PM  10   to -- you know, typically pay to have the sponsorship, he -- he

11   offered to structure it as a loan.  And, in return, he would

12   give us a list of -- he was going to put together a list of

13   deliverables to -- you know, that were going to be positive for

14   the company.

04:09PM  15       Q.    So he -- he wanted the loan from your company?

16       A.    Not necessarily -- well, it wasn't -- it was just

17   needed the loan.  I decided to fund it on my own because the

18   company -- it wouldn't have made sense for the company to do it

19   at the time.

04:09PM  20       Q.    Okay.  In other words, was that your personal money?

21       A.    Correct.

22       Q.    How much of a loan did Mr. Itum ask for?

23       A.    Uh, I -- I don't remember what he asked for.  I

24   believe we landed on somewhere around 100- to 125,000.  Don't

04:10PM  25   recall the exact.

UNITED STATES DISTRICT COURT

1      Q.    When you say list of deliverables that he -- he

2   listed, what were those deliverables?

3      A.    Uh, I don't know off the top of my head all of them,

4   um, because I don't have access to that document or that e-mail

04:10PM   5   anymore.  Um, but I believe there were things like wrapping a

6   helicopter with our brand featured on it, our brand featured at

7   the event on the step and repeat, um, you know, a lot of

8   signage everywhere, stations that had our product featured.

9   And that was kind of the -- the featured beverage of the event.

04:10PM  10      Q.    Okay.  And speaking more about the event itself,

11   where was that event going to take place?

12      A.    Uh, in -- in Indio or -- I believe, yeah, somewhere

13   around where Coachella is.  I don't know the exact -- the exact

14   name of the venue.  Some -- it was a hotel, from what I

04:11PM  15   remember.  I just don't know the exact name of it.

16      Q.    Was it supposed to coincide in terms of the time

17   with the Coachella --

18      A.    Yes.

19      Q.    -- Music Festival?

04:11PM  20      A.    Yes.

21      Q.    And was that -- you said you had met him the first

22   time in 2017, but are we referring to the 2017 Coachella event?

23      A.    I -- I believe so.  I believe so.

24      Q.    And did you ultimately decide to lend the defendant

04:11PM  25   that much money?  You said, I think, up to around 125,000.

1    A.    Yeah.  It's -- it seemed like it made sense for the

2    brand.  You know, it was a positive exposure for a brand that I

3    had -- I had invested in.  And we needed something like that.

4    It seemed like it was a good opportunity for the brand.

04:12PM  5    Q.    Was $125,000 a lot of money to you at the time?

6    A.    Uh, yeah.  It -- yeah, at the time.

7    Q.    What did the defendant tell you about when he would

8    pay you back for that loan?

9    A.    I don't recall the exact terms or how long.  I

04:12PM  10   think -- I don't know.  If you have anything that you could --

11   I know a document exists that has that information, I just

12   don't have it -- I don't have access to it.

13   Q.    Yeah, but just an approximate is fine, if you don't

14   know the exact amount of time.  Are we talking months? years?

04:12PM  15   weeks?

16   A.    Again, I don't know the exact number.  I wish I

17   could tell you.

18   Q.    Okay.  We'll come to that in a moment, then, the

19   document -- the documents.

04:12PM  20   Did you attend the event at the 2017 Coachella --

21   the refresh party?

22   A.    Correct.

23   Q.    Okay.  And could you describe the event, please?

24   A.    Yeah.  Um, it was -- it was a -- it was nice.

04:13PM  25   There's -- our product was everywhere.  He did come through on

UNITED STATES DISTRICT COURT

1    the deliverables from what I recall.  Um, you know, there was

2    Getty Images there.  There were celebrities there.  We had

3    Post Malone perform there.  It was -- it was a good event.  It

4    was good for the company.

04:13PM  5        Q.    Okay.  And did you meet the defendant in person?

6        A.    I did at that time.

7        Q.    Okay.  And do you recognize -- do you see the

8    defendant in the room -- Mr. Itum in the room today?

9        A.    I can't -- I think -- I think that's him right

04:13PM  10   there.

11        Q.    Could you describe who you're pointing to?

12        A.    Okay.  Yeah.  The gentleman in the -- in the purple

13   tie.  It's been a long time since I've seen him, yeah.

14             MR. FEE:  Stipulated, Your Honor.

04:13PM  15             THE COURT:  So noted for the record.

16             THE WITNESS:  Sorry?

17             THE COURT:  That's -- I just am noting on the record

18   that you've identified the defendant.

19             THE WITNESS:  Okay.

04:14PM  20        Q.    (BY MR. PI:)  After the event, did you get paid back

21   in a timely fashion?

22        A.    Not necessarily.  Uh, I believe he had defaulted on

23   the terms.

24        Q.    Okay.  And what happened?

04:14PM  25        A.    He -- he defaulted on the terms.

UNITED STATES DISTRICT COURT

|  |  |  |
|---|---|---|
|  | 1 | Q.    Did you talk to him about it? |
|  | 2 | A.    Oh, yeah. |
|  | 3 | Q.    What did he say? |
|  | 4 | A.    He -- he said he was trying his hardest to -- to get |
| 04:14PM | 5 | it done. |
|  | 6 | Q.    Did he say why he was not able to pay you back on |
|  | 7 | time? |
|  | 8 | A.    I believe there is a myriad of excuses, but I don't |
|  | 9 | recall anything in particular. |
| 04:14PM | 10 | Q.    Have you heard the name Ted Farnsworth before? |
|  | 11 | A.    I've heard the name Ted. |
|  | 12 | Q.    Generally or in connection with Mr. Itum? |
|  | 13 | A.    In connection with Mr. Itum, yes. |
|  | 14 | Q.    Tell us what Mr. Itum said about a Ted. |
| 04:14PM | 15 | A.    That he was -- I know that he was a -- I believe |
|  | 16 | executive -- I don't know his exact position at the company |
|  | 17 | that he was at.  I believe it was MoviePass.  I don't know his |
|  | 18 | exact title at the company, but I -- he -- he represented that |
|  | 19 | it seemed like Ted was kind of instrumental, it seems, in |
| 04:15PM | 20 | helping to -- to get -- to get the company paid back -- or get |
|  | 21 | me paid back.  Sorry. |
|  | 22 | Q.    I'm displaying Exhibit 11, this was previously |
|  | 23 | admitted.  This is -- let me just display it.  It's going to be |
|  | 24 | on your screen, but you also have, if you want, there's a hard |
| 04:15PM | 25 | copy in the box to your left. |

UNITED STATES DISTRICT COURT

1    A.    Okay.  Well, I see this.  Uh-huh.

2    Q.    Okay.  Do you recognize this e-mail?

3    A.    No, other than what -- CC Khalid, Brody, I wanted to

4    let you know -- thanks, Khalid.

04:16PM    5    This was to Ted.  This is not to me.  But my e-mail

6    is on there, I see.

7    Q.    That -- which e-mail is yours?  You can --

8    A.    Brody@CannabinoidWater.com.

9    Q.    That's your e-mail -- that was your e-mail?

04:16PM    10    A.    That was my e-mail, correct.

11    Q.    And so did you ever receive an e-mail from

12    Ted Farnsworth at your Cannabinoid Water® e-mail address

13    stating, "Brody, I wanted to let you know that you should be in

14    receipt of $150,000 on Tuesday.  We have received your wire

04:16PM    15    instructions and initiated the process"?

16    Do you recall ever receiving an e-mail like that

17    from Ted Farnsworth?

18    A.    I do not recall.  That doesn't mean I didn't, but I

19    don't recall that at all.

04:16PM    20    Q.    And when -- excuse me.

21    Were you eventually paid back by the defendant?

22    A.    I was.

23    Q.    Okay.  How much were you paid back?

24    A.    150,000.

04:17PM    25    Q.    So you had previously testified that you had lent

| | |
|---|---|
| 1 | him something around 100- to 125,000.  Why was the return |
| 2 | payment 150,000? |
| 3 | A.    Because I believe that was in the terms of the |
| 4 | agreement; that if he defaulted, then he was responsible for |
| 04:17PM  5 | paying an extra 25,000. |
| 6 | Q.    I'm going to go now to defense Exhibit No. 2.  It's |
| 7 | DX2. |
| 8 | MR. PI:  And I can put it on the ELMO or if the |
| 9 | defense can display it, that might be faster but -- do you have |
| 04:17PM  10 | it? |
| 11 | MR. FEE:  Yeah.  We have it. |
| 12 | MR. PI:  Is that okay with the Court? |
| 13 | THE COURT:  That's fine. |
| 14 | MR. FEE:  It's Ms. Thomas. |
| 04:17PM  15 | MR. PI:  Oh, Ms. Thomas.  I'm going to put you as |
| 16 | the source.  I'm looking for defense Exhibit 2. |
| 17 | Okay.  So I am not -- this is displaying defense |
| 18 | Exhibit 2.  Could you zoom, please, to the -- |
| 19 | THE COURT:  Which has been admitted by stipulation; |
| 04:18PM  20 | correct? |
| 21 | MR. PI:  It has been, yes.  This is already |
| 22 | admitted. |
| 23 | Could you zoom into the top portion that just shows |
| 24 | all of the text, including the to and from fields, please? |
| 04:18PM  25 | THE WITNESS:  Right.  "Do you think you can |

write" -- "Do you think you can write Brody DeBrino and let him know that you've scheduled his payment of 150,000 for no later than Friday?  Brody@CannabinoidWater.com.  It would get him off my neck."

04:18PM  Q.    (BY MR. PI:)  Subsequent -- this date here is February 13th, 2018.  Did you receive anything from Ted Farnsworth, any communication from Ted Farnsworth letting you know that he scheduled your payment of $150,000 no later than the Friday following February 13th, 2018?

04:18PM  A.    I do not recall receiving that e-mail.  Um, I'd imagine that those -- you should have all those e-mails, no, to verify that.

Q.    Well, the question is whether you recall ever seeing --

04:19PM  A.    No, I don't recall that.

MR. PI:  Can you put this -- you can clear this exhibit.

I'm now displaying Exhibit 83 from -- this is Government exhibit, and I'll take the screen back.

04:19PM  Thank you, Ms. Thomas.

Q.    (BY MR. PI:)  Okay.  Now we're in Exhibit 83. Again, this is the next day, February 14th, 2018.

As you can see, it's a substantially similar e-mail. Around the time of February 14th, the next day, did you ever receive -- do you recall receiving an e-mail from

|  | 1 | Ted Farnsworth? |
|  | 2 | MR. FEE:  Objection. |
|  | 3 | THE COURT:  What's your objection? |
|  | 4 | MR. FEE:  Foundation, Your Honor.  These are in |
| 04:19PM | 5 | evidence.  The witness is not on them, clearly doesn't recall |
|  | 6 | them.  We're just sort of making arguments based off of |
|  | 7 | documents instead of asking the witness. |
|  | 8 | THE COURT:  Well, I haven't heard an argument.  But |
|  | 9 | he can ask the witness if he's ever seen this e-mail, even if |
| 04:20PM | 10 | he's not on it. |
|  | 11 | So that's the question; correct? |
|  | 12 | MR. PI:  Yes, Your Honor. |
|  | 13 | THE COURT:  Okay.  Overruled. |
|  | 14 | Q.   (BY MR. PI:)  Have you seen this e-mail before? |
| 04:20PM | 15 | A.   Not that I recall, no. |
|  | 16 | Q.   Was the information in it forwarded to you, to your |
|  | 17 | recollection? |
|  | 18 | MR. FEE:  Objection. |
|  | 19 | THE WITNESS:  Not to my recollection. |
| 04:20PM | 20 | THE COURT:  The objection is overruled. |
|  | 21 | MR. PI:  Okay.  This is the last one.  It is |
|  | 22 | Government Exhibit 82, already admitted into evidence. |
|  | 23 | Q.   (BY MR. PI:)  Could you please read to yourself |
|  | 24 | Exhibit 82? |
| 04:20PM | 25 | The question is going to be:  Did Mr. Itum ever |

```
  1   share the fact that he was communicating with Teddy about the

  2   debt that he owed you?

  3        A.    I --

  4              MR. FEE:  Same objection, Your Honor.

  5              THE COURT:  Overruled.

  6              THE WITNESS:  I -- I believe Ted was mentioned.

  7   Whether it was via phone, I don't recall, but he was -- he made

  8   it sound like Ted was, you know -- he made it sound like it was

  9   up to him, from what I recall.

 10              It didn't seem like he was in control of the funds

 11   to -- to pay me back.  So, yeah, I mean, clearly based on this,

 12   it looks like he's asking him to -- to help him out here.  I

 13   don't know.

 14        Q.    (BY MR. PI:)  Okay.  Mr. DeBrino, I think you

 15   previously testified that you -- you were paid $150,000.  Once

 16   you were paid, did you believe you were paid in full for the

 17   loan that you had given to Mr. Itum?

 18        A.    I -- I received the funds, so, therefore, I

 19   considered it paid in full.

 20        Q.    Thank you.

 21              MR. PI:  No further questions at this time.

 22              THE COURT:  Thank you.

 23              Cross-examination.

 24              MR. FEE:  Thank you, Your Honor.

 25   ///
```

1       **CROSS-EXAMINATION**

2    BY MR. FEE:

3        Q.    Hi, Mr. DeBrino.

4        A.    How's it going?

04:22PM   5        Q.    Pretty good.

6              You said you got $150,000 repaid; right?

7        A.    I recall, yes.

8        Q.    So he -- he paid you too late under the agreement,

9    but Mr. Itum complied with the agreement that he paid you sort

04:22PM  10    of the amount -- the elevated amount that was triggered under

11    the agreement.  Fair to say?

12        A.    From what I recall, yes.

13        Q.    Got you.

14              So it was 125K.  And then about a year later, about

04:22PM  15    150-?

16        A.    Well, no.  He -- I lent him the money.  Then when he

17    paid me, it was all at once.

18        Q.    Right.

19        A.    From what I recall.

04:22PM  20        Q.    And do you know how long it was, roughly, if you

21    remember, between when you loaned him and when you got it back?

22        A.    I don't have the exact dates.  I don't recall the

23    exact time frame.

24        Q.    All good.  But in any event, it was a 25K increase

04:22PM  25    above the amount you loaned him?

1          A.    That was the agreement.

2          Q.    And you were asked and answered some questions for

3    the prosecution about whether you knew about Ted or Teddy and

4    his involvement in paying you back.  Do you remember that?

04:23PM   5          A.    I --

6          Q.    It just happened.  I'm just -- I'm leading up to the

7    next question.

8                So your understanding is that Mr. Itum was asking

9    Ted, that Ted person, for the funds so that Mr. Itum could

04:23PM   10   repay the debt owed to you; is that correct?

11         A.    Based on what I was -- I was shown here, the

12   internal communication between him and Ted, it would appear

13   that way.  Then other conversations, he mentioned that he -- he

14   made it seem like it's not really up to him necessarily.

04:23PM   15         Q.    That he wasn't in control of the funds, somebody

16   else was?

17         A.    That's how it was represented.

18         Q.    Um --

19         A.    I just wanted to get paid back.

04:23PM   20         Q.    I hear you.  I hear you.  And you did.

21               The Coachella event that you attended, you had

22   talked about how it was good; right?  You got what you hoped to

23   get out of the event for your brand, Cannabinoid Water®.

24   Cannabinoid?

04:24PM   25         A.    Yeah, Cannabinoid.  Tomato, tomato.

UNITED STATES DISTRICT COURT

1      Q.    And what was that?  Content?

2      A.    Content, positive press via Getty Images.  There

3  were celebrities there.  We had celebrity performances, yeah.

4      Q.    And Mr. Itum, as far as you understood, was the one

04:24PM  5  who ran that event.  He organized that 2017 event?

6      A.    Yes.  Seemed to be the key component in

7  orchestrating the event.

8      Q.    And it was a success, as far as you know?

9      A.    I would say it wasn't a failure.

04:24PM  10     Q.    There you go.

11         Um, do you recall Mr. Itum telling you that he was

12  going to get the funds as a payment out of a MoviePass in order

13  to repay you?

14     A.    That was not -- how he was getting the funds seemed

04:25PM  15  to jump around, and it was very confusing to me.  I wasn't

16  concerned about the source of the funds.  I just wanted him to

17  get -- to pay me back.  And it seemed like he was doing his

18  best.  I didn't really understand what he was doing.  I just

19  understood that he was trying his best to get the funds paid

04:25PM  20  back.

21     Q.    Got it.

22         And as you ran through on direct a little bit, you

23  don't remember, fair to say, receiving an e-mail from Mr. Itum

24  where he indicated the funds were going to come out of

04:25PM  25  MoviePass so that he could repay you?

```
 1        A.    I don't -- no.  I don't recall an e-mail saying --
 2  coming from MoviePass directly.
 3        Q.    Well, coming from Mr. Itum, telling you it was going
 4  to come out of MoviePass.  You don't remember --
 5        A.    Yeah, I do know that the wire came from his company,
 6  Kaleidoscope.
 7        Q.    Gotcha.
 8             MR. FEE:  Your Honor, may I approach to refresh?
 9  This way.  With DX -- a document not in evidence that I have
10  marked as DX16.
11             THE COURT:  Thank you.
12                  (Exhibit No. 16 for identification.)
13             MR. PI:  Your Honor, I don't know which question the
14  witness said he doesn't recall.
15             MR. FEE:  That's the point.
16             THE COURT:  Well, if the witness hasn't answered a
17  question stating he can't recall, you can't refresh his memory.
18             MR. FEE:  I'm sorry, Your Honor.  He did say he does
19  not recall receiving such an e-mail, indicating the funds --
20             THE COURT:  That's correct.  Well, he said he didn't
21  recall receiving an e-mail saying it was coming from MoneyPass.
22             MR. FEE:  MoviePass.
23             THE COURT:  MoviePass.
24             MR. FEE:  And that is --
25             THE COURT:  Go ahead.  You may approach.
```

**UNITED STATES DISTRICT COURT**

1       MR. FEE:  So, Mr. DeBrino, just take a look.  Don't

2    read it out loud.  And look up when you're done reading it.

3                 (Pause in the proceedings.)

4                 THE WITNESS:  Oh, okay.  Wait.  And then there's a

04:27PM  5    second part.

6                 (Pause in the proceedings.)

7                 THE WITNESS:  From Khalid, to Ted -- was this --

8                 THE COURT:  All right.  Just --

9                 MR. FEE:  Don't ask questions about -- the rules.

04:27PM 10    Just tell me when you're done reading it, and I'm going to ask

11    you a question.

12                 (Pause in the proceedings.)

13                 THE WITNESS:  Oh, okay.

14       Q.    (BY MR. FEE:)  Okay.  So the question, Mr. DeBrino,

04:27PM 15    is:  Does this document refresh your recollection as to whether

16    you received an e-mail from Mr. Itum indicating that the source

17    of funds would be for MoviePass?

18       A.    So I can't tell if the bottom begin forward message

19    included me on there.  So in that case, I wouldn't know.  But

04:28PM 20    are -- I can't tell, I just know that the top shows that was to

21    me.  Then it says begin forward message so --

22       Q.    I'm sorry to interrupt, Mr. DeBrino.  The rules are

23    you can't read the document.  So I'm just asking, your memory,

24    is it refreshed by what you've seen?  It sounds like the answer

04:28PM 25    might be no.

         1        A.    Not necessarily.  I don't -- no.  Not necessarily,

         2    no.

         3        Q.    All good.

         4        A.    The top --

04:28PM   5              THE COURT:  Don't -- don't.

         6              MR. FEE:  Don't read the document.

         7              THE COURT:  Wait for the question.

         8              MR. FEE:  The rules of the courtroom -- and of

         9    evidence, I'm sorry.

04:28PM  10              Last thing, if we can put up Government's Exhibit 12

        11    on page 1, please.  And if we can zoom in on, say, the first

        12    third of that document.

        13        Q.    (BY MR. FEE:)  Mr. DeBrino, do you recognize this to

        14    be the loan agreement between you and Khalid Itum?

04:29PM  15        A.    It appears to be, yes.

        16        Q.    And fair to say that Khalid Itum is the real name of

        17    the person to whom you loaned the money, so far as you

        18    understand?

        19        A.    Yes.

04:29PM  20        Q.    And if we could go to page 9 of this document,

        21    Government Exhibit 12, and focus on the top third.

        22              That's Khalid's name and your name; right?

        23        A.    Uh-huh.

        24        Q.    And do you recognize Kaleidoscope as the company he

04:29PM  25    was using to put on the 2017 event?

```
         1        A.    Correct.

         2        Q.    And finally, Mr. DeBrino, at no point did Mr. Itum

         3   tell you that any aspect of the loan, the guarantee agreement,

         4   or the repayment of the loan was secret; correct?

04:30PM   5        A.    Secret to -- between, like, us?

         6        Q.    Yeah.  Secret -- meaning like he never said to you,

         7   "Hey, Brody, don't tell anybody about this deal we have going

         8   on"; correct?

         9        A.    Yeah.  I don't recall -- no.  No.

04:30PM  10              MR. FEE:  No further questions, Mr. DeBrino.  Thank

        11   you.

        12              THE COURT:  Redirect?

        13              MR. PI:  No, thank you, Your Honor.

        14              THE COURT:  All right.  Thank you.  You may step

04:30PM  15   down.

        16              THE WITNESS:  Okay.

        17              THE COURT:  You're excused.

        18              All right, ladies and gentlemen.  We'll be in

        19   recess, as far as you're concerned, until tomorrow morning at

04:30PM  20   9:00 o'clock.

        21              Please remember what I've instructed you before.

        22   Don't discuss the case with anyone, amongst yourselves or with

        23   anyone, don't do any research about anything related to the

        24   case in the broadest possible sense.  Don't make up your minds

04:30PM  25   about any issue.
```

UNITED STATES DISTRICT COURT

1       I understand that we're in for some weather starting

2   tomorrow.  So drive safely, allow yourself plenty of time to

3   get here so that we can start promptly at 9:00 o'clock.  And I

4   will see you then.

04:31PM  5       Thank you very much.

6       Leave your notebooks on your chairs.

7       THE COURTROOM DEPUTY:  All rise.  This court is

8   adjourned.

9           (Out of the presence of the jury:)

04:31PM  10      THE COURT:  All right.  You may be seated.  We're on

11  the record outside the presence of the members of the jury.

12      Before I forget, counsel, please remind your

13  witnesses not to be chewing gum when they're in the courtroom.

14      MR. PI:  Yes, Your Honor.  I apologize for that.  It

04:31PM  15  didn't occur to me even to have to remind --

16      THE COURT:  Exactly.  Well, there is a sign outside,

17  but -- in the future.  I don't like to embarrass a witness on

18  the witness stand.  I will embarrass anybody in the spectator

19  section or counsel, if I see you chewing gum.

04:32PM  20      All right.  Thank you.

21      MR. PI:  Yes, Your Honor.

22      THE COURT:  Tomorrow your witnesses -- order of

23  witnesses for tomorrow?

24      MR. PI:  It's unchanged from what I said earlier.

04:32PM  25  We will start right off with Mr. Julian Ross and then go into

```
 1    Jeff Consoletti.  Our third witness tomorrow will be

 2    Mr. Benson, Stuart Benson.  And then the fourth and probably

 3    last witness will be FBI Agent Lyssa Bevan.

 4              THE COURT:  Do you think you'll finish tomorrow?

 5              MR. PI:  If the crosses have been kind of like they

 6    have been today, these are longer witnesses, but we have the

 7    full day, my best guess is we will rest tomorrow.

 8              THE COURT:  All right.  Thank you.

 9              Anything else?

10              MR. FEE:  No, Your Honor.

11              THE COURT:  All right.  Mr. Aveis?

12              MR. AVEIS:  Can we have a minute, please?  Can we

13    just discuss --

14              THE COURT:  Oh, certainly.

15              MR. AVEIS:  Sorry.

16                  (Off-the-record discussion between counsel.)

17              MR. FEE:  Your Honor, may I approach and take the

18    thing -- the document?

19              THE COURT:  Yes, please.

20              MR. PI:  Thank you, Your Honor.  The one request

21    that we would have is, if the Government is correct and we've

22    got four witnesses left, we think we're going to rest tomorrow,

23    we'd like to be able to see the defense's witness list.

24              I think at the pretrial conference, the Court had

25    indicated both parties should file by the Monday preceding.  We
```

04:32PM    5

04:32PM   10

04:33PM   15

04:33PM   20

04:33PM   25

**UNITED STATES DISTRICT COURT**

1   haven't seen a witness list yet.  Obviously everybody knows the

2   defendant doesn't have to -- they don't have to reveal that

3   point, but if we could have a lead --

4           THE COURT:  What's -- at this point, do you

04:33PM  5   anticipate calling witnesses?

6           MR. FEE:  If we can confer, I think we are going to

7   call some witnesses.  Let us confer, given some of the -- what

8   we've heard today and we'll e-mail them tonight, I promise.

9           THE COURT:  Tonight.  "Tonight" meaning by

04:34PM  10  9:00 o'clock?

11          MR. FEE:  6:00 o'clock.  That's what I --

12          THE COURT:  Great.  Even better.

13          All right.  Thank you very much.  See you tomorrow.

14          And meet with counsel, remember, at 8:30.  If you

04:34PM  15  have anything to bring up, let Mr. Tamayo know.  Don't wait

16  until 8:59 because I'm going to bring the jury in at

17  9:00 o'clock, assuming they're all here.  All right?

18          Thank you.

19          MR. FEE:  Thank you, Your Honor.  Good night.

04:34PM  20          (Proceedings concluded at 4:34 p.m.)

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )


             I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.




             DATED THIS 31ST DAY OF JANUARY, 2024.




                    /S/ MYRA L. PONCE
             _____
             MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                FEDERAL OFFICIAL COURT REPORTER