BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
DAVID Y. PI (Cal. Bar No. 337432)
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorneys
Major Frauds/Transnational Organized Crime Sections
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3659/0813
    Facsimile: (213) 894-6269
    E-mail:  David.Pi@usdoj.gov
            Daniel.Weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>        v.<br><br>KHALID ITUM,<br>  aka "Khalid Sharer Taher Itum,"<br><br>    Defendant. | No. CR 2:23-82-AB<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT KHALID ITUM; DECLARATION OF DAVID Y. PI<br><br>Sentencing Date:  02/20/26<br>Sentencing Time:  1:30 p.m.<br>Location:  Courtroom of the Hon. André Birotte Jr.<br><br>**[DECLARATION AND EXHIBIT FILED UNDER SEAL]** |

    Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys David Y. Pi and Daniel H. Weiner, hereby files its sentencing position regarding defendant KHALID ITUM ("defendant").

    This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Investigation Report ("PSR") (Dkt. 123), and such further evidence and argument as the Court may permit.

The government reserves the right to file a response to any sentencing position submitted by defendant and to file any supplemental sentencing position that may be necessary.

Dated: January 23, 2026

Respectfully submitted,

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

         /s/
DAVID Y. PI
DANIEL H. WEINER
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Defendant used his position as an executive to embezzle $260,000 from his employer to pay off his personal debts. Specifically, in 2018, defendant was a Vice President at MoviePass, a company owned by Helios & Matheson Analytics, Inc. ("HMNY"), a publicly traded company. Prior to his employment at MoviePass, defendant had fallen into personal debt to two lenders in the amount of $260,000. Unable to repay this debt on his own, defendant submitted false invoices to MoviePass and HMNY in the amount of his debts. In addition to his direct misrepresentations to his employer, defendant also convinced an event planner to include false line items in a budget summary to support defendant's false invoices. Relying on defendant's misrepresentations, his employer paid the false invoices. For this conduct, the jury convicted defendant of two counts of wire fraud.

In the Presentence Investigation Report ("PSR"), the United States Probation and Pretrial Services Office ("Probation Office") calculated a total offense level of 19, and a criminal history category of II, resulting in an advisory Sentencing Guidelines range of 33 to 41 months' imprisonment. (PSR ¶¶ 51, 59.)

The government agrees with the Probation Office's calculation of defendant's Base Offense Level of 7 and a 12-level increase for an actual loss exceeding $250,000. (PSR ¶¶ 40-42.) However, defendant should also be subject to a 2-level enhancement for sophisticated means under USSG § 2B1.1(b)(10), which would result in a total offense level of 21. The government agrees with the Probation Office's calculation of defendant's criminal history category. The government also agrees with the Probation Office's recommendation of

$260,000 of restitution. Based on an offense level of 21 and a criminal history category of II, defendant's Sentencing Guidelines range would be 41 to 51 months' imprisonment. The government recommends a low-end term of imprisonment of 41 months, 3 years' supervised release, restitution of $260,000, a fine commensurate to the costs of prosecution, up to $250,000, and a $100 special assessment.

**II.   DEFENDANT'S CRIME[1]**

    **A.   Defendant Accumulated a Debt of $260,000**

In April 2017, defendant produced an event at the Coachella music festival called "Kaleidoscope: Lawn Talks." Kaleidoscope Productions LLC ("Kaleidoscope") was an event planning and marketing firm founded by defendant in 2017. The event took place before defendant began working at MoviePass. Neither MoviePass nor its parent company, HMNY, was involved in any way with the event.

Tom Buttgenbach, a solar energy entrepreneur, testified that defendant was an acquaintance who asked to borrow Buttgenbach's credit card to cover a $40,000 hotel charge for the Kaleidoscope event. (RT II, 221:6-8, 17-21; 224:7-22; 225:18-25; 226:1-12.) Buttgenbach received from the hotel, and signed, an authorization that allowed the hotel to use his credit card up to $41,000. (RT II, 226:13-25, 227:1-15.) He then learned that "something must have gone awfully wrong" when he got his credit card bill for a hotel charge of more than $100,000. (RT II, 228:7-25.) Defendant claimed that "the

---

[1] References to the reporter's transcript of the trial are first to the volume number, e.g., "II," then to the page and line(s). "GEX" refers to government's exhibits received in evidence at trial. The government previously lodged the entirety of the trial transcripts and the exhibits referred to herein at Dkt. 130.

hotel screwed up" and that he (defendant) had not authorized that charge. (RT II, 230:1-4.)

Buttgenbach paid the entire charge (his card issuer refused to reverse it). Defendant strung him out for nearly a year when Buttgenbach emailed him that "[t]his has been going on too long and [I need to take action] before the statute of limitation runs out[.]" (GEX 84.) That email prompted a "settlement agreement," drafted by the hotel's counsel, between the hotel, Buttgenbach, and defendant. The agreement stated that "certain claims have arisen between the parties" relating to the approximately $110,000 charge against Buttgenbach's credit card. (RT II, 232:3-10, GEX 3.) The agreement provided that defendant would pay the hotel the entire charge, approximately $110,000, but the hotel, having already been paid, would pass that money through to Buttgenbach. (RT II, 231:3-23; 232:13-17; GEX 3.)

Julian Ross, the hotel's manager, testified about how the settlement agreement came about. Defendant had asked Ross if the hotel could refund "the form of payment . . . not necessarily using [Buttgenbach's] name." (RT III, 291:11-25, 292:1-14, 305:11-17.) Regarding the large charge that exceeded Buttgenbach's $41,000 authorization, defendant "chalked it up, I believe, to [hotel] a clerical error." (RT III, 292:12.) But contrary to defendant's effort to blame to the hotel, Ross learned from an employee, Patricia Donovan, that "Mr. Buttgenbach's card was *charged at the direction of Khalid [Itum]*." (RT III, 316:16-17; italics added.) No less, Ross's testimony was corroborated by defendant's email to Ross's staff in which, responding to how defendant was going to cover the charges that exceeded Buttgenbach's $41,000 authorization, defendant wrote

3

"Patricia, I was unaware of this! Thanks for letting me know! Had given authorization to use the same CC for all the payments! Please go ahead.., sorry!!!" (RT III, 317:2-9, GEX 31.)  Defendant never explained to Ross "why [defendant] wanted to send approximately $110,000 to the hotel, only for the hotel to then forward that same amount of money on to Mr. Buttgenbach."  (RT III, 317:15-21.)

Brody DeBrino – defendant's other personal creditor – testified that defendant asked him for a loan of around $100,000-$125,000 to help defendant promote brands at a 2017 Coachella event. (RT II 251:1-25, 252:1-25, 253:21-23.)  Defendant "defaulted" on the $125,000 loan, providing "a myriad of excuses," and requiring that defendant repay a total of $150,000.  (RT II 256:8-9, 258:1-5.)

### B. Defendant Joins MoviePass and Embezzles $260,000 to Pay Off His Personal Debts

In November 2017, defendant joined MoviePass as Vice President of Business Development.  MoviePass was a private company with offices in New York.  MoviePass's primary product offering was a movie subscription service whereby subscribers could pay a fixed monthly fee to see a number of movies each month.  (RT IV, 406:14-20.)  Around December 2017, MoviePass became a subsidiary of HMNY, a publicly traded company.  (RT IV, 400:23-25, 401:1-5, 402:2-8, 407:1-18.)

Defendant's personal creditors (Buttgenbach and DeBrino) continued to hound defendant for repayment well into the first few months of defendant's employment at MoviePass.  Benson knew Ted Farnsworth as HMNY's CEO who "had oversight of MoviePass as well." (RT IV, 422:18-25, 423:1.)  Farnsworth and defendant were "very cordial.  They were very friendly."  (RT IV, 423:10; GEX 110.)  Thus,

4

in February 2018, defendant exchanged several text messages, imploring Farnsworth to help pay defendant's personal creditors, including "Teddy . . . this guy is killing me today. He is really annoyed with me . . . do you think we can get the 150 done today?" (GEX 82.)  In another exchange, from defendant's personal Gmail email account to his friend Farnsworth's personal Hotmail email account, defendant wrote, "[u]gh. Just got [a litigation threat] from the other, $100k, investor [Buttgenbach]! When it rains, it pours . . .." (GEX 84.)

Within days, defendant emailed Farnsworth at Farnsworth's work email account two invoices totaling $150,000 – the exact amount that defendant owed to personal creditor DeBrino – that sought payment from HMNY for work purportedly performed by defendant's personally owned business, Kaleidoscope. (GEX 61.)  There was no dispute that Kaleidoscope had nothing to do with MoviePass and had no contract with MoviePass for anything.  Defendant's cover email stated that, "[p]er our agreement," he was attaching invoices for prompt payment to Kaleidoscope's bank account. (GEX 61.)[2]

Stuart Benson, the Chief Financial Officer of HMNY, was copied on the email. (RT IV, 400:23-25, 401:1-5, 402:2-8.)  Although Benson was cc'd on the email, he testified that he did not know about any such "agreement" and did not believe it was a proper business expense because "it would make no sense to pay [defendant] as an employee through th[ese] invoice[s]." (RT IV, 430:5-25, 431:16-17, 432:15-19.)  Benson would have wanted to know about the agreement

---

[2] There was no dispute that defendant solely controlled the Kaleidoscope bank account into which the funds identified in the two wire fraud counts (counts one and two) were deposited. (GEX 67.)

5

between defendant and Farnsworth as impermissible "potential related party transaction." (RT IV, 437:21-25, 438:1-7.)

But HMNY did not pay Kaleidoscope (i.e., defendant) for either of the two invoices. Undaunted, defendant then sent *another* invoice, this one seeking payment from MoviePass rather than from HMNY, for $150,000 – again the same amount that defendant personally owed to DeBrino. (GEX 62.) Unlike the earlier two invoices that purported to pay for the acquisition of two movies ("American Animals" and "Burden"), this single invoice purported to pay for unspecified "production services." (GEX 68.) There is no dispute that MoviePass thereafter wired $150,000 to Kaleidoscope's (i.e., defendant's) account that formed the basis for wire fraud count one, and no dispute that Kaleidoscope (i.e., defendant) the next day wired the same amount out of that account to pay off defendant's personal creditor DeBrino.

About a month after paying off DeBrino, defendant still needed to pay off Buttgenbach. To do so defendant submitted yet another invoice on Kaleidoscope's letterhead to HMNY that sought payment of $350,000 for an upcoming Coachella event. (GEX 62.) The invoice included a charge to reimburse Kaleidoscope's purported payment for a block of hotel rooms for that same event. (Id.) However, there was no dispute that the upcoming Coachella event had nothing to do with defendant's Coachella event a year earlier for which he ran up personal debts to Buttgenbach and DeBrino, or that the amount on that line item was substantially identical to the amount defendant owed Buttgenbach. But defendant used the invoice to make it appear that he had advanced money on HMNY's behalf for hotel rooms for the upcoming (2018) Coachella event in order to conceal his intended use

6

of HMNY's money to pay his personal debt to Buttgenbach that arose from the 2017 Coachella event.

Event planner Consoletti testified that he was hired to plan MoviePass promotional events that included the upcoming (2018) Coachella festival. (RT III, 319:25, 320:1-2; 327:16-25.) He too knew defendant and Farnsworth to be "close." (RT III, 357:6-14.) In order to support the bogus invoice, defendant directed Consoletti, in multiple emails and text messages, to add a line item on his (Consoletti's) budget to inflate the overall costs of the nearly $1 million 2018 Coachella event by $110,000 to cover defendant's personal debt to Buttgenbach. (E.g., RT III, 344:22-25, 345:1; 349:8-12; GEX 40; 353:7-25, 354:1-8.) Consoletti sent the inflated budget to defendant for his (defendant's) "approval," and defendant in turn "approved" the budget. (RT III, 355:13-20.) *Consoletti's business, however, had covered the hotel room costs – not defendant or Kaleidoscope* – and Consoletti did not know why defendant wanted Consoletti to include the line item on the budget. (RT III, 353:7-22.) The budget line item, submitted for payment to, and paid by, HMNY, ultimately, and falsely, read "Full Hotel Buy-Out Fee - paid direct by [Kaleidoscope]." (GEX 41.)

There was no dispute that defendant paid off his debt to Buttgenbach out of funds he received from HMNY and based on the bogus Kaleidoscope invoice and the false line item on Consoletti's budget.

There is no dispute that there was a $350,000 wire from HMNY to Kaleidoscope on March 30, 2018, and a subsequent wire of $110,000 from Kaleidoscope to the hotel where defendant had used Buttgenbach's credit card. After receiving the $110,000 from Kaleidoscope, the hotel repaid Buttgenbach.

7

**III. THE PROBATION OFFICE'S FINDINGS AND CALCULATIONS**

In the PSR, the Probation Office determined that defendant's base offense level was 7, under USSG § 2B1.1(a)(1).  (PSR ¶ 40.)  The Probation Office then applied a 12-level increase under USSG § 2B1.1(b)(1)(G), for a loss exceeding $250,000.  (PSR ¶¶ 41-42.)  The Probation Office therefore calculated that defendant's total offense level is 19.  (PSR ¶ 51.)

The Probation Office also calculated defendant's criminal history score as 2 and his criminal history category as II. (PSR ¶ 59.)  With a total offense level of 19 and a criminal history category of II, the Probation Office calculated defendant's advisory Guidelines range would be 33 to 41 months' imprisonment.  (PSR ¶ 100.)

Finally, the Probation Office found that defendant has the ability to pay restitution, and the Guidelines and statute dictate that restitution shall be ordered under 18 U.S.C. § 3663A and USSG § 5E1.1.  (PSR ¶¶ 96, 112, 114.)

**IV.   THE GOVERNMENT'S RECOMMENDED SENTENCE**

The government agrees with Probation's calculation as to the base offense level, the 12-level increase under USSG § 2B1.1(b)(1)(G), and as to defendant's criminal history category of II.  The Court should additionally apply a 2-level enhancement to defendant's offense level for sophisticated means, under USSG § 2B1.1(b)(10), increasing his total offense level to 21.

The Guidelines range at offense level 21 and criminal history category II is 41 to 51 months' imprisonment.  The government recommends that the Court sentence defendant to a low-end sentence of 41 months' imprisonment, 3 years' supervised release (along with the

8

terms that the Probation Office recommends), restitution of $260,000, a fine commensurate to the costs of prosecution, up to $250,000, and a $100 special assessment. The government's recommended sentence is sufficient, but not greater than necessary, to address defendant's criminal conduct and account for all the factors the Court must consider under 18 U.S.C. § 3553(a).

### A. Offense Level Calculation

The Guidelines advise a 2-level enhancement if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." USSG § 2B1.1(b)(10). The application notes to subsection (b)(10) states:

> "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

The Court should apply a 2-level enhancement for sophisticated means for two reasons. First, defendant hid the transactions in his scheme using a corporate shell account. Specifically, rather than simply directing MoviePass to pay directly to lenders, defendant caused MoviePass to pay Kaleidoscope. This payment concealed the fact that his bogus invoices were designed to pay off his personal debts, rather than to compensate him for work purportedly performed by Kaleidoscope. Moreover, with respect to the Buttgenbach debt, defendant took an additional step of sending money from Kaleidoscope to the hotel where he had used Buttgenbach's credit card and then directing the hotel to repay Buttgenbach. Defendant could have

9

repaid Buttgenbach directly from Kaleidoscope's account, but took these additional steps to make it seem as though Kaleidoscope was making a legitimate payment for the 2018 MoviePass event. In reality, that cost was already paid for by Consoletti.

Second, defendant used sophisticated means by directing Consoletti to submit a false budget that indicated Kaleidoscope was making payments to the hotel for the 2018 MoviePass event. Defendant then used that false budget to corroborate his false invoice for reimbursement. In addition, defendant participated in the organization of the 2018 MoviePass event at the same hotel where he had incurred his personal debt to Buttgenbach. By making a payment to that hotel under the guise of a legitimate 2018 MoviePass event, it further concealed the fact that the payment was in fact made to the hotel to pay off a personal debt to Buttgenbach that had been incurred long before defendant joined MoviePass. Defendant's concealment of the nature of transactions at the same hotel over multiple years created a shroud of confusion that defendant used to evade detection and justifies a sophisticated means enhancement. See, e.g., United States v. Jennings, 711 F.3d 1144, 1145 (9th Cir. 2013) (explaining that "[c]onduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement" and holding that "[d]efendants' effort to conceal income by using a bank account with a deceptive name was sufficiently sophisticated to support application of the sentencing enhancement); United States v. Augare, 800 F.3d 1173, 1175-76 (9th Cir. 2015) (applying the enhancement where a defendant took "coordinated and repetitive steps ... to transfer money" from one account "to his personal bank account"); United States v. Horob,

10

735 F.3d 866, 872 (9th Cir. 2013) (applying the enhancement because "the complicated and fabricated paper trail made discovery of [the] fraud difficult.").

With a 2-level enhancement, defendant's total offense level would be 21, rather than the Probation Office's calculation of 19.

### B. Section 3553(a) Factors

#### 1. Nature and Circumstances of the Offense, § 3553(a)(1)

The nature and circumstances of defendant's crime warrant a low-end, but still significant, Guidelines sentence. Although there are no identified individual victims who suffered a concrete loss, all shareholders of publicly traded companies, like HMNY, are generalized victims of embezzlement against a company. Companies and entrepreneurs rely on investors to build businesses that provide useful products and services and contribute to the economy more broadly. A bedrock of our system of business investment is that the interests of the investors will be protected against fraud and abuse. Defendant stole $260,000 from his employer and a significant custodial sentence of 41 months is warranted under these circumstances.

#### 2. History and Characteristics of Defendant, § 3553(a)(1)

In addition, a low-end, but still significant, Guidelines sentence is warranted by defendant's history and characteristics. Defendant's criminal history score alone does not capture the gravity of his pattern of criminal behavior. In 2010, defendant was convicted of misdemeanor theft for embezzling $36,068 from his prior employer. (PSR ¶ 56.) That theft was originally charged as a felony First Degree Theft, but the victim, T.M., told prosecutors that he would be comfortable with a misdemeanor to spare defendant from a

11

felony conviction. Despite T.M.'s generous, forgiving approach toward defendant after defendant had stolen from him, defendant subsequently made disparaging remarks about T.M. to others, which led T.M. to issue a "cease and desist" letter to defendant. In the attached letter from T.M., he articulates the way in which he has been negatively impacted by learning of defendant's continued fraud against others when he was given a second chance after his first misdemeanor conviction. (Declaration of David Y. Pi, Ex. 1.) Defendant was sentenced to 180 days' imprisonment for his prior theft conviction, but his sentence was suspended.

The fact that defendant committed a similar offense in this case demonstrates a pattern of disregard for the law. The government's recommendation appropriately takes these factors into account.

3. <u>Need for Deterrence and To Promote Respect for the Law, § 3553(a)(2)</u>

The government's recommended low-end Guidelines sentence would also appropriately promote respect for the law, protect the community, and deter defendant and others who would seek to emulate his conduct. <u>See</u> 18 U.S.C. § 3553(a)(2)(B) (the sentence imposed must "afford adequate deterrence to criminal conduct," which encompasses both specific and general deterrence). The government submits that 41 months' custody would give defendant sufficient time to consider his choices and their consequences. In addition, three years' supervised release would hold defendant accountable for his future actions and deter him from committing future crimes. This sentence would also serve as a warning to others that similar fraudulent conduct will be met with fair but serious punishment.

As noted above, the sentences defendant previously received for

12

theft from his employer did not provide sufficient punishment to deter defendant from committing similar offenses again. For that reason, a more severe sentence than those previously imposed is warranted here.

        4.   <u>Need for the Sentence To Avoid Unwarranted Disparities, § 3553(a)(6)</u>

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants. One way of doing so is to correctly calculate the Guidelines range. See <u>United States v. Treadwell</u>, 593 F.3d 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted disparity' . . . ."); <u>Gall v. United States</u>, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."). Here, under the correctly calculated Guidelines range, other defendants "with similar records who have been found guilty of similar conduct" as defendant can expect a sentence between 41 and 51 months. As such, the government's recommended low-end Guidelines sentence, within that range, avoids an unwarranted disparity with similarly situated defendants.

**V.   RESTITUTION**

The government agrees with the Probation Office regarding restitution and recommends defendant be ordered to pay $260,000 in restitution to Helios & Matheson Analytics. (PSR ¶ 112.)

**VI.  SPECIAL ASSESSMENT AND FINE**

Defendant must pay a $200 mandatory special assessment. (PSR ¶ 109; 18 U.S.C. § 3013(a)(2)(A).)

13

The government agrees with the Probation Office that costs of prosecution should be imposed on defendant as provided under USSG § 5E1.2 and 18 U.S.C. § 3572(a). (PSR ¶ 111.) However, such fine should be imposed only to the extent that it does not impair defendant's ability to pay restitution. 18 U.S.C. § 3572(b). Defendant has a reasonably high earning capacity. (PSR ¶ 96.) He does not have any dependents. (PSR at p. 2.) The expected costs to the government for imprisonment and supervised release would exceed the high end of the Guidelines for a fine. (PSR ¶ 111; USSG § 5E1.22(c)(3).) For the above reasons, the government recommends that a fine commensurate to the costs of prosecution, which will vary by the length of his sentence, up to $250,000. (PSR ¶¶ 108, 111.)

## VII. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose a low-end Guidelines sentence of 41 months' imprisonment, 3 years' supervised release, $260,000 restitution to victim HMNY, a fine to be determined based on the length of his sentence, and a $200 special assessment.