DAVID SARRATT (SBN 332438)
JOSH COHEN (SBN 217853)
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, CA 94108
Telephone: (415) 738-5700
Facsimile: (415) 644-5628
dsarratt@debevoise.com
jacohen@debevoise.com

Attorneys for Defendant
KHALID ITUM

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 23-00082-AB |
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT** |
| KHALID ITUM, | HEARING DATE: Friday, February 20, 2026 |
| Defendant. | TIME: 1:30 p.m. |
| | LOCATION: Courtroom 7B |
| | JUDGE: Hon. André Birotte Jr. |

**SENTENCING MEMORANDUM**

Khalid Itum (hereafter "Mr. Itum"), through undersigned counsel, respectfully submits his objections to the presentence report ("PSR") and sentencing memorandum.

## I.    INTRODUCTION

The government's sentencing memorandum attempts a return to the simplistic narrative that it originally charged in this case, suggesting that this is a typical fraud case in which sham invoices were submitted to deceive MoviePass and secure payment for non-existent work. But there is a reason the government abandoned that theory on the eve of trial—it is not true, as the government's own proof at trial makes clear.

The trial evidence showed that Mr. Itum submitted invoices for labor and services that benefitted MoviePass, HMNY, and its affiliated entities, including MoviePass Ventures and Moviefone. Everything Mr. Itum did in this case was with the full knowledge, approval, and direction of his superiors, Mitch Lowe and Ted Farnsworth, who were authorized to act on behalf of their companies. The government belatedly recognized the defense would be able to show Mr. Itum "made the [allegedly] false invoices with the approval and support of the CEO of HMNY, Mr. Farnsworth." Tr. Vol. I at 11:18–19. So, the government "adapted" at trial to a theory that, rather than being victims of deception, his superiors "co-schemed" with Mr. Itum regarding the two payments at issue to circumvent the companies' internal policies. *See id.* at 18:14–15 ("[W]e adapted as trial was approaching and as we learned more.").[1] The government proposed a supplemental jury instruction to permit this co-schemer theory on the night before trial.

Perhaps unsurprisingly given the lack of clarity in the government's approach, the jury returned a divided verdict on the wire fraud and money

---

[1]  Transcript citations are to the volumes of the trial transcript except where otherwise noted.

laundering charges, signaling either confusion or a troubling compromise.
Regardless whether the government's adapted theory makes up a wire fraud (we
maintain it does not), the government cannot ignore the effect this change of theory,
and the evidence that compelled them to make it, have on sentencing.

The actual facts of this case are straightforward.  Mr. Itum was candid with
Mr. Farnsworth and Mr. Lowe that he had two pre-existing business debts.  He took
on extra work and additional projects on behalf of MoviePass and its affiliates, for
which his bosses recognized he had created real value for the companies.  Mr. Itum
forthrightly asked for compensation for this work, and to resolve his prior debts,
and his bosses agreed.  The total amount of additional compensation at issue in this
case, $260,000, brought Mr. Itum in line with the results of a benchmarking study
by a third-party consulting firm, Radford, which showed that Mr. Itum's overall
compensation was otherwise far below the competitive range.  Mr. Itum sought and
followed his bosses' direction as to how those payments should be invoiced and
recorded.  And Mr. Itum then immediately used that money to pay off his debts.

What the government ended up seeking to prove at trial was that Mr. Itum
got paid for that work the wrong way.  Tr. Vol. VI at 679:19–21 (government
arguing "[e]mployees do not get to invoice for their salaries or bonuses.  And
employees are not permitted to be consultants on the side.").  If that is a fraud at all,
it does not involve a pecuniary loss to the company.  Mr. Itum ultimately got paid
an objectively reasonable amount, as the benchmark study confirmed, based on his
bosses' appreciation of the value he created.  It is also decidedly less serious than
what the government originally charged and in no way deserving of a custodial
sentence, much less the harsh consequence of potential removal from the United
States for a lawful permanent resident who has been here since childhood.

As explained in more detail below, because there is no applicable loss
enhancement under U.S.S.G. § 2B1.1, and because (as the PSR concluded) the

offense did not involve sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C), the appropriate offense level is 7. The PSR incorrectly takes account of an expunged DUI offense in reaching a criminal history category (CHC) of II; removing that offense from the calculation, Mr. Itum's CHC is I. At offense level 7 and CHC I, the applicable advisory Guidelines range is 0–6 months.

For all the reasons set forth herein, the Court should find that a non-custodial sentence is sufficient but not greater than necessary to achieve the goals of sentencing.

## II.    BACKGROUND

### A.    Khalid Itum

Mr. Itum, a Jordanian citizen, was born in Kuwait to his Jordanian parents. Mr. Itum grew up in Saudi Arabia on an ARAMCO company compound in which his parents worked as physicians in a primarily American community. At age 15, Mr. Itum had the privilege to move to the United States to attend Choate Rosemary Hall, a boarding school in Connecticut.

Despite having no connection to the United States, Mr. Itum arrived at boarding school and thrived, showing what has been a lifelong talent of bringing people together with his characteristic enthusiasm. Mr. Itum was a scholar, an athlete, and an integral member of the Choate community. During his time at Choate, he not only excelled in the classroom, but he also made giving back to his community a quintessential part of his experience. Serving as a prefect during his senior year of high school, Khalid took responsibility for the oversight of a dormitory full of freshman boys, while also leading the senior class as their president. *See* S. Vaccaro Ltr., Ex. E.29. Mr. Itum went above and beyond the responsibilities of his position: he mentored, counseled, and aided the youngest and most vulnerable students, transforming their experience from negative to overwhelmingly positive. *See* J. Vaccaro Ltr., Ex. E.18.

Mr. Itum went to Johns Hopkins University for college, where he received his Bachelor of Arts in International Affairs and Economics. Mr. Itum was an active member of a fraternity and served on the student government, where he organized community events and fundraisers. *See* S. Eisele Ltr., Ex. E.32. After graduating Phi Beta Kappa and winning a funded fellowship from Johns Hopkins, he pursued a degree in International Affairs and Finance at the Johns Hopkins University School of Advanced International Studies (SAIS), where Mr. Itum spent his first year in Bologna, Italy and his second in Washington, D.C. During his SAIS program, Mr. Itum's classmates and roommates universally commended Mr. Itum's selflessness, his leadership qualities, and his kindness. *See, e.g.*, K. Russell Ltr., Ex. E.20; S. Eisele Ltr., Ex. E.32; C. & A. Wee Ltr., Ex. E.6.

After the attacks on September 11, 2001, during which Mr. Itum and his classmates were in Europe, Mr. Itum organized a trip to Jordan to visit his family and to offer his classmates a window into life in the Middle East. *See* E. Shanahan Ltr., Ex. E.11. During that trip, Mr. Itum arranged opportunities to meet with companies, organizations, political activists, and international aid organizations. *See* A. Krasniewska Shahidi Ltr., Ex. E.3, at 2. While visiting the historic site of Petra, one of Mr. Itum's classmates suffered a fall and was seriously injured. Mr. Itum, without hesitation, mobilized immense resources and secured a military helicopter evacuation, even after the initial outreach had been declined by the U.S. Embassy in Amman. *See id.* at 3. During that helicopter ride, Mr. Itum insisted, even during a dark moment for his classmate, that they look out onto the horizon to experience the wonder of a Jordanian desert sunset, helping his friend see a small glimmer of positivity in an otherwise traumatic moment. *See id.* That anecdote captures Mr. Itum to a tee: he encourages others to see the beauty and positivity in the world, even in the face of difficulty or strife.

As another of his many supporters reports, in 2008, Mr. Itum organized a

-4-

volunteer trip to Argentina to perform service for underprivileged communities. *See* R. Moore Ltr., Ex. E.28. During a visit to a school in a small town in the Andes mountains, a school administrator asked if anyone from the trip wanted to speak to the community. Mr. Itum, without hesitation, volunteered to give an impromptu and passionate speech to over 300 students and faculty about the importance of chasing their dreams and the possibilities that the students could realize through their pursuit of higher education. *Id*.

And in 2010, after a devastating earthquake ravaged Port-Au-Prince, Haiti, Mr. Itum organized a fundraiser with an ambitious goal to raise $100,000 for the Red Cross. *See* W. Jones Ltr., Ex. E.38. Mr. Itum ended up raising nearly $200,000 in one night, even inspiring one benefactor to *singlehandedly* donate $100,000. *See id.* Mr. Itum then organized a trip for his peers to travel to Haiti to hand-deliver and administer aid, build structures, and volunteer for an orphanage impacted by the earthquake. *See id.* He followed this up by arranging sponsorships for the orphanage's forty children, many of which lasted years. *See id.*

Mr. Itum's generosity and kindness in his personal life is not separate and apart from how he acts in his professional life; rather, he embraces these qualities in the workplace. When Mr. Itum was leading business development for MoviePass, for example, he was generous with his time and expressed a willingness to assist anyone, even where the benefit to Mr. Itum was not immediately clear. In 2017, Mr. Itum received a LinkedIn message from a stranger who wanted to join MoviePass. Despite having no connection to this individual, Mr. Itum took time out to schedule an interview with them within 24 hours. *See* A. Lampell Ltr., Ex. E.1. A few weeks later, when Mr. Itum called this individual to offer him a position at MoviePass, Mr. Itum offered him a more generous salary than what this individual was making at his current position in order to incentivize this individual, and the other members of his team, to work hard and to invest in themselves (and

1  each other).  *See id.*

2      Peers who have worked with Mr. Itum on business transactions have noted

3  that Mr. Itum was "always a voice in the room that advocated for the right work,

4  and [who] empowered everyone involved to bring their best so we could all come

5  together and deliver our best.  He championed each individual on the team, and

6  provided great direction and astute feedback without ever compromising creative or

7  strategic guidance."  B. Hodge Ltr., Ex. E.4, at 2.  That is an accurate summary of

8  who Mr. Itum was in 1995 when he arrived at Choate, who he was in 2017 while he

9  was at MoviePass, and who he is today.

10      **B.    Coachella 2017**

11      This level of ambitious enthusiasm took an unlucky turn in early 2017.  At

12  the time, Mr. Itum was seeking to strike out on his own and planned an event at the

13  Coachella Music Festival to promote his production company, Kaleidoscope

14  Productions, LLC.  Along with JJ/LA, a separate production company,

15  Kaleidoscope hosted an industry-networking space during the festival where

16  professionals could engage in TED-talk style discussions about the future of music,

17  as well as meet for cocktails, food, and conversation.  *See* Tr. Vol. III at 322:19–24.

18  The venue was a prime, boutique hotel, The Chateau at Lake La Quinta, an

19  influential gathering spot during the festival.  Only weeks before the festival, with

20  planning and contracting well underway, the event's lead sponsor changed the

21  nature of its investment from dollars to airline miles, leaving Mr. Itum's production

22  company stuck with significant event expenses.  Mr. Itum borrowed money from

23  two individuals.  *First*, Tom Buttgenbach authorized his own credit card to be

24  charged approximately $41,000 by the hotel hosting the event.  Due to a series of

25  miscommunications between the hotel and Mr. Itum, the hotel erroneously

26  overcharged Mr. Buttgenbach's credit card resulting in a total bill of approximately

27  $110,000.  *Second*, Mr. Itum converted a planned sponsorship into a loan when he

28

borrowed $125,000 from Brody DeBrino in exchange for Mr. Itum's promise to
pay DeBrino $150,000.  The event was an overwhelming success, and afterwards,
Mr. Itum owed Mr. Buttgenbach $110,000, and owed Mr. DeBrino $150,000.

### C.    Mr. Itum's Employment at MoviePass

Mr. Itum joined MoviePass in October 2017.  Mr. Itum served as a Business
Development Executive, though he wore many hats at the entrepreneurial start-up
that was MoviePass.  Mr. Itum was candid with Mr. Farnsworth at the time he
joined about his pre-existing debts but agreed to start on a lower base salary given
the startup environment on the understanding that he would be eligible for
additional compensation for his work as the business and his role grew.  Mr. Itum's
talents were quickly recognized, and he was pulled into multiple projects and roles
within the MoviePass ecosystem.

In 2018, Mr. Itum helped organize official events on behalf of MoviePass as
part of his role in business development.  In January 2018, Mr. Itum performed
significant work on behalf of both MoviePass and the newly established MoviePass
Ventures (an entity related to MoviePass and owned by MoviePass's corporate
parent, HMNY) at the Sundance Film Festival.  At the direction of HMNY CEO
Ted Farnsworth, Mr. Itum was tasked with leading the research, negotiation, and
purchase of films to be screened and promoted by MoviePass.  During the festival,
Mr. Itum spent his time meeting with film directors, negotiating potential film
rights, and networking to build MoviePass Ventures' brand and the company's
profile.  MoviePass Ventures, through the work of Mr. Itum and his colleagues,
eventually purchased the rights to *American Animals* and bid on several other
successful indie films (including, but not limited to, *Blindspotting*, one of President
Barack Obama's top films of 2018).  *American Animals* went on to be one of the
best performing indie films of 2018, and Mr. Itum's hard work and promotional
skill put MoviePass on radars across the film industry.  *See* Ex. A (Mr. Itum

1    circulating a final press release touting MoviePass Ventures' successful acquisition

2    of the right to *American Animals*).

3          Due to Mr. Itum's success at the Sundance Film Festival, Mr. Itum was

4    tasked with planning and hosting an event at the 2018 Coachella Music Festival.

5    The 2018 Coachella event, which involved co-branding with major brands like

6    iHeartMedia, was an overwhelming success for MoviePass, and it brought in

7    significant revenue for the company at a time when the company badly needed it.

8    In particular, the partnership between iHeartMedia and MoviePass generated

9    subscription revenue of over $4 million in the first two quarters after the Coachella

10   event.  *See* Tr. Vol. IV at 513:13–18 (former HMNY CFO Stuart Benson, testifying

11   about Def. Ex. 11).  Mr. Itum coordinated and executed this significant event,

12   including negotiating partnerships and sourcing sponsors, vendors, and talent.

13   Concurrently, Mr. Itum helped lead HMNY's acquisition of Moviefone, a company

14   previously part of Verizon's digital arm, Oath, a deal that was announced in early

15   April 2018.

16         In recognition of Mr. Itum's hard work and impact on MoviePass and

17   HMNY, he was elevated to Executive Vice President of MoviePass and took a

18   leading role at the head of the company in late 2018.  The HMNY CFO at the time,

19   Stuart Benson—later the government's star witness at trial—was vocal in his belief

20   that Mr. Itum was integral to the survival of MoviePass.  *See* Ex. B (Mr. Benson

21   emailing the HMNY Board of Directors suggesting that Mr. Itum walk them

22   through how MoviePass intended to stay in business).

23   **D.    MoviePass Commissions a Benchmarking Study on Its Executive**

24   **Compensation**

25         In 2018, MoviePass retained an HR consultancy, Radford, to evaluate its

26   executive compensation as compared with market benchmarks for peer companies.

27   The MoviePass team had become aware that its compensation structure sometimes

28

-8-

fell behind the market for similar companies, and so Radford was tasked with
confirming the pay gaps.  The report created by Radford, attached as Ex. C
(the "Radford Report"), highlighted that, while most of the MoviePass executives
were paid within or above the competitive range for the industry, Mr. Itum's total
cash compensation was 33% below the market's 50th percentile.  *Id.* at 4.  In fact,
his compensation fell well below even the market's 25th percentile.  *Id.* at 10.  He
was a large outlier on the executive team despite the significant revenue he had
generated for the company.  *See id.*  The work that Mr. Itum had been doing for
MoviePass and its related entities clearly resembled that of a Top Business
Development officer, given Mr. Itum's success at developing opportunities such as
the $4 million iHeartMedia and MoviePass partnership—but his salary was not at
all commensurate with his contributions to the company.

### E.    Itum Repaid His Debtors Using Money Earned at MoviePass

During Mr. Itum's employment at MoviePass, he endeavored to make his
creditors, Messrs. Buttgenbach and DeBrino, whole.  Mr. Itum's employment
contract with MoviePass left open the possibility for him to receive discretionary
payments based on Mr. Itum's performance, and he also took on work for affiliate
entities, including MoviePass Ventures and Moviefone, at the request of his
superiors.  Accordingly, after the Sundance Movie Festival, Mr. Itum requested that
Mr. Farnsworth and Mr. Lowe reward his hard work purchasing *American Animals*
and building MoviePass Ventures' credibility by paying Mr. Itum additional
compensation.  Mr. Lowe and Mr. Farnsworth agreed, and they directed Mr. Itum
to submit an invoice to MoviePass for $150,000.  *See* Tr. Vol. V at 626:17–22 (Mr.
Lowe testifying that Mr. Farnsworth had told him that Mr. Itum was "in bad shape
financially" and that Farnsworth "wanted to kind of acknowledge both the work
Khalid had done with Coachella and the Sundance and organizing the work" and
"directed me to pay this bonus").  Mr. Lowe then emailed MoviePass's payroll and

1    finance coordinator and directed them to pay Mr. Itum that amount.

2        Mr. Itum received that payment and immediately used this money to pay

3    back Mr. DeBrino.  Messrs. Lowe and Farnsworth were completely aware that the

4    payment would be used to settle Mr. Itum's debts.  Mitch Lowe testified that Mr.

5    Itum had told Mr. Farnsworth "Ted, I'm having financial problems.  You owe me

6    some money for helping organize the Coachella event, and MoviePass owes me a

7    bonus.  So how can we solve all three of those things at the same time?"  *Id.* at

8    629:3–7.

9        Mr. Itum similarly requested compensation in recognition of his extensive

10   efforts preparing for the 2018 Coachella event.  While discussing Mr. Itum's debt to

11   Mr. Buttgenbach with Mr. Farnsworth, Mr. Itum explained that he was owed

12   compensation which he intended to use to pay back Mr. Buttgenbach.  *See* Tr. Vol.

13   III at 384:23–385:16 (Jeff Consoletti referring to Gov't Ex. 50 and testifying that

14   Mr. Itum planned to tell Mr. Farnsworth again what the $110,000 was for); Gov't

15   Ex. 84 (Mr. Itum emailing Mr. Farnsworth a message from Mr. Buttgenbach that he

16   needs to "have a reimbursement made" and including "$100k" under Tom

17   Buttgenbach); Def. Ex. 3 (Mr. Farnsworth saying "Relax we will get him paid.

18   You got my word" in response to a text from Mr. Itum about the Buttgenbach loan).

19   Per the direction of Mr. Farnsworth, Mr. Itum submitted a budget to HMNY

20   itemizing a $110,000 payment to be paid to the hotel that hosted the 2017 and 2018

21   Coachella events, noting that the hotel would be paid directly by Kaleidoscope.  *See*

22   Tr. Vol. III at 386:10–25 (Mr. Consoletti testifying that Mr. Farnsworth rejected

23   Mr. Itum's recommendation that JJ/LA handle the $110,000 payment); Gov't Ex.

24   48 (Mr. Itum texting Mr. Consoletti about the payment "Ultimately it should be run

25   how ted wants it to run.").

26       Mr. Itum went so far as to highlight, underline, and italicize that line item to

27   emphasize that the money sent to Kaleidoscope by HMNY would be paid directly

28

SENTENCING MEMO AND OBJECTIONS TO PRESENTENCE REPORT
CASE NO. CR 23-00082-AB

to the hotel *by* Kaleidoscope (Mr. Itum).  The purpose of this payment was to compensate Mr. Itum through his company, and it is beyond dispute that Mr. Itum's superiors were fully aware that Mr. Itum planned to pay back Mr. Buttgenbach with the funds and that they approved this specific payment method.  The government conceded as much at trial during closing arguments.  Tr. Vol. VI at 677:11–12 ("So there's no doubt now, Mr. Farnsworth knows the purpose of this money, paying personal debt." (citing Def. Ex. 3)).

Mr. Itum received the money earned for his valuable services to the company and did just what had been approved and sanctioned by his superiors: he promptly paid the hotel $110,000, the amount it charged Mr. Buttgenbach's credit card in 2017.  After the hotel received Mr. Itum's payment, it issued Mr. Buttgenbach a check for $110,000, resolving Mr. Itum's outstanding debt and removing a roadblock to MoviePass hosting its 2018 Coachella event at the hotel.

In total, these two additional payments brought Mr. Itum's overall compensation in line with the competitive range identified in the benchmarking survey.

### F.    Current Proceedings

Prior to charging this case, the government sought Mr. Itum's assistance in connection with separate proceedings against Messrs. Lowe and Farnsworth.  Mr. Itum was prepared to provide the government with truthful information, but those discussions did not proceed.  The government then sought an indictment against Mr. Itum based on a tenuous theory of prosecution that revolved around a relatively small alleged loss amount.  On February 17, 2023, a grand jury charged Mr. Itum with two counts of wire fraud (Counts One and Two) and two counts of money laundering (Counts Three and Four).  The case proceeded to trial in early 2024, which lasted three days from jury selection to verdict.

On the literal eve of trial, the government "adapted" its theory of prosecution

and admitted as much on the morning of jury selection. Tr. Vol. I at 18:14–15
(Mr. Pi stating "[W]e adapted as trial was approaching and as we learned more").
Rather than trying to prove that Mr. Itum deceived the MoviePass and HMNY
CEOs, with no notice, the government recast the CEOs as co-schemers with
Mr. Itum. The government tethered its prosecution of the case to alleged violations
of company policy and sought a co-schemer instruction, despite the indictment and
pretrial filings containing no notice of a conspiracy or co-schemers. This last-
minute shift negated Mr. Itum's prepared defense which established that the CEOs
were authorized to act on behalf of their companies and were not deceived when
they approved payments to Mr. Itum for valuable services rendered and that they
approved the payments with full awareness that the funds would be used to settle
debts related to the successful 2017 Coachella event. The government's case then
hinged on alleged violations of a corporate policy it never showed the jury. *See* Tr.
Vol. VI at 676:18–20 (government's closing arguments highlighting that Mr.
Benson "talked about how an employee should not get paid by invoice, neither for
their salary nor for their bonus. That's improper"); *id.* at 679:19–21 (government
arguing "[e]mployees do not get to invoice for their salaries or bonuses. And
employees are not permitted to be consultants on the side"); *id.* at 704:19–21
(government arguing "[y]ou cannot invoice for an employee. . . . Why invoice it?
Modify the contract"). And two former MoviePass employees testified that they
never saw any policy regarding related-party transactions nor one prohibiting
employees from working as consultants for HMNY or a related entity. *See* Tr. Vol.
V at 591:4–11; 605:19–606:1.

    The jury returned a divided verdict, reflecting the closeness of this case and a
potential compromise verdict, convicting Mr. Itum on both counts of wire fraud
(Counts One and Two) but acquitting him on both counts of money laundering
(Counts Three and Four).

-12-

After trial, the case was transferred to this Court, and Mr. Itum moved for an acquittal, or in the alternative, a new trial. That motion was denied in August 2024, although the Court acknowledged the case will present substantial issues on appeal. *See* Tr. for Hr'g on Mot. for Acquittal or New Trial, 5:4–6; 40:18–20.

## III.    OBJECTIONS TO THE PRESENTENCE REPORT[2]

### Page 2:

Mr. Itum's place of birth is Kuwait, not Jordan. Mr. Itum's citizenship is Jordanian.

### Page 3:

Mr. Itum's legal address is 31910 9th Avenue, Laguna Beach, CA 92651, and not 4050 Glencoe Avenue Apartment 301, Marina del Rey, CA 90292.

### Page 4:

Mr. Itum generally objects to the guideline summary. Specifically, Mr. Itum objects to the +12-level enhancement for "specific offense characteristics" and objects to Mr. Itum's criminal history category being II. Accordingly, Mr. Itum objects to the resulting guideline sentence and fine calculations.

### Page 5:

1. Mr. Itum's indictment contains four charges. *See* Dkt. No. 1.

### Page 6:

20. Mr. Itum did not borrow Mr. Buttgenbach's credit card. Mr. Buttgenbach authorized his own card to be charged in the amount of $41,000. *See* Gov't Ex. 2. Mr. Itum did not charge $105,000 to Mr. Buttgenbach's credit card, the hotel did, and at trial, the manager of the hotel admitted that if the hotel had exceeded the authorized amount, that would have been a "mistake or an error that the hotel ha[d] made," not Mr. Itum's, "if they exceeded the credit card authorization without getting additional permission[.]" Tr. Vol. III at 304:11–13.

---

[2]  All page numbers and references to numbering in Section III refer to the Presentence Investigation Report, Dkt. No. 123, unless otherwise specified.

-13-

22.  Mr. Itum did not submit false invoices for services "purportedly rendered by Kaleidoscope and JJ/LA." Mr. Itum submitted invoices, pursuant to the direction of the Chief Executive Officers of MoviePass and HMNY, in recognition of services he rendered to MoviePass, HMNY, and HMNY's related entities.

**Page 7:**

23.  Mr. Itum did not submit "sham invoices to HMNY's executives for services purportedly rendered by Kaleidoscope and JJ/LA." Mr. Itum submitted invoices which reflected the work he performed in bidding on, negotiating, and acquiring multiple films at the Sundance Film Festival as part of his employment for affiliated companies of HMNY, as tasked by the CEO of HMNY. No invoice submitted by Mr. Itum was false or a "sham."

25.  Mr. Itum did not "illegally obtain[] funds to which he was not entitled[.]" Mr. Itum was awarded this additional compensation with the full knowledge and approval of the direction of the CEOs of HMNY and MoviePass in recognition of his valuable work. *See* Tr. Vol. V at 626:17–22 (Mitch Lowe testifying that Mr. Farnsworth wanted to pay Mr. Itum a bonus to acknowledge his work related to Coachella and Sundance). This additional compensation brought Mr. Itum's overall compensation into line with the competitive range based on his performance. *Compare* Radford Report at 12 (showing the 75th percentile market rate of total compensation for Top Business Development officers as $488,700), *with* Radford Report at 3 (detailing Mr. Itum's total compensation as $225,000)[3].

26.  Mr. Itum did not hire JJ/LA in order "to obtain the $110,000 to repay T.B." Mr. Itum hired JJ/LA to assist in the planning and production of the Coachella event. *See* Tr. Vol. III at 363:23–364:18. There is no dispute that the 2018 Coachella event was real, and that it was a success for the company,

---

[3]  In calculating Mr. Itum's total compensation of $225,000, the Radford Report assumed he would be paid a bonus of $75,000 (50% of his base salary) at the end of year. *See* Radford Report at 3. However, Mr. Itum did not receive this bonus in 2018.

-14-

increasing both subscribers and revenue.

27.  Mr. Itum did not direct JJ/LA to "submit line items" to "cover Itum's debt[.]"  In fact, the budget provided by JJ/LA emphasized that the hotel buyout fee was to be "paid direct by KSCOPE (Kaleidoscope, Itum's company)."  *See* Def. Ex. 10.  Kaleidoscope did in turn pay that amount to the hotel, highlighting, underlining, and italicizing this line on the invoice, with the full approval and knowledge of Ted Farnsworth that this amount was going to cover the amount Mr. Itum owed for the previous year's event.

**Page 8:**

28.  Mr. Itum did not "falsely claim that he was using $110,000 of the $350,000 to pay the expense indicated in the JJ/LA budget."  On the contrary, the line item in the budget explicitly stated that the fee to the hotel would be "paid direct by KSCOPE."  *See* Def. Ex. 10.

30.  As explained in response to paragraph 25, Mr. Itum did not "illegally obtain[] funds[.]"

31.  Mr. Itum disputes that the total loss amounts to $260,000.  Mr. Itum submits that HMNY suffered no loss.  Mr. Itum was awarded this additional compensation with the full knowledge and approval of the direction of the CEOs of HMNY and MoviePass in recognition of his valuable work.  *See* Tr. Vol. V at 626:17–22 (Mitch Lowe testifying that Mr. Farnsworth wanted to pay Mr. Itum a bonus to acknowledge his work related to Coachella and Sundance); *id.* at 617:10 (Mr. Lowe testifying that the work Mr. Itum performed for MoviePass-related entities "might lead to more revenue for MoviePass" itself).  This additional compensation brought Mr. Itum's overall compensation into line with the competitive range based on his performance.  *Compare* Radford Report at 12 (showing the 75th percentile market rate of total compensation for Top Business Development officers as $488,700), *with* Radford Report at 3 (detailing Mr. Itum's

total compensation as $225,000 with a base salary that was 41% below the market's 50th percentile for his position).

33. As explained below and in response to paragraph 31, HMNY's loss was not $260,000; it was $0.

**Page 9:**

38. Mr. Itum did not hire JJ/LA in order "to include line items in their budget." Mr. Itum hired JJ/LA to assist in the planning and production of the Coachella event. *See* Tr. Vol. III at 363:23–364:18.

40. Mr. Itum did not plead guilty.

42. Mr. Itum disputes that a 12-level increase applies pursuant to U.S.S.G. § 2B1.1(b)(1)(G). Mr. Itum submits that no increase is appropriate because HMNY suffered no loss.

**Page 10:**

45. Mr. Itum did not "circumvent various company procedures." Mr. Itum followed the direction of his superiors, the CEOs of MoviePass and HMNY. In any event, the government did not introduce evidence at trial of any such procedures or evidence that Mr. Itum was made aware of such procedures and sought to circumvent them. The record shows that Mr. Itum disclosed his prior debts openly to his superiors, that they agreed Mr. Itum was deserving of additional compensation, and that Mr. Itum sought and followed their direction in terms of how this additional compensation should be paid. *See* Tr. Vol. V at 629:3–7 (Mitch Lowe testifying that Mr. Itum said, "Ted, I'm having financial problems. You owe me some money for helping organize the Coachella event, and MoviePass owes me a bonus. So how can we solve all three of those things at the same time?"); Gov't Ex. 50 (showing that Mr. Itum texted Mr. Consoletti that he planned to "walk [Farnsworth] through it, and ask him how he wants me to handle: (1) the $110k for buy-out (will tell him again what it is for)"); Gov't Ex. 48 (Mr. Itum texting Mr.

-16-

Consoletti about the payment to the Coachella event noted, "Ultimately it should be run how ted wants it to run").

47.  Mr. Itum's Adjusted Offense Level should be 7, not 19.

51.  Mr. Itum's Total Offense Level should be 7, not 19.

**Page 11:**

57.  Mr. Itum was sentenced to ten days in jail in addition to eleven months of unsupervised probation and a fine of $2,000.  Mr. Itum served four days of this jail sentence, and the Municipal Court in Arizona suspended the remaining six days.  *See* Ex. D, Order to Set Aside J.  Consistent with the disposition, Mr. Itum applied to set aside the judgment and the complaint was dismissed.  *See id.*
Because the "court records for this case have been purged," it should be deemed expunged under U.S.S.G. § 4A1.2(j) and not count toward Mr. Itum's criminal history.

**Page 12:**

58.  Mr. Itum's criminal history score should be one, not two.

59.  Mr. Itum's total criminal history score should be one, not two.

62.  Mr. Itum self-surrendered to the Palos Verdes Estates Police Department to voluntarily serve his sentence for the Arizona DUI.  He was booked by officers, but they were unable to find any offense, and he was released.  He did not serve time in jail in Palos Verdes.  *See supra* at 57.

**Page 13:**

64.  Mr. Itum's mother is Faten Tayseer Dawood.

67.  Mr. Itum grew up in Abqaiq, Saudi Arabia.  He moved to Connecticut for boarding school at the age of 15, not 14.  Mr. Itum lived in Baltimore from 1998–2001, not 1989–2002.  Mr. Itum moved to Washington, D.C. in 2002.
Mr. Itum spent the 2001–2002 school year in Bologna as part of his graduate education at Johns Hopkins' School of Advanced International Studies (SAIS).

**Page 18:**

97.  Mr. Itum submits that restitution in this case would be inappropriate.

**Page 20:**

112.  Restitution should not be ordered in the amount of $260,000.

114.  Restitution should not be ordered.

115.  Several factors warrant a departure from the applicable sentencing
guideline range.  These are fully explained below.

**Page 21:**

116.  Several factors warrant a variance from the applicable sentencing
guideline range.  These are fully explained below.

**IV.    LEGAL STANDARD**

Sentencing proceedings begin with the district court's calculation of the
applicable Guidelines range.  *See United States v. Prien-Pinto*, 917 F.3d 1155, 1157
(9th Cir. 2019) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).  But the
Sentencing Guidelines are just "one factor among several courts must consider in
determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85,
105 (2007).  While the Guidelines must serve as the "starting point and the initial
benchmark" of this inquiry, the sentencing court "may not presume that the
Guidelines range is reasonable" and "must make an individualized assessment
based on the facts presented." *Gall*, 552 U.S. at 50.

**V.    DISCUSSION**

The government's sentencing memorandum avoids entirely the about-face it
made before trial and fails to acknowledge the essential facts of this case:
Mr. Farnsworth and Mr. Lowe agreed Mr. Itum was deserving of additional
compensation for his valuable services to the company and related entities.  And
Mr. Itum consistently sought and followed their direction in terms of how this
additional compensation should be paid.  Even if the <u>method</u> of that compensation

-18-

could be viewed as a wire fraud upon the company, it was not in any way one that
resulted in a pecuniary loss—Mr. Itum was paid what his superiors determined he
deserved, for genuine events and work that created value for the company, in an
amount that was in line with a reputable third-party benchmarking study.  Mr. Itum
disclosed his prior debts openly to his superiors and, with their knowledge, used the
additional compensation to resolve those debts.  Even on the government's theory
of pecuniary loss, it is clear that (1) Mr. Itum's straightforward disclosure of his
prior debts, (2) his transparent requests for additional compensation based on
demonstrated value to the company, (3) the reasonableness of that overall
compensation, and (4) his following superiors' direction on how it should be paid,
all constitute significantly mitigating circumstances justifying a non-custodial
sentence.

### A.    HMNY Suffered No Loss

The Sentencing Guidelines do not present a single method for loss
calculation under U.S.S.G. § 2B1.1, "nor could they, given the fact-intensive and
individualized nature of the inquiry."  *United States v. Zolp*, 479 F.3d 715, 718
(9th Cir. 2007).  Section 2B1.1 explains that the sentencing judge is "in a unique
position to assess the evidence and estimate the loss based upon that evidence."
U.S.S.G. § 2B1.1, cmt. 3(B).  While loss may be estimated by "the fair market
value of the property unlawfully taken," *id.*, cmt. 3(B)(i), it must be reduced by "the
fair market value of the services rendered" by the defendant.  *United States v.
Solakyan*, 119 F.4th 575, 595 (9th Cir. 2024) (citing U.S.S.G. § 2B1.1 cmt.
3(D)(i)).  Indeed, courts "cannot ignore economic benefits that the defendant
provided the victim" when calculating loss, *United States v. Bhikha*, No. 19-cr-
00115, 2021 WL 3363293, at *2 (N.D. Cal. Aug. 3, 2021), and it is "unjust" for a
district court to set a loss amount which ignores any "considerable value" provided
by the defendant to the victim.  *United States v. Martin*, 796 F.3d 1101, 1110 (9th

Cir. 2015); *see also United States v. Anders*, 333 F. App'x 950, 955 (6th Cir. 2009)
(reversible error where the court "disregard[ed] application note [to U.S.S.G.
§ 2B1.1 3(D)(i)]," which permits a defendant "to a credit against the loss in an
amount equal to the value of the services rendered").

At sentencing, the government bears the burden of proof on any facts
underlying a proposed sentencing enhancement, *Zolp*, 479 F.3d at 718, and the
government must prove those facts by a preponderance of the evidence.  *See United
States v. Lucas*, 101 F.4th 1158, 1162 (9th Cir. 2024).  Where a defendant raises
objections to the PSR, the Court is "obligated to resolve the factual dispute, and the
government bears the burden of proof."  *United States v. Showalter*, 569 F.3d 1150,
1160 (9th Cir. 2009).

The value of Mr. Itum's work far exceeded any loss based on the manner of
payment.  Because a company suffers no loss where the value it receives from an
employee accused of fraud exceeds the compensation provided to that employee, no
enhancement in offense level is appropriate under § 2B1.1.  *See Bhikha*, 2021 WL
3363293, at *3.

*Bhikha* is instructive.  Bhikha, a Senior Director at Cisco, accepted kickbacks
from a third-party company in exchange for facilitating Cisco's business
relationship with that company, ultimately saving Cisco "tens of millions of
dollars."  *Id.* at *1–2.  At sentencing, the government argued that the payments
Cisco made to Bhikha's companies, approximately $10 million, should count
toward the calculation of loss *in addition to* the $1.15 million in kickbacks Bhikha
received directly; however, Judge Breyer critiqued that approach, noting that it
essentially asks the court to "stop its analysis before considering what services
Bhikha provided to Cisco, contrary to U.S.S.G. § 2B1.1 cmt. 3[(D)].  It also ignores
the economic reality that Bhikha's conduct benefitted Cisco[.]"  *Id.* at *4.  Judge
Breyer ultimately held that Bhikha was entitled to a credit that at least equaled

Cisco's payments to Bhikha's companies, because "Cisco made tens of millions of dollars as a result of Bhikha's fraud; it did not somehow lose money at the same time." *Id.* at *3.

Here, HMNY and MoviePass significantly benefitted from Mr. Itum's labor—HMNY and MoviePass did not "somehow lose money at the same time." *See id.*

While the payments made to Mr. Itum by HMNY and MoviePass in this case totaled $260,000, the value that Mr. Itum provided to those companies, based on the evidence presented at trial, far exceeded that figure.  Former Chief Financial Officer of HMNY Stuart Benson, the government's star witness, testified that the partnership between iHeartMedia and MoviePass—which was spearheaded, negotiated, and executed by Mr. Itum—generated over $4.25 million dollars in revenue between April 2018, when it launched after Coachella, and September 2018.  *See* Tr. Vol. IV at 513:13–18 (Stuart Benson testifying about Def. Ex. 11); *see also* Def. Ex. 7 at 8 (MoviePass/iHeartMedia contract negotiated and executed by Itum).  In addition, MoviePass was able to book the venue for its 2018 Coachella event by piggybacking off the success of Kaleidoscope's 2017 event at the same venue.  *See* Tr. Vol. III at 372:24–373:1 (Mr. Consoletti testifying that MoviePass got the benefit of being able to book the hotel because of the success of the 2017 event).  Like in *Bhikha*, this Court cannot ignore the legitimate services that Mr. Itum provided, nor that Mr. Itum's conduct tangibly and significantly benefitted MoviePass and HMNY.  2021 WL 3363293, at *4; *see also Martin*, 796 F.3d at 1110 (holding that it would be "unjust to set the loss resulting from [a] fraud as the entire value of the contracts" where the defendant had "fully perform[ed] all of the contracts . . . g[iving] the government considerable value").  Thus, there is no loss associated with the $110,000 payment at issue in Count Two, given that MoviePass and HMNY received a value of at least $4.25 million.

-21-

1      Similarly, regarding the $150,000 payment at issue in Count One, Mitch

2    Lowe testified that Ted Farnsworth informed Lowe that Farnsworth wanted to

3    "acknowledge both the work Khalid had done with Coachella and the Sundance and

4    organizing the work," and he therefore "directed [Lowe] to pay this bonus."

5    Tr. Vol. V at 626:17–22.  Mr. Lowe, Itum's boss, understood that there had been "a

6    lot of advance work" that went into acquiring the film *American Animals* at

7    Sundance.  *Id.* at 590:13–19.  MoviePass Ventures' investment in *American*

8    *Animals* was a demonstrable financial success which also resulted in incremental

9    marketing revenue for MoviePass.  As a result, Lowe approved the payment and

10   MoviePass wired $150,000 to Itum's company.  *See* Def. Ex. 4.  No evidence at

11   trial disputes or negates the fact that Mr. Itum performed valuable services to

12   MoviePass and HMNY which entitled him to payment from those entities, and

13   indeed, the government admitted that Mr. Itum performed valuable work on behalf

14   of HMNY in its post-trial briefing.  *See* Dkt. No. 130 at 2 (government explaining

15   that Mr. Lowe testified that Mr. Farnsworth "wanted to essentially book HMNY's

16   payment for [Itum's] personal debts as an employment bonus for [Itum's] work for

17   MoviePass").  As with Count Two, there is no justification for the $150,000 wire

18   arising out of the Sundance Festival to be added to Mr. Itum's loss calculation

19   under U.S.S.G. § 2B1.1.

20      In sum, while it is the government's burden to prove that HMNY suffered a

21   loss of $260,000 when it paid Mr. Itum $260,000, it is the government's burden to

22   further prove by a preponderance of the evidence that the alleged loss of $260,000

23   *exceeded* any value that Mr. Itum provided to the company by acquiring "American

24   Animals," negotiating partnerships with iHeartMedia, and providing ancillary

25   business services to HMNY and its related entities.

26      The evidence demonstrates that Mr. Itum's superiors recognized the value of

27   his work and sought to compensate him appropriately.  Mr. Itum's actions

28

-22-

generated millions of dollars of revenue for MoviePass and HMNY.  While Mr. Itum strongly disputes that HMNY suffered any loss, even if it did, the gains to HMNY provided by Mr. Itum's work (at least $4.25 million) far offset the alleged loss ($260,000).  Accordingly, no enhancement in offense level is appropriate under § 2B1.1.  Because the 12-level increase applied by the probation department in the PSR is not warranted, and because probation determined that there were no other applicable adjustments, Mr. Itum's total offense level should remain at the base level of 7.[4]  *See* PSR at ¶¶ 40–51.

### B.    The Offense Did Not Involve Sophisticated Means

The government attempts to add to the PSR offense level calculation by incorrectly arguing that a 2-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) should apply for the use of "sophisticated means."  But nothing in this case comes close to approaching the "especially complex or especially intricate offense conduct" required for such an enhancement.  § 2B1.1, cmt. n.9(B).  Mr. Itum dealt directly and openly with Messrs. Lowe and Farnsworth when discussing the additional compensation he was owed for his services to the company, and informed them that he owed two prior debts.  He then followed their direction on how to get paid for the work he had done.  That hardly evidences a complicated scheme to hide the true nature of transactions.  The Court should reject the government's argument and find that a 2-level enhancement is not warranted.

The commentary to the sentencing guidelines outlines various examples of sophisticated means "pertaining to the execution or concealment of an offense."  *Id.*  None of the enumerated mechanisms are present in this case.  There were no

---

[4]   The probation department calculated a 12-level increase based on a loss exceeding $250,000 but less than $550,000.  PSR at ¶ 42.  Mr. Itum notes for the Court that, in December 2025, the Sentencing Commission proposed amendments to the Sentencing Guidelines that adjust the monetary tables and values to account for inflation.  Under the proposed amendment to § 2B1.1, loss amounts exceeding $200,000 but less than $350,000 would result in an offense level increase of 10.  *See* Proposed Amendments to the Sentencing Guidelines (Dec. 2025) at 44.

-23-

fictious entities, no corporate shells, and no offshore financial accounts. *See id.*  It is undisputed that the invoices for Mr. Itum's labor and services were approved by the MoviePass and HMNY CEOs with full knowledge that the payments would be used to resolve Mr. Itum's pre-existing debts.  Indeed, Messrs. Farnsworth and Lowe directed Mr. Itum to submit these invoices.  Having followed his superiors' instructions on the method of compensation, Mr. Itum cannot be viewed as operating with any degree of sophistication in hiding his tracks.  Even if Mr. Itum had acted without the approval of company executives, nothing in his conduct was especially complex or intricate to distinguish it from ordinary invoice fraud.

In the probation department's assessment, the offense at issue in this case was unremarkable and not of sufficient complexity to warrant the application of an enhancement.  In seeking the enhancement, the government first paints Mr. Itum's production and marketing services company, Kaleidoscope Productions, LLC, of which he is the well-documented founder and CEO, as a "corporate shell" in order to argue he "hid the transactions" at issue.  Gov't Sent'g Mem., Dkt. No. 157 (Gov't Mem.) at 9.  This characterization ignores the fact that Messrs. Farnsworth, Lowe, and Benson all understood Kaleidoscope was Mr. Itum's company and that Farnsworth and Lowe understood that the payments to the company would be used to settle Mr. Itum's personal debts.  Kaleidoscope was also a fully functional entity that produced successful, real-world events, not an empty corporate shell that existed in name only.  This differs from the circumstances in *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013), where the defendant had chosen a deliberately deceptive name for a bank account to mimic his company's primary vendor and conceal income.  It was well known at MoviePass and HMNY that Kaleidoscope was owned by Mr. Itum and that he was the primary signer on its accounts.  Payments to Kaleidoscope were readily traceable to Mr. Itum, and so the use of the company as a payee for the wires hardly evidences a sophisticated

-24-

attempt to keep the path of the funds undetected.  The Ninth Circuit has viewed the
fact that the victim, here HMNY and MoviePass, knew to whom it was making
payments as a consideration against applying the sophisticated means enhancement.
*See United States v. Patterson*, No. 22-10113, 2023 WL 3073103, at *2 (9th Cir.
Apr. 25, 2023) (overturning the district court's application of the enhancement
because the "straightforward nature of [the] offense distinguishes it from cases
where [the court] affirmed the enhancement").

    And contrary to the government's assertion, the "additional step" of
repayment of the debt to Mr. Buttgenbach through the hotel rather than directly by
Kaleidoscope was not so complex as to suggest a sophisticated scheme.  As the
government acknowledges in its own submission, the reimbursement of
Mr. Buttgenbach through the hotel was pursuant to a "settlement agreement[]
drafted by the hotel's counsel."  Gov't Mem. at 3.  This formality is hardly a form
of subterfuge.  The government cites to *United States v. Augare*, 800 F.3d 1173,
1175–76 (9th Cir. 2015), but the "coordinated and repetitive steps" in that case
involved transferring money to a co-defendant who donated money back to a
charity, whose bank account the defendant controlled and from which he withdrew
the "donated" money into his personal account.  That multi-layered transactional
loop is a far cry from the one-time, single step payment made to the hotel pursuant
to a documented settlement agreement drafted by the hotel's counsel to resolve a
potential legal dispute between the hotel and Mr. Buttgenbach.  The straightforward
flow of funds as part of a negotiated refund was transparent to both MoviePass and
hotel personnel.

    The government further argues that the inclusion of a line item for the hotel
payment in the budget submitted to HMNY by JJ/LA amounts to sophisticated
means that concealed the nature of the payments.  This ignores the testimony and
evidence introduced at trial showing that this budget was submitted at the request of

Mr. Farnsworth, that the line item explicitly stated that the hotel fee would be paid

by Kaleidoscope, and that this particular line item was highlighted, underlined, and

in italics.  And despite the government's claim that the booking of a popular hotel

for an event two years in a row "created a shroud of confusion," returning to the

same venue does not suggest an especially complex concealment, particularly when

the hotels' records clearly documented the flow of funds.  (They returned to the

hotel because the prior event had been a success.)  The single budget line entry and

corresponding invoice submitted by Mr. Itum—which was highlighted and

italicized for emphasis—hardly qualifies as a "complicated and fabricated paper

trail [that] made discovery" difficult.  Gov't Mem. at 10–11 (quoting *United States

v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013)).  The defendant in *Horob*

"manipulated several people to lie for him, used several different bank accounts

(including accounts of other people) to move funds around, and fabricated

numerous documents" causing the Ninth Circuit to describe his scheme as

"complex."  Mr. Itum's conduct came nowhere close to such intricacy.

> The Sentencing Commission has recognized that there is also a distinction
between the sophistication of an overall scheme and whether a defendant's own
conduct was "sophisticated."  As such, the Commission narrowed the focus on the
enhancement to cases where "the defendant intentionally engaged in or caused the
conduct constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C).  In
explaining Amendment 792, which became effective November 1, 2015, the
Commission noted that "basing the enhancement on the defendant's own
intentional conduct better reflects the defendant's culpability and will appropriately
minimize application of this enhancement to less culpable offenders."  U.S.S.G.
Amendment 792.  Mr. Itum submitted the invoices for payments at the direction of
and with the approval of his superiors, so even, if the government believes the
payments were part of a sophisticated scheme, if has failed to show Mr. Itum

-26-

1 himself had the requisite intentionality to warrant a sentencing enhancement.

2 Even when leaving aside that Mr. Itum sought the approval and direction
3 from the two CEOs, there was nothing remarkable, "especially complex," or
4 "especially intricate" about the documenting of the payments.  And the fact that
5 there were two payments is not sufficient to establish a complex scheme because
6 "[r]epeated actions alone do not constitute sophisticated means." *Patterson*, 2023
7 WL 3073103, at *1.  That the probation department chose not to apply the
8 enhancement in the PSR offense level calculation underscores that Mr. Itum's
9 conduct, even on the government's view, falls under ordinary fraud mechanics
10 rather than sophisticated means.

11 For these reasons, the Court should reject the government's request for a 2-
12 level enhancement and calculate Mr. Itum's total offense level at the base level
13 of 7.

14 ### C.    Criminal History Calculation

15 #### 1.    Mr. Itum's 2012 Arizona DUI Conviction Was Set Aside and
16 Should Be Considered Expunged.

17 Expunged convictions are not counted in a defendant's criminal history score
18 under the Guidelines.  U.S.S.G. § 4A1.2(j).  Included in the PSR's criminal history
19 computation is Mr. Itum's October 2012 conviction in Arizona Municipal Court for
20 Driving Under the Influence ("DUI"), for which Mr. Itum was sentenced to ten
21 days in jail, 11 months of probation, and a fine.  PSR ¶ 57.  The Municipal Court
22 set aside this conviction in March 2019, thereby releasing Mr. Itum from "all
23 penalties and disabilities resulting from the conviction."  Ex. D, Order to Set Aside
24 J.  The sole exceptions are penalties imposed by the Department of Transportation
25 and that, as an evidentiary matter, "the conviction may be used as a conviction if
26 such conviction would be admissible had it not been set aside."  *Id.*
27 The Ninth Circuit has viewed the Arizona Statute under which this

28

-27-

1    conviction was set aside, Ariz. Rev. Stat. § 13-905 (formerly § 13-907 and

2    hereinafter the "Arizona Statute"), as "an expungement statute." *See United States*

3    *v. Felix*, 561 F.3d 1036, 1044 (9th Cir. 2009) (finding that "defendant, although

4    entitled to expungement, never followed the formal procedures as required by the

5    [Arizona Statute]" and that "expungement does not occur automatically under ARS

6    § 13-907(A)"); *see also United States v. Ceverizzo*, 74 F.3d 629, 632 (5th Cir.

7    1996) (citing the language of the Arizona Statute and noting it "(1) appears to make

8    expunction discretionary, and (2) establishes that affirmative steps on the part of the

9    convicted person or a representative are necessary to affect the expunction").

10   Unlike the defendants in *Felix and Ceverizzo*, however, Mr. Itum followed the

11   Arizona Statute's formal procedures, and his 2012 conviction has been formally set

12   aside.  Ex. D, Order to Set Aside J.  Mr. Itum's DUI has therefore been expunged

13   for the purposes of U.S.S.G. § 4A1.2(j), and the Court should not include it in the

14   Court's computation of Mr. Itum's criminal history score.  Mr. Itum's CHC should

15   accordingly be Category I.

16       The PSR reached a different conclusion based on Application Note 10, which

17   addresses prior sentences "set aside," but that policy statement impermissibly

18   narrows the applicable Guideline.  *See Kisor v. Wilkie*, 588 U.S. 558 (2019);

19   *Stinson v. United States*, 508 U.S. 36 (1993).  Ninth Circuit precedent has made

20   clear that "the role of the Application Notes is to explain the Guidelines, not enact

21   policy changes to them."  *United States v. Kirilyuk*, 29 F.4th 1128, 1138 (9th Cir.

22   2022).  As a result, the Ninth Circuit utilizes the framework outlined in *Kisor* "to

23   determine whether to defer to the commentary's interpretation of a Guideline."

24   *United States v. Trumbull*, 114 F.4th 1114, 1117–18 (9th Cir. 2024) (citations

25   omitted).  The Supreme Court ruled in *Kisor* that "the possibility of deference can

26   arise only if a regulation is genuinely ambiguous."  *Kisor*, 588 U.S. at 573.

27   "Accordingly, if a Sentencing Guideline is unambiguous, *Kisor* makes it

28

-28-

impermissible to defer to the commentary." *Trumbull*, 114 F.4th at 1123 (Bea, J., concurring).  In other words, where the Guidelines are clear, it is both inappropriate and unnecessary for a Court to defer to the commentary.

U.S.S.G. § 4A1.2(j) is unambiguous: it clearly states that "[s]entences for expunged convictions are not counted."  Application Note 10, on the other hand, carves out "procedures pursuant to which previous convictions may be set aside or the defendant may be pardoned for reasons unrelated to innocence or errors of law" suggesting that "[s]entences resulting from such convictions are to be counted" in the computation of criminal history.  U.S.S.G. § 4A1.2 cmt. n.10.  But the Ninth Circuit has "ruled that the Guidelines commentary need not be followed when it establishes a 'narrowing' construction not 'found in the Guideline text.'" *Kirilyuk*, 29 F.4th at 1137 (citing *United States v. Lambert*, 498 F.3d 963, 971 (9th Cir. 2007)).[5]  That is precisely the case here.

Accordingly, the only question for this Court is whether Mr. Itum's 2012 conviction should properly be considered "expunged."  It should be.  The effect of the Arizona court's order under § 13-905 was to relieve Mr. Itum of all penalties and disabilities resulting from the conviction.  The Ninth and Fifth Circuits have thus both regarded § 13-905 as an expungement statute.  *See Felix*, 561 F.3d at 1044; *Ceverizzo*, 74 F.3d at 632.  While the Arizona Statute may permit a conviction set aside to be "[u]sed as a prior conviction" if such conviction would otherwise be admissible, Ariz. Rev. Stat. § 13-905(E)(3), under the Guidelines, convictions of this sort—*i.e.*, convictions as to which the defendant has been relieved of disabilities—are *not* admissible for purposes of determining criminal history.

Because Mr. Itum's 2012 DUI should be considered expunged, it should not

---

[5] While the Ninth Circuit has held that convictions set aside under California's analogous statute, Cal. Penal Code § 1203.4, are not expunged convictions for the purposes of § 4A1.2(j), *see United States v. Carver*, 132 F.4th 1158 (9th Cir. 2025), it has not applied the same interpretation to the Arizona Statute.

be factored into the criminal history computation under U.S.S.G. § 4A1.2(j).
Therefore, Mr. Itum's CHC is I.

***

For the reasons explained above, because there is no applicable loss
enhancement under U.S.S.G. § 2B1.1, and because the offense did not involve
sophisticated means, the appropriate offense level is 7.  Mr. Itum's 2012 DUI
offense should be considered expunged and therefore excluded from the CHC
calculation, resulting in CHC of I.  At offense level 7 and CHC I, the appropriate
advisory Guidelines range is 0–6 months.

## VI.   A SENTENCE OF PROBATION IS SUFFICIENT TO ACHIEVE THE PURPOSES SET FORTH IN 18 U.S.C. § 3553(A)

Mr. Itum respectfully submits that a noncustodial sentence is sufficient, but
not greater than necessary, to fulfill the goals of sentencing enumerated in
18 U.S.C. § 3553(a).

### A.    A Felony Probation Sentence Provides Adequate Deterrence and Just Punishment.

In its recommendation letter to the Court, the probation department
highlights the need for Mr. Itum's sentence to afford adequate deterrence, because
the probation officer has determined that his "risk of recidivism is high."  Dkt.
No. 122 at 6.  There is no question that deterrence, both general and specific, is an
important goal of sentencing.  *See* 18 U.S.C. § 3553(a)(2)(B)–(C).  However, Mr.
Itum respectfully disagrees with the probation officer's suggestion that he has such
a high risk of recidivism that the court must impose a custodial sentence.  Rather, a
custodial term is not necessary to achieve a deterrent effect.

The probation officer's assessment is based on Mr. Itum's two prior offenses.
Mr. Itum was convicted over thirteen years ago of driving under the influence, a
misdemeanor.  He served four days in jail, completed his 11 months of probation,

-30-

paid a $2,000 fine, and the conviction has been set aside by the Arizona municipal court.  This misdemeanor conviction, and the resulting probation sentence, arise out of conduct wholly unrelated to the offense at hand.  Mr. Itum does not dispute the wrongfulness of his actions in 2012 but respectfully submits that this lapse of judgment should not weigh heavily here.  His other conviction, for theft in the second degree, is even older, having been imposed over fifteen years ago, and his sentence of one year of supervised probation has long been served.

The government makes much of the 2010 conviction, arguing that the gravity of misdemeanor to which Mr. Itum pleaded guilty is not captured by the criminal history score.  However, to do so, the government relies on the dated recollections of Mr. Itum's former employer who supposedly spared Mr. Itum a felony conviction.  Mr. Itum readily admits that he used a company card for approximately $5,000 in personal expenses over the course of two years with the knowledge and permission of his employer, T.M., who received monthly bank statements.  He did so because the small company did not have the infrastructure to quickly reimburse Mr. Itum for his many business expenses.  T.M. admits that the company was a very small operation with five total employees, but also admits its annual sales grew rapidly after Mr. Itum arrived.  Thanks in large part to Mr. Itum's hard work and efforts, including partnering with major architecture, design, and real estate firms across Washington, D.C., the company's sales grew by millions while Mr. Itum was employed as the company's only business development professional.  Mr. Itum built valuable relationships in the industry and was recruited by a major competitor whose revenue was five times the size of T.M.'s company's. Disheartened by the continued lack of internal structure and leadership under T.M., Mr. Itum exercised his right to join the competitor firm as a high-level executive. T.M. took this move poorly and pursued legal action to discredit and harm Mr. Itum, including seeking criminal charges.  Rather than fight an expensive and time-

-31-

intensive criminal case, with the attendant risks to his immigration status, Mr. Itum
chose to plead guilty to a second degree misdemeanor for offenses involving under
amounts under $1,000.  However, his conduct 15 years ago hardly evidences the
"pattern of disregard for the law" that the government attempts to draw.[6]

Mr. Itum has not sustained a conviction in over thirteen years and has never
been sentenced to prison.  His criminal history is far less serious when compared to
others with a criminal history category of II, many of whom have served significant
prior imprisonment without being deterred.

Courts recognize that deterrence does not require "a period of incarceration."
*United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (affirming district
court's conclusion that a sentence of probation and the fact of a felony conviction
would serve to deter defendant from future wrongdoing); *see also United States v.
McCarthy*, No. 22-CR-00491, 2023 WL 3741996, at *3 (E.D.N.Y. May 30, 2023)
(determining "any term of incarceration would be far greater punishment than is
necessary to achieve" specific deterrence).  And Congress has acknowledged that
"[i]t may very often be that release on probation under conditions designed to fit the
particular situation will adequately satisfy any appropriate deterrent or punitive
purpose." *Id.* at 1016 n.9 (quoting S. Rep. No. 98-225, at 92).  Empirical academic
research has found "little evidence of a specific deterrent effect arising from the
experience of imprisonment compared with the experience of noncustodial
sanctions such as probation."  Daniel S. Nagin, *Deterrence in the Twenty-First
Century*, 42 Crime & Just. 199, 201 (2013); *see also* David Weisburd et. al.,
*Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*,
33 Criminology 587, 601 (1995) (finding prison does not have a specific deterrent
impact upon the likelihood of rearrest over a 126-month follow-up period).

---

[6]  While the government has attached a "victim impact statement" from T.M. to its
sentencing memorandum, T.M. is clearly not a victim in this current case and is not
entitled to make a statement at Mr. Itum's sentencing hearing.

-32-

1  Therefore, any need for deterrence in this case cannot justify a custodial sentence

2  for Mr. Itum.

3      **B.      The Circumstances of the Offense Justify a Non-Custodial
               Sentence**

4

5      Under 18 U.S.C. § 3553(a)(1), the Court must consider the "nature and

6  circumstances of the offense."  The offense Mr. Itum was convicted of does not

7  warrant a significant sentence of incarceration.  This was not a complex, ranging

8  scheme to exploit vulnerable victims.  Instead, the government's prosecution boiled

9  down to proving Mr. Itum violated a company policy of which he wasn't even

10 aware.  And by acquitting Mr. Itum of the money laundering counts, the jury

11 confirmed that this case did not involve the classic hallmarks of concealment or

12 sophistication.

13     The offense for which he was convicted is derived from actions Mr. Itum

14 took to bring meaningful and measurable value to his employer.  There is no

15 dispute that he built successful events and partnerships and provided film

16 acquisition and production services for HMNY's related entities in addition to his

17 regular employment at MoviePass, such as helping with the acquisition of

18 Moviefone by HMNY in spring 2018.  His extensive efforts were recognized by his

19 superiors who wished to compensate him appropriately.  This is not a case in which

20 the defendant extracted millions for personal gain by pulling the wool over the

21 company's eyes.  Mr. Itum never intended to hurt HMNY, and indeed, HMNY

22 benefitted significantly from Mr. Itum's employment.  After asking Messrs.

23 Farnsworth and Lowe for compensation to recognize his hard work, Mr. Itum

24 followed their direction on how to get paid and had strong reason to believe that he

25 was paid appropriately.

26     The government's theory of Mr. Itum's alleged fraud at trial turned on the

27 *manner* and *form* of the payments received by Mr. Itum, which the government

28

-33-

argued violated unwritten company policies or unspecified norms pertaining to public companies. *See* Tr. Vol. VI at 680:18–21 (Mr. Itum "effectively tried to double [his salary] through an invoice, which Mr. Benson testified is not permitted. He knew his own contract provisions, and he went around them with an invoice.").

The evidence at trial bore out the reality that Messrs. Lowe and Farnsworth controlled how and when Mr. Itum was paid. *See, e.g.*, Def. Ex. 4 (email from Mitch Lowe to Annemarie Corey directing her to "pay Khalid Itum a $150k bonus today if possible," noting that "Khalid will send an invoice from his company to pay this and then no withholding." Annemarie Corey replied that the payment would be characterized as "a consultant bonus."); *see also* Def. Ex. 6 (text message between Mr. Itum and Mr. Benson where Mr. Itum states that "ted sent approval" for a wire to Mr. Itum's company for services rendered from the Coachella festival, to which Mr. Farnsworth responds, "Yes I did for $350k").

The government suggested at trial that the proper method for Mr. Itum to receive this compensation would have been through an amendment to his employment contract; proceeding in that manner may have been good practice, but it would not have made any financial difference to HMNY. And communications that Mr. Itum only received from the government in January 2026 and that were not available at trial confirm that Mr. Benson, the government's star witness, trusted Mr. Itum with the future of MoviePass even months after the payments. *See* Ex. B (Mr. Benson emailing the HMNY Board of Directors suggesting that Mr. Itum walk them through how MoviePass intended to stay in business). Mr. Benson's conduct does not suggest he believed Mr. Itum had committed a serious theft from the company.

By raising these facts, Mr. Itum is not ignoring the jury's verdict. Rather, Mr. Itum wishes to highlight the differences between his conduct and that of other defendants in the heartland of what is contemplated by the Guidelines. For all the

-34-

1   reasons explained above, Mr. Itum asks the Court to make an individualized

2   assessment of his unique characteristics and the particulars of the offense when

3   fashioning an appropriate sentence and requests that it impose a sentence of

4   probation.  *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (note to

5   18 U.S.C. § 3551) (Congress advising that "sentencing decisions should be

6   designed to ensure that prison resources are, first and foremost, reserved for those

7   violent and serious criminal offenders who pose the most dangerous threat to

8   society"); *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (affirming

9   a below-Guidelines sentence of probation and substantial community service for a

10  defendant whose fraud in excess of over $1 million "did not pose the same danger

11  to the community as many other crimes").

12      **C.    Mr. Itum's History and Characteristics Further Support the**
13          **Sufficiency of a Non-Custodial Sentence.**

14      Throughout his life Mr. Itum has shown incredible devotion to his family,

15  friends, and community.  His family instilled in him values of generosity and

16  kindness that he brings to every aspect of his life.  Dozens of letters speak to

17  Mr. Itum's character and integrity.  For example, his classmates across the years

18  describe him as "a person of unwavering generosity, genuine compassion, and

19  steadfast loyalty,"  C. & A. Wee Ltr., Ex. E.6, who is "remarkably gifted in using

20  his generosity of spirit on behalf of others, without others feeling any loss of

21  dignity or agency,"  A. Krasniewska Shahidi Ltr., Ex. E.3, and who demonstrates

22  "his commitment to propriety, equity, compassion, and support of others."  D.

23  Zaccagnino Ltr., Ex. E.7.  Mr. Itum is not only one who is there for friends as they

24  overcome challenging personal transitions, but he's also one who is willing to lead

25  and organize efforts to expose students to the beauty of other countries despite

26  political strife, as evidenced by his efforts in organizing multiple educational and

27  volunteer trips for fellow students.

28

-35-

From an early age, Mr. Itum demonstrated exceptional resilience and
adaptability, leaving his family and home in the Middle East to excel in demanding
academic environments in the United States.  He distinguished himself not only
through graduating with honors from high school and Phi Beta Kappa from Johns
Hopkins, but also through the consistent mentorship and care for others described
in his letters of support.  He was known as a "bridge builder," and throughout his
education and adult life, he repeatedly took initiative to organize service,
humanitarian, and charitable efforts—raising substantial funds for disaster relief,
leading international volunteer work, and placing himself in demanding situations
to assist others in crisis.  *See* E. Shanahan Ltr., Ex. E.11, at 2.  Colleagues in his
professional life describe him as selfless, ethical, and committed to empowering
those around him.  *See, e.g.*, M. Ouedraogo Ltr., Ex. E.23; A. Lamb Ltr., Ex. E.2.
Mr. Itum's qualities are the foundation for the community he's built in the United
States, and his presence in each of their lives is impactful, particularly because "the
foundation for his work is serving others and delivering value to others, be it for
profit or for impact."  *See* T. Krim Ltr., Ex. E.36.  He is credited with helping
friends "understand who [they are] and what [they] want to do in this world," K.
Russell Ltr., Ex. E.20, and Mr. Itum "is not merely a friend but a pillar of strength
and virtue."  S. & M. Koch Ltr., Ex. E.31.  Even the United States government has
acknowledged that Mr. Itum is a person of exceptional talent and promise.  Mr.
Itum self-sponsored his application for lawful permanent residency, an
exceptionally competitive process, on the bases of his extraordinary ability and his
work in the national interest.  *See* Ex. F, Permanent Residency Pet. Ltrs. of
Recommendation.  Mr. Itum's contributions to this country were recognized and
rewarded by the government when it granted him a Green Card in 2005.

The circumstances here make incarceration particularly unnecessary to deter
Mr. Itum from reoffending.  And the Court should take into consideration the

-36-

collateral punishment Mr. Itum has already suffered, and will continue to face, when fashioning an appropriate sentence that provides just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).

The implications of a custodial sentence are further detrimental to Mr. Itum's health and safety, as a custodial sentence virtually assures of Mr. Itum's removal from the United States. Mr. Itum is a Jordanian citizen, raised in Saudi Arabia, and living in the United States as a Permanent Resident. PSR at 2. He arrived as a 15-year-old schoolboy, and, over the decades since, he has established a successful and meaningful life in this country. His many friends and family members who have submitted letters to the Court laud the impact he has had on them during his time in the United States. Mr. Itum has no shortage of loved ones who call him a "gem of a human," and a "remarkable individual who embodies the values of compassion, integrity, and generosity." *See* H. Slusher Ltr., Ex. E.14. Mr. Itum's brother, a naturalized American citizen, lives in Washington, D.C. with his American fiancé. Mr. Itum's sister, a naturalized American citizen, and mother to three, lives in Plano, Texas, and is married to an American citizen. And Mr. Itum's other sister, a Lawful Permanent Resident, lives in Los Angeles, CA. His life is here in Los Angeles, the city he has lived the longest. A custodial sentence carries a significant likelihood that Mr. Itum will be placed into removal proceedings and deported to a country where homosexuality can be criminalized under public morality laws and where he has never lived. And the Supreme Court has confirmed that felony probation alone, even without the risk to immigration status, is a weighty sanction that imposes "several standard conditions that substantially restrict [an individual's] liberty." *Gall*, 552 U.S. at 50.

Furthermore, Mr. Itum has already suffered a significant toll from the jury's verdict, including stress, humiliation, and financial hardship, all on top of losing his livelihood and his professional reputation. *See United States v. MacKay*,

20 F. Supp. 3d 1287, 1297 (D. Utah 2014), *aff'd*, 610 F. App'x 797 (10th Cir. 2015)
("[R]ecognizing that the sentence imposed on MacKay must be just, the Court does
not entirely disregard the considerable negative impacts this case has already had
on him and his family.  He has already lost standing in his community, faced the
humiliation of a public trial, lost his job, spent a great deal of money on his defense,
and otherwise experienced major financial setbacks, and has no doubt suffered
many emotional pains and negative health consequences that accompany such a
process.  While it can be rightly said that in many respects he brought these
problems on himself, they cannot be completely forgotten when attempting to
fashion a just sentence."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235
(D.N.M. 2007) (finding variance appropriate where defendant was collaterally
punished by loss of his position and reputation and widespread media coverage).
Mr. Itum has lost much of what he has worked for throughout his life, and the
outcome of this case is widely known throughout the country.

Accordingly, a non-custodial sentence is sufficient but not greater than
necessary to achieve the purposes of sentencing under § 3553(a), while recognizing
Mr. Itum's extraordinary history of service, the severe collateral consequences he
has already endured, and the profound and unnecessary harm that incarceration
would impose.

VII.   **CONCLUSION**

This is not the archetypal fraud case that the Guidelines contemplate.
Mr. Itum disclosed his pre-existing debts to his superiors, asked for compensation
in recognition of his valuable work for the company, MoviePass, and its affiliates,
and followed his superiors' direction on how to be paid.  On this record, there is no
pecuniary loss to the company, no basis for a sophisticated-means enhancement,
and the correct offense level calculation is 7.  Because the PSR improperly counts
an expunged DUI conviction, the correct criminal history category is I, yielding an

-38-

advisory Guidelines range of 0–6 months.

Mr. Itum's individual circumstances reinforce the conclusion that a noncustodial sentence is sufficient, but not greater than necessary, to satisfy § 3553(a). He has already suffered economic hardship and reputational damage, and—critically, as a long-time lawful permanent resident—faces potential immigration consequences that would vastly magnify the punitive effect of any custodial sentence. These realities weigh strongly in favor of a probationary sentence.

For the foregoing reasons, Mr. Itum respectfully urges the Court to place him on probation, with the special condition that he perform community service for the City of Los Angeles for an organization approved by the Court. Indeed, Mr. Itum has a number of local charities he is eager to volunteer for, including Project Angel Food and the Trevor Project, and he would enthusiastically begin this work while his appeal is pending.

Dated: February 6, 2026                    Respectfully submitted,

                                           DEBEVOISE & PLIMPTON LLP

                                           By: /s/ David Sarratt
                                           David Sarratt (SBN 332438)
                                             dsarratt@debevoise.com
                                           Josh Cohen (SBN 217853)
                                             jacohen@debevoise.com
                                           650 California Street, Fl 31
                                           San Francisco, California 94108
                                           Tel.: (415) 738-5700
                                           Fax: (415) 644-5628

                                           *Attorneys for Defendant Khalid Itum*

SENTENCING MEMO AND OBJECTIONS TO PRESENTENCE REPORT
CASE NO. CR 23-00082-AB