BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
DAVID Y. PI (Cal. Bar No. 337432)
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorneys
Major Frauds/Transnational Organized Crime Sections
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3659/0813
    Facsimile: (213) 894-6269
    E-mail:  David.Pi@usdoj.gov
            Daniel.Weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>KHALID ITUM,<br>  aka "Khalid Sharer Taher Itum,"<br><br>      Defendant. | No. CR 2:23-82-AB<br><br>GOVERNMENT'S SUPPLEMENTAL SENTENCING POSITION FOR DEFENDANT KHALID ITUM; DECLARATION OF DAVID Y. PI<br><br>Sentencing Date:  03/05/26<br>Sentencing Time:  11:00 a.m.<br>Location:  Courtroom of the Hon. André Birotte Jr. |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys David Y. Pi and Daniel H. Weiner, hereby files its supplemental sentencing position regarding defendant KHALID ITUM ("defendant").

This supplemental sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the revised Presentence Investigation Report ("PSR") (Dkt. 169), and such further evidence and argument as the Court may permit.

The government reserves the right to file a response to any

sentencing position submitted by defendant and to file any supplemental sentencing position that may be necessary.

Dated: March 3, 2026

Respectfully submitted,

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

_____/s/_____
DAVID Y. PI
DANIEL H. WEINER
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

The government incorporates by reference the facts and arguments presented in its sentencing memorandum (Dkt. 157) and submits this supplement to address several objectionable features of defendant's sentencing memorandum.

**I. DEFENDANT'S CULPABILITY AND CRIMINAL HISTORY**

The jury in this case found defendant guilty of two counts of wire fraud for submitting false invoices that caused a $260,000 loss to his employer. (Verdict, Dkt. 88.) Rather than expressing contrition, defendant denies wrongdoing and seeks a non-custodial sentence. (See generally, Defendant's Sentencing Memorandum (Dkt. 163) ("Def. Mem.").) Doubling down on his lack of acceptance of responsibility, defendant also recants his guilty plea in a prior case where he stole from another employer, arguing that the only reason he pled guilty there was to avoid "an expensive and time intensive criminal case." (Def. Mem. 32.) Defendant has the right to argue his innocence even after a guilty verdict. However, at sentencing, the Court should not credit these arguments regarding culpability that were already rejected by the jury. Nor should the Court accept defendant's revisionist takeback of his guilty plea when considering his criminal history. Instead, defendant's decision to eschew responsibility for his actions supports a substantial sentence because defendant remains undeterred and presents a sense of entitlement from punishment.

**Defendant Was Not Entitled to the Money He Embezzled**

Defendant's main argument is that his employer, HMNY, suffered no loss because the fair market value of his services matched the amount he embezzled from the company. (Def. Mem. 19.) First,

defendant already raised this argument before the jury and in his Rule 29-33 motion. (Dkts. 117 at 50-51; 124.) Both the jury and Court rejected that argument because if defendant had been entitled to the $260,000 as a "bonus," he would not have lied to his employer about services that he did not actually provide and would have instead gone through the legal procedures to obtain a bonus. (Dkts. 88, 141.) Specifically, defendant submitted a false invoice making it appear as though he paid to book a hotel for an HMNY event, when in fact, that cost had been paid by an event planner for HMNY. (See Government Sentencing Memorandum (Dkt. 157) at 6-7.) Defendant backed up that false invoice by asking the event planner to submit a budget that falsely corroborated defendant's invoice. (Id.) In addition, defendant had an employment contract that dictated his compensation. If he had been entitled to greater compensation than provided in his contract, he would have gone through the formal means of obtaining one. (Id. at 5-6.)

Defendant misconstrues caselaw on the calculation of fair market value of services and ignores the fact that he was compensated for his work through his employment contract. (Declaration of David Y. Pi, Ex. A (Defendant's Employment Contract).) For example, defendant cites United States v. Solakyan, 119 F. 4th 575 (9th Cir. 2024). There, the Ninth Circuit cited the Sentencing Guidelines for the proposition that loss shall be reduced by the fair market value of services rendered. See accord, United States v. Anders, 333 F. App'x 950, 955 (6th Cir. 2009). However, Solakyan addressed improper medical billing and analyzed the modification of loss amount for procedures that were properly billed for services rendered. Here, in contrast, defendant lied about paying to book a set of hotel rooms on

2

behalf of his employer.  There should be no reduction of the loss amount because he provided <u>zero</u> value to the employer with respect to that invoice.  Similarly, with respect to the other set of false invoices he submitted (to repay his debt to creditor DeBrino), defendant received an additional $150,000 in compensation for "production services."  However, the work he performed for production services was part of his job for which he was already compensated, and the additional payment was not authorized under his contract.

Defendant's other cited case fares no better.  In <u>United States v. Bhikha</u>, the defendant's offense resulted in a loss of $1.15 million, the amount that the defendant received in kickbacks.  <u>See</u> No. 19-CR-00115-CRB-1, 2021 WL 3363293, at *3 (N.D. Cal. Aug. 3, 2021), adhered to, No. 19-CR-00115-CRB-1, 2021 WL 3854753 (N.D. Cal. Aug. 30, 2021).  However, the fair market value of services the defendant provided to the victim "at least equaled the amount that [the victim] paid to [the defendant's] companies because those services resulted in tens of millions in profits for [the victim]."  <u>Id.</u> at 3.  Again, <u>Bhikha</u> is inapposite here because defendant provided <u>zero</u> fair market value to his employer with respect to the hotel payment (defendant did not pay anything), and he was separately and fully compensated through his salary and target bonus (set at $75,000) for work that he claims was the basis for his $150,000 "bonus."

Defendant further argues that a Radford consultant report showed that he and his co-executives were underpaid relative to the 50th percentile compensation in the market of "technology companies with more than $100M in invested capital."  (Dkts. 163 at 8-9; 163-3 at 5.)  According to that study, defendant's base salary was 41% below

3

the market's 50th percentile and his total cash compensation, including bonus, was 33% below the market's 50th percentile. (Id.) However, these numbers are meaningless because they are divorced from the context of HMNY's financial health and the facts of this case.

First, the study does not consider the financial health and status of HMNY and its subsidiary, MoviePass. As it turned out, the executives of HMNY drove the company into bankruptcy only around 18 months after the Radford study, in January of 2020.[1] It is not surprising that executive compensation in 2018 reflected the company's performance and financial situation just before it crashed.

Second, the study defendant cites occurred after he had already embezzled company money to pay himself a $260,000 "bonus." The Radford report does not consider that bonus when it concludes defendant was underpaid. (Dkt 163-3 at 5-6.) If defendant and his employer actually considered the $260,000 he embezzled from HMNY to be a permitted bonus, it should have been included in the Radford data, which would have then placed defendant's total compensation above the 75th percentile of total cash compensation. (Id. at 6.) Specifically, defendant's base salary of $150,000[2] plus his "bonus" of $260,000, would have given him a total cash compensation of

---

[1] See MoviePass Is Shutting Down Permanently and Liquidating in Bankruptcy, CNN Business, January 29, 2020 (https://www.cnn.com/2020/01/29/media/moviepass-bankruptcy) (last accessed on March 3, 2026); MoviePass Parent Files for Bankruptcy, The Wall Street Journal, January 29, 2020 (https://www.wsj.com/articles/moviepass-parent-files-for-bankruptcy-11580311356) (last accessed on March 3, 2026).

[2] Defendant's employment contract indicates his base salary as $120,000 per year. (Pi Decl., Ex. A) It is not clear whether Radford had updated data or if defendant did amend his contract to increase his salary to $150,000 in 2018. However, in either situation, the analysis of defendant's total compensation remains substantially unchanged.

4

$410,000, significantly greater than the 75th percentile's total cash compensation of $348,600. (Id.)  Clearly, no one at HMNY or MoviePass considered the payments to defendant as a bonus because they did not report it to Radford when they asked Radford to assess his compensation package.

Third, the Radford study is based on a sample of 25 technology companies, including Airbnb, Grubhub, Yelp, and other companies that were well established at the time.  Their profit margins may have been much higher, and executives may have had many more decades of experience than defendant or had been able to negotiate higher starting salaries based on their past performance.  Radford did not apparently take any of these factors into account.

Defendant's argument that he earned the money he embezzled is meritless and shows only that he continues to feel entitled to the money he stole.  A jury of his peers found that he was not so entitled, and these facts support a harsher sentence to deter this conduct in the future, not leniency.

**Defendant's Criminal History**

In 2010, defendant pled guilty to misdemeanor theft for embezzling $35,068 from his prior employer, T.M.  In his sentencing memorandum, defendant denies responsibility for his past wrongs, implying that the only reason he pled guilty was because he wanted to avoid an "expensive and time-intensive criminal case." (Def. Sent. Mem. At 32-33.)  This contradicts his guilty plea, which is a sworn statement that he is factually guilty.  Defendant's attempt to take back his admission of guilt further demonstrates his lack of remorse and likewise supports a more significant punishment to deter him from embezzling from an employer for a third time.

5

## II. DEFENDANT'S LETTERS OF SUPPORT

Defendant submitted 39 Character Letters of Support (Def. Mem. Ex. E), 10 letters of support from his permanent residency petition (Def. Mem. Ex. F), and 15 more letters of support in a supplemental filing (Dkt. 171-1). These letters generally paint a picture of defendant as a kind and affable person, but they do not support leniency. Defendant had a wide and supportive network of people who were ready to help him achieve his goals and offer him professional opportunities. He could have leveraged his life advantages and connections to pay back his personal debts through honest and legal means. Instead, he chose to lie and deceive his employer. The fact that he deliberately chose an illegal means of repaying his debts when legal opportunities were abundantly available to him demonstrates why a below-Guidelines sentence is inappropriate here.

## III. RESTITUTION AND PENALTIES

In its sentencing position, the government recommended that the Court order restitution of $260,000 to HMNY. (Dkt. 157 at 15.) The government subsequently learned from the HMNY and MoviePass bankruptcy representative, Alan Nisselson at Windels Marx, that the bankruptcy has been closed and he will not be seeking restitution here.

Considering that representation, the government requests that the Court order restitution of $260,000 to victim HMNY, and further order that if restitution cannot be made to HMNY on account of the closure of its bankruptcy proceedings, defendant shall pay that $260,000 as a fine, in addition to any other fine the Court orders.

## IV. CONCLUSION

For the foregoing reasons, and the reasons articulated in its

6

sentencing position (Dkt. 157), the government respectfully requests that the Court impose a low-end Guidelines sentence of 41 months' imprisonment, 3 years' supervised release, $260,000 restitution to victim HMNY or a fine, an additional fine to be determined based on the length of his sentence, and a $200 special assessment.